

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x
FERGUSON FAMILY TRUST, On Behalf of    :   Civil Action No.
Itself and All Others Similarly Situated,
                                        :
                                           CLASS ACTION
                         Plaintiff,     :
                                           COMPLAINT FOR VIOLATION OF THE
                                        :  FEDERAL SECURITIES LAWS AND
          vs.                              DELAWARE LAW
                                        :
FALCON STRATEGIES TWO LLC,
AMACAR GP, INC., CITIGROUP              :
ALTERNATIVE INVESTMENTS LLC,
CITIGROUP, INC. and REAZ ISLAM,        :

                         Defendants.    :

———————————————————— x   DEMAND FOR JURY TRIAL

RECEIVED
MAY 20 2008
U.S.D.C. S.D. N.Y.
CASHIERS

## NATURE OF THE ACTION

1.      This is a class action on behalf of all persons or entities who have tendered or are being asked to tender their shares of Falcon Strategies Two LLC ("Falcon" or the "Company") in connection with a tender and exchange offer (the "Tender Offer"), on the basis of a Confidential Tender and Exchange Offer Memorandum, dated May 8, 2008 (the "Memorandum"), that contains materially misleading statements and omissions. This action charges defendants Falcon, AMACAR GP, Inc. ("AMACAR"), Citigroup, Inc. ("Citigroup"), Citigroup Alternative Investments LLC ("CAI") and Reaz Islam ("Islam") with violations of Sections 10(b) and 14(e) of the Exchange Act of 1934 (the "Exchange Act"), as well as Rule 10b-5 promulgated thereunder and Delaware law.

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5], as well as Section 14(e) of the Exchange Act [15 U.S.C. § 78n(e)] and Delaware law. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act [15 U.S.C. § 78aa], and it has supplemental jurisdiction over the Delaware law claims under 28 U.S.C. § 1367.

3.      Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b), as many of the acts and practices complained of herein occurred in substantial part in this District, including the dissemination of the materially false and misleading statements alleged herein. In addition, Citigroup and CAI have operations located in this District and Falcon lists its mailing address as c/o CAI, in New York, New York.

4.      In connection with the acts, conduct and other wrongs alleged herein, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails and interstate telephone communications.

**PARTIES**

5.    Plaintiff Ferguson Family Trust acquired and holds Falcon's 2005 Series 3-A shares and, like other investors, received the Memorandum from defendants pursuant to which Falcon has asked investors to tender their shares in connection with the Tender Offer.

6.    Defendant Falcon is a Delaware limited liability company that was purportedly formed on April 27, 2004 to serve as a multi-strategy fixed income alternative seeking to provide investors with absolute returns, current income and portfolio diversification. The Company, which commenced operations on October 29, 2004, claimed to invest in a select combination of fixed income strategies and to achieve attractive risk-adjusted returns. Falcon issued nine series of units of limited liability company interests (or "shares") that comprise Portfolio "A" of its investments, which are the subject of the Tender Offer.[1]  Falcon lists its mailing address as c/o CAI, 731 Lexington Avenue, 27th Floor, New York, New York.

7.    Defendant AMACAR is a Delaware corporation that serves as the sole managing member of the Company.  AMACAR purportedly assigned substantially all authority to manage the day-to-day operations and assets of Falcon to CAI.

8.    Defendant CAI is an integrated alternative investments platform that manages a wide range of products across five asset classes, including private equity, hedge funds, real estate, fixed income and infrastructure. CAI manages capital on behalf of defendant Citigroup, as well as third-party institutional and high net worth investors, and has headquarters located at 731 Lexington Avenue, 27th Floor, New York, New York. CAI acts as the investment manager for Falcon, and manages the day-to-day operations and assets of Falcon.   In connection with its operation of the

---

[1]    It appears that the Company has not issued any shares for Portfolio "B."

Company, CAI receives a management fee which is calculated as a percentage of net assets, calculated and paid monthly in arrears, a portion of which is used to pay investment managers and sub-advisors to any Portfolio funds (presumably including Islam). CAI also receives an incentive allocation which is calculated as a percentage of the cumulative return of a series of shares calculated and paid quarterly in arrears. CAI has received millions of dollars in management and incentive fees during its tenure, and had an incentive to leverage the fund's operations in order to generate fees.

9.      Defendant Islam served as the Managing Director and Senior Investment Officer of CAI and the Managing Director of Citigroup Fixed Income Alternatives, which purportedly specializes in the identification, development and management of alternative fixed-income products. At all relevant times, Islam managed Falcon on behalf of CAI.

10.      Defendant Citigroup describes itself as a global diversified financial services holding company whose businesses provide a broad range of financial services to consumer and corporate customers. Citigroup has more than 200 million customer accounts and does business in more than 100 countries. Citigroup is the parent company of CAI. Concurrently with each share tendered by investors in connection with the Tender Offer, Falcon will sell one share of a new class of limited liability company interest to Citigroup and/or its affiliated entities for a purchase price equal to the amount of consideration offered to members in the Tender Offer. The proceeds from the sale of these shares to Citigroup will be used to pay the offered consideration to the members who tender their shares.

## SUBSTANTIVE ALLEGATIONS

### Background

11.      In October 2004, Falcon was formed by Citigroup to serve as a multi-strategy fixed income alternative seeking to provide investors with absolute returns, current income and portfolio

diversification. In order to achieve these benefits, Falcon purported to invest in certain fixed-income investments that Citigroup claimed would provide higher yields. Plaintiff and other investors acquired shares in Falcon as a result of this seemingly conservative investment approach, which Citigroup and its agents represented as a safe investment for them based on their conservative risk tolerances.

12.    In actuality, unbeknownst to investors, Falcon's investment approach was not conservative but was instead highly leveraged on the condition of the credit markets and liquidity in the bond markets. In this regard, Falcon's investments were more akin to derivatives. In fact, Falcon employed municipal bond arbitrage,[2] carried commercial debt obligations and held asset-backed mortgage instruments that were intrinsically tied to the condition of the credit and bond markets. Moreover, Falcon heavily invested in funds under the Citigroup umbrella that employed these investment strategies. When these markets failed, the underlying investments declined in value.

13.    These issues adversely impacted the value of Falcon's, so much so that in February 2008, Falcon and its affiliated funds entered into a $500 million credit facility with Citigroup to obtain additional borrowing capacity and liquidity to help meet variation margin calls and prevent a forced sale of fund assets by financing counterparties. As of March 31, 2008, the funds had drawn an aggregate of approximately $335 million under the credit facility. Although the repayment of the

---

[2]    Municipal bond arbitrage generally consists of building a leveraged portfolio of tax-exempt municipal bonds while simultaneously hedging the duration risk in that portfolio by shorting taxable corporate bonds. It is a relative value strategy that attempts to capitalize on the fact that interest on municipal bonds is exempt from federal income tax. The arbitrage manifests itself in the form of a relatively cheap longer-maturity municipal bond, which is a municipal bond that yields significantly more than 65% of a corresponding taxable corporate bond. The steeper slope of the municipal yield curve allows participants to collect more after-tax income from the municipal bond portfolio than is spent on the interest rate swap.

credit facility is subordinate in right to the claims of other financing counterparties, it is senior to the interests of Plaintiff and the other investors in Falcon and the other funds.

14.     Despite the cash infusion provided by the credit facility, the value of Falcon's shares continued to decline. On March 20, 2008, CAI announced that because of the Company's low cash position and ongoing dislocation in the credit markets, it had indefinitely suspended redemptions from the Falcon funds (and payments of related redemption proceeds) and semi-annual income distributions in an effort to preserve liquidity. Falcon has since suspended further investment and its activities are now limited to the Tender Offer, liquidation of the Company's assets, and winding-up the Company's affairs.

### The Tender Offer

15.     On May 8, 2008, the defendants commenced the Tender Offer and disseminated the Memorandum to investors. In connection with the Tender Offer, Falcon has offered to pay $0.45 cents for each share tendered by an investor, on the condition that the investor will tender all of his shares and unconditionally agree to release any actual or potential legal claim against any of the defendants, their affiliates and numerous third-parties (the "Release").[3] For each share tendered, Falcon will issue one share of a new class of limited liability company interest to Citigroup and/or its affiliated entities in exchange for a payment of $0.45 per share (*i.e.*, a price equal to the amount of consideration offered to members in the Tender Offer). The proceeds from the sale of these shares to Citigroup will be used to pay the investors who tendered their shares.

_____

[3]     In addition, members who are "accredited investors" (as defined in Rule 501(a) of Regulation D under the Securities Act of 1933) may elect to receive a newly-issued "participation" share in addition to the offered consideration, although the Memorandum indicates that the ownership of such shares "is not likely to result in any appreciation or otherwise in a recoupment of [a member's] initial investment . . . ."

## The Memorandum is Materially Misleading

16.     Defendants have asked Plaintiff and the other investors of Falcon to tender their shares on the basis of the Memorandum, which contains materially misleading statements and omissions of fact.

17.     One of the most glaring omissions in the Memorandum is the absence of any information permitting investors to accurately value their shares. While the Memorandum includes attachments that purport to ascribe a "net asset value" for each series of shares as of March 31, 2008, nowhere does the Memorandum provide *current* financial figures necessary to calculate the present value of the shares. In fact, nowhere in the Memorandum do defendants actually disclose the manner in which they calculated the net asset value of the shares, nor the specific information that they utilized in doing so. Merely telling investors that a series of shares is worth $0.196 per share as of March 31, 2008 (in the case of Plaintiff's holdings), when the Memorandum is dated May 8, 2008 and the Tender Offer expires on June 30, 2008, does not provide investors with an accurate assessment of the true value of their shares *today*. Nor does it provide investors with the means to calculate the value themselves. This information, however, is perhaps the most material to investors, who are being asked to tender their shares in lieu of attempting to recoup their losses by remaining as an investor in the Company during Citigroup's planned liquidation of the Company.

18.     A similarly glaring omission is the absence of any specific information regarding the nature or value of the Company's underlying assets, which are allocated to five strategies within the credit, residential mortgage-backed, asset-backed and municipal securities markets. The only disclosure that the Memorandum makes regarding these assets is the approximate percentage of the portfolio that they occupied as of March 31, 3008:

> (i) relative value preferred securities (approximately 0.5% of total assets as of March 31, 2008), (ii) relative value fixed income (mortgage-backed securities and asset-

- 6 -

backed securities) (approximately 62.5% of total assets as of March 31, 2008), (iii) municipal arbitrage (approximately 11.2% of total assets as of March 31, 2008), (iv) opportunistic mortgage-backed securities (approximately 17.2% of total assets as of March 31, 2008) and (v) diversified asset-backed securities (approximately 8.6% of total assets as of March 31, 2008). Because of market illiquidity outside of preferred and municipal arbitrage securities, the Company's assets are as of the date of this Confidential Memorandum invested primarily in mortgage-backed and asset-backed securities.

Merely providing an approximate allocation of assets does not permit members to determine the value that each particular asset class contributes to the Company, nor whether the value of that particular group of assets is increasing or decreasing. In addition, because investors do not know the particular composition of the assets in each of these classes, they cannot determine whether the investment strategies may provide diversification benefits that their other investments do not.

19.    Another significant omission in the Memorandum is its failure to disclose sufficient information regarding the nature of the existing and potential claims covered by the Release, which precludes investors from determining what they have been asked to release. This disclosure deficiency compounds the lack of disclosure regarding the value of the Company's assets and shares, because investors must agree to the Release in order to participate in the Tender Offer, thereby releasing potentially valuable avenues of recourse against Citigroup and the other defendants in connection with the management of the fund.

20.    Moreover, in the Memorandum, defendants disclosed the existence of a putative class action that an investor of an affiliated fund, Falcon Strategies Two B LLC ("Falcon Two B"), commenced in the United States District Court for the Southern District of Florida against that fund, Citigroup and CAI. Although defendants did not mention it, that litigation was apparently voluntarily dismissed by the plaintiff on May 12, 2008, a mere four days after the Tender Offer was commenced and the Memorandum was disseminated to investors. Investors have not been provided

with any information regarding the resolution or discontinuation of that action, even though such information may very well bear on the propriety of any claims they may have against the defendants.

21.    In addition, defendants disclosed in the Memorandum that Citigroup "is currently responding to a U.S. regulatory inquiry relating to Falcon Two B, Citi, and certain other funds sponsored by, and entities affiliated with, Citi." Other than that general statement, however, the Memorandum fails to disclose any information regarding the nature and scope of the inquiry (including which regulatory authority initiated it), which particular funds are under investigation, and which other Citigroup entities are also a subject of the inquiry. Moreover, although the Memorandum indicates that Citigroup is responding to the inquiry, defendants have not disclosed any additional information regarding the inquiry, including the nature and content of its response. This information is not only material because it may provide further insight into whether investors have a valuable claim against Citigroup and the other defendants that they will be forced to waive if they participate in the Tender Offer, but it is also material because, since inception, Falcon has substantially invested in funds formed by Citigroup or run by CAI as investment manager. For example, as of the year ending December 31, 2007, Falcon had 98.81% of its assets invested in eleven funds affiliated with Citigroup and/or CAI – each one run by CAI as investment manager. In order for investors to know what claims they are releasing, they need more information regarding the investigation and the funds that are the subject of it, since those funds comprised nearly the entirety of Falcon's investments prior to its demise.

22.    Additionally, investors cannot determine for themselves whether the liquidation of those assets may generate proceeds that exceed the amount of the Tender Offer consideration. In this regard, the Memorandum notes that Citigroup will liquidate the Company's assets within twelve to eighteen months after the Company issues shares to Citigroup in connection with the Tender

Offer. The value of the assets in the portfolio may very well gain in value during that time, but investors do not have the information to determine how much.

23. The Memorandum also misrepresents the events resulting in the drastic decline in value of the Company's shares. For example, the Memorandum indicates that Falcon was formed to serve as a multi-strategy fixed income alternative seeking to provide investors with absolute returns, current income and portfolio diversification. In actuality, however, Falcon employed quite risky investment strategies that failed to provide these benefits, resulting in the substantial decline of the investors' investments. The impact of these ill-suited investment strategies is perhaps best evidenced by the fact that Falcon now claims that the net asset value of nearly every series of shares has declined to approximately 20% of the initial capital invested.

24. Moreover, the Company appears to have shifted away from its initial investment strategies – or at least the strategies that it claimed to follow. Indeed, the Memorandum indicates that "[b]ecause of market illiquidity outside of preferred and municipal arbitrage securities, the Company's assets are as of the date of this Confidential Memorandum invested primarily in mortgage-backed and asset-backed securities." Investors did not necessarily purchase shares in Falcon to invest in such securities.

25. In addition, the Memorandum purports to describe the general market conditions that adversely affected the value of the underlying assets and hence the shares. At the same time, however, it fails to disclose what portion of the losses – or which losses, in particular – was the result of general market conditions as opposed to specific problems within a given market.

26. And, the Memorandum misrepresents the purpose of the Tender Offer. Although the Memorandum represents that defendants have undertaken the Tender Offer "to create immediate liquidity" for investors, they fail to disclose that the primary reason they have initiated the Tender

Offer is to limit or entirely eliminate their liability by requiring investors who tender to agree to the Release. In this regard, the value of the Release itself likely far exceeds the offered consideration, but once again investors are not provided with the information to determine how much.

### The Tender Offer is Coercive
### In the Absence of All Material Information

27.    The Tender Offer is coercive because it requires members to tender their shares without all material information; it obligates Falcon to accept tendered shares only where the tender is accompanied by a broad general release of all claims; and it requires members to submit to arbitration in connection with their tender should any claims arise.

28.    First, in order to induce members to tender their shares, the defendants have structured the Tender Offer to permit members to tender their shares, and receive payment, prior to its expiration. This has the effect of prompting members to tender their shares on the basis of the misleading Memorandum, which fails to disclose all material information regarding the Tender offer, including the actual net asset value of each series of shares.

29.    Second, defendants have agreed to accept shares only from those members who agree to the Release. In other words, any members who refuse to waive potential or actual claims against any of the defendants and their representatives, but still wish to tender their shares, cannot do so. However, the scope of the Release is so wide-ranging that it extends to virtually anyone who has ever come into contact with the Company since its existence, including the following:

> . . . . the Company, the Investment Manager, the Company's advisory board, the selling broker for the Existing Shares, Citigroup Inc. and its subsidiaries (collectively, "Citi"), AMACAR GP, Inc. (the "Managing Member"), auditors and tax preparers of the Company, past and present sub-advisors of the Company, U.S. Bank National Association (the "Administrator") and past and present counsel (Cayman and U.S.) to such parties (such parties, and their respective employees, officers, directors, partners, counsel and agents of each of the aforesaid parties, past, present and future, and each of their respective "Affiliates" (as defined below), are

collectively referred to herein as the "Releasees"), as well as the Releasees' heirs, executors, administrators, successors and assigns . . . .[4]

30.    The Release is also unduly overbroad because it provides for the release of virtually any conceivable past, present or future claim against any of the parties for whom such claim is to be released. Investors are thus given the illusory choice of accepting $0.45 per share in exchange for releasing any claim against anyone relating to the Company.

31.    Third, the Tender Offer is coercive because it is also conditioned upon the tendering members' acceptance of a broad arbitration clause, which merely serves as another way in which to preclude investors from asserting any claims against any of the defendants.

### Scienter Allegations

32.    Charged with the responsibility of running the day-to-day operations of the Company, CAI, its parent company Citigroup, and the actual manager of the fund, Islam, knew or recklessly disregarded the fact that certain of the investment strategies that they employed were ill-suited for Plaintiff and the other investors' investment goals or risk tolerances. These defendants were also aware of changing market environments, and the risks that such changes posed, which could – and ultimately did – result in massive losses to the fund that could have been prevented had the fund not been so leveraged toward these markets. Moreover, because AMACAR did not delegate all of its authority to manage Falcon to CAI, and could not delegate all of its management responsibility or the fiduciary duties it owes to investors, AMACAR is charged with knowledge of the inappropriate investment strategies that Citigroup, CAI and Islam pursued.

---

[4]    The Release defines the term "Affiliates" as "a person controlled by, controlling or under common control with another person (which shall include without limitation the Falcon Funds, as defined in the Confidential Memorandum, and Falcon Strategies LLC)," and the term "person" as "any individual person, corporation, trust, limited liability company, partnership, custodian or other account, contractual arrangement or any other juridical entity."

33.   Throughout their tenure in managing the fund, defendants gave investors the impression that their investments were conservatively managed, and that defendants were taking steps to insulate the investments from losses as a result of volatility in the marketplace. In a letter dated April 24, 2006 regarding Falcon's financial performance for the year ended December 31, 2005, CAI noted that "[m]unicipal arbitrage was the largest contributor to overall returns and cash flow, as municipal bonds outperformed taxables due to strong investor demand and declining supply, especially at year-end." As a result of the performance of these investments, CAI indicated that it "tactically increased the fund's allocation to Municipal Arbitrage, consistent with our views on interest rates and relative value expectations partially driven by the record levels of supply in those markets." As of December 31, 2005, 98.39% of Falcon's net assets were placed in eight funds affiliated with or run by Citigroup, CAI and/or Islam. CAI received management fees of nearly $2.1 million and an incentive allocation of nearly $1 million from the Company.

34.   By letter dated April 30, 2007 regarding Falcon's financial performance for the year ended December 31, 2006, Islam, on behalf of CAI, once against assured investors that their investments were safe even in light of increasingly volatile market conditions. For example, he indicated that "[o]verall for 2006, the fixed income markets were quite challenging and subject to a flat-to-inverted Treasury yield curve and a tight credit spread environment . . . By late summer, downward revisions in GDP, weaker manufacturing data, and softening in the housing market illuminated uncertainty about the U.S. outlook as it appeared economic momentum was beginning to ebb." In response, Islam noted that "we re-balanced our portfolio in the later part of 2006 by moving into *less volatile and more liquid strategies* in an attempt to give us more flexibility to exploit potential opportunities in 2007." [Emphasis added.] As part of the fund's outlook for 2007, Islam acknowledged the "downturn in the housing market" that began apparent "[n]ear the end of 2006,"

- 12 -

and noted that "[b]y 4Q2006, it appeared that business profitability may have already peaked and that economy-wide profit margins and balance sheets may be under pressure."

35.    In closing, Islam noted that although "market volatility will most likely remain elevated/increase," CAI was *reducing its cash positions* by increasing its exposure to such volatility:

> For this year, we anticipate continued relative value and trading opportunities within each of our substrategies. *First, we anticipate a challenging environment for certain mortgage-related securities.* Headline risks concerning the state of the housing market and economic uncertainties may technically impact spreads, despite our view that fundamentals appear sound. Second, we expect that the Treasury yield curve will normalize and steepen particularly on the short-end of the curve. Third, *market volatility will most likely remain elevated/increase given the extent of uncertainty around the economy, the upcoming Fed policy, and impact from a potentially steeper yield curve.* Although the timing and results of these factors are unclear, we anticipate that they should create additional investment opportunities relative to 2006. As opportunities may develop, *we plan to selectively decrease our cash positions by increasing exposure to select strategies including: Fixed Income Relative Value, Opportunistic MBS, Municipal Arbitrage, and Diversified ABS throughout the year.* [Emphasis added.]

As of December 31, 2006, 87.11% of Falcon's net assets were placed in nine funds affiliated with or run by Citigroup, CAI and/or Islam. CAI earned management fees of nearly $2.4 million and an incentive allocation of approximately $4 million from the Company.

36.    By letter dated April 28, 2008 regarding Falcon's financial performance for the year ended December 31, 2007, the Company's auditor, KPMG, revealed that although the financial statements were audited under the assumption that Falcon would continue as a going concern, the Company's future was anything but certain:

> The Company is exposed to disruptions and uncertainties in the credit markets resulting in liquidity difficulties, raising costs of re-financing and an overall decline in the prices of asset holdings . . . These conditions . . . indicate the existence of a material uncertainty which may cast significant doubt about the Company's ability to continue as a going concern.  These financial statements do not include any adjustments that might result from the outcome of this uncertainty.

Even as of December 31, 2007, 98.81% of Falcon's net assets were placed in eleven funds affiliated with or run by Citigroup, CAI and/or Islam, four of which, as of April 15, 2008, the Company had "substantially redeemed all holdings" in. Nevertheless, CAI still earned management fees of more than $1.7 million and an incentive allocation of approximately $200,000 from the Company.

37.    On April 28, 2008, *The Wall Street Journal* reported on the demise of the Falcon fund, providing, in pertinent part, as follows:

> The losses by the two hedge funds at issue, called Falcon and ASTA/MAT, are the latest examples of the credit crunch hammering retail, or individual, investors who believed they were holding low-risk securities.
>
> \*       \*       \*
>
> Last year, as Citigroup was gearing up to launch new Falcon and ASTA/MAT funds, it encouraged brokers at Smith Barney and in Citigroup's private bank to pitch the funds to their best customers. One reason for the push: Initial market tremors caused the Falcon family to decline by more than 10%, and Citigroup hoped to stabilize it with an infusion of cash.
>
> By September, the new Falcon fund had raised about $71 million. A new ASTA/MAT fund raised about $800 million. Both new funds were heavily comprised of retail investors.
>
> Citigroup brokers and fund managers assured prospective investors that the new hedge funds were low-risk, with Falcon likely to post losses of no more than 5% a year in the worst-case scenario, according to people familiar with the situation.
>
> "That's why they bought it," says a Smith Barney broker whose clients, many of them wealthy retirees, invested in the Falcon fund. "These kinds of clients weren't looking for a home run."
>
> \*       \*       \*
>
> As of March 31, the new Falcon fund was worth just 25% of its initial value, according to internal documents. The ASTA/MAT fund had shriveled by Feb. 29 to less than 10% of its original value, the documents show. ***Even as their performances deteriorated, Reaz Islam, the 41-year-old manager of the funds, reassured uncertain brokers and clients that the funds were likely to rebound, according to people familiar with the matter.*** [Emphasis added.]

- 14 -

38.    As demonstrated above, defendants knew or had reason to know that the markets were becoming increasingly volatile, yet they invested Falcon's assets in strategies that exposed the Company to further losses anyway, in contravention of the Company's stated investment strategies and the investors' known investment goals and risk tolerances.

39.    Moreover, defendants were charged with the responsibility of managing the Company's operations and investments and apprising themselves of all material information regarding same, and they have used this information to generate management and incentive fees for themselves in furtherance of a scheme to acquire the outstanding shares of Falcon without disclosing all material information to investors regarding, *inter alia*, the value of the shares or the underlying assets, the purpose for the Tender Offer, the circumstances surrounding the ongoing regulatory investigation, and the Release.

40.    In addition, defendants acted with scienter insofar as they knew or recklessly disregarded that the Memorandum contains materially misleading statements and omissions, and they participated or acquiesced in its preparation and dissemination. At all relevant times, each of the defendants occupied a position of power and control over the Company and/or the Tender Offer, and had the ability to issue statements on the Company's behalf or the opportunity to participate in the Company's formulation and dissemination of statements to investors. Defendants also have and had access to internal and other non-public information regarding the Company's operations. In knowing or reckless disregard of the true facts concerning the Company, the defendants prepared and disseminated the Memorandum. They were thus active participants in the fraud alleged herein, which the defendants have pursued in order to induce investors to agree to the Release; facilitate Citigroup's takeover of the Company; and liquidate the Company for their own benefit to the detriment of investors.

## CLASS ACTION ALLEGATIONS

41.    Plaintiff brings this action as a class action on behalf of itself and those members who have tendered or are being asked to tender their shares to Falcon in connection with the Tender Offer. Excluded from the Class are defendants, the current and former officers and directors of any of the defendants, and, with respect to any of the foregoing, the members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

42.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Citigroup or its transfer agents and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. Falcon issued nine series of millions of dollars worth of shares.

43.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected, although possibly to different degrees, by defendants' wrongful conduct in the violation of federal and Delaware law.

44.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

45.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are: whether defendants violated the Exchange Act and/or breached fiduciary duties owed under Delaware law; whether the Memorandum omits and/or misrepresents material facts about the value of the shares, the nature and value of the Company's

assets, the purpose and scope of the release that defendants have required as a condition of accepting any tendered shares, and other matters related to the Tender Offer; and to what extent the members of the Class have sustained damages and the proper measure of damages.

46.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small when viewed individually in the context of the Tender Offer, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### For Violation of Section 10(b) of the Exchange Act and Rule 10b-5
### Against All Defendants

47.    Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

48.    The Memorandum, which defendants disseminated to Falcon's members in connection with the Tender Offer, contained false and misleading statements and omissions of material fact in violation of Section 10(b) and Rule 10b-5.

49.    Defendants knew or recklessly disregarded that the Memorandum contained these statements and omissions, and nevertheless failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

50.    Plaintiff and the other investors did not know, nor in the exercise of reasonable diligence could have known, of the untruths and omissions contained in the Memorandum.

51.    As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class cannot make an informed decision about whether to tender their shares in connection with the Tender Offer.

52.    Defendants must be compelled to disclose additional information to Plaintiff and other investors in order to permit them to make an informed decision.

53.    By reason of the conduct alleged herein, the defendants have violated Section 10(b) and Rule 10b-5 and will continue to do so unless and until the Tender Offer is enjoined by the Court and they are required to issue supplemental and/or corrective disclosures to the members of the Class.

## COUNT II

### For Violation of Section 14(e) of the Exchange Act
### Against All Defendants

54.    Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

55.    The Tender Offer is subject to Section 14(e) of the Exchange Act, which makes it unlawful "to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer . . . ."

56.    The Memorandum, which defendants disseminated to Falcon's members in connection with the Tender Offer, contained false and misleading statements and omissions of material fact in violation of Section 14(e).

57.    Defendants knew or recklessly disregarded that the Memorandum contained these statements and omissions, and nevertheless failed to disclose material facts necessary in order to

make the statements made, in light of the circumstances under which they were made, not misleading.

58.    Plaintiff and the other investors did not know, nor in the exercise of reasonable diligence could have known, of the untruths and omissions contained in the Memorandum, and, as members of the Company subject of the Tender Offer, they require the protection of Section 14(e).

59.    As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class cannot make an informed decision about whether to tender their shares in connection with the Tender Offer.

60.    Defendants must be compelled to disclose additional information to Plaintiff and other investors in order to permit them to make an informed decision.

61.    By reason of the conduct alleged herein, the defendants have violated Section 14(e) and will continue to do so unless and until the Tender Offer is enjoined by the Court and they are required to issue supplemental and/or corrective disclosures to the members of the Class.

### COUNT III

**Claim for Breach of Fiduciary Duties and/or Aiding and Abetting
Breach of Fiduciary Duty Under Delaware Law
Against All Defendants**

62.    Plaintiff repeats and realleges the allegations set forth above in paragraphs 1 through 46 as if set forth fully herein.

63.    By attempting to induce investors to tender their shares on the basis of the materially misleading Memorandum, defendants have violated the fiduciary duties of care, loyalty, candor and good faith owed to these investors under Delaware law.

64.    Moreover, in drafting and disseminating the Memorandum, defendants have unfairly utilized confidential information regarding Falcon to their advantage and to the detriment of the

investors, who are being asked to tender their shares on the basis of such incomplete and misleading information.

65.    In the absence of injunctive relief requiring defendants to issue supplemental and/or corrective disclosures to members, and enjoining defendants from proceeding with the Tender Offer and accepting any tendered shares, members will be irreparably harmed because they will be forced to determine whether to tender their shares in connection with the Tender Offer on the basis of the materially misleading statements and omissions of fact contained in the Memorandum. Members will thus be required to make a determination of whether to relinquish their interest in the Company on the basis of inadequate information, a situation created by defendants' violation of the fiduciary duties of care, loyalty, candor and good faith owed to such members.

66.    Members will also be irreparably harmed without the required additional information because, as a condition of tendering their shares, they are required to accept the Release, which purports to eliminate any legal claim such members may have against any of the parties involved in operating the Company. Investors must similarly agree to arbitrate any claim that they may have, which will also serve as an impediment to their right to bring a claim against defendants should they so choose.

67.    In addition, to the extent that any of the defendants do not directly owe fiduciary duties to the investors, they aided and abetted the breaches of fiduciary duty alleged herein by the other defendants that owe such duties.

68.    As a result of the actions of the defendants, plaintiff and the Class have been and will be irreparably harmed in the absence of injunctive relief.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A.      Determining that this action is a proper class action and certifying plaintiff as Class

representative;

B.      Enjoining defendants, and any person or entity affiliated with them, from proceeding

with any aspect of the Tender Offer or any attendant transaction thereto, including the acceptance of

any tendered shares and the payment for such shares or the issuance of shares to Citigroup, until

such time as Defendants disseminate all material information relating to the Tender Offer to Falcon's

investors;

C.      Awarding plaintiff and the Class their reasonable costs and expenses incurred in this

action, including counsel fees and expert fees; and

D.      Awarding such additional equitable/injunctive or other relief as deemed appropriate

by the Court.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED: May 20, 2008                    COUGHLIN STOIA GELLER
                                         RUDMAN & ROBBINS LLP
                                       SAMUEL H. RUDMAN
                                       ROBERT M. ROTHMAN
                                       JOSEPH RUSSELLO


                                       SAMUEL H. RUDMAN

                                       58 South Service Road, Suite 200
                                       Melville, NY  11747
                                       Telephone:  631/367-7100
                                       631/367-1173 (fax)

COUGHLIN STOIA GELLER
 RUDMAN & ROBBINS LLP
DARREN J. ROBBINS
DAVID C. WALTON
DAVID T. WISSBROECKER
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)

Attorneys for Plaintiff

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

DAVID P. FERGUSON, on behalf of David P. and Marguerite M. Ferguson Trustees, Ferguson Family Trust UDT November 24, 1999 ("Plaintiff") declares:

1.  Plaintiff has reviewed a complaint and authorized its filing.

2.  Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.  Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.  Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

Acquisitions:

| Date Acquired | Cost of Falcon Shares Acquired |
|---|---|
| March 1, 2005 | $500,000 + fees |
|  |  |
|  |  |

Sales:

| Date Sold | Proceeds of Falcon Shares Sold |
|---|---|
| N/A |  |
|  |  |
|  |  |

5.  Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws except as detailed below during the three years prior to the date of this Certification:

FALCON

6.    The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _14th_ day of _May_____, 2008.

_____
DAVID P. FERGUSON, Trustee

FALCON