UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x
FERGUSON FAMILY TRUST, On Behalf of : Civil Action No. 08 CIV 4723
Itself and All Others Similarly Situated, :
                                   :
                Plaintiff, : **AFFIDAVIT IN SUPPORT OF**
                                   : **APPLICATIONS BY ORDER TO SHOW**
  vs. : **CAUSE FOR EXPEDITED DISCOVERY**
                                   : **AND A PRELIMINARY INJUNCTION**
FALCON STRATEGIES TWO LLC, :
AMACAR GP, INC., CITIGROUP :
ALTERNATIVE INVESTMENTS LLC, :
CITIGROUP, INC. and REAZ ISLAM, :
                                   :
                Defendants. :
———————————————————— x

STATE OF NEW YORK    )
                        ) ss:
COUNTY OF SUFFOLK  )

       Samuel H. Rudman, an attorney duly licensed to practice in the State of New York, hereby

deposes and says, under penalty of perjury, that:

      1.      I am a member of the law firm of Coughlin Stoia Geller Rudman & Robbins LLP,

counsel for Plaintiff Ferguson Family Trust ("Plaintiff") in this matter, and I submit this Affidavit in

support of Plaintiff's application by Order to Show Cause, pursuant to Fed. R. Civ. P. 65, for a

preliminary injunction enjoining defendants from proceeding with any aspect of the tender offer that

defendant Falcon Strategies Two LLC ("Falcon" or the "Company") commenced on or about May 8,

2008 (the "Tender Offer"), pursuant to which Falcon intends to acquire its outstanding shares, until

defendants make supplemental and/or corrective disclosure to investors. I also submit this Affidavit

in support of Plaintiff's application for expedited discovery, and for the purpose of placing before

the Court certain documentary exhibits that are referenced in the accompanying Memorandum of

Law in support of Plaintiff's applications.

## Summary of Plaintiff's Claims

2.      This class action is brought pursuant to Section 10(b) and 14(e) of the Exchange Act of 1934 (the "Exchange Act"), as well as Rule 10b-5 promulgated thereunder and Delaware law, on behalf of Plaintiff and a class of investors to whom the Tender Offer is directed. Specifically, Plaintiff alleges that defendants they have attempted to induce investors to participate in the Tender Offer on the basis of the materially misleading disclosures provided by the Memorandum, in violation of the Exchange Act.[1]  Plaintiff also alleges that defendants have breached their fiduciary duties under Delaware law on the basis of such inadequate disclosure, because it constitutes a violation of the fiduciary duties of care, good faith, loyalty and candor that defendants owe to Falcon's investors. Plaintiff seeks injunctive relief on both claims.

## Plaintiff Will Suffer Immediate and Irreparable Injury
## In the Absence of Preliminary Injunctive Relief

3.      As demonstrated in the Memorandum, Plaintiff and the other investors will suffer immediate and irreparable injury in the absence of preliminary injunctive relief, because they are being asked to tender their shares without all material information necessary to do so. Only through injunctive relief will Defendants be compelled to disclose this information to investors.

4.      As explained in the Memorandum of Law, the misleading nature of the disclosure provided by the Memorandum constitutes a violation of the Exchange Act and Delaware law, both of which require complete and transparent disclosure to investors in connection with the Tender Offer. Moreover, under Delaware law, stakeholders have an inviolate right to full and accurate disclosure

---

[1]      Specifically, Section 10(b) and Rule 10b-5 prohibit the making of any false or misleading statement or omission in connection with the purchase or sale of a security, while Section 14(e) prohibits such statements and omissions in connection with any tender offer.

of all material facts prior to making a significant decision in connection with a corporate transaction, of which the Tender Offer clearly qualifies.

5.    Here, the inadequacies in the Memorandum preclude investors from making an information decision about whether to tender their shares. Specifically, the Memorandum contains deficiencies with respect to the following issues:

- The present and potential value of the Company's assets and shares, as well as the makeup of those assets and the Company's individual investments;

- The nature of any claims that Defendants are requiring investors to release as a condition to the acceptance of any tendered shares (the "Release");

- The nature, scope and subject matter of the U.S. regulatory inquiry to which Citigroup is responding as well as any related civil litigation; and

- The events leading up to the investors' massive losses, the Tender Offer and the wind-up and liquidation of the Company's assets and operations.

6.    Investors thus cannot determine the present or potential value of their shares or the Company's assets, which is a predominant concern for them because they are being asked to give up their interests in the Company on uncertain terms, with outdated information from March 31, 2008. Valuation information is also material to some investors who tender their shares, because those investors – i.e., accredited investors – have the opportunity to elect to receive a so-called "participation share" for each tendered share, which is tied to certain future Company events. Moreover, Citigroup has indicated that it will liquidate the Company's assets within twelve to eighteen months, during which time investors can hold their shares if they refuse to participate in the Tender Offer. But even this determination can only be made on full and accurate information.

7.    Investors also cannot determine the specific nature of any claims they may have against the defendants, which is of particular concern here because defendants have taken the unusual step of requiring investors to agree to the Release in order to particulate in the Tender Offer.

The Release, however, is so wide-ranging that it purports to extend to Defendants and numerous third parties and cover virtually any conceivable claim an investor has or could have. The Release would thus inure to the benefit of including Citigroup (and presumably its other funds), which is presently the subject of a U.S. regulatory inquiry, although, as noted above, defendants have failed to make adequate disclosure regarding such inquiry.

8.      Finally, the Memorandum misrepresents the events leading up to the investors' losses, which prompted the Tender Offer in the first place.

### Expedited Discovery is Required Here

9.      Expedited discovery is required here in advance of a determination of Plaintiff's motion for preliminary injunctive relief, because Plaintiff has identified material misrepresentations and omissions in the Memorandum and Defendants are in exclusive possession of the missing information. Accordingly, expedited discovery is necessary to provide the Court with a complete record upon which to order supplemental and/or corrective disclosures that Plaintiff requests.

### Exhibits Referenced in the Memorandum of Law

10.      The following documents, each of which is a true and correct copy, are referred to as Exhibits in the accompanying Memorandum of Law by the corresponding letters set forth next to each one:

A.      Proposed Order, providing the requested preliminary injunctive relief;

B.      Complaint For Violation of The Federal Securities Laws And Delaware Law;

C.      Confidential Tender and Exchange Offer Memorandum, dated May 8, 2008;

D.      Plaintiff's Request for the Production of Documents, dated May 20, 2008.

WHEREFORE, it is respectfully requested that this Court grant Plaintiff's motion for expedited discovery, and, after due consideration, also grant Plaintiff's application for a preliminary injunction, together with such other, different or further relief as this Court deems just and proper.

Dated: Melville, New York
       May 20, 2008

SAMUEL H. RUDMAN

Sworn to and subscribed before me
this 20th day of May 2008.

Notary Public

**KELLY A. STADELMANN**
Notary Public, State Of New York
No. 01ST6047260
Qualified In Nassau County
Commission Expires August 28, 2010

# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x

FERGUSON FAMILY TRUST, On Behalf of : Civil Action No. 08 CIV 4723
Itself and All Others Similarly Situated,

                      Plaintiff,    :  [PROPOSED] ORDER GRANTING
                           :  PRELIMINARY INJUNCTIVE RELIEF
        vs.                :
                           :  <u>CLASS ACTION</u>

FALCON STRATEGIES TWO LLC, :
AMACAR GP, INC., CITIGROUP :
ALTERNATIVE INVESTMENTS LLC, :
CITIGROUP, INC. and REAZ ISLAM, :

               Defendants.  :

———————————————————— x

AND NOW, this _____ day of _____, 2008, it is hereby ORDERED and ADJUDGED that:

(a)    Plaintiff has sustained its burden of satisfying the elements required by Fed. R. Civ. P. 65 for the entry of a preliminary injunction consistent with the relief set forth herein;

(b)    The above-captioned defendants, and any person or entity affiliated with them, are hereby enjoined, restrained and barred from proceeding with any aspect of the tender offer that defendant Falcon Strategies Two LLC commenced on or about May 8, 2008 (the "Tender Offer"), including the acceptance of any tendered shares and the payment for such shares or the issuance of shares to defendant Citigroup, Inc. and/or any of its affiliates, until such time as the defendants make supplemental and/or corrective disclosure of all material information to Falcon's members/investors relating to the Tender Offer in a manner that is consistent with the Court's determination of the motion (the "Disclosures"); and

(c)    Defendants shall provide the plaintiff with a draft of any Disclosures, with sufficient time for plaintiff to confer with defendants in a good faith attempt to agree upon the content of any such Disclosures, prior to their dissemination.  In the event that the parties cannot reach agreement as to the context of the Disclosures, they shall jointly raise the issue before the Court by faxing a letter to Chambers requesting a telephone conference.

# O R D E R

IT IS SO ORDERED.

DATED: _____    _____

UNITED STATES DISTRICT JUDGE

# EXHIBIT B

**08 CIV 4723**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x
FERGUSON FAMILY TRUST, On Behalf of      :      Civil Action No.
Itself and All Others Similarly Situated,
                                         :
                                Plaintiff,      :      CLASS ACTION
                                         :
                                         :      COMPLAINT FOR VIOLATION OF THE
        vs.                              :      FEDERAL SECURITIES LAWS AND
                                         :      DELAWARE LAW
FALCON STRATEGIES TWO LLC,               :
AMACAR GP, INC., CITIGROUP               :
ALTERNATIVE INVESTMENTS LLC,             :
CITIGROUP, INC. and REAZ ISLAM,          :
                                         :
                                Defendants.     :
                                         :      DEMAND FOR JURY TRIAL
———————————————————— x

RECEIVED
MAY 4 0 2008
U.S.D.C. S.D. N.Y.
CASHIERS

## NATURE OF THE ACTION

1.     This is a class action on behalf of all persons or entities who have tendered or are being asked to tender their shares of Falcon Strategies Two LLC ("Falcon" or the "Company") in connection with a tender and exchange offer (the "Tender Offer"), on the basis of a Confidential Tender and Exchange Offer Memorandum, dated May 8, 2008 (the "Memorandum"), that contains materially misleading statements and omissions. This action charges defendants Falcon, AMACAR GP, Inc. ("AMACAR"), Citigroup, Inc. ("Citigroup"), Citigroup Alternative Investments LLC ("CAI") and Reaz Islam ("Islam") with violations of Sections 10(b) and 14(e) of the Exchange Act of 1934 (the "Exchange Act"), as well as Rule 10b-5 promulgated thereunder and Delaware law.

## JURISDICTION AND VENUE

2.     The claims asserted herein arise under and pursuant to Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5], as well as Section 14(e) of the Exchange Act [15 U.S.C. § 78n(e)] and Delaware law. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act [15 U.S.C. § 78aa], and it has supplemental jurisdiction over the Delaware law claims under 28 U.S.C. § 1367.

3.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b), as many of the acts and practices complained of herein occurred in substantial part in this District, including the dissemination of the materially false and misleading statements alleged herein. In addition, Citigroup and CAI have operations located in this District and Falcon lists its mailing address as c/o CAI, in New York, New York.

4.     In connection with the acts, conduct and other wrongs alleged herein, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails and interstate telephone communications.

- 1 -

**PARTIES**

5.     Plaintiff Ferguson Family Trust acquired and holds Falcon's 2005 Series 3-A shares and, like other investors, received the Memorandum from defendants pursuant to which Falcon has asked investors to tender their shares in connection with the Tender Offer.

6.     Defendant Falcon is a Delaware limited liability company that was purportedly formed on April 27, 2004 to serve as a multi-strategy fixed income alternative seeking to provide investors with absolute returns, current income and portfolio diversification. The Company, which commenced operations on October 29, 2004, claimed to invest in a select combination of fixed income strategies and to achieve attractive risk-adjusted returns. Falcon issued nine series of units of limited liability company interests (or "shares") that comprise Portfolio "A" of its investments, which are the subject of the Tender Offer.[1]  Falcon lists its mailing address as c/o CAI, 731 Lexington Avenue, 27th Floor, New York, New York.

7.     Defendant AMACAR is a Delaware corporation that serves as the sole managing member of the Company. AMACAR purportedly assigned substantially all authority to manage the day-to-day operations and assets of Falcon to CAI.

8.     Defendant CAI is an integrated alternative investments platform that manages a wide range of products across five asset classes, including private equity, hedge funds, real estate, fixed income and infrastructure. CAI manages capital on behalf of defendant Citigroup, as well as third-party institutional and high net worth investors, and has headquarters located at 731 Lexington Avenue, 27th Floor, New York, New York. CAI acts as the investment manager for Falcon, and manages the day-to-day operations and assets of Falcon.   In connection with its operation of the

---

[1]     It appears that the Company has not issued any shares for Portfolio "B."

Company, CAI receives a management fee which is calculated as a percentage of net assets, calculated and paid monthly in arrears, a portion of which is used to pay investment managers and sub-advisors to any Portfolio funds (presumably including Islam). CAI also receives an incentive allocation which is calculated as a percentage of the cumulative return of a series of shares calculated and paid quarterly in arrears. CAI has received millions of dollars in management and incentive fees during its tenure, and had an incentive to leverage the fund's operations in order to generate fees.

9.    Defendant Islam served as the Managing Director and Senior Investment Officer of CAI and the Managing Director of Citigroup Fixed Income Alternatives, which purportedly specializes in the identification, development and management of alternative fixed-income products. At all relevant times, Islam managed Falcon on behalf of CAI.

10.    Defendant Citigroup describes itself as a global diversified financial services holding company whose businesses provide a broad range of financial services to consumer and corporate customers. Citigroup has more than 200 million customer accounts and does business in more than 100 countries. Citigroup is the parent company of CAI. Concurrently with each share tendered by investors in connection with the Tender Offer, Falcon will sell one share of a new class of limited liability company interest to Citigroup and/or its affiliated entities for a purchase price equal to the amount of consideration offered to members in the Tender Offer. The proceeds from the sale of these shares to Citigroup will be used to pay the offered consideration to the members who tender their shares.

## SUBSTANTIVE ALLEGATIONS

### Background

11.    In October 2004, Falcon was formed by Citigroup to serve as a multi-strategy fixed income alternative seeking to provide investors with absolute returns, current income and portfolio

diversification. In order to achieve these benefits, Falcon purported to invest in certain fixed-income investments that Citigroup claimed would provide higher yields. Plaintiff and other investors acquired shares in Falcon as a result of this seemingly conservative investment approach, which Citigroup and its agents represented as a safe investment for them based on their conservative risk tolerances.

12.    In actuality, unbeknownst to investors, Falcon's investment approach was not conservative but was instead highly leveraged on the condition of the credit markets and liquidity in the bond markets. In this regard, Falcon's investments were more akin to derivatives. In fact, Falcon employed municipal bond arbitrage,[2] carried commercial debt obligations and held asset-backed mortgage instruments that were intrinsically tied to the condition of the credit and bond markets. Moreover, Falcon heavily invested in funds under the Citigroup umbrella that employed these investment strategies. When these markets failed, the underlying investments declined in value.

13.    These issues adversely impacted the value of Falcon's, so much so that in February 2008, Falcon and its affiliated funds entered into a $500 million credit facility with Citigroup to obtain additional borrowing capacity and liquidity to help meet variation margin calls and prevent a forced sale of fund assets by financing counterparties. As of March 31, 2008, the funds had drawn an aggregate of approximately $335 million under the credit facility. Although the repayment of the

---

[2]    Municipal bond arbitrage generally consists of building a leveraged portfolio of tax-exempt municipal bonds while simultaneously hedging the duration risk in that portfolio by shorting taxable corporate bonds. It is a relative value strategy that attempts to capitalize on the fact that interest on municipal bonds is exempt from federal income tax. The arbitrage manifests itself in the form of a relatively cheap longer-maturity municipal bond, which is a municipal bond that yields significantly more than 65% of a corresponding taxable corporate bond. The steeper slope of the municipal yield curve allows participants to collect more after-tax income from the municipal bond portfolio than is spent on the interest rate swap.

credit facility is subordinate in right to the claims of other financing counterparties, it is senior to the interests of Plaintiff and the other investors in Falcon and the other funds.

14.    Despite the cash infusion provided by the credit facility, the value of Falcon's shares continued to decline. On March 20, 2008, CAI announced that because of the Company's low cash position and ongoing dislocation in the credit markets, it had indefinitely suspended redemptions from the Falcon funds (and payments of related redemption proceeds) and semi-annual income distributions in an effort to preserve liquidity. Falcon has since suspended further investment and its activities are now limited to the Tender Offer, liquidation of the Company's assets, and winding-up the Company's affairs.

### The Tender Offer

15.    On May 8, 2008, the defendants commenced the Tender Offer and disseminated the Memorandum to investors. In connection with the Tender Offer, Falcon has offered to pay $0.45 cents for each share tendered by an investor, on the condition that the investor will tender all of his shares and unconditionally agree to release any actual or potential legal claim against any of the defendants, their affiliates and numerous third-parties (the "Release").[3] For each share tendered, Falcon will issue one share of a new class of limited liability company interest to Citigroup and/or its affiliated entities in exchange for a payment of $0.45 per share (i.e., a price equal to the amount of consideration offered to members in the Tender Offer). The proceeds from the sale of these shares to Citigroup will be used to pay the investors who tendered their shares.

---

[3]    In addition, members who are "accredited investors" (as defined in Rule 501(a) of Regulation D under the Securities Act of 1933) may elect to receive a newly-issued "participation" share in addition to the offered consideration, although the Memorandum indicates that the ownership of such shares "is not likely to result in any appreciation or otherwise in a recoupment of [a member's] initial investment . . . ."

### The Memorandum is Materially Misleading

16.    Defendants have asked Plaintiff and the other investors of Falcon to tender their shares on the basis of the Memorandum, which contains materially misleading statements and omissions of fact.

17.    One of the most glaring omissions in the Memorandum is the absence of any information permitting investors to accurately value their shares. While the Memorandum includes attachments that purport to ascribe a "net asset value" for each series of shares as of March 31, 2008, nowhere does the Memorandum provide *current* financial figures necessary to calculate the present value of the shares. In fact, nowhere in the Memorandum do defendants actually disclose the manner in which they calculated the net asset value of the shares, nor the specific information that they utilized in doing so. Merely telling investors that a series of shares is worth $0.196 per share as of March 31, 2008 (in the case of Plaintiff's holdings), when the Memorandum is dated May 8, 2008 and the Tender Offer expires on June 30, 2008, does not provide investors with an accurate assessment of the true value of their shares *today*. Nor does it provide investors with the means to calculate the value themselves. This information, however, is perhaps the most material to investors, who are being asked to tender their shares in lieu of attempting to recoup their losses by remaining as an investor in the Company during Citigroup's planned liquidation of the Company.

18.    A similarly glaring omission is the absence of any specific information regarding the nature or value of the Company's underlying assets, which are allocated to five strategies within the credit, residential mortgage-backed, asset-backed and municipal securities markets. The only disclosure that the Memorandum makes regarding these assets is the approximate percentage of the portfolio that they occupied as of March 31, 3008:

(i) relative value preferred securities (approximately 0.5% of total assets as of March 31, 2008), (ii) relative value fixed income (mortgage-backed securities and asset-

- 6 -

backed securities) (approximately 62.5% of total assets as of March 31, 2008), (iii) municipal arbitrage (approximately 11.2% of total assets as of March 31, 2008), (iv) opportunistic mortgage-backed securities (approximately 17.2% of total assets as of March 31, 2008) and (v) diversified asset-backed securities (approximately 8.6% of total assets as of March 31, 2008). Because of market illiquidity outside of preferred and municipal arbitrage securities, the Company's assets are as of the date of this Confidential Memorandum invested primarily in mortgage-backed and asset-backed securities.

Merely providing an approximate allocation of assets does not permit members to determine the value that each particular asset class contributes to the Company, nor whether the value of that particular group of assets is increasing or decreasing. In addition, because investors do not know the particular composition of the assets in each of these classes, they cannot determine whether the investment strategies may provide diversification benefits that their other investments do not.

19.    Another significant omission in the Memorandum is its failure to disclose sufficient information regarding the nature of the existing and potential claims covered by the Release, which precludes investors from determining what they have been asked to release. This disclosure deficiency compounds the lack of disclosure regarding the value of the Company's assets and shares, because investors must agree to the Release in order to participate in the Tender Offer, thereby releasing potentially valuable avenues of recourse against Citigroup and the other defendants in connection with the management of the fund.

20.    Moreover, in the Memorandum, defendants disclosed the existence of a putative class action that an investor of an affiliated fund, Falcon Strategies Two B LLC ("Falcon Two B"), commenced in the United States District Court for the Southern District of Florida against that fund, Citigroup and CAI. Although defendants did not mention it, that litigation was apparently voluntarily dismissed by the plaintiff on May 12, 2008, a mere four days after the Tender Offer was commenced and the Memorandum was disseminated to investors. Investors have not been provided

with any information regarding the resolution or discontinuation of that action, even though such information may very well bear on the propriety of any claims they may have against the defendants.

21.    In addition, defendants disclosed in the Memorandum that Citigroup "is currently responding to a U.S. regulatory inquiry relating to Falcon Two B, Citi, and certain other funds sponsored by, and entities affiliated with, Citi." Other than that general statement, however, the Memorandum fails to disclose any information regarding the nature and scope of the inquiry (including which regulatory authority initiated it), which particular funds are under investigation, and which other Citigroup entities are also a subject of the inquiry. Moreover, although the Memorandum indicates that Citigroup is responding to the inquiry, defendants have not disclosed any additional information regarding the inquiry, including the nature and content of its response. This information is not only material because it may provide further insight into whether investors have a valuable claim against Citigroup and the other defendants that they will be forced to waive if they participate in the Tender Offer, but it is also material because, since inception, Falcon has substantially invested in funds formed by Citigroup or run by CAI as investment manager. For example, as of the year ending December 31, 2007, Falcon had 98.81% of its assets invested in eleven funds affiliated with Citigroup and/or CAI – each one run by CAI as investment manager. In order for investors to know what claims they are releasing, they need more information regarding the investigation and the funds that are the subject of it, since those funds comprised nearly the entirety of Falcon's investments prior to its demise.

22.    Additionally, investors cannot determine for themselves whether the liquidation of those assets may generate proceeds that exceed the amount of the Tender Offer consideration. In this regard, the Memorandum notes that Citigroup will liquidate the Company's assets within twelve to eighteen months after the Company issues shares to Citigroup in connection with the Tender

Offer. The value of the assets in the portfolio may very well gain in value during that time, but investors do not have the information to determine how much.

23.    The Memorandum also misrepresents the events resulting in the drastic decline in value of the Company's shares. For example, the Memorandum indicates that Falcon was formed to serve as a multi-strategy fixed income alternative seeking to provide investors with absolute returns, current income and portfolio diversification. In actuality, however, Falcon employed quite risky investment strategies that failed to provide these benefits, resulting in the substantial decline of the investors' investments. The impact of these ill-suited investment strategies is perhaps best evidenced by the fact that Falcon now claims that the net asset value of nearly every series of shares has declined to approximately 20% of the initial capital invested.

24.    Moreover, the Company appears to have shifted away from its initial investment strategies – or at least the strategies that it claimed to follow. Indeed, the Memorandum indicates that "[b]ecause of market illiquidity outside of preferred and municipal arbitrage securities, the Company's assets are as of the date of this Confidential Memorandum invested primarily in mortgage-backed and asset-backed securities." Investors did not necessarily purchase shares in Falcon to invest in such securities.

25.    In addition, the Memorandum purports to describe the general market conditions that adversely affected the value of the underlying assets and hence the shares. At the same time, however, it fails to disclose what portion of the losses – or which losses, in particular – was the result of general market conditions as opposed to specific problems within a given market.

26.    And, the Memorandum misrepresents the purpose of the Tender Offer. Although the Memorandum represents that defendants have undertaken the Tender Offer "to create immediate liquidity" for investors, they fail to disclose that the primary reason they have initiated the Tender

Offer is to limit or entirely eliminate their liability by requiring investors who tender to agree to the Release. In this regard, the value of the Release itself likely far exceeds the offered consideration, but once again investors are not provided with the information to determine how much.

## The Tender Offer is Coercive
## In the Absence of All Material Information

27.    The Tender Offer is coercive because it requires members to tender their shares without all material information; it obligates Falcon to accept tendered shares only where the tender is accompanied by a broad general release of all claims; and it requires members to submit to arbitration in connection with their tender should any claims arise.

28.    First, in order to induce members to tender their shares, the defendants have structured the Tender Offer to permit members to tender their shares, and receive payment, prior to its expiration. This has the effect of prompting members to tender their shares on the basis of the misleading Memorandum, which fails to disclose all material information regarding the Tender offer, including the actual net asset value of each series of shares.

29.    Second, defendants have agreed to accept shares only from those members who agree to the Release. In other words, any members who refuse to waive potential or actual claims against any of the defendants and their representatives, but still wish to tender their shares, cannot do so. However, the scope of the Release is so wide-ranging that it extends to virtually anyone who has ever come into contact with the Company since its existence, including the following:

> . . . . the Company, the Investment Manager, the Company's advisory board, the selling broker for the Existing Shares, Citigroup Inc. and its subsidiaries (collectively, "Citi"), AMACAR GP, Inc. (the "Managing Member"), auditors and tax preparers of the Company, past and present sub-advisors of the Company, U.S. Bank National Association (the "Administrator") and past and present counsel (Cayman and U.S.) to such parties (such parties, and their respective employees, officers, directors, partners, counsel and agents of each of the aforesaid parties, past, present and future, and each of their respective "Affiliates" (as defined below), are

collectively referred to herein as the "Releasees"), as well as the Releasees' heirs, executors, administrators, successors and assigns . . . .[4]

30.    The Release is also unduly overbroad because it provides for the release of virtually any conceivable past, present or future claim against any of the parties for whom such claim is to be released. Investors are thus given the illusory choice of accepting $0.45 per share in exchange for releasing any claim against anyone relating to the Company.

31.    Third, the Tender Offer is coercive because it is also conditioned upon the tendering members' acceptance of a broad arbitration clause, which merely serves as another way in which to preclude investors from asserting any claims against any of the defendants.

**Scienter Allegations**

32.    Charged with the responsibility of running the day-to-day operations of the Company, CAI, its parent company Citigroup, and the actual manager of the fund, Islam, knew or recklessly disregarded the fact that certain of the investment strategies that they employed were ill-suited for Plaintiff and the other investors' investment goals or risk tolerances. These defendants were also aware of changing market environments, and the risks that such changes posed, which could – and ultimately did – result in massive losses to the fund that could have been prevented had the fund not been so leveraged toward these markets. Moreover, because AMACAR did not delegate all of its authority to manage Falcon to CAI, and could not delegate all of its management responsibility or the fiduciary duties it owes to investors, AMACAR is charged with knowledge of the inappropriate investment strategies that Citigroup, CAI and Islam pursued.

---

[4]    The Release defines the term "Affiliates" as "a person controlled by, controlling or under common control with another person (which shall include without limitation the Falcon Funds, as defined in the Confidential Memorandum, and Falcon Strategies LLC)," and the term "person" as "any individual person, corporation, trust, limited liability company, partnership, custodial or other account, contractual arrangement or any other juridical entity."

- 11 -

33.    Throughout their tenure in managing the fund, defendants gave investors the impression that their investments were conservatively managed, and that defendants were taking steps to insulate the investments from losses as a result of volatility in the marketplace. In a letter dated April 24, 2006 regarding Falcon's financial performance for the year ended December 31, 2005, CAI noted that "[m]unicipal arbitrage was the largest contributor to overall returns and cash flow, as municipal bonds outperformed taxables due to strong investor demand and declining supply, especially at year-end." As a result of the performance of these investments, CAI indicated that it "tactically increased the fund's allocation to Municipal Arbitrage, consistent with our views on interest rates and relative value expectations partially driven by the record levels of supply in those markets." As of December 31, 2005, 98.39% of Falcon's net assets were placed in eight funds affiliated with or run by Citigroup, CAI and/or Islam. CAI received management fees of nearly $2.1 million and an incentive allocation of nearly $1 million from the Company.

34.    By letter dated April 30, 2007 regarding Falcon's financial performance for the year ended December 31, 2006, Islam, on behalf of CAI, once against assured investors that their investments were safe even in light of increasingly volatile market conditions. For example, he indicated that "[o]verall for 2006, the fixed income markets were quite challenging and subject to a flat-to-inverted Treasury yield curve and a tight credit spread environment . . . By late summer, downward revisions in GDP, weaker manufacturing data, and softening in the housing market illuminated uncertainty about the U.S. outlook as it appeared economic momentum was beginning to ebb." In response, Islam noted that "we re-balanced our portfolio in the later part of 2006 by moving into *less volatile and more liquid strategies* in an attempt to give us more flexibility to exploit potential opportunities in 2007." [Emphasis added.] As part of the fund's outlook for 2007, Islam acknowledged the "downturn in the housing market" that began apparent "[n]ear the end of 2006,"

- 12 -

and noted that "[b]y 4Q2006, it appeared that business profitability may have already peaked and that economy-wide profit margins and balance sheets may be under pressure."

35.     In closing, Islam noted that although "market volatility will most likely remain elevated/increase," CAI was *reducing its cash positions* by increasing its exposure to such volatility:

> For this year, we anticipate continued relative value and trading opportunities within each of our substrategies. *First, we anticipate a challenging environment for certain mortgage-related securities.* Headline risks concerning the state of the housing market and economic uncertainties may technically impact spreads, despite our view that fundamentals appear sound. Second, we expect that the Treasury yield curve will normalize and steepen particularly on the short-end of the curve. Third, *market volatility will most likely remain elevated/increase given the extent of uncertainty around the economy, the upcoming Fed policy, and impact from a potentially steeper yield curve.* Although the timing and results of these factors are unclear, we anticipate that they should create additional investment opportunities relative to 2006. As opportunities may develop, *we plan to selectively decrease our cash positions by increasing exposure to select strategies including: Fixed Income Relative Value, Opportunistic MBS, Municipal Arbitrage, and Diversified ABS throughout the year.* [Emphasis added.]

As of December 31, 2006, 87.11% of Falcon's net assets were placed in nine funds affiliated with or run by Citigroup, CAI and/or Islam. CAI earned management fees of nearly $2.4 million and an incentive allocation of approximately $4 million from the Company.

36.     By letter dated April 28, 2008 regarding Falcon's financial performance for the year ended December 31, 2007, the Company's auditor, KPMG, revealed that although the financial statements were audited under the assumption that Falcon would continue as a going concern, the Company's future was anything but certain:

> The Company is exposed to disruptions and uncertainties in the credit markets resulting in liquidity difficulties, raising costs of re-financing and an overall decline in the prices of asset holdings . . . These conditions . . . indicate the existence of a material uncertainty which may cast significant doubt about the Company's ability to continue as a going concern. These financial statements do not include any adjustments that might result from the outcome of this uncertainty.

Even as of December 31, 2007, 98.81% of Falcon's net assets were placed in eleven funds affiliated with or run by Citigroup, CAI and/or Islam, four of which, as of April 15, 2008, the Company had "substantially redeemed all holdings" in. Nevertheless, CAI still earned management fees of more than $1.7 million and an incentive allocation of approximately $200,000 from the Company.

37.    On April 28, 2008, *The Wall Street Journal* reported on the demise of the Falcon fund, providing, in pertinent part, as follows:

> The losses by the two hedge funds at issue, called Falcon and ASTA/MAT, are the latest examples of the credit crunch hammering retail, or individual, investors who believed they were holding low-risk securities.
>
> *          *          *
>
> Last year, as Citigroup was gearing up to launch new Falcon and ASTA/MAT funds, it encouraged brokers at Smith Barney and in Citigroup's private bank to pitch the funds to their best customers. One reason for the push: Initial market tremors caused the Falcon family to decline by more than 10%, and Citigroup hoped to stabilize it with an infusion of cash.
>
> By September, the new Falcon fund had raised about $71 million. A new ASTA/MAT fund raised about $800 million. Both new funds were heavily comprised of retail investors.
>
> Citigroup brokers and fund managers assured prospective investors that the new hedge funds were low-risk, with Falcon likely to post losses of no more than 5% a year in the worst-case scenario, according to people familiar with the situation.
>
> "That's why they bought it," says a Smith Barney broker whose clients, many of them wealthy retirees, invested in the Falcon fund. "These kinds of clients weren't looking for a home run."
>
> *          *          *
>
> As of March 31, the new Falcon fund was worth just 25% of its initial value, according to internal documents. The ASTA/MAT fund had shriveled by Feb. 29 to less than 10% of its original value, the documents show. ***Even as their performances deteriorated, Reaz Islam, the 41-year-old manager of the funds, reassured uncertain brokers and clients that the funds were likely to rebound, according to people familiar with the matter***. [Emphasis added.]

- 14 -

38.    As demonstrated above, defendants knew or had reason to know that the markets were becoming increasingly volatile, yet they invested Falcon's assets in strategies that exposed the Company to further losses anyway, in contravention of the Company's stated investment strategies and the investors' known investment goals and risk tolerances.

39.    Moreover, defendants were charged with the responsibility of managing the Company's operations and investments and apprising themselves of all material information regarding same, and they have used this information to generate management and incentive fees for themselves in furtherance of a scheme to acquire the outstanding shares of Falcon without disclosing all material information to investors regarding, *inter alia*, the value of the shares or the underlying assets, the purpose for the Tender Offer, the circumstances surrounding the ongoing regulatory investigation, and the Release.

40.    In addition, defendants acted with scienter insofar as they knew or recklessly disregarded that the Memorandum contains materially misleading statements and omissions, and they participated or acquiesced in its preparation and dissemination. At all relevant times, each of the defendants occupied a position of power and control over the Company and/or the Tender Offer, and had the ability to issue statements on the Company's behalf or the opportunity to participate in the Company's formulation and dissemination of statements to investors. Defendants also have and had access to internal and other non-public information regarding the Company's operations. In knowing or reckless disregard of the true facts concerning the Company, the defendants prepared and disseminated the Memorandum. They were thus active participants in the fraud alleged herein, which the defendants have pursued in order to induce investors to agree to the Release; facilitate Citigroup's takeover of the Company; and liquidate the Company for their own benefit to the detriment of investors.

- 15 -

## CLASS ACTION ALLEGATIONS

41.    Plaintiff brings this action as a class action on behalf of itself and those members who have tendered or are being asked to tender their shares to Falcon in connection with the Tender Offer. Excluded from the Class are defendants, the current and former officers and directors of any of the defendants, and, with respect to any of the foregoing, the members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

42.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Citigroup or its transfer agents and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. Falcon issued nine series of millions of dollars worth of shares.

43.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected, although possibly to different degrees, by defendants' wrongful conduct in the violation of federal and Delaware law.

44.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

45.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are: whether defendants violated the Exchange Act and/or breached fiduciary duties owed under Delaware law; whether the Memorandum omits and/or misrepresents material facts about the value of the shares, the nature and value of the Company's

assets, the purpose and scope of the release that defendants have required as a condition of accepting any tendered shares, and other matters related to the Tender Offer; and to what extent the members of the Class have sustained damages and the proper measure of damages.

46.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small when viewed individually in the context of the Tender Offer, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### For Violation of Section 10(b) of the Exchange Act and Rule 10b-5
### Against All Defendants

47.     Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

48.     The Memorandum, which defendants disseminated to Falcon's members in connection with the Tender Offer, contained false and misleading statements and omissions of material fact in violation of Section 10(b) and Rule 10b-5.

49.     Defendants knew or recklessly disregarded that the Memorandum contained these statements and omissions, and nevertheless failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

50.     Plaintiff and the other investors did not know, nor in the exercise of reasonable diligence could have known, of the untruths and omissions contained in the Memorandum.

- 17 -

51.     As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class cannot make an informed decision about whether to tender their shares in connection with the Tender Offer.

52.     Defendants must be compelled to disclose additional information to Plaintiff and other investors in order to permit them to make an informed decision.

53.     By reason of the conduct alleged herein, the defendants have violated Section 10(b) and Rule 10b-5 and will continue to do so unless and until the Tender Offer is enjoined by the Court and they are required to issue supplemental and/or corrective disclosures to the members of the Class.

## COUNT II

### For Violation of Section 14(e) of the Exchange Act
### Against All Defendants

54.     Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

55.     The Tender Offer is subject to Section 14(e) of the Exchange Act, which makes it unlawful "to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer . . . ."

56.     The Memorandum, which defendants disseminated to Falcon's members in connection with the Tender Offer, contained false and misleading statements and omissions of material fact in violation of Section 14(e).

57.     Defendants knew or recklessly disregarded that the Memorandum contained these statements and omissions, and nevertheless failed to disclose material facts necessary in order to

- 18 -

make the statements made, in light of the circumstances under which they were made, not misleading.

58.     Plaintiff and the other investors did not know, nor in the exercise of reasonable diligence could have known, of the untruths and omissions contained in the Memorandum, and, as members of the Company subject of the Tender Offer, they require the protection of Section 14(e).

59.     As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class cannot make an informed decision about whether to tender their shares in connection with the Tender Offer.

60.     Defendants must be compelled to disclose additional information to Plaintiff and other investors in order to permit them to make an informed decision.

61.     By reason of the conduct alleged herein, the defendants have violated Section 14(e) and will continue to do so unless and until the Tender Offer is enjoined by the Court and they are required to issue supplemental and/or corrective disclosures to the members of the Class.

## COUNT III

### Claim for Breach of Fiduciary Duties and/or Aiding and Abetting
### Breach of Fiduciary Duty Under Delaware Law
### Against All Defendants

62.     Plaintiff repeats and realleges the allegations set forth above in paragraphs 1 through 46 as if set forth fully herein.

63.     By attempting to induce investors to tender their shares on the basis of the materially misleading Memorandum, defendants have violated the fiduciary duties of care, loyalty, candor and good faith owed to these investors under Delaware law.

64.     Moreover, in drafting and disseminating the Memorandum, defendants have unfairly utilized confidential information regarding Falcon to their advantage and to the detriment of the

- 19 -

investors, who are being asked to tender their shares on the basis of such incomplete and misleading information.

65.    In the absence of injunctive relief requiring defendants to issue supplemental and/or corrective disclosures to members, and enjoining defendants from proceeding with the Tender Offer and accepting any tendered shares, members will be irreparably harmed because they will be forced to determine whether to tender their shares in connection with the Tender Offer on the basis of the materially misleading statements and omissions of fact contained in the Memorandum.  Members will thus be required to make a determination of whether to relinquish their interest in the Company on the basis of inadequate information, a situation created by defendants' violation of the fiduciary duties of care, loyalty, candor and good faith owed to such members.

66.    Members will also be irreparably harmed without the required additional information because, as a condition of tendering their shares, they are required to accept the Release, which purports to eliminate any legal claim such members may have against any of the parties involved in operating the Company.  Investors must similarly agree to arbitrate any claim that they may have, which will also serve as an impediment to their right to bring a claim against defendants should they so choose.

67.    In addition, to the extent that any of the defendants do not directly owe fiduciary duties to the investors, they aided and abetted the breaches of fiduciary duty alleged herein by the other defendants that owe such duties.

68.    As a result of the actions of the defendants, plaintiff and the Class have been and will be irreparably harmed in the absence of injunctive relief.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment, as follows:

- 20 -

A.    Determining that this action is a proper class action and certifying plaintiff as Class representative;

B.    Enjoining defendants, and any person or entity affiliated with them, from proceeding with any aspect of the Tender Offer or any attendant transaction thereto, including the acceptance of any tendered shares and the payment for such shares or the issuance of shares to Citigroup, until such time as Defendants disseminate all material information relating to the Tender Offer to Falcon's investors;

C.    Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Awarding such additional equitable/injunctive or other relief as deemed appropriate by the Court.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury.

DATED:  May 20, 2008                COUGHLIN STOIA GELLER
                                      RUDMAN & ROBBINS LLP
                                    SAMUEL H. RUDMAN
                                    ROBERT M. ROTHMAN
                                    JOSEPH RUSSELLO


                                    SAMUEL H. RUDMAN

                                    58 South Service Road, Suite 200
                                    Melville, NY  11747
                                    Telephone:  631/367-7100
                                    631/367-1173 (fax)

- 21 -

COUGHLIN STOIA GELLER
 RUDMAN & ROBBINS LLP
DARREN J. ROBBINS
DAVID C. WALTON
DAVID T. WISSBROECKER
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)

Attorneys for Plaintiff

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

DAVID P. FERGUSON, on behalf of David P. and Marguerite M. Ferguson Trustees, Ferguson Family Trust UDT November 24, 1999 ("Plaintiff") declares:

1.    Plaintiff has reviewed a complaint and authorized its filing.

2.    Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

**Acquisitions:**

| Date Acquired | Cost of Falcon Shares Acquired |
|---|---|
| March 1, 2005 | $500,000 + fees |
|  |  |
|  |  |

**Sales:**

| Date Sold | Proceeds of Falcon Shares Sold |
|---|---|
| N/A |  |
|  |  |
|  |  |

5.    Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws except as detailed below during the three years prior to the date of this Certification:

FALCON

6.    The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, `except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 14th day of May , 2008.

_____
DAVID P. FERGUSON, Trustee

FALCON

# EXHIBIT C

CONFIDENTIAL TENDER AND EXCHANGE OFFER MEMORANDUM

# FALCON STRATEGIES TWO LLC
## PORTFOLIO A

**Offers Existing Holders a Cash Payment and
Offers Existing Holders that are Accredited Investors
a Cash Payment and Newly Created Participation Shares
in Exchange for any and all Existing Shares of Limited Liability Company Interest**

———————

Falcon Strategies Two LLC (Portfolio A of which is referred to herein as "we," "us" or the "Company") is offering to exchange a cash payment of $0.45 per share (the "Exchange Consideration") as described in this confidential tender and exchange offer memorandum (this "Confidential Memorandum") for its outstanding shares of each series of limited liability company interest (the "Existing Shares" and the holders of Existing Shares, the "Existing Holders"). Existing Holders who are "accredited investors," as defined in Rule 501(a) of Regulation D under the Securities Act of 1933, as amended (the "Securities Act" (such offerees collectively being referred to herein as the "Accredited Investors") may also elect to receive, in addition to the Exchange Consideration, one share of limited liability company participation interest (a "Participation Share") for each Existing Share so tendered. The foregoing transactions are collectively referred to herein as the "Exchange Offer." For each Existing Share tendered, we will sell one share of a new class of limited liability company interest to Citi (as defined herein) (the "Citi Shares") for a purchase price per Citi Share equal to the Exchange Consideration, the proceeds of which will be used to pay the Exchange Consideration. Upon the liquidation of the Company or the redemption of the Citi Shares (in each case, a "Participation Event"), each Participation Share issued will be allocated an amount equal to 75% of the excess by which the then current net asset value per share of the corresponding Citi Share exceeds the Exchange Consideration plus an amount equal to the cost of capital on the purchase price of such Citi Share (initially 9%). Existing Holders that are not Accredited Investors may participate in the Exchange Offer, but such holders will not be entitled to receive Participation Shares in addition to the Exchange Consideration. All other terms and requirements of the Exchange Offer will remain the same with respect to such holders. By tendering your Existing Shares in the Exchange Offer you will, with respect to your investment in the Company, not be allocated any further losses of the Company, but your continued investment in the Company through ownership of Participation Shares, if applicable, is not likely to result in any appreciation or otherwise in a recoupment of your initial investment (although we can make no assurance that, upon the occurrence of a Participation Event, Existing Holders who participate in the Exchange Offer (whether or not eligible or electing to receive Participation Shares) will be in a better position than Existing Holders who choose not to participate). In order to tender your Existing Shares, you will be required to unconditionally release and discharge (the "Release") any and all claims against us, Citigroup Alternative Investments LLC (the "Investment Manager"), the selling broker for the Existing Shares, Citigroup Inc. and its subsidiaries (collectively, "Citi"), AMACAR GP, Inc. (the "Managing Member"), and a number of other individuals and entities described herein relating to or arising from the acquisition, disposition or ownership of Existing Shares of any series, whether those claims arise under United States federal or state securities laws, arbitration agreements or otherwise and regardless of whether those claims are known or unknown at the time of the exchange (See "Release" in this Confidential Memorandum).

**None of the Participation Shares have been registered under the Securities Act or any state securities law and, unless so registered, may not be offered or sold except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act and applicable state securities laws. The offer of the Participation Shares is being made in reliance upon the exemption from registration provided by Section 4(2) of the Securities Act and similar exemptions from registration provided by certain state securities laws. Accordingly, the Participation Shares are being offered only to Accredited Investors as that term is defined above. The Participation Shares will be subject to significant restrictions on transfer, see "Acknowledgements and Consents" on page 27.**

*The decision as to whether to participate in the Exchange Offer involves a high degree of risk and uncertainty. You should carefully consider the risks and other information described in this Confidential Memorandum before making a decision whether to participate in the Exchange Offer. In order for holders of Participation Shares to receive a distribution upon the occurrence of a Participation Event, there will need to be a significant increase in the Company's net asset value as compared to its net asset value as of March 31, 2008. As a result, we currently do not anticipate there being any distribution to holders of Participation Shares upon the occurrence of a Participation Event. Existing Holders that are not Accredited Investors that participate in the Exchange Offer and Accredited Investors who do not elect to receive Participation Shares will not receive any Participation Allocation upon the liquidation of the Company. The Company expects to complete its liquidation and Citi expects to redeem its Citi Shares in the next twelve to eighteen months, although such period may be longer or shorter.*

**THE PARTICIPATION SHARES ARE NOT DEPOSITS IN, OBLIGATIONS OF OR GUARANTEED BY CITIBANK, N.A. OR ANY OF ITS AFFILIATES, DO NOT HAVE THE BENEFIT OF DEPOSIT INSURANCE, AND ARE NOT GUARANTEED BY ANY GOVERNMENTAL ENTITY.**

**DISTRIBUTION OR REPRODUCTION OF ALL OR ANY PART OF THIS CONFIDENTIAL MEMORANDUM, OR DIVULGING ITS CONTENTS OTHER THAN AS SPECIFICALLY SET FORTH HEREIN, IS UNAUTHORIZED.**

---

**THE EXCHANGE OFFER WILL EXPIRE AT 5:00 P.M., NEW YORK CITY TIME, ON MONDAY, JUNE 30, 2008, UNLESS EXTENDED BY THE COMPANY WITH RESPECT TO ALL SERIES OF EXISTING SHARES (THE "EXPIRATION DATE"). EXISTING HOLDERS WHO PROPERLY SUBMIT THEIR EXCHANGE OFFER SUBSCRIPTION AGREEMENTS PRIOR TO 5:00 P.M., NEW YORK CITY TIME, ON MAY 30, 2008 OR SUBSEQUENT TO 5:00 P.M. ON MAY 30, 2008 BUT PRIOR TO 5:00 P.M., NEW YORK CITY TIME ON JUNE 13, 2008 MAY ELECT TO RECEIVE THE EXCHANGE CONSIDERATION AND PARTICIPATION SHARES, IF APPLICABLE, WITH RESPECT TO SUCH SHARES BY JUNE 6, 2008 OR JUNE 20, 2008, RESPECTIVELY (EACH SUCH CASE, "EARLY SETTLEMENT"), BUT WILL RETAIN THE RIGHT TO REVOKE SUCH TENDERS PRIOR TO THE EXPIRATION DATE BY RETURN TO THE COMPANY OF ANY SUCH EXCHANGE CONSIDERATION AND FORFEITURE OF ANY PARTICIPATION SHARES DELIVERED PURSUANT TO SUCH EARLY SETTLEMENT IN ADDITION TO COMPLIANCE WITH THE OTHER REVOCATION PROCEDURES DESCRIBED IN THIS CONFIDENTIAL MEMORANDUM.**

———————

The date of this Confidential Memorandum is May 8, 2008.

## SUMMARY TERMS OF THE OFFER

- The Expiration Date is 5:00 p.m., New York City time, on June 30, 2008, unless extended by us at our sole discretion with respect to all series of Existing Shares. The Company reserves the right to amend or terminate the terms of this Exchange Offer in its sole discretion, as more fully described under "The Exchange Offer" on page 18. Any action described herein to be taken by the Company may be made by the Managing Member or the Investment Manager.

- Except as set forth in this Confidential Memorandum, we will accept any and all outstanding Existing Shares of any series that are properly tendered and not revoked prior to the Expiration Date. Holders of Existing Shares who wish to tender such shares will be required to tender all Existing Shares of all series so held by them in order to participate in the Exchange Offer, as more fully described under "The Exchange Offer" on page 18. Notwithstanding anything to the contrary contained herein, certain persons who are affiliates of Citi ("Citi Affiliated Persons") that are also Existing Holders are expected to be excluded from participating in the Exchange Offer. Such exclusion from participation should not be construed as a recommendation or view on whether or not you should participate in the Exchange Offer but rather an effort to minimize perceived conflicts of interest associated with affiliates of the Company participating in the Exchange Offer. None of the Company, the Investment Manager, Citi, our Managing Member or any of their respective affiliates is making any recommendation regarding whether you should participate in the Exchange Offer; accordingly, you must make your own determination whether to participate in the Exchange Offer.

- We will pay, on the terms and subject to the conditions set forth herein and in the related Exchange Offer Subscription Agreement, the Exchange Consideration of $0.45 per Existing Share and issue the Participation Shares, if applicable, to those holders who have properly tendered and not properly revoked their election to tender their Existing Shares and receive Exchange Consideration and Participation Shares, if applicable, prior to the Expiration Date. Other than with respect to Existing Shares tendered for Early Settlement, we will issue the Participation Shares, if applicable, and pay the Exchange Consideration promptly following the Expiration Date upon our determination that the conditions to the Exchange Offer have been satisfied or waived, as more fully described under "The Exchange Offer" on page 18.

- Upon the occurrence of a Participation Event, each Participation Share will be allocated an amount equal to 75% of the excess by which the then current net asset value per share of the corresponding Citi Share exceeds the Exchange Consideration plus an amount equal to the cost of capital on the purchase price of such Citi Share (3-month LIBOR plus a variable spread determined by Citi, compounding annually, which will initially be equal to 9% but may increase or decrease based on various market, economic and other factors, the "Cost of Capital"). We do not expect the Cost of Capital to vary materially from the initial percentage. In order for holders of Participation Shares to receive a distribution upon the occurrence of a Participation Event, there will need to be a significant increase in the Company's net asset value as compared to its net asset value as of March 31, 2008. As a result, we currently do not anticipate there being any distribution to holders of Participation Shares upon the occurrence of a Participation Event.

- If the Exchange Offer is not consummated, all tendered Existing Shares will be returned, regardless of when they were tendered, no Participation Shares or Citi Shares will be issued and no Exchange Consideration will be paid, other than with respect to any Early Settlement, which settlements, if any, will be rescinded. The Company has not set a minimum tender amount as a condition for the consummation of the Exchange Offer. In the event that you elect to revoke your election to tender your Existing Shares and you follow all the procedures for revocation described under the caption "The Exchange Offer—Revocation Rights" on page 21, you shall continue to be a holder of the Existing Shares.

- The offer of the Participation Shares pursuant to the Exchange Offer is being extended in reliance on the exemption from registration provided by Section 4(2) of the Securities Act and similar exemptions from registration provided by certain state securities laws and has not been registered with the Securities and Exchange Commission (the "SEC"). In order to preserve certain private offering exemptions under the Securities Act, only Accredited Investors may receive Participation Shares in addition to the Exchange Consideration. All Existing Holders were required to be Accredited Investors at the time they acquired their Existing Shares. However, Existing Holders that are no longer Accredited Investors may participate in the Exchange Offer and receive the Exchange Consideration and thereby realize immediate liquidity similar to tendering Existing Holders that are Accredited Investors. All other terms and requirements of the Exchange

Offer will remain the same with respect to such holders.  Existing Holders that are Accredited Investors may also elect not to receive Participation Shares.

- The Participation Shares are subject to significant restrictions on transfer, as described under the caption "Acknowledgements and Consents" on page 27.  Participation Shares (similar to the Existing Shares) may not be directly or indirectly transferred, resold or otherwise hypothecated without the prior written consent of the Investment Manager (which may grant or withhold such consent in its sole discretion) and in compliance with applicable securities laws.

- No Existing Shares of any series or Participation Shares are listed for trading on any national securities exchange or for quotation on any automated quotation system and we do not intend to list the Existing Shares or Participation Shares for trading or quotation and do not expect any other market to develop.

- Although there is no direct authority addressing an exchange such as the Exchange Offer, the transaction is expected to be a taxable exchange with respect to the Existing Shares exchanged (or deemed exchanged) for Exchange Consideration, and a non-taxable exchange with respect to the Existing Shares deemed exchanged for Participation Shares, as described more fully under "Certain United States Federal Income Tax Consequences" on page 23.  Existing Holders that do not participate in the Exchange Offer will not incur any U.S. federal income tax liability as a result of the consummation of the Exchange Offer.

- We will not receive any cash proceeds from the Exchange Offer other than from the concurrent sale of the Citi Shares, as described herein, the proceeds of which will be used to pay the Exchange Consideration, as more fully described under "The Exchange Offer" on page 18.  Any Existing Shares that are properly tendered and accepted pursuant to the Exchange Offer will be considered redeemed.

- By tendering your Existing Shares in the Exchange Offer and executing the Exchange Offer Subscription Agreement and accompanying Release (whether or not you are an Accredited Investor and whether or not you elect to receive Participation Shares) you will unconditionally release and discharge any and all claims against the Company, the Investment Manager, our advisory board, the selling broker for the Existing Shares, Citi, the Managing Member, any of the Company's past or present sub-advisors, the Company's auditors and tax preparers, U.S. Bank National Association (the "Administrator") and past and present counsel (Cayman and U.S.) to such parties (such parties, and their respective affiliates, including but not limited to any other Falcon Fund (as defined herein) and Falcon Strategies LLC, and the employees, officers, directors, partners, counsel and agents of each of the aforesaid parties, are collectively referred to herein as the "Releasees") relating to or arising from the acquisition, disposition or ownership of Existing Shares of any series, whether those claims arise under United States federal or state securities laws, arbitration agreements or otherwise and regardless of whether those claims are known or unknown at the time of such exchange.

- In connection with this Exchange Offer, the Company's Limited Liability Company Agreement (the "LLC Agreement") is being amended to set forth the terms of the Participation Shares and the Citi Shares and related matters.  Such amendments do not require the consent of the Existing Holders.

- Existing Holders may elect Early Settlement and receive the Exchange Consideration and Participation Shares, if applicable, by June 6, 2008 with respect to Existing Shares tendered prior to 5:00 p.m. on May 30, 2008 or by June 20, 2008 with respect to such Existing Shares tendered after 5:00 p.m. on May 30, 2008 but prior to 5:00 p.m. on June 13, 2008, as more fully described under "The Exchange Offer—Early Settlement" on page 19.  Such holders will retain the right to revoke such tenders prior to the Expiration Date by return to the Company of the applicable Exchange Consideration and forfeiture of any Participation Shares received in addition to compliance with the other revocation procedures described herein.

**This Confidential Memorandum is for the exclusive use of Existing Holders (other than certain Citi Affiliated Persons that are expected to be excluded from the Exchange Offer) in connection with this Exchange Offer and their legal, tax, financial and other advisers on a confidential basis, and may not be used by any other person or for any other purpose.  In consideration for the receipt of this Confidential Memorandum, the recipient agrees that, in the absence of the express prior written consent of the Company or Investment Manager, it will not reproduce, copy, use or transmit this document or the information contained herein, in whole or in part or permit such action by others for any purpose (except that an Existing Holder may provide copies of this Confidential Memorandum or portions hereof to its legal, tax, financial and other advisers for the purpose described above).  Except as set forth below, the recipient further agrees**

to keep strictly confidential the information contained herein or made available in connection with any further investigation of the Company.

This Confidential Memorandum summarizes various documents and other information. Those summaries are qualified in their entirety by reference to the documents and information to which they relate. In making an investment decision, you must rely on your own examination of the Company, the Investment Manager, the Participation Shares, the Release, the value of the Exchange Consideration and the terms of the Exchange Offer, including the merits and risks involved in the Exchange Offer. No representation is made to you or any other Existing Holder regarding the legality of an investment in the Participation Shares by the electing Accredited Investors under any applicable legal investment or similar laws or regulations or the adequacy of the Exchange Consideration. The contents of this Confidential Memorandum are not to be construed as legal, business, tax or other advice. You should consult your own advisors as needed to assist you in making your decision whether to participate in the Exchange Offer.

No dealer, salesperson or other person has been authorized to give any information or to make any representations not contained in this Confidential Memorandum, and, if given or made, such information or representation must not be relied upon as having been authorized by the Company, the Investment Manager, Citi, our Managing Member or any of our or their respective affiliates.

This Confidential Memorandum does not constitute an offer to sell or a solicitation of an offer to buy Participation Shares to any person in any jurisdiction where it is unlawful to make such an offer or solicitation. The information contained in this Confidential Memorandum is current only as of the date hereof and neither the delivery of this Confidential Memorandum nor the offering, sale or delivery of the Participation Shares pursuant to the Exchange Offer made hereunder shall, under any circumstances, create any implication that the information contained herein is accurate as of any time other than the date hereof.

None of the Participation Shares described in this Confidential Memorandum has been registered or qualified under the Securities Act, the securities laws of any state or the securities laws of any other jurisdiction. This is a private offering of Participation Shares pursuant to exemptions provided by Section 4(2) of the Securities Act, Rule 506 of Regulation D thereunder and applicable state securities laws. Neither the Securities and Exchange Commission, the securities regulatory authority of any state nor the securities regulatory authority of any other jurisdiction has passed upon the value of the Participation Shares, the Release or any Exchange Consideration, made any recommendations as to their purchase, approved or disapproved this Exchange Offer, or passed upon the adequacy or accuracy of this Confidential Memorandum. Any representation to the contrary is a criminal offense.

Participation Shares of each series are subject to restrictions on transferability and resale and may not be directly or indirectly transferred, resold or otherwise hypothecated without the prior written consent of the Investment Manager (which may grant or withhold such consent in its sole discretion), and in compliance with applicable securities laws.

During the course of this Exchange Offer and prior to the Expiration Date, each Existing Holder and its representative(s), if any, is invited to question the Company, the Managing Member and the Investment Manager concerning the terms and conditions of the Exchange Offer and to obtain additional information, to the extent the Company, the Investment Manager or the Managing Member has such information or can acquire it without unreasonable expense or effort, concerning the Company, the Exchange Offer or to verify the accuracy of information contained in this Confidential Memorandum. Subject to the foregoing, any representation or information not contained herein must not be relied upon as having been authorized by the Company, the Investment Manager or its Managing Member because no person has been authorized to make any such representations or to provide any such information. Questions for the Company, the Investment Manager and the Managing Member may be directed to the Investment Manager, attention Investor Services, as set forth herein.

Notwithstanding anything to the contrary set forth herein, each Existing Holder (and each employee, representative or other agent of such Existing Holder) may disclose to any and all persons, without limitations of any kind, the tax treatment and tax structure of the transactions contemplated herein and all

materials of any kind (including any options or other tax analyses) that are provided to such Existing Holder relating to such tax treatment and tax structure.  This authorization of tax disclosure is retroactively effective to the commencement of the first discussions between such Existing Holder and the Investment Manager, Managing Member or the Company regarding the transactions contemplated herein.

The Managing Member is exempt from registration with the U.S. Commodity Futures Trading Commission ("CFTC") as a commodity pool operator because this pool is operated pursuant to the following criteria: (i) shares in this pool are exempt from registration under the Securities Act, and such shares are not offered and sold through a public offering in the United States; and (ii) (a) each natural person participant (including such person's self-directed employee benefit plan, if any), is a "qualified eligible person," as that term is defined in CFTC Regulation Section 4.7(a)(2); and (b) each non-natural person participant is a "qualified eligible person," as that term is defined in CFTC Regulation Section 4.7, or an "accredited investor," as that term is defined in Sections 501(a)(1)-(3), (7), and (8) of Regulation D under the Securities Act.  Unlike a registered commodity pool operator, the Managing Member is not required to deliver a disclosure document and a certified annual report to participants in the Company.  The Managing Member will, however, deliver audited annual reports described herein.

## NOTICE TO FLORIDA RESIDENTS

Where sales are made to five or more persons in Florida, any such sale made pursuant to section 517.061(11) of the Florida Securities Act shall be voidable by the purchaser either within three days after the first tender of consideration is made by such purchaser to the issuer, or an agent of the issuer, or an escrow agent or within three days after the availability of that privilege is communicated to such purchaser, whichever occurs later.

## NOTICE TO GEORGIA RESIDENTS

These securities have been issued or sold in reliance on paragraph (13) of Code Section 10-5-9 of the Georgia Securities Act of 1973, and may not be sold or transferred except in a transaction which is exempt under such act or pursuant to an effective registration under such act.

## NOTICE TO NEW HAMPSHIRE RESIDENTS

Neither the fact that a registration statement or an application for a license has been filed under Chapter 421-b of the New Hampshire Revised Statutes with the State of New Hampshire nor the fact that a security is effectively registered or a person is licensed in the State of New Hampshire constitutes a finding by the Secretary of State that any document filed under Chapter 421-b of the New Hampshire Revised Statutes is true, complete and not misleading.  Neither any such fact nor the fact that an exemption or exception is available for a security or a transaction means that the Secretary of State has passed in any way upon the merits or qualifications or, or recommended or given approval to, any person, security or transaction.  It is unlawful to make, or cause to be made, to any prospective purchaser, customer or client any representation inconsistent with the provisions of this paragraph.

# TABLE OF CONTENTS

**Page**

Summary ..................................................................................................................................... 2
Risk Factors .............................................................................................................................. 13
The Exchange Offer .................................................................................................................. 18
Release ...................................................................................................................................... 23
Certain United States Federal Income Tax Consequences........................................................ 23
Acknowledgements and Consents.............................................................................................. 27
Counsel...................................................................................................................................... 28

ANNEX A – Net Asset Value

## FORWARD-LOOKING STATEMENTS

This Confidential Memorandum includes forward-looking statements. Forward-looking statements may be identified by the presence in such statements of the words "may," "will," "expect," "intend," "anticipate," "believe," "attempt," "seek," or "project" or the negatives, derivatives, and variations of such words or comparable terminology. The Company has based these forward-looking statements on the Company's current expectations and projections about future events. These forward-looking statements are subject to risks, uncertainties and assumptions about the Company and its investments. Additionally, some forward-looking statements are based on the assumption that the volatility of market conditions in the future will generally not deviate materially from the volatility of market conditions seen over the past decade. Such assumptions would be invalidated in the event of an extended market disruption.

Neither the Company, the Investment Manager nor the Managing Member or their respective affiliates undertake any obligation to update or revise any forward-looking statements, whether as a result of new information, future events or otherwise. In light of these risks, uncertainties and assumptions, the prospective events discussed in this Confidential Memorandum may not occur.

**BEFORE DETERMINING TO PARTICIPATE IN THE EXCHANGE OFFER, EXISTING HOLDERS WHO WISH TO TENDER THEIR EXISTING SHARES SHOULD READ THIS ENTIRE CONFIDENTIAL MEMORANDUM AND REFER TO THE COMPANY'S HISTORICAL FINANCIAL STATEMENTS, WHICH HAVE PREVIOUSLY BEEN PROVIDED TO INVESTORS, INCLUDING THE COMPANY'S AUDITED FINANCIAL STATEMENTS FOR THE YEAR ENDED DECEMBER 31, 2007. ADDITIONALLY, EXISTING HOLDERS SHOULD CONSULT THEIR INDEPENDENT LEGAL, TAX, FINANCIAL AND OTHER ADVISORS, AND MAKE THEIR OWN INVESTIGATION OF THE COMPANY, THE RELEASE AND THE EXCHANGE OFFER. CITI, ITS AFFILIATES AND ITS EMPLOYEES ARE NOT IN THE BUSINESS OF PROVIDING TAX AND LEGAL ADVICE TO INVESTORS. THE CONTENTS OF THIS CONFIDENTIAL MEMORANDUM ARE NOT TO BE CONSIDERED AS LEGAL, TAX, BUSINESS OR OTHER ADVICE. YOU SHOULD CONSULT YOUR OWN ADVISORS, INCLUDING INDEPENDENT LEGAL AND TAX ADVISORS, AS NEEDED TO ASSIST YOU IN MAKING YOUR DECISION WHETHER TO PARTICIPATE IN THE EXCHANGE OFFER.**

# SUMMARY

*This summary highlights selected information from this Confidential Memorandum and may not contain all the information that is important to you. As used in this Confidential Memorandum, the terms "we," "us," "our," and "the Company" refer to Falcon Strategies Two LLC Portfolio A. Any action described herein to be taken by the Company may be made by the Managing Member or the Investment Manager.*

## The Company

The Company was formed to serve as a multi-strategy fixed income alternative seeking to provide investors with absolute returns, current income and portfolio diversification. The Company invested in a select combination of fixed income strategies and sought to achieve attractive risk-adjusted returns. As of March 31, 2008, the Company had $471.6 million of capital and $79.6 million of net assets in a total of nine series of Existing Shares. For the net asset value per Existing Share as of March 31, 2008 of the series of Existing Shares you own, which may vary from series to series, please refer to Annex A of this Confidential Memorandum.

Beginning in August 2007, the global bond markets began experiencing a reduction in the availability of credit. Over the following months, this credit crunch rapidly accelerated due to a combination of many factors, including falling asset values, forced de-leveraging and low trading activity in what has become a vicious cycle of de-leveraging across the financial system. These market conditions have severely impacted the cash position and net asset value of the Company.

On February 20, 2008, an affiliate of Citigroup Alternative Investments LLC (the "Investment Manager") entered into an approximately $500 million 364 day secured credit facility (the "Credit Facility") with Falcon Strategies Two B LLC for its benefit and the benefit of the Company, Falcon Strategies Three Ltd. and Falcon Strategies Four LLC (collectively with the Company, the "Falcon Funds") and Falcon Strategies LLC, currently not a borrower under the Credit Facility. As of March 31, 2008, the Falcon Funds had drawn an aggregate of approximately $335 million under the Credit Facility (which is attributable pro rata to each of the Falcon Funds). Each of the Falcon Funds, together with Falcon Strategies LLC, pursues substantially the same investment program pursued by the Company. The Investment Manager entered into the Credit Facility to provide the Falcon Funds with additional borrowing capacity and liquidity to help meet variation margin calls and prevent a forced sale of fund assets by financing counterparties during a period of extreme market distress and falling asset values. Because the size of the Credit Facility was based on then current market conditions and volatility projections, which may change over time, we can give no assurance that the Credit Facility will be of sufficient size to prevent a missed margin call and forced unwind if market conditions continue to deteriorate. The repayment of the Credit Facility is subordinate in right to the claims of other financing counterparties, but senior to the claims of the investors in the Falcon Funds, including the Existing Holders. The Credit Facility may be used for the Falcon Funds' liquidity purposes only and cannot be used to fund redemption payments or distributions to investors.

On March 20, 2008, the Investment Manager announced that because of the Company's low cash position and the ongoing dislocation in the credit markets, it believed that it was advisable and in the best overall interests of the Existing Holders to indefinitely suspend both redemptions from the Falcon Funds (and payments of related redemption proceeds) and semi-annual income distributions in an effort to preserve liquidity. The Investment Manager continues to look for opportunities to sell assets, increase liquidity and reduce leverage across the Company's various strategies to allow the Company to move toward a more defensive position, but the Company has suspended further investment pursuant to the strategies and its activities are now limited to this Exchange Offer and related transactions and the sale of the Company's assets and corresponding liquidation of the Company. The Company's assets are currently allocated to the following five strategies within the credit, residential mortgage-backed, asset-backed and municipal securities markets: (i) relative value preferred securities (approximately 0.5% of total assets as of March 31, 2008), (ii) relative value fixed income (mortgage-backed securities and asset-backed securities) (approximately 62.5% of total assets as of March 31, 2008), (iii) municipal arbitrage (approximately 11.2% of total assets as of March 31, 2008), (iv) opportunistic mortgage-backed securities (approximately 17.2% of total assets as of March 31, 2008) and (v) diversified asset-backed securities (approximately 8.6% of total assets as of March 31, 2008). Because of market illiquidity outside of preferred and municipal arbitrage securities, the

Company's assets are as of the date of this Confidential Memorandum invested primarily in mortgage-backed and asset-backed securities. See "Risk Factors" herein for a discussion of the degrees of risk and uncertainty associated with investments in these securities markets.

The Company does not expect to resume redemptions of Existing Shares or initiate any redemption of Citi Shares (and as a result, Participation Shares) prior to liquidation of the Company. The Company expects the sales of the Company's assets and the liquidation of the Company to be completed over the next twelve to eighteen months, subject to the risks and uncertainties described herein.

### Background and Purpose of the Offer

In connection with our review of the developments identified above and their impact on the Existing Holders, we are undertaking the Exchange Offer to create immediate liquidity for Existing Holders by exchanging Existing Shares for the Exchange Consideration (which represents a premium to the March 31, 2008 net asset value per Existing Share, which varies with respect to each series of Existing Shares (the net asset value as of March 31, 2008 with respect to the series of Existing Shares you own is set forth in Annex A hereto)), and issuing Participation Shares to Existing Holders that are Accredited Investors and make an election to receive such shares, thereby allowing holders of the Participation Shares to continue to participate in certain of the profits, if any, of the Company's portfolio of assets upon the occurrence of a Participation Event. Existing Holders who tender their Existing Shares for exchange will not be exposed to any further losses of the Company, while those who continue to hold Existing Shares may suffer further losses if the net asset value of the Company continues to decline as the Company's assets are liquidated. However, there can be no assurance that any profits on the assets of the Company will be realized or that any such profits will be sufficient to result in any distribution to holders of the Existing Shares or Participation Shares upon the occurrence of an applicable Participation Event, that the Company's liquidation will occur on the timetable anticipated by the Investment Manager, as described herein, or that Existing Holders that do not participate in the Exchange Offer will ultimately realize a greater amount than those Existing Holders that participate in the Exchange Offer. In order for holders of Participation Shares to receive a distribution upon the occurrence of a Participation Event, there will need to be a significant increase in the Company's net asset value as compared to its net asset value as of March 31, 2008. As a result, we currently do not anticipate there being any distribution to holders of Participation Shares upon the occurrence of a Participation Event.

### Transactions Overview

The Exchange Offer and related transactions have two primary components: (1) the exchange of Existing Shares tendered by Existing Holders for the Exchange Consideration and, with respect to Accredited Investors who elect to receive Participation Shares, the Participation Shares, and (2) the sale and issuance to Citi of the Citi Shares equal to the number of Existing Shares accepted for exchange in the Exchange Offer, the proceeds of such issuance will be used to pay the Exchange Consideration. Existing Holders that are not Accredited Investors may participate in the Exchange Offer and receive the Exchange Consideration (but not the Participation Shares) and thereby realize immediate liquidity similar to tendering Existing Holders that are Accredited Investors. In addition, Existing Holders that are Accredited Investors may also elect not to receive Participation Shares. All Existing Holders who wish to tender their Existing Shares in the Exchange Offer, whether or not eligible or electing to receive Participation Shares, will also be required to grant the Release, foregoing any and all legal claims against the Releasees relating to or arising from the acquisition, disposition or ownership of Existing Shares of any series, whether those claims arise under United States federal or state securities laws, arbitration agreements or otherwise and regardless of whether those claims are known or unknown at the time of the exchange. In connection with this Exchange Offer, the Company's LLC Agreement is being amended to set forth the terms of the Participation Shares and the Citi Shares and related matters. Such amendments do not require consent of the Existing Holders.

**Additional Information**

     Falcon Strategies Two LLC is a Delaware limited liability company and was formed in 2004.  Our mailing address is c/o Citigroup Alternative Investments LLC, Attn: Investor Services, 731 Lexington Avenue, 27th Floor, New York, New York 10022.  The telephone number for our office is (212) 783-1330.

**The Exchange Offer**

**Existing Shares**..................................... Shares of limited liability company interest which are divided into nine series (the "Existing Shares") of Portfolio A.

**Participation Shares**............................... The number of shares of the Company's series P limited liability company participation interest (the "Participation Shares") equal to the number of Existing Shares tendered by Accredited Investors (as defined below) that elect to receive Participation Shares in addition to the Exchange Consideration.

**Citi Shares**.............................................. The number of the Company's series C limited liability company interest (the "Citi Shares") equal to the aggregate number of Existing Shares tendered by Existing Holders (whether or not eligible or electing to receive Participation Shares).

**Exchange Consideration** ......................... $0.45 per Existing Share (up to a total of approximately $184.3 million if all outstanding Existing Shares are tendered). The Exchange Consideration represents a premium to the March 31, 2008 net asset value per Existing Share. The net asset value as of March 31, 2008 with respect to the series of Existing Shares you own is set forth in Annex A hereto.

**Release**..................................................... In order to participate in the Exchange Offer, each tendering Existing Holder (whether or not an Accredited Investor and whether or not electing to receive Participation Shares), by executing the Exchange Offer Subscription Agreement, will unconditionally release and discharge any and all claims against the Releasees, relating to or arising from the acquisition, disposition or ownership of Existing Shares of any series, whether those claims arise under United States federal or state securities laws, arbitration agreements or otherwise and regardless of whether those claims are known or unknown at the time of the exchange.

**Exchange Offer**....................................... For each Existing Share of any series outstanding and held by an Accredited Investor (other than certain Citi Affiliated Persons) who properly tenders and does not properly revoke the election to tender Existing Shares prior to the Expiration Date and elects to receive Participation Shares in addition to the Exchange Consideration, we will issue one (1) Participation Share. In addition, subject to the terms, conditions and exceptions described herein, we will pay the Exchange Consideration of $0.45 per share to all Existing Holders (whether or not an Accredited Investor and whether or not electing to receive Participation Shares, and other than certain Citi Affiliated Persons) who tender and do not revoke the election to tender Existing Shares prior to the Expiration Date. Other than in connection with Early Settlement, the Exchange Consideration will be paid only upon consummation of the Exchange Offer. The Company reserves the right to amend the amount of the Exchange Consideration with respect to one or more series of Existing Shares in its sole discretion.

By participating in the Exchange Offer you will, with respect to your investment in the Company, not be allocated further losses of the Company, but your continued investment in the Company is not likely to result in any appreciation or otherwise in a recoupment of your

initial investment.

**Expiration Date** ........................................ The Expiration Date for the Exchange Offer will be 5:00 p.m., New York City time, on June 30, 2008, unless extended with respect to all series of Existing Shares.

**Holders Entitled to Elect to Receive**
**Participation Shares and the**
**Exchange Consideration** ......................... The right to elect to receive Participation Shares in addition to the Exchange Consideration in the Exchange Offer is being offered only to persons who are "accredited investors" as defined in Rule 501(a) of Regulation D under the Securities Act ("Accredited Investors"). Existing Holders that are not Accredited Investors may still participate in the Exchange Offer. Such holders will be entitled to receive the Exchange Consideration but will not be entitled to elect to receive Participation Shares. In addition, Existing Holders that are Accredited Investors may also elect not to receive Participation Shares. All other terms and requirements of the Exchange Offer will remain the same with respect to such holders. Each Existing Holder that wishes to tender his or her Existing Shares in the Exchange Offer must agree in the manner set forth herein and in the Exchange Offer Subscription Agreement to tender all Existing Shares of all series held by such Existing Holder in order to participate in the Exchange Offer.

**Conditions to the Exchange Offer** ........... The Exchange Offer is subject to certain conditions, any or all of which we may waive. The Exchange Offer is not conditioned upon the participation of a minimum number of Existing Holders. See the discussion below under the caption "The Exchange Offer— Conditions to the Exchange Offer" beginning on page 22.

**Procedures for Tendering**
**Existing Shares** ....................................... See "The Exchange Offer—Procedures for Tendering Existing Shares." For further information, please contact the Investment Manager for assistance. No action is required if you decline to participate in the Exchange Offer.

**Revocation of Tendered Existing**
**Shares** ..................................................... Tenders of Existing Shares (including Existing Shares tendered for Early Settlement) of any series may be validly revoked at any time prior to the Expiration Date. See "The Exchange Offer—Revocation Rights" beginning on page 21. A revocation must revoke all Existing Shares of all series held by such holder. A form of notice of revocation is attached as Annex A to the Exchange Offer Subscription Agreement.

**Acceptance of Tenders** ........................... Subject to certain conditions described herein, we will accept any and all Existing Shares of any series from Existing Holders which are properly tendered and which tender is not properly revoked on or prior to the Expiration Date.

Other than with respect to Existing Shares tendered for Early Settlement as described below, we will issue the Participation Shares to Accredited Investors that elect to receive Participation Shares in addition to the Exchange Consideration, and pay the Exchange Consideration to all properly tendering holders, promptly following the Expiration Date upon our determination that the conditions to the

Exchange Offer have been satisfied.

**No Recommendation to Participate
by the Board or Otherwise** ...................... Notwithstanding anything to the contrary contained herein, certain Citi Affiliated Persons are expected to be excluded from participating in the Exchange Offer. Such exclusion from participation should not be construed as a recommendation or view on whether or not you should participate in the Exchange Offer but rather an effort to minimize perceived conflicts of interest associated with affiliates of the Company participating in the Exchange Offer. None of the Company, the Investment Manager, Citi, our Managing Member or any of their respective affiliates is making any recommendation regarding whether you should participate in the Exchange Offer; accordingly, you must make your own determination whether to tender your Existing Shares for exchange.

**Consequences of Not Participating
in the Exchange Offer** ............................. Existing Holders who do not participate in the Exchange Offer will continue to hold their Existing Shares and receive no Exchange Consideration or Participation Shares and not be required to execute the Release. Redemptions with respect to the Existing Shares are not expected to resume prior to liquidation of the Company. Those who continue to hold Existing Shares may suffer further losses if the net asset value of the Company continues to decline as the Company's assets are liquidated. It is unlikely that the net asset value of the Company will increase prior to liquidation to an amount in excess of the Exchange Consideration. However, there can be no assurance that Existing Holders who do not participate in the Exchange Offer will not be in a better position upon liquidation of the Company than those Existing Holders who do participate in the Exchange Offer.

**Early Settlement** ....................................... Existing Holders may elect Early Settlement and receive the Exchange Consideration and Participation Shares, if applicable, by June 6, 2008 with respect to Existing Shares tendered prior to 5:00 p.m. on May 30, 2008 or by June 20, 2008 with respect to Existing Shares tendered after 5:00 p.m. on May 30, 2008 but prior to 5:00 p.m. on June 13, 2008, as more fully described under "The Exchange Offer—Early Settlement" on page 19. Such holders will retain the right to revoke such tenders prior to the Expiration Date by return to the Company of the applicable Exchange Consideration and forfeiture of any Participation Shares received in addition to compliance with the other revocation procedures described herein.

**Certain United States Federal
Income Tax Consequences** ...................... Although there is no direct authority addressing an exchange such as the Exchange Offer, the transaction is expected to be a taxable exchange with respect to the Existing Shares exchanged (or deemed exchanged) for Exchange Consideration, and a non-taxable exchange with respect to the Existing Shares deemed exchanged for Participation Shares, as described more fully under "Certain United States Federal Income Tax Consequences" on page 23. Existing Holders that do not participate in the Exchange Offer will not incur any U.S. federal income tax liability as a result of the consummation of the Exchange Offer.

**The tax consequences to you of the Exchange Offer will depend on your individual situation. You should consult your tax advisor for a full understanding of these tax consequences.**

Use of Proceeds........................................ We will not receive any cash proceeds from the Exchange Offer other than from the concurrent sale of the Citi Shares, the proceeds of which will be used to pay the Exchange Consideration. Any Existing Shares of any series that are properly tendered and accepted pursuant to the Exchange Offer will be considered redeemed.

**Lack of Dealer Manager; Exchange Agent; Information Agent**........................ We are not employing the services of any dealer manager, exchange agent or information agent in connection with the Exchange Offer. No broker, dealer, commercial bank or trust company has been authorized to act as our agent for purposes of the Exchange Offer other than the Managing Member and the Investment Manager.

**Fees and Expenses**.................................. We will bear all expenses related to the Exchange Offer. As a result, you are not required to pay any brokerage commissions or any other fees or expenses to the Company, the Managing Member or the Investment Manager.

**Additional Information**........................... You may obtain additional copies of this Confidential Memorandum or a copy of the LLC Agreement and the proposed amendments thereto, as well as our financial statements for the years ended December 31, 2006 and 2007 and historical net asset values by contacting the Investment Manager at the phone number and address set forth on the back cover of this Confidential Memorandum.

### The Participation Shares

Subject to the terms, conditions and exceptions contained herein, we are offering to exchange the Exchange Consideration plus one Participation Share, if so elected, for each Existing Share of any series validly tendered by any Accredited Investor in accordance with this Confidential Memorandum and the accompanying Exchange Offer Subscription Agreement.

**Participation Allocation**......................... Upon the liquidation of the Company, each Participation Share will be redeemed and, immediately prior to such redemption, each Participation Share will be allocated an amount equal to 75% of the excess by which the then current net asset value per share of the corresponding Citi Share exceeds the Exchange Consideration plus Citi's Cost of Capital (such excess in each case, the "Participation Allocation"), as set forth in the following calculation:

Participation Allocation = (0.75) * ((Net asset value per Citi Share) - (Exchange Consideration + Cost of Capital))

In order for holders of Participation Shares to receive a distribution upon the occurrence of a Participation Event, there will need to be a significant increase in the Company's net asset value as compared to its net asset value as of March 31, 2008. As a result, we currently do not anticipate there being any distribution to holders of Participation Shares upon the occurrence of a Participation Event.

**Allocation of Profits and Losses** ............ Other than as set forth above, the Participation Shares will not be allocated any of the profits or losses of the Company.

**Term** ...................................................... The Participation Shares will remain outstanding until liquidation of the Company or the redemption of the corresponding Citi Shares. Liquidation of the Company is anticipated to occur, in the sole discretion of the Investment Manager and Managing Member, within twelve to eighteen months from the issuance of the Participation Shares, although the term may be longer or shorter.

**Redemption**............................................. If Citi Shares are redeemed prior to the liquidation of the Company, then the same number of Participation Shares will simultaneously be compulsorily redeemed by the Company. Holders of Participation Shares will participate pro rata in any such compulsory redemption, without regard to series, and, immediately prior to such compulsory redemption, the Participation Allocation will be calculated with respect to the Citi Shares to be redeemed. The Participation Allocation will then be distributed with respect to each Participation Share so redeemed at the same time the Citi Shares receive their redemption proceeds. Participation Shares are not otherwise redeemable.

**Voting Rights**.......................................... Participation Shares are non-voting other than with respect to matters directly adversely impacting such Participation Shares. For such matters, Participation Shares will vote as one class with all other classes of limited liability company interest (including in certain circumstances, with holders of Existing Shares and/or holders of Citi Shares) entitled to vote on such matters.

| | |
|---|---|
| **Lack of Transferability** .......................... | Participation Shares may not be directly or indirectly transferred, resold or otherwise hypothecated without the consent of the Investment Manager (which may grant or withhold such consent in its sole discretion) and only to those who meet the same standards as those required to be an Accredited Investor. |
| **Management Fee** ................................... | Participation Shares will not be subject to a management fee. |
| **Incentive Allocation**............................... | Participation Shares will not be subject to an incentive allocation. |

**The Citi Shares**

    Concurrently with the consummation of the Exchange Offer or Early Settlement, as applicable, the Company is selling to Citi a number of series C shares of limited liability company interest equal to the number of Existing Shares accepted for exchange in the Exchange Offer at a purchase price per share equal to the Exchange Consideration, the proceeds of which issuance will be used to pay the Exchange Consideration.

**Participation Deduction** ......................... Upon the liquidation of the Company, each Citi Share will have deducted from the liquidation proceeds, if any, attributable to such Citi Share an amount equal to 75% of the excess by which the then current net asset value per share of such Citi Share exceeds the Exchange Consideration plus an amount equal to the Cost of Capital on the purchase price of such Citi Share (the "Participation Deduction"). To the extent that Citi Shares are issued without corresponding Participation Shares also being issued, such Citi Shares will not be subject to the Participation Deduction upon the occurrence of a Participation Event and Citi will be entitled to retain such amount.

**Allocation of Profits and Losses** ............ Other than as set forth above, the Citi Shares will be allocated their pro rata share of the profits or losses of the Company in the same manner as profits and losses are allocated to the Existing Shares.

**Term** ...................................................... Unless earlier redeemed, the Citi Shares will remain outstanding until liquidation of the Company, which is anticipated to occur, in the sole discretion of the Investment Manager and Managing Member, within twelve to eighteen months from the issuance of the Citi Shares, although such period may be longer or shorter.

**Redemption** ............................................ If Citi Shares are redeemed, then the same number of Participation Shares will simultaneously be compulsorily redeemed. The first Citi Shares eligible for redemption are those with respect to which a corresponding Participation Share was issued. Once all such Citi Shares are redeemed, then Citi Shares issued without a corresponding Participation Share issued may be redeemed. Citi Shares are subject to the same redemption terms as the Existing Shares. The Company expects liquidation to be completed and redemption of the Citi Shares in the next twelve to eighteen months, although such period may be longer or shorter.

**Voting Rights** .......................................... Citi Shares will possess the same voting rights as the Existing Shares and will vote as a single class with all other classes of limited liability company interest entitled to vote on any matter brought to a vote of holders (including in certain circumstances, with holders of Existing Shares and/or holders of Participation Shares).

**Lack of Transferability** .......................... Citi Shares may not be directly or indirectly transferred, resold or otherwise hypothecated without the consent of the Company or Investment Manager (which may grant or withhold such consent in its sole discretion) and only to those who meet the same standards as those required to be an Accredited Investor. Any such transfer shall not impair the Participation Allocation with respect to the Participation Shares.

**Management Fee** .................................... Citi Shares will not be subject to a management fee.

**Incentive Allocation**............................... Citi Shares will not be subject to an incentive allocation.

**Distributions**.......................................... The Company does not intend to make any distribution with respect to the Citi Shares prior to the liquidation of the Company.

# RISK FACTORS

*The decision as to whether to participate in the Exchange Offer involves a high degree of risk and uncertainty. You should carefully consider the risks and uncertainties described below as well as the other information appearing elsewhere in this Confidential Memorandum before making a decision whether to participate in the Exchange Offer. The risks and uncertainties described below are intended to highlight risks and uncertainties that are specific to us but are not the only risks and uncertainties that we face. The Company's investments involve risks, and there can be no assurance that the Company will achieve its objectives or that holders will receive any distribution on the Participation Shares or that Existing Holders that do not participate in the Exchange Offer will not suffer further losses. In considering participation in the Exchange Offer, Existing Holders should consult their independent legal, tax, financial and other advisers, and should be aware of certain considerations and risk factors, which include, but are not limited to, the risks described below.*

*The information in this Confidential Memorandum includes forward-looking statements which involve risks and uncertainties. Our actual results could differ materially from those anticipated in these forward-looking statements as a result of numerous factors, including those described in this section and elsewhere in this Confidential Memorandum and in the Company's financial statements that have been previously provided to investors, including the audited annual financial statements for the year ended December 31, 2007. See "Forward-Looking Statements."*

**Market Effects**

Over the past nine months, an unprecedented wave of volatility has swept through the global fixed income markets, leading to sharp price declines and pushing risk premiums on many credit instruments to record or near-record highs vis-à-vis U.S. treasury securities. In many sectors, buyers have virtually vanished, making it difficult or impractical to sell large blocks of securities without incurring substantial losses. Even the short-term money markets have been disrupted, forcing the Federal Reserve and the world's major central banks to intervene repeatedly. The magnitude of the negative effect of such factors on the liquidity and prices of financial assets in general, or a particular asset, is difficult to predict. The value of the Existing Shares has been negatively impacted by these factors and the return on the sale of the Company's assets upon liquidation will be affected by these conditions. As a result, holders of Participation Shares should not anticipate realizing any distribution on these shares upon the occurrence of a Participation Event.

**General Economic Conditions**

The crisis in the financial markets has had an adverse affect on many investments, particularly those using leveraged strategies to take advantage of expected risk relationships or market inefficiencies. Various funds, including the sub-funds in which the Company invests (the "Funds"), using such leveraged strategies may be vulnerable to requests for additional collateral, or margin calls, when market conditions deteriorate. While fund managers can and often do seek short-term financing to ride out temporary bouts of illiquidity due to a lack of buyers, under current conditions, financing can be difficult or impossible to arrange. This has forced many funds, including the Funds, to sell assets into sharply declining markets. The return on the sale of the Company's assets upon liquidation will be affected by these conditions, which could impair the Company's ability to sell investments at or above the price at which they were purchased and therefore raise amounts sufficient to make distributions to holders of Participation Shares upon the occurrence of a Participation Event. These conditions may also continue to negatively impact the value of the Existing Shares.

**Liquidity**

Beginning in August 2007, the global bond markets began experiencing a reduction in the availability of credit. Over the following months, this credit crunch rapidly accelerated due to a combination of many factors, including falling asset values, forced de-leveraging and low trading activity in what has become a vicious cycle of de-leveraging across the financial system. These market conditions have severely impacted the cash position and net asset value of the Existing Shares (the net asset value as of March 31, 2008 with respect to the series of Existing Shares you own is set forth in Annex A hereto) and there can be no assurance that such conditions will not result in further losses to Existing Holders that do not participate in the Exchange Offer or impact the ability of holders of Participation Shares to receive a distribution upon the occurrence of a Participation Event.

As a result, the Investment Manager has indefinitely suspended both redemptions from the Company (and payments of related redemption proceeds) and semi-annual income distributions in an effort to preserve liquidity and does

not expect to allow redemptions to resume before the liquidation of the Company. The Investment Manager continues to look for opportunities to sell assets, increase liquidity and reduce leverage across the Company's various strategies to allow the Company to move toward a more defensive position, but the Company has now suspended further investment pursuant to the strategies and its activities are now limited to this Exchange Offer and related transactions and the sale of the Company's assets and the corresponding liquidation of the Company, which the Company expects to complete over the next twelve to eighteen months. There can be no guarantee that liquidation will occur in that timetable.

While the Existing Shares are being exchanged for the Exchange Consideration, representing a premium to the March 31, 2008 net asset value per Existing Share which varies with respect to each series of Existing Shares and, in certain circumstances, Participation Shares, such consideration represents substantially less than the initial per share investment of the Existing Holders and it is unlikely that Existing Holders who receive Participation Shares will receive any additional distribution upon the occurrence of a Participation Event. Existing Holders who retain their Existing Shares may receive more or less per share upon redemption or the liquidation of the Company than the aggregate of the Exchange Consideration plus any Participation Allocation (which will be determined by Citi and may vary both due to various market, economic and other factors as well as by fluctuations in 3-month LIBOR affecting the Cost of Capital), depending on the amounts received upon the sale of the Company's assets. Existing Holders that are not Accredited Investors and Accredited Investors who do not elect to receive Participation Shares will not receive any distributions other than the Exchange Consideration upon their tender of Existing Shares. In order for holders of Participation Shares to receive a distribution upon the occurrence of a Participation Event, there will need to be a significant increase in the Company's net asset value as compared to its net asset value as of March 31, 2008. As a result, we currently do not anticipate there being any distribution to holders of Participation Shares upon the occurrence of a Participation Event.

**Risk of Loss**

By participating in the Exchange Offer you will, with respect to your investment in the Company, not be allocated further losses of the Company, but your continued investment in the Company through ownership of Participation Shares, if applicable, is not likely to result in any appreciation or otherwise in a recoupment of your initial investment. As of March 31, 2008, the net asset value per Existing Share, which varies with respect to each series of Existing Shares, was substantially below the initial investment price. It is unlikely that the Company's assets will be sold at or above the price at which they were purchased and may decline in value before they are sold. Existing Holders that are not Accredited Investors, or Existing Holders who are Accredited Investors but elect not to receive Participation Shares, that participate in the Exchange Offer will not receive any further distributions. Existing Holders who elect not to participate in the Exchange Offer and retain their Existing Shares may suffer further losses if the net asset value of the Company continues to decline as the assets are liquidated, while in the likely scenario that assets are sold at prices that are less than the sum of the Exchange Consideration and the Cost of Capital (which will be determined by Citi and may vary both due to various market, economic and other factors as well as by fluctuations in 3-month LIBOR affecting the Cost of Capital), those Existing Holders who receive Participation Shares in exchange for Existing Shares are unlikely to realize any Participation Allocation. While we do not expect the Cost of Capital to change materially from its initial percentage (9%), we have not set any maximum percentage above which the Cost of Capital may not rise.

**Margin Call Risk**

On February 20, 2008, the Investment Manager entered into the approximately $500 million 364 day secured Credit Facility (the "Credit Facility") with the Falcon Funds, including the Company, and Falcon Strategies LLC. As of March 31, 2008, the Falcon Funds had drawn an aggregate of approximately $335 million under the Credit Facility (which is attributable pro rata to each of the Falcon Funds). The Investment Manager entered into the Credit Facility to provide the Falcon Funds with additional borrowing capacity and liquidity to help meet variation margin calls and prevent a forced sale of fund assets by financing counterparties during a period of extreme market distress and falling asset values. The Credit Facility may be used for the Falcon Funds' liquidity purposes only and cannot be used to fund redemption payments or distributions to investors. Because the size of the Credit Facility was based on then current market conditions and volatility projections, which may change over time, we can give no assurance that the Credit Facility will be of sufficient size to prevent a missed margin call and forced unwind if market conditions continue to deteriorate. If future margin calls exceed the amount the Company is able to borrow under the Credit Facility, we may be forced to sell assets at disadvantageous prices to meet such margin calls and there may not be any additional funds for distribution upon liquidation of the Company. Neither the Investment Manager, nor any of its affiliates, has any obligation to provide further credit or financial support to the Company and there should be no expectation that it will do so.

14

**Risk of Litigation and Release of Liability**

On April 4, 2008 an investor in Falcon Strategies Two B LLC ("Falcon Two B"), one of the Falcon Funds, filed a class action complaint against Falcon Two B, Citi and the Investment Manager in the U.S. District Court for the Southern District of Florida, for common law fraud, violations of Florida blue sky law, negligent misrepresentation and violations of Section 12(a)(2) of the Securities Act. The complaint alleges that the Investment Manager misrepresented the level of risk of its investment strategy and that Falcon Two B and the Investment Manager were aware and knew high risk investment and management strategies were being undertaken in managing Falcon Two B, but failed to disclose those investment strategies to the existing investors and continued to market the fund as a low risk investment tool to investors. The plaintiff seeks compensatory and punitive damages, as well as disgorgement of profits and commissions, reimbursement of legal fees and expenses, restitution and rescission. There can be no assurance that similar suits and claims will not be made against the Company. Additionally, the Investment Manager or any individuals selected to advise and manage Funds (each such individual, an "Advisor") might become involved in litigation as a result of investments made by the Company or any other Falcon Fund. Under such circumstances, the Company and/or the Falcon Funds could be named as a defendant in a lawsuit or regulatory action. Citi is currently responding to a U.S. regulatory inquiry relating to Falcon Two B, Citi, and certain other funds sponsored by, and entities affiliated with, Citi.

You are releasing various parties, including without limitation the Company, the Investment Manager and any Advisor, from liability in connection with any investment loss in respect of your Existing Shares in order to participate in the Exchange Offer; although you are not releasing such parties to the extent, and with respect to, equity interests you may own in any other Falcon Fund. In addition, to the extent that you or others have claims against us or any Releasee in connection with your or their Existing Shares and choose to litigate such claims, including the claim described above with respect to Falcon Two B or similar claims that may be brought against one or more of the Falcon Funds, including the Company, you will not be able to pursue any such claims or participate in any award or settlement which may be obtained as a result of such litigation, which award or settlement may include compensatory and punitive damages, as well as disgorgement of profits and commissions, reimbursement of legal fees and expenses, restoration and rescission. Any damages required to be paid by the Company will reduce the funds available, if any, for distribution on the Participation Shares upon the occurrence of a Participation Event.

**Valuation**

As a result of the ongoing dislocation in the credit markets described above, the net asset value of the Existing Shares may not reflect the amount that may be received by the Company for its assets upon their liquidation. This is particularly the case given the Company's investments in mortgage-backed and asset-backed securities and collateralized debt obligations, which asset classes could be subject to valuation adjustments as a result of the factors described herein. To the extent that the Company is able to sell such assets for more than their currently reported value, Existing Holders who do not tender their Existing Shares may be entitled to per share distributions that are greater than the aggregate of the Exchange Consideration plus the Participation Allocation, if applicable and if any. We can make no assurance that, upon the occurrence of a Participation Event, Existing Holders who participate in the Exchange Offer will be in a better position than Existing Holders who choose not to participate and receive a direct per share liquidation distribution of the proceeds of the sale of assets.

**Lack of Control**

The Managing Member of the Company is AMACAR GP, Inc., a Delaware corporation. Subject to the provisions of the LLC Agreement, as amended in connection with this Exchange Offer, the Managing Member delegates substantially all authority to manage the day-to-day operations and the assets of the Company to the Investment Manager pursuant to an investment management agreement (the "Investment Management Agreement"). The holders of Participation Shares will not be entitled to make decisions with respect to the management, disposition or other realization of any investment made by the Company, or regarding the Company's business and affairs. In addition, because the Participation Shares are non-voting other than with respect to matters directly and adversely impacting the Participation Shares, their holders will not be able to determine the outcome of matters submitted to a vote of our members for approval and will not be able to cause or prevent a change in control and, following the Exchange Offer, holders of Existing Shares and Citi Shares will control 100% of all voting interests of the Company.

**Non-Transferability of Shares**

The Participation Shares represent highly illiquid investments. You will not be permitted to directly or indirectly transfer, resell or otherwise hypothecate your Participation Shares (or Existing Shares) without the prior written consent of the Company or Investment Manager, which may be withheld in their sole discretion, and the satisfaction of certain other conditions, including compliance with applicable securities laws. You should not expect the Company or Investment Manager to grant their consent to transfers. There is currently no market for any series of Participation Shares, and it is not contemplated that one will develop. You may not be able to liquidate your investment in the event of an emergency or for any other reason, and your Participation Shares may not be readily accepted as collateral for a loan.

**Possible Alternative Characterizations of the Exchange Offer for U.S. Federal Income Tax Purposes**

Although there is no direct authority addressing an exchange such as the Exchange Offer, the transaction is expected to be a taxable exchange with respect to the Existing Shares exchanged (or deemed exchanged) for Exchange Consideration, and a non-taxable exchange with respect to the Existing Shares deemed exchanged for Participation Shares, as described more fully under "Certain United States Federal Income Tax Consequences" below.

You should be aware that the proper U.S. federal income tax treatment of, and the consequences arising from, the receipt of the Participation Shares is uncertain and subject to multiple potential characterizations under current law, including for example, treatment of the Participation Shares as a contractual right calling for a contingent payment to which Section 483 of the U.S. Internal Revenue Code of 1986, as amended (the "Code"), might apply and in which case the exchange would be a taxable exchange in its entirety, and a portion of any gain subsequently recognized in respect of the Participation Shares may be treated as ordinary income. There can be no assurance that the U.S. Internal Revenue Service ("IRS") will not assert that another characterization properly applies to the receipt of the Participation Shares. You are urged to consult your tax advisor regarding the consequences to you arising from an election to receive Participation Shares in the Exchange Offer, particularly as regards the various potential characterizations.

Further, if you exchange your Existing Shares pursuant to the Exchange Offer, (whether or not you are eligible or elect to receive Participation Shares), a portion of the Exchange Consideration paid to you may be deemed a payment for your release and assignment of claims. The proper treatment for U.S. federal income tax purposes of your receipt of any deemed payments for your release and assignment of claims is uncertain. No opinion or assurance can be given that the IRS will not challenge the treatment of any deemed payments for your release and assignment of claims as additional consideration for surrender of the Existing Shares, and assert that such amount should be treated as an ordinary income payment in exchange for your release and/or assignment of current and future claims. You should consult your tax advisor regarding the tax consequences to you with respect to your right to, and your receipt of, any deemed payments for your release and assignment of claims.

**Illiquidity of Underlying Investments**

Certain of the Funds in which the Company invests hold illiquid investments. Illiquidity increases risk and may make it impossible to close out positions against which the market is moving, as well as cause delays in the payment of withdrawal proceeds to the Company. Lack of liquidity can make it economically unfeasible for a Fund to recognize profits or limit losses on open positions.

In particular, certain Funds have invested in restricted, as well as thinly traded, securities (including privately placed securities, which are subject to resale restrictions). This illiquidity has further restricted the ability of our Funds to dispose of such securities in a timely fashion and at a fair price. In some cases, there is no trading market for these securities, and the Funds would be forced to liquidate these positions, if at all possible, at disadvantageous prices. As such, the Funds have been forced to hold such securities despite adverse price movements. Funds may have also sold securities at unfavorable prices, however, in order to fund redemptions or reallocations from such Fund, leading to additional losses. In addition, Funds which have made short sales of illiquid securities may have had difficulties in covering the short sales, resulting in potentially unlimited losses on those positions. Continuing illiquidity may reduce the chances of favorable sales of our remaining investments and, as a result, reduce the chances that you will receive any distribution on your Participation Shares upon the occurrence of a Participation Event as well as continue to negatively impact the value of the Existing Shares.

**Key Personnel**

As noted above, the Investment Manager manages the operations of the Company. The members of the Company are not entitled to make decisions with respect to the management, disposition or other realization of any investment made by the Company, or regarding the Company's business and affairs. Consequently, the success of the sale of the Company's assets and corresponding liquidation depends, in large part, upon the skill and expertise of the individuals employed by the Investment Manager.

**Conflicts of Interest**

Citigroup Inc. and its affiliates (collectively, for purposes of this section, "Citigroup") engage in a broad spectrum of activities, including insurance, banking, underwriting, private equity and financial advisory activities, and have extensive investment activities that are independent from, and may from time to time conflict with those of, the Company or its shareholders. For example, Citigroup may have participated in advising Existing Holders in the purchase of Existing Shares and now has authority on behalf of the Company in the Exchange Offer relating to such shares. There may also be instances where the interests of Citigroup conflict with the interests of the Company or the Funds. Citi is also purchasing the Citi Shares concurrently with this offering, and may have interests that differ from those of the Existing Holders as a result of the ownership of the Citi Shares. Certain affiliates of the Investment Manager may engage in transactions with, and may provide services to, the Advisors or to funds in which the Company has invested or may potentially invest, and will receive compensation from such entities. The Investment Manager and its affiliates may also provide services to, invest in, advise, sponsor or act as investment manager to investment vehicles and other person or entities that may have similar structures and investment objectives and policies to those of the Company, that may compete with the Company and Funds for investment opportunities and that may co-invest with the Company in certain transactions.

The activities of Citigroup may also restrict or preclude the Investment Manager, and therefore the Company, from pursuing certain investment opportunities and from taking certain actions with respect to a particular investment. In addition to investment management services, affiliates of the Investment Manager may provide services to the Company or to the Advisors, including, without limitation, brokerage and custodial services and moneys held by the Company may be invested in instruments issued by Citigroup and money market funds managed by Citigroup.

Any such activities may create a conflict of interest between the Company and Citigroup, including the Investment Manager and the Advisors. We can give no assurance that, to the extent conflicts arise between the interests of the Company and those of Citigroup, such conflicts will be resolved in our favor.

**Other Clients of Advisors**

In addition to the Funds, the Advisors generally will manage other accounts (including other accounts in which the Advisors may have an interest) and may have financial and other incentives to favor such accounts over the Funds. In investing on behalf of a number of different clients, Advisors may face limits on their management resources, as well as limited market opportunities. These limitations and increased competition for the same market opportunities could make it difficult or impossible for a Fund to liquidate a particular position at a price indicated by an Advisor's strategy.

# THE EXCHANGE OFFER

**General**

Upon the terms, conditions and exceptions set forth in this Confidential Memorandum, we are offering Existing Holders the Exchange Consideration in exchange for outstanding Existing Shares validly tendered and whose tender is not revoked prior to the Expiration Date as described below. Existing Holders that are Accredited Investors that participate in the Exchange Offer may also elect to receive one Participation Share of a corresponding series for every Existing Share validly tendered, in addition to the Exchange Consideration. Existing Holders who are not Accredited Investors who participate in the Exchange Offer will receive the Exchange Consideration in exchange for outstanding Existing Shares validly tendered and not revoked prior to the Expiration Date, but are not eligible to elect to receive Participation Shares. All Existing Holders that wish to tender their Existing Shares in the Exchange Offer will be required to execute the Release, releasing and discharging any and all claims against the Releasees relating to or arising from the acquisition, disposition or ownership of the Existing Shares of any series, whether those claims arise under federal or state securities laws or otherwise. Each Existing Holder who wishes to tender his or her Existing Shares in the Exchange Offer must agree in the manner set forth herein and in the Exchange Offer Subscription Agreement to tender all Existing Shares held by such Existing Holder in order to participate in the Exchange Offer, regardless of any Early Settlement election. The Exchange Consideration represents a premium to the March 31, 2008 net asset value per Existing Share, which premium varies slightly with respect to each series of Existing Shares based upon the slight variance in March 31, 2008 net asset value for each series. The net asset value as of March 31, 2008 with respect to the series of Existing Shares that you own is set forth in Annex A hereto.

Existing Shares tendered for exchange in the Exchange Offer will be considered redeemed upon acceptance and consummation of the Exchange Offer by the Company, subject to revocation in the case of Existing Shares tendered for Early Settlement. Concurrently with the Exchange Offer (including upon any Early Settlement), the Company will sell such number of Citi Shares to Citi representing a number of shares equal to the number of Existing Shares tendered in the Exchange Offer (whether or not tendered by Existing Holders who elect to receive Participation Shares), for a purchase price of $0.45 per Citi Share, the proceeds of which will be used to pay the Exchange Consideration. In the case of a validly revoked tender by an Existing Holder participating in Early Settlement, the Citi Shares corresponding to such revoked Existing Shares will be cancelled and the purchase price for such Citi Shares will be returned to Citi.

This Confidential Memorandum, together with the Exchange Offer Subscription Agreement, is being sent to all registered holders of Existing Shares as of May 8, 2008. The Company reserves the right to amend the terms of this Exchange Offer in its sole discretion. The Exchange Offer is not conditioned upon the participation of a minimum number of Existing Holders. In addition, our obligation to accept Existing Shares for exchange in the Exchange Offer is subject to the satisfaction of the conditions set forth hereunder "—Conditions to the Exchange Offer," any or all of which we may waive in our sole discretion.

None of the Company, the Investment Manager, Citi, our Managing Member or any of their respective affiliates is making any recommendation regarding whether you or any Existing Holder should participate in the Exchange Offer, and, accordingly, you must make your own determination whether to participate in the Exchange Offer. Notwithstanding anything to the contrary contained herein, certain Citi Affiliated Persons are expected to be excluded from participating in the Exchange Offer (and as a result, any Citi Affiliated Person that receives this Confidential Memorandum should not deem such receipt as an invitation to participate in the Exchange Offer). Such exclusion from participation should not be construed as a recommendation or view on whether or not you should participate in the Exchange Offer but rather an effort to minimize perceived conflicts of interest associated with affiliates of the Company participating in the Exchange Offer.

Existing Shares of any series will be deemed to have been accepted as validly tendered if, as and when we have given oral or written notice thereof to the Investment Manager. The Investment Manager will act as agent for tendering Existing Holders in delivering the Participation Shares and/or the Exchange Consideration to such Existing Holders.

We and our affiliates reserve the right to purchase or make offers for any Existing Shares of any series that remain outstanding subsequent to the Expiration Date or, as set forth under "—Conditions to the Exchange Offer," to terminate the Exchange Offer, or, after the Expiration Date, to redeem any series of Existing Shares as a whole or in part and from time to time, as permitted by the LLC Agreement, and to the extent permitted by applicable law, purchase Existing Shares in privately negotiated transactions or otherwise. Following consummation of the Exchange Offer, the terms of any such redemptions, purchases or offers could differ from the terms of the Exchange Offer.

Tendering holders of Existing Shares of any series will not be required to pay brokerage commissions or fees or, subject to the instructions in the Exchange Offer Subscription Agreement, transfer taxes with respect to the receipt of the Participation Shares in exchange for Existing Shares pursuant to the Exchange Offer.  We will pay all charges and expenses, other than certain applicable taxes, in connection with the Exchange Offer.  See "—Fees and Expenses" below.

**Expiration Date; Extensions; Amendments**

The Expiration Date is 5:00 p.m., New York City time on June 30, 2008, unless the Exchange Offer period is extended with respect to all series of Existing Shares, in which case the Expiration Date will be the last date to which the Exchange Offer is extended.  We may extend the Exchange Offer from time to time, in our sole discretion, for any purpose including without limitation to permit the satisfaction or waiver of all conditions to the Exchange Offer.

We expressly reserve the right to (i) delay acceptance of any Existing Shares, extend the Exchange Offer or terminate the Exchange Offer and not accept Existing Shares not previously accepted if any of the conditions set forth herein under "—Conditions to the Exchange Offer" shall have not been waived or satisfied prior to the Expiration Date, and (ii) amend at any time, or from time to time, the terms of the Exchange Offer.  To extend the Expiration Date, the Company will so notify the Investment Manager and the Existing Holders in writing or orally and will make a public announcement thereof, not later than 9:00 a.m., New York City time, on the next business day after the previously scheduled Expiration Date.  If the Exchange Offer is amended in a manner determined by us to constitute a material change, we will promptly disclose such amendment in a manner reasonably calculated to inform the Existing Holders of such amendment.

The minimum period during which the Exchange Offer will remain open following material changes in the terms of such Exchange Offer or in the information concerning such Exchange Offer (other than a change in Exchange Consideration) will depend upon the facts and circumstances of such change, including the relative materiality of the terms or information changes.  With respect to any change in the Exchange Consideration, a minimum ten business-day extension period will be made to allow for adequate dissemination of such change.  If any of the terms of the Exchange Offer, or the terms of the Participation Shares, are amended in a manner we determine to constitute a material change adversely affecting any Existing Holder, we will promptly disclose any such amendment in a manner reasonably calculated to inform such Existing Holders of such amendment and we will extend the Exchange Offer period for a time period which we, in our sole discretion, deem appropriate, depending upon the significance of the amendment and the manner of disclosure to holders of Existing Shares, if the Exchange Offer period would otherwise expire during such time period.  Existing Holders who tender their Existing Shares for Early Settlement will receive the benefit of any amendment to the Exchange Offer, including but not limited to any increase in Exchange Consideration or change in the terms of Participation Shares, and will retain revocation rights until the Expiration Date, including any extension.

**Early Settlement**

Existing Holders may elect Early Settlement and receive the Exchange Consideration and Participation Shares, if applicable, by June 6, 2008 with respect to Existing Shares tendered prior to 5:00 p.m. (New York City time) on May 30, 2008 or by June 20, 2008 with respect to Existing Shares tendered prior to 5:00 p.m. (New York City time) on June 13, 2008.  Such holders will retain the right to revoke such tenders prior to the Expiration Date by return to the Company of such Exchange Consideration and forfeiture of any Participation Shares received in addition to compliance with the other revocation procedures described herein.  See "—Revocation Rights" below.  You should consult your tax advisor regarding the tax consequences to you with respect to the revocation of any Existing Shares tendered and accepted for Early Settlement.

Existing Holders who desire to participate in Early Settlement should so indicate by marking the appropriate boxes in, and signing and dating, the accompanying Exchange Offer Subscription Agreement.

Existing Holders who have tendered Existing Shares for Early Settlement who wish to revoke such tenders must also return the Exchange Consideration received prior to the Expiration Date.  Upon acceptance by the Company of a valid notice of revocation and return of the Exchange Consideration, the Citi Shares issued and corresponding to such revoked Existing Shares will be cancelled, any Participation Shares received pursuant to such Early Settlement will be rescinded and an equal number of Existing Shares of the applicable series will be re-credited to such holders' account on the books and records of the Company.  The capital accounts of such holders will be re-established in the same amount as immediately prior to their previous tenders.

**Procedures for Tendering Existing Shares in the Exchange Offer**

All Exchange Offer Subscription Agreements that are validly delivered and not validly revoked will be given effect in accordance with the specifications therein. Tenders of Existing Shares may only be made with respect to all of the Existing Shares owned by such Existing Holder and such Existing Holder must also execute the Release. Elections with respect to receipt of Participation Shares shall apply to all Existing Shares tendered. In order to change an election after delivering a completed Exchange Offer Subscription Agreement, Existing Holders must properly revoke their prior tender by following the procedures described under "—Revocation Rights" (and, if applicable "—Early Settlement") and then resubmit a new Exchange Offer Subscription Agreement.

Existing Holders who desire to participate in the Exchange Offer should so indicate by marking the appropriate boxes in, and signing and dating, the accompanying Exchange Offer Subscription Agreement and Release and any other required attachments thereto, and delivering such items in accordance with the instructions contained herein and therein. Unless all of the appropriate boxes in the Exchange Offer Subscription Agreement are checked, the Existing Holder will not be deemed to have tendered his or her Existing Shares in the Exchange Offer or granted the Release.

The Exchange Offer Subscription Agreement must be executed in exactly the same manner as the name of the Existing Holder appears on the books and records of the Company. **If Existing Shares are held of record by two or more joint Existing Holders, all such Existing Holders must sign the Exchange Offer Subscription Agreement and Release.** If a signature is by a trustee, executor, administrator, guardian, attorney-in-fact, officer of a corporation or other Existing Holder acting in a fiduciary or representative capacity, such person should so indicate when signing. If an Existing Holder has Existing Shares registered in different names, separate Exchange Offer Subscription Agreements and corresponding Releases must be executed covering each form of registration. If an Exchange Offer Subscription Agreement is executed by a person other than the Existing Holder, then such person must have been authorized by proxy or in some other manner acceptable to the Company to execute the Exchange Offer Subscription Agreement with respect to the applicable Existing Shares on behalf of the Existing Holder, but the corresponding Release must be executed by the Existing Holder. If shares of one series of Existing Shares are held in a manner different than the shares of another series of Existing Shares, then an Exchange Offer Subscription Agreement and corresponding Release will be required for each series of Existing Shares.

An Existing Holder must complete, sign and date the Exchange Offer Subscription Agreement and Release (or photocopies thereof) and deliver such Exchange Offer Subscription Agreement and Release and any other required documentation by mail, first-class postage prepaid, hand delivery, overnight courier or by facsimile transmission (with an original to be delivered subsequently) to the appropriate address or number set forth in the Exchange Offer Subscription Agreement. Delivery of Exchange Offer Subscription Agreements and other applicable documentation should be made sufficiently in advance of the Expiration Date to assure that the Exchange Offer Subscription Agreements are received prior to the Expiration Date (and, in the case of facsimile transmission, that the original Exchange Offer Subscription Agreements are received by the appropriate party prior to 5:00 p.m., New York City time, on the second business day following the Expiration Date) or the applicable date of Early Settlement, as applicable.

The Company reserves the right to receive Exchange Offer Subscription Agreements by any other reasonable means or in any form that reasonably evidences the tender of Existing Shares and the granting of the Release.

All questions as to the validity, form, eligibility (including time of receipt), acceptance and revocations of tender of Existing Shares will be resolved by the Company, whose determination will be binding. The Company reserves the absolute right to reject any or all Exchange Offer Subscription Agreements and revocations thereof that are not in proper form or the acceptance of which could, in the opinion of the Company's counsel, be unlawful. The Company also reserves the right to waive any irregularities in connection with deliveries of Exchange Offer Subscription Agreements, which the Company may require to be cured within such time as the Company determines. Neither the Company, the Managing Member, the Investment Manager, the Administrator nor any other person shall have any duty to give notification of any such irregularities or waiver, nor shall any of them incur any liability for failure to give such notification. Deliveries of Exchange Offer Subscription Agreements or notices of revocation will not be deemed to have been made until such irregularities have been cured or waived. The Company, in its sole discretion, may waive any irregularities in any deliveries of Exchange Offer Subscription Agreements, which may include irregularities in how or when Exchange Offer Subscription Agreements are delivered. The Company's interpretation of the terms and conditions of the Exchange Offer (including this Confidential Memorandum and the accompanying Exchange Offer Subscription Agreement and the instructions hereto and thereto) will be final and binding on all parties.

**Acceptance of Existing Shares for Exchange; Delivery of Participation Shares and/or Exchange Consideration**

Subject to the limitations set forth herein, upon satisfaction or waiver of all of the conditions to the Exchange Offer, all Existing Shares properly tendered and not revoked will be accepted, and the Participation Shares, if applicable, will be issued and payment of the Exchange Consideration will be made promptly after acceptance of the Existing Shares, which, in the case of Existing Holders who elect Early Settlement and do not validly revoke such tenders, will be by May ●, 2008, June 6, 2008 or June 20, 2008 with respect to shares tendered for Early Settlement prior to 5:00 p.m. on May ●, 2008, May 30, 2008 or June 13, 2008, respectively, and for other Existing Shares, promptly after the Expiration Date. See "—Conditions to the Exchange Offer." For purposes of the Exchange Offer, Existing Shares shall be deemed to have been accepted as validly tendered for exchange when, as and if we have given oral or written notice thereof to the Investment Manager. For each Existing Share tendered for exchange by an Accredited Investor that elects to receive Participation Shares, such holder will receive one Participation Share and the Exchange Consideration. For each Existing Share tendered by an Existing Holder that is not an Accredited Investor or is an Accredited Investor who has not elected to receive Participation Shares, the holder will receive the Exchange Consideration. Exchange Consideration will be paid by wire transfer to the Smith Barney or Citi Private Bank account(s) in which the Existing Shares to be exchanged are held and Participation Shares, if applicable, will be credited to such account.

In all cases, issuances of Participation Shares for Existing Shares that are accepted for exchange pursuant to the Exchange Offer will be made only after timely receipt of a properly completed and duly executed Exchange Offer Subscription Agreement and all other required documents in accordance with the terms thereof.

If any tendered Existing Shares are not accepted for any reason set forth under "—Conditions to the Exchange Offer," such unaccepted or such unexchanged Existing Shares will be credited to the account of the applicable Existing Holder in the name of the Existing Holder of such Existing Shares on the books and records of the Company as promptly as practicable after the expiration or termination of the Exchange Offer with respect to the applicable series of Existing Shares.

**Revocation Rights**

Tenders of Existing Shares (including Existing Shares tendered for Early Settlement) may be revoked at any time prior to the Expiration Date.

For a revocation of a tender to be effective, a written notice of revocation (the form of which is attached as Annex A to the Exchange Offer Subscription Agreement) must be received by the appropriate party prior to the Expiration Date in accordance with the instructions set forth in the Exchange Offer Subscription Agreement. Any such notice of revocation must:

- specify the name of the person that tendered the Existing Shares to be revoked;

- state that the tender of all Existing Shares previously made are to be revoked (and to be effective all of such Existing Holder's Existing Shares (across all series) must be revoked);

- contain a statement that such Existing Holder is revoking its election to tender such Existing Shares;

- be signed by the holder in the same manner as the original signature on the Exchange Offer Subscription Agreement by which such Existing Shares were tendered, or be accompanied by documents of transfer, acceptable to the Investment Manager, to have the Administrator register the transfer of such Existing Shares in the name of the person revoking the tender; and

- specify the name in which such Existing Shares are registered, if different from the person who tendered such shares.

All questions as to the validity, form, eligibility and time of receipt of such notice will be determined by us, and our determination shall be final and binding on all parties. Any Existing Shares so revoked will be deemed not to have been validly tendered for exchange for purposes of the Exchange Offer and the corresponding Release shall be voided. Any Existing Shares that have been tendered for exchange but are not exchanged for any reason will be credited to an account in the name of the Existing Holder of such Existing Shares on the books and records of the Company for the Existing Shares as soon as practicable after revocation, rejection of tender or termination of the Exchange Offer with

21

respect to the Existing Holder. Properly revoked Existing Shares may be retendered by following the procedures described under "—Procedures for Tendering Existing Shares in the Exchange Offer" above at any time prior to the Expiration Date including execution of a new Release.

**Conditions to the Exchange Offer**

Notwithstanding any other provision of the Exchange Offer, or any extension of the Exchange Offer, we shall not be required to accept for exchange any Existing Shares, issue any Participation Shares or make any payment of the Exchange Consideration, and we may terminate or amend the Exchange Offer, if at any time prior to the consummation of the Exchange Offer, we determine, in our reasonable judgment, that any of the following conditions has not been satisfied, prior to or concurrently with such consummation of the Exchange Offer:

- the completion of the other components of the related transactions, including the closing of the offer and sale of the Citi Shares;

- our assets would not be treated as assets of any "employee benefit plan" as defined in and subject to ERISA or of any "plan" subject to Section 4975 of the Code none of the transactions contemplated under the Exchange Offer constitute or give rise to a non-exempt prohibited transaction as defined in Section 406 of ERISA or Section 4975(c) of the Code for any purpose of ERISA or Section 4975 of the Code.

- there shall not have occurred or be likely to occur any event affecting our business or financial affairs that would or might prohibit, prevent, restrict or delay consummation of the Exchange Offer and related transactions as a whole, or that will, or is reasonably likely to, impair the contemplated benefits to us of the Exchange Offer and related transactions as a whole or that might be material to the Existing Holders of a series of Existing Shares in deciding whether to accept the Exchange Offer; and

- there shall not have been any action taken or threatened, or any statute, rule, regulation, judgment, order, stay, decree or injunction promulgated, enacted, entered, enforced or deemed applicable to the Exchange Offer or related transactions or the exchange of Existing Shares or issuance of Participation Shares or payment of Exchange Consideration pursuant to the Exchange Offer, by or before any court or governmental regulatory or administrative agency or authority, tribunal, domestic or foreign, which (1) challenges the making of the Exchange Offer or the related transactions as a whole or might, directly or indirectly, prohibit, prevent, restrict or delay consummation of, or might otherwise adversely affect in any material manner, the Exchange Offer or the related transactions as a whole or (2) could materially adversely affect our business, condition (financial or otherwise), income, operations, properties, assets, liabilities or prospects, or materially impair the contemplated benefits of the Exchange Offer or the related transactions as a whole to us or that might be material to Existing Holders of a series of Existing Shares in deciding whether to accept such Exchange Offer.

The foregoing conditions are for our sole benefit and may be asserted by us regardless of the circumstances giving rise to any such condition (including any action or inaction by us) or may be waived by us, in whole or in part, at any time and from time to time, in our sole discretion. The failure by us at any time to exercise any of the foregoing rights shall not be deemed a waiver of any such right and each such right shall be deemed an ongoing right which may be asserted at any time and from time to time by us. If we terminate or revoke the Exchange Offer, Participation Shares issued pursuant to Early Settlement will be rescinded and an equal number of Existing Shares will be re-credited to each applicable Existing Holder's account on the books and records of the Company, and each such Existing Holder will be required to return all Exchange Consideration previously received. The capital accounts of such holders will be re-established in the same amount as immediately prior to their previous tenders.

**Fees and Expenses**

We will pay the aggregate Exchange Consideration to those Existing Holders who validly tender and do not revoke their Existing Shares prior to the Exchange Date with the proceeds of the offer and sale of the Citi Shares.

Additionally, we will pay all transfer taxes, if any, applicable to the exchange of Existing Shares pursuant to the Exchange Offer. Existing Holders of Existing Shares of any series will not be required to pay a redemption fee on the exchange of Existing Shares pursuant to the Exchange Offer. If, however, Participation Shares or Existing Shares of any series are to be issued in the name of any person other than the registered holder of the Existing Shares tendered for principal amounts not tendered or accepted for exchange or if tendered Existing Shares are registered in the name of any

person other than the person signing the Exchange Offer Subscription Agreement, or if a transfer tax is imposed for any reason other than the exchange of Existing Shares pursuant to the Exchange Offer, then the amount of any such transfer taxes imposed on the registered holder or any other persons will be payable by the tendering holder.  If satisfactory evidence of payment of such taxes or exemption therefrom is not submitted with the Exchange Offer Subscription Agreement, the amount of such transfer taxes will be billed directly to such tendering holder.

**RELEASE**

In connection with this Exchange Offer, participants tendering Existing Shares of any series will be required to execute and deliver the Release.  The Release releases and discharges all claims against the Company, the Investment Manager, our advisory board, the selling broker for the Existing Shares, Citi, the Managing Member, any of our past or present sub-advisors, our auditors and tax preparers, the Administrator and past and present counsel (Cayman and U.S.) to such parties  (such parties, and their respective affiliates (including but not limited to any other Falcon Fund and Falcon Strategies LLC) and the employees, officers, directors, partners, counsel and agents of each of the aforesaid parties, are collectively referred to herein as the "Releasees") from all actions or claims directly or indirectly arising from, relating to or in any manner connected with (i) any investment by such participant in the Company, including the acquisition or disposition of any securities of the Company, (ii) such participant's acceptance of the terms of this Exchange Offer, (iii) the operation, management, supervision, or investment of any of the assets of the Company by any of the Releasees or (iv) any actions taken or omitted to be taken by any of the Releasees in connection with or otherwise relating to or affecting in any way the Company or the acquisition, ownership or disposition of Existing Shares of any series, whether those claims arise under United States federal or state securities laws, arbitration agreements or otherwise and regardless of whether those claims are known or unknown at the time of tender pursuant to the Exchange Offer.  No Participation Shares will be issued in exchange for Existing Shares, and no Exchange Consideration will be paid, unless a properly executed Release has been delivered by the tendering Existing Holder in accordance with the Exchange Offer Subscription Agreement.

**CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES**

**TO ENSURE COMPLIANCE WITH TREASURY DEPARTMENT CIRCULAR 230, HOLDERS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF FEDERAL TAX ISSUES IN THIS MEMORANDUM IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON, BY HOLDERS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON HOLDERS UNDER THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS BEING USED IN CONNECTION WITH THE PROMOTION OR MARKETING (WITHIN THE MEANING OF CIRCULAR 230) BY THE COMPANY OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

The following summary describes the material U.S. federal income tax consequences to the current Existing Holders who are U.S. Holders of an exchange of Existing Shares for the Participation Shares, if eligible and so elected, and the Exchange Consideration pursuant to the Exchange Offer.  This summary is based on current provisions of the Code, applicable regulations of the U.S. Department of the Treasury ("Treasury Regulations"), judicial authority and rulings and pronouncements of the IRS as in effect on the date hereof, all of which are subject to change, possibly with retroactive effect.  There can be no assurance that the IRS will not take views contrary to those summarized below, and no ruling from the IRS has been or will be sought by us.

This discussion deals only with Existing Holders who hold their shares as capital assets. This discussion does not deal with all tax consequences that may be relevant to all categories of Existing Holders (such as dealers in securities, foreign currencies, or commodities, traders in securities that elect to mark their holdings to market, financial institutions, regulated investment companies, real estate investment trusts, holders whose functional currency is not the U.S. dollar, insurance companies, tax-exempt organizations, non-U.S. persons, holders with shares received through the exercise of qualified incentive stock options, holders who may be subject to the alternative minimum tax or personal holding company provisions of the Code, or holders who hold shares as part of a hedging, integrated, conversion or constructive sale transaction or as a position in a straddle).

This discussion does not address the state, local or foreign tax consequences of participating in the Exchange Offer. Further, the U.S. federal income tax treatment of an Existing Holder participating in the Exchange Offer depends in some instances on determinations of fact and interpretations of complex provisions of U.S. federal income tax law for which no clear precedent or authority may be available. Accordingly, you should consult your tax advisor regarding the U.S. federal, state, local and foreign tax consequences of participating in or abstaining from the Exchange Offer in light of your specific tax situation.

For purposes of this section, a "U.S. Holder" is, as determined for U.S. federal income tax purposes, (i) a citizen or individual resident of the United States of America, (ii) a corporation that is created or organized in or under the laws of the United States of America, any state thereof or the District of Columbia, (iii) an estate, the income of which is includible in gross income for U.S. federal income tax purposes regardless of its source or (iv) a trust if, in general, a court within the United States of America is able to exercise primary supervision over its administration and one or more U.S. persons have the authority to control all substantial decisions of such trust, or if it has a valid election in effect under applicable Treasury Regulations to be treated as a "U.S. person."

In the case of an Existing Holder that is treated as a partnership for U.S. federal income tax purposes, the U.S. federal income tax treatment of a partner therein will generally depend on the status of the partner and upon the activities of the partnership. Partners in partnerships considering participation in the Exchange Offer should consult their tax advisors.

### Non-Participation in the Exchange Offer.

Existing Holders that do not participate in the Exchange Offer will not incur any U.S. federal income tax liability as a result of the consummation of the Exchange Offer.

### Tax Consequences to Existing Holders of Participation in the Exchange Offer.

*Electing to Receive the Exchange Consideration and the Participation Shares.* Although there is no direct authority addressing an exchange such as the Exchange Offer, the receipt of the Exchange Consideration and the Participation Shares in exchange for Existing Shares pursuant to the Exchange Offer is expected to be subject to the "disguised sale" rules of the Code. As a result, the transaction is expected to be a taxable exchange with respect to the Existing Shares exchanged for Exchange Consideration, and a non-taxable exchange with respect to the Existing Shares exchanged for Participation Shares. This means that your basis in your Existing Shares should be allocated between the Existing Shares deemed surrendered for the Exchange Consideration (the "Deemed Sale Shares") and the Existing Shares deemed surrendered for the Participation Shares (the "Deemed Exchange Shares"), based on the relative fair market value of the Exchange Consideration and the Participation Shares as of the date of the Exchange Offer. The remainder of this discussion assumes such treatment, except as expressly noted to the contrary,

You generally will recognize gain or loss on a sale of your Deemed Sale Shares equal to the difference, if any, between (i) your "amount realized" on the sale and (ii) your adjusted tax basis in the Deemed Sale Shares surrendered in the Exchange Offer. Your adjusted basis in your Deemed Sale Shares generally will be adjusted for items of income, gain, deduction or loss allocated, for tax purposes, to you by the Company for periods prior to the Exchange Offer with respect to the Deemed Sale Shares and will include your allocable share of the Company's nonrecourse borrowings (as defined for U.S. federal income tax purposes), if any, with respect to the Deemed Sale Shares. The "amount realized" with respect to your Deemed Sale Shares will be equal to the sum of the Exchange Consideration received pursuant to the Exchange Offer plus your allocable share of the Company's nonrecourse borrowings (as defined for U.S. federal income tax purposes), if any, with respect to the Deemed Sale Shares.

The gain or loss recognized by you on the disposition of the Deemed Sale Shares pursuant to the Exchange Offer generally will be treated as a long-term capital gain or loss if you held the Deemed Sale Shares for more than one year. Long-term capital gains recognized by individuals and certain other noncorporate taxpayers generally will be subject to a maximum U.S. federal income tax rate of 15%. Notwithstanding your holding period in your Deemed Sale Shares, you will recognize ordinary income to the extent your allocable share of the Company's "unrealized receivables" or items of Company inventory exceeds your basis in such unrealized receivables or items of Company inventory, as determined pursuant to Treasury Regulations. For these purposes, accrued but untaxed market discount, if any, on securities held by

the Company will be treated as an unrealized receivable. You should consult your tax advisor regarding the length of your holding period and the treatment of any gain or loss as long-term or short-term capital gain or loss.

Certain limitations apply to the use of capital losses. If you are an individual taxpayer, any capital loss recognized on your Deemed Sale Shares generally will be deductible only to the extent of your capital gains for the taxable year plus up to $3,000 of ordinary income ($1,500 in the case of a married individual filing a separate return). Excess capital losses may be carried forward by individuals indefinitely. If you are a corporation, such capital loss generally will be deductible only to the extent of your capital gains for the taxable year. Corporations may carry capital losses back three years and forward five years. You should consult your tax advisor regarding your ability to deduct any capital loss incurred in connection with the Exchange Offer.

Your initial basis in the Participation Shares should equal your adjusted basis in the Deemed Exchange Shares. Your holding period in the Participation Shares should include your holding period in the Deemed Exchange Shares. Your basis in the Participation Shares will be adjusted by your allocable share, if any, of the Company's items of income, gain, loss, deduction or credit. Future distributions on, or disposition proceeds in respect of, the Participation Shares in excess of your adjusted basis will be taxable as gain from the sale or exchange of such Participation Shares and will be long-term capital gain or loss if your holding period in the Participation Shares exceeds one year.

*Alternative Characterization of the Exchange Offer with Respect to the Participation Shares*. You should be aware that the proper U.S. federal income tax treatment of, and the consequences arising from, the receipt of the Participation Shares is subject to multiple potential characterizations under current law, including for example, treatment of the Participation Shares as a contractual right calling for a contingent payment to which Section 483 of the Code might apply and in which case the exchange would be a taxable exchange in its entirety and a portion of any gain recognized in respect of the Participation Shares may be treated as ordinary income. There can be no assurance that the IRS will not assert that another characterization properly applies to the receipt of the Participation Shares. Certain of such characterizations could, if asserted successfully by the IRS, adversely affect the U.S. federal income tax consequences arising from the receipt of Participation Shares in the Exchange Offer. You are urged to consult your tax advisors regarding the consequences to you arising from the election to receive of Participation Shares in the Exchange Offer, particularly as regards the various alternative characterizations.

*Electing to Receive Only the Exchange Consideration*. If you elect to receive only the Exchange Consideration in exchange for your Existing Shares, you will be treated as having sold your Existing Shares for the Exchange Consideration in a fully taxable transaction. You generally will recognize gain or loss on the sale equal to the difference, if any, between (i) your "amount realized" on the sale and (ii) your adjusted tax basis in your Existing Shares. Your adjusted basis in your Existing Shares generally will be adjusted for items of income, gain, deduction or loss allocated, for tax purposes, to you by the Company for periods prior to the Exchange Offer with respect to the Existing Shares and will include your allocable share of the Company's nonrecourse borrowings (as defined for U.S. federal income tax purposes), if any, with respect to the Existing Shares. The "amount realized" with respect to your Existing Shares will be equal to the sum of the Exchange Consideration received pursuant to the Exchange Offer plus your allocable share of the Company's nonrecourse borrowings (as defined for U.S. federal income tax purposes), if any, with respect to the Existing Shares.

The gain or loss recognized by you generally will be treated as a long-term capital gain or loss if you held the Existing Shares for more than one year. Long-term capital gains recognized by individuals and certain other noncorporate taxpayers generally will be subject to a maximum U.S. federal income tax rate of 15%. Notwithstanding your holding period in your Existing Shares, you will recognize ordinary income to the extent your allocable share of the Company's "unrealized receivables" or items of Company inventory exceeds your basis in such unrealized receivables or items of Company inventory, as determined pursuant to Treasury Regulations. For these purposes, accrued but untaxed market discount, if any, on securities held by the Company will be treated as an unrealized receivable.

Certain limitations apply to the use of capital losses. If you are an individual taxpayer, any capital loss recognized on a sale of your Existing Shares generally will be deductible only to the extent of your capital gains for the taxable year plus up to $3,000 of ordinary income ($1,500 in the case of a married individual filing a separate return). Excess capital losses may be carried forward by individuals indefinitely. If you are a corporation, such capital loss generally will be deductible only to the extent of your capital gains for the taxable year. Corporations may carry capital losses back three years and forward five years. You should consult your tax advisor regarding your ability to deduct any capital loss incurred in connection with the Exchange Offer. You should also consult your tax advisor regarding the length of your holding period and the treatment of any gain or loss as long-term or short-term capital gain or loss.

*Release and Assignment of Claims.*  If you participate in the Exchange Offer, a portion of the Exchange Consideration paid to you may be deemed a payment for your release and assignment of claims. The proper treatment for U.S. federal income tax purposes of your receipt of any deemed payments for your release and assignment of claims is uncertain. No opinion or assurance can be given that the IRS will not challenge the treatment of any deemed payments for your release and assignment of claims as part of the consideration for surrender of the Existing Shares, and assert that such amount should be treated as an ordinary income payment in exchange for your release and/or assignment of current and future claims. You should consult your tax advisor regarding the tax consequences to you with respect to your right to, and your receipt of, any deemed payments for your release and assignment of claims.

**Tax Shelter Regulations.**

The IRS has issued final Regulations that may require the Company or its Existing Holders to report their direct or indirect participation in certain "reportable transactions" by filing IRS Form 8886 ("Reportable Transaction Disclosure Statement").

A "reportable transaction" includes a transaction that results in a loss claimed under Section 165 of the Code by a taxpayer (computed without taking into account offsetting income or gain items, and without regard to limitations on its deductibility) in excess of the thresholds described below, unless the transaction has been exempted from reporting by the IRS.  Your participation in the Exchange Offer may be considered participation in such a "reportable transaction" and require you to file a Reportable Transaction Disclosure Statement if you recognize a loss with respect to the Deemed Sale Shares in excess of certain thresholds (currently, at least $2 million in any single taxable year or $4 million for the taxable year the Exchange Offer is entered into and the five succeeding taxable years for Existing Holders that are that are individuals, S corporations or trust, and at least $10 million in any single taxable year or $20 million for the taxable year the Exchange Offer is entered into and the five succeeding taxable years for Existing Holders that are corporations).

**Information Reporting and Backup Withholding.**

U.S. Holders participating in the Exchange Offer may be subject to information reporting and backup withholding on any cash payments received by them in the Exchange Offer.  To prevent the possible application of U.S. federal back-up withholding tax (currently, 28%) with respect to the payment of the Exchange Consideration, U.S. Holders are generally required to provide us a completed Substitute IRS Form W-9, included with the letter of transmittal. Back-up withholding is not an additional tax. Any amounts withheld under the back-up withholding rules may be refunded or credited against any such holder's U.S. federal income tax liability, if any, provided that the required information is furnished to the IRS.

**State and Local Withholding and Disclosure.**

We may be required under state or local tax laws to deduct and withhold a portion of the Exchange Consideration with respect to U.S. Holders participating in the Exchange Offer. U.S. Holders should consult their tax advisors concerning whether any state or local withholding would be required on an exchange of your Existing Shares for Exchange Consideration and Participation Shares, if eligible and so elected, and whether such amounts may be available to such holders as a credit on state or local tax returns.

In addition, some jurisdictions may impose reporting requirements similar to those described above in "—Tax Shelter Regulations."  You are urged to consult your tax advisor with respect to any applicable state or local law filing or disclosure requirement with respect to your participation in the Exchange Offer.

**THE FOREGOING SUMMARY IS INCLUDED HEREIN SOLELY FOR GENERAL INFORMATION AND DOES NOT CONSTITUTE TAX ADVICE.  YOU SHOULD CONSULT YOUR TAX ADVISOR AS TO THE SPECIFIC CONSEQUENCES TO YOU OF THE EXCHANGE OFFER INCLUDING THE APPLICABILITY OF STATE, LOCAL, OR FOREIGN INCOME OR OTHER TAX LAWS.**

## ACKNOWLEDGEMENTS AND CONSENTS

Because the following restrictions will apply to Participation Shares, holders of Existing Shares who exchange their Existing Shares for Participation Shares in the Exchange Offer are advised to consult legal counsel prior to making any offer, resale, pledge or transfer of the Participation Shares.

The Participation Shares to be issued in the Exchange Offer have not been registered under the Securities Act or any state or non-U.S. securities laws and may not be offered or sold within the United States or to, or for the account or benefit of, U.S. persons except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act and any applicable state and foreign securities laws. Accordingly, the right to receive Participation Shares, is only for those individuals and entities that are "accredited investors" (as defined in Rule 501(a) under the Securities Act).

**By delivering an Exchange Offer Subscription Agreement and receiving Participation Shares, if eligible and so electing, and the Exchange Consideration in the Exchange Offer, each such Existing Holder participating in the Exchange Offer will be deemed to:**

1.      Represent that it is acquiring the Participation Shares for its own account or an account with respect to which it exercises sole investment discretion and that it and any such account is an Accredited Investor;

2.      Acknowledge that the Participation Shares may not be directly or indirectly transferred, resold or otherwise hypothecated without the prior written consent of the Investment Manager (which may grant or withhold such consent in its sole discretion);

3.      Acknowledge that the Participation Shares issued in the Exchange Offer have not been, nor will they be, registered under the Securities Act or with any securities regulatory authority of any jurisdiction and that such Participation Shares may not be offered or sold within the United States or to, or for the account or benefit of, U.S. persons except as set forth below;

4.      Agree that it will deliver to each person to whom it transfers any of the Participation Shares notice of any restrictions on transfer of such Participation Shares; and

5.      Understand that, unless registered under the Securities Act, any Participation Shares issued in the Exchange Offer in certificated form will bear a legend to the effect that such shares may only be transferred upon prior written consent of the Company or Investment Manager and in compliance with applicable federal and state securities laws. Participation Shares issued in book entry form will be subject to appropriate stop orders limiting transfer.

**All Existing Holders who deliver an Exchange Offer Subscription Agreement and receive the Exchange Consideration in the Exchange Offer, whether or not eligible or electing to receive Participation Shares, will be deemed to:**

1.      Represent that it has such knowledge and experience in financial and business matters, that it is capable of evaluating the merits and risks of participating in the Exchange Offer;

2.      Represent that it is tendering all of its Existing Shares and, upon the completion of the Exchange Offer and the exchange of its Existing Shares for Participation Shares, if applicable, the only shares or other equity interests of the Company owned by it will be such Participation Shares and otherwise will own no equity interests of the Company;

3.      Represent that it is a sophisticated investor and understands, fully appreciates and is willing to assume any and all risks associated with and any and all potential negative or adverse consequences of its participation in the Exchange Offer including, but not limited to, the risks described in this Confidential Memorandum;

4.      Grant the Release; and

5.      Acknowledge that the Company, the Investment Manager and others will rely upon the truth and accuracy of the foregoing acknowledgments, representations and agreements, and agree that if any of the acknowledgments,

representations or warranties deemed to have been made by it by its exchange of Existing Shares are no longer accurate, it shall promptly notify the Company and the Investment Manager.  If it is acquiring any Participation Shares as a fiduciary or agent for one or more investor accounts, it represents that it has sole investment discretion with respect to each such account and it has full power to make the foregoing acknowledgments, representations and agreements on behalf of each such account.

## COUNSEL

The Investment Manager has retained Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden") to serve as counsel to the Investment Manager with respect to certain matters relating to the Exchange Offer.  Skadden may act as counsel to the Investment Manager in connection with investments made by the Company or the day to day operation of the Company.  Skadden does not represent and has not represented the Company, the Funds or their respective members in organizing the Company or the Funds, negotiating their business terms or in connection with this Exchange Offer.  It is not anticipated that, in connection with the general operation of the Company or the Funds, the Company or the Funds will engage separate counsel.

Skadden's engagement by the Investment Manager in respect of the Company is limited to the specific matters as to which it is consulted by the Investment Manager and, therefore, there may exist facts or circumstances which could have a bearing on the Company's or the Investment Manager's financial condition or operations with respect to which Skadden has not been consulted and for which Skadden expressly disclaims any responsibility.  Skadden is not representing any Existing Holder in connection with the Exchange Offer.

The Investment Manager may remove Skadden at any time without the consent of, or notice to, the holders.

Confidential Tender and Exchange Offer Memorandum

# Falcon Strategies Two LLC
## PORTFOLIO A

Offers Existing Holders
a Cash Payment
and
Offers Existing Holders that are Accredited Investors
a Cash Payment and Newly Created Participation Shares
in Exchange for any and all
Existing Shares of Limited Liability Company Interest

———————————

**Copies of the Exchange Offer Subscription Agreement will be accepted by the Company pursuant to the instructions set forth therein.  Questions or requests regarding the Exchange Offer may be directed to the Investment Manager at the address set forth below:**

## Citigroup Alternative Investments LLC

731 Lexington Avenue
27th Floor
New York, NY  10022
Attn:  Investor Services
Telephone: (212) 783-1330

———————————

May 8, 2008

**ANNEX A TO CONFIDENTIAL TENDER AND EXCHANGE OFFER MEMORANDUM**

**NET ASSET VALUE AS OF MARCH 31, 2008 AND EXCHANGE CONSIDERATION**

**FALCON STRATEGIES TWO LLC - SERIES 2004-2A**

| Net Asset Value | |
|---|---|
| **Per Share** | **Percentage of Initial Capital Invested*** |
| $0.205 | 20.5% |

| Exchange Consideration | |
|---|---|
| **Per Share** | **Percentage of Initial Capital Invested*** |
| $0.450 | 45.0% |

| **Distributions Since Inception as a Percentage of Initial Capital Invested*** |
|---|
| 20.5% |

\* Initial Capital Invested represents purchases from the Company and not any subsequent transfers

**ANNEX A TO CONFIDENTIAL TENDER AND EXCHANGE OFFER MEMORANDUM**

**NET ASSET VALUE AS OF MARCH 31, 2008 AND EXCHANGE CONSIDERATION**

**FALCON STRATEGIES TWO LLC - SERIES 2004-3A**

| Net Asset Value | |
| --- | --- |
| **Per Share** | **Percentage of Initial Capital Invested*** |
| $0.192 | 19.2% |

| Exchange Consideration | |
| --- | --- |
| **Per Share** | **Percentage of Initial Capital Invested*** |
| $0.450 | 45.0% |

| **Distributions Since Inception as a Percentage of Initial Capital Invested*** |
| --- |
| 20.5% |

\* Initial Capital Invested represents purchases from the Company and not any subsequent transfers

**ANNEX A TO CONFIDENTIAL TENDER AND EXCHANGE OFFER MEMORANDUM**

**NET ASSET VALUE AS OF MARCH 31, 2008 AND EXCHANGE CONSIDERATION**

**FALCON STRATEGIES TWO LLC - SERIES 2004-4A**

| Net Asset Value | |
|---|---|
| **Per Share** | **Percentage of Initial Capital Invested*** |
| $0.193 | 19.1% |

| Exchange Consideration | |
|---|---|
| **Per Share** | **Percentage of Initial Capital Invested*** |
| $0.450 | 44.5% |

| **Distributions Since Inception as a Percentage of Initial Capital Invested*** |
|---|
| 20.2% |

\* Initial Capital Invested represents purchases from the Company and not any subsequent transfers

**ANNEX A TO CONFIDENTIAL TENDER AND EXCHANGE OFFER MEMORANDUM**

**NET ASSET VALUE AS OF MARCH 31, 2008 AND EXCHANGE CONSIDERATION**

**FALCON STRATEGIES TWO LLC - SERIES 2005-1A**

| Net Asset Value | |
|---|---|
| **Per Share** | **Percentage of Initial Capital Invested*** |
| $0.192 | 19.1% |

| Exchange Consideration | |
|---|---|
| **Per Share** | **Percentage of Initial Capital Invested*** |
| $0.450 | 44.9% |

| **Distributions Since Inception as a Percentage of Initial Capital Invested*** |
|---|
| 18.2% |

\*  Initial Capital Invested represents purchases from the Company and not any subsequent transfers

**ANNEX A TO CONFIDENTIAL TENDER AND EXCHANGE OFFER MEMORANDUM**

**NET ASSET VALUE AS OF MARCH 31, 2008 AND EXCHANGE CONSIDERATION**

**FALCON STRATEGIES TWO LLC - SERIES 2005-2A**

| Net Asset Value | |
| --- | --- |
| **Per Share** | **Percentage of Initial Capital Invested\*** |
| $0.203 | 20.3% |

| Exchange Consideration | |
| --- | --- |
| **Per Share** | **Percentage of Initial Capital Invested\*** |
| $0.450 | 44.9% |

| **Distributions Since Inception as a Percentage of Initial Capital Invested\*** |
| --- |
| 18.2% |

\*  Initial Capital Invested represents purchases from the Company and not any subsequent transfers

**ANNEX A TO CONFIDENTIAL TENDER AND EXCHANGE OFFER MEMORANDUM**

**NET ASSET VALUE AS OF MARCH 31, 2008 AND EXCHANGE CONSIDERATION**

**FALCON STRATEGIES TWO LLC - SERIES 2005-3A**

| Net Asset Value | |
|---|---|
| **Per Share** | **Percentage of Initial Capital Invested*** |
| $0.196 | 19.4% |

| Exchange Consideration | |
|---|---|
| **Per Share** | **Percentage of Initial Capital Invested*** |
| $0.450 | 44.5% |

| **Distributions Since Inception as a Percentage of Initial Capital Invested*** |
|---|
| 18.0% |

\* Initial Capital Invested represents purchases from the Company and not any subsequent transfers

**ANNEX A TO CONFIDENTIAL TENDER AND EXCHANGE OFFER MEMORANDUM**

**NET ASSET VALUE AS OF MARCH 31, 2008 AND EXCHANGE CONSIDERATION**

**FALCON STRATEGIES TWO LLC - SERIES 2004-1A**

| Net Asset Value | |
|---|---|
| **Per Share** | **Percentage of Initial Capital Invested*** |
| $0.213 | 21.3% |

| Exchange Consideration | |
|---|---|
| **Per Share** | **Percentage of Initial Capital Invested*** |
| $0.450 | 45.0% |

| Distributions Since Inception as a Percentage of Initial Capital Invested* |
|---|
| 20.5% |

\*  Initial Capital Invested represents purchases from the Company and not any subsequent transfers

**ANNEX A TO CONFIDENTIAL TENDER AND EXCHANGE OFFER MEMORANDUM**

**NET ASSET VALUE AS OF MARCH 31, 2008 AND EXCHANGE CONSIDERATION**

**FALCON STRATEGIES TWO LLC - SERIES 2005-4A**

| Net Asset Value | |
|---|---|
| **Per Share** | **Percentage of Initial Capital Invested*** |
| $0.192 | 19.5% |

| Exchange Consideration | |
|---|---|
| **Per Share** | **Percentage of Initial Capital Invested*** |
| $0.450 | 45.7% |

| **Distributions Since Inception as a Percentage of Initial Capital Invested*** |
|---|
| 14.7% |

\* Initial Capital Invested represents purchases from the Company and not any subsequent transfers

# EXHIBIT D

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

————————————————————— x
FERGUSON FAMILY TRUST, On Behalf of : Civil Action No. 08 CIV 4723
Itself and All Others Similarly Situated,     :
                                              :
                        Plaintiff,            : **PLAINTIFF'S REQUEST FOR THE**
                                              : **PRODUCTION OF DOCUMENTS**
            vs.                               :
                                              : CLASS ACTION
FALCON STRATEGIES TWO LLC,                    :
AMACAR GP, INC., CITIGROUP                    :
ALTERNATIVE INVESTMENTS LLC,                  :
CITIGROUP, INC. and REAZ ISLAM,               :
                                              :
                        Defendants.           :
                                              :
————————————————————— x

Pursuant to this Court's Local Rules and Fed. R. Civ. P. 26 and 34, Plaintiff hereby requests

that the above-named defendants produce for inspection and copying at the offices of Coughlin Stoia

Geller Rudman & Robbins LLP, 52 Duane Street, 7th Floor, New York, New York 10007, the

following documents within their possession, custody or control, or that of any of their agents,

within such time as the Court orders or as otherwise agreed to by the parties, and in accordance with

the definitions and instructions set forth below.

**I.    DEFINITIONS**

1.    "You" and "your" means the person or entity responding to these Requests.

2.    "Defendants" means the above-named defendants, or any of them (separately and

together), and any of their predecessors, successors, divisions, subsidiaries, officers, directors,

employees, agents or anyone acting or purporting to act on its behalf.

3.    "Tender Offer" means the tender and exchange offer that defendant Falcon Strategies

Two LLC ("Falcon" or the "Company") commenced on or about May 8, 2008.

4.    "Memorandum" means the Confidential Tender and Exchange Offer Memorandum,

dated May 8, 2008, pursuant to which Falcon commenced the Tender Offer.

## II.    DOCUMENTS REQUESTED

REQUEST NO. 1:

Documents sufficient to disclose the current net asset value of Falcon's units/shares, assets or investments.

REQUEST NO. 2:

Documents sufficient to disclose the manner in which Defendants calculated the net asset value of the shares, as reflected in annexes to the Memorandum.

REQUEST NO. 3:

Documents sufficient to disclose the current or anticipated makeup of Falcon's assets and/or investments, including documents concerning the planned or current liquidation of Falcon.

REQUEST NO. 4:

Documents concerning any appraisal, calculation or analysis of the Company's value, including the value of its shares, assets and/or investments.

REQUEST NO. 5:

Documents sufficient to disclose any actual or potential claims covered by the release that investors must agree to as prerequisite to participating in the Tender Offer (the "Release").

REQUEST NO. 6:

Documents and communications concerning the Release, including drafts thereof.

REQUEST NO. 7:

Documents concerning the U.S. regulatory inquiry that Defendants have disclosed.

REQUEST NO. 8:

Documents sufficient to disclose any regulatory or criminal inquiry or investigation of which Defendants are aware concerning: the Company; Defendants; funds in which the Company has invested or currently invests; or funds sponsored or managed by Citigroup, Inc. or any affiliates.

REQUEST NO. 9:

Documents sufficient to disclose Defendants' response to any regulatory or criminal inquiry or investigation of which they are aware, including the inquiry referred to in the Memorandum.

REQUEST NO. 10:

Documents concerning the litigation against Falcon Strategies Two B LLC disclosed in the Memorandum, including the terms on which such action was voluntary discontinued and/or whether Defendants offered anything of value in exchange for such discontinuation.

REQUEST NO. 11:

Documents sufficient to disclose whether Defendants have offered or paid any consideration to any investors that differs from that which they would obtain in connection with the Tender Offer.

REQUEST NO. 12:

Documents sufficient to disclose any civil litigation of which Defendants are aware concerning: the Company; Defendants; funds in which the Company has invested or currently invests; or funds sponsored or managed by Citigroup, Inc. or any affiliates.

REQUEST NO. 13:

Documents sufficient to disclose why Defendants have offered $0.45 per share in the Tender Offer (as opposed to some other form or amount of consideration).

REQUEST NO. 14:

Documents sufficient to disclose why Defendants have offered certain investors the opportunity to elect to receive participation shares, as well as how Defendants arrived at the formula disclosed in the Memorandum with respect to determining the value of such shares.

REQUEST NO. 15:

Documents concerning the preparation, drafting and issuance of the Memorandum, including documents sufficient to identify those who assisted in its preparation or approved its dissemination.

DATED: May 20, 2008

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
SAMUEL H. RUDMAN
ROBERT M. ROTHMAN
JOSEPH RUSSELLO

JOSEPH RUSSELLO

58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
DARREN J. ROBBINS
DAVID C. WALTON
DAVID T. WISSBROECKER
655 West Broadway, Suite 1900
San Diego, CA 92101-3301
Telephone: 619/231-1058
619/231-7423 (fax)

Attorneys for Plaintiff