UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FERGUSON FAMILY TRUST, On Behalf of Itself and All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>FALCON STRATEGIES TWO LLC, AMACAR GP, INC., CITIGROUP ALTERNATIVE INVESTMENTS LLC, CITIGROUP, INC. and REAZ ISLAM,<br><br>Defendants. | Civil Action No. 08 CIV 4723<br><br><br>AFFIDAVIT OF JAMES O'BRIEN |

STATE OF NEW YORK      )
                                             : ss.:
COUNTY OF NEW YORK   )

James O'Brien, being sworn, says:

1.      I am the Co-Head of Citi's Global Fixed Income Group, which has oversight of Falcon Strategies Two LLC ("Falcon" or the "Company").

2.      I submit this affidavit in opposition to plaintiff's application for a preliminary injunction and expedited discovery.  I have personal knowledge of the facts stated in this affidavit.

**Falcon**

3.      Falcon is a Delaware limited liability company that was formed in 2004 to invest in fixed income markets for the benefit of sophisticated, high net worth investors.  In 2004 and 2005, Falcon issued unregistered shares to a limited number of purchasers, who were required to be both "accredited investors" and "qualified purchasers" under the federal securities

laws. The minimum investment was $500,000. The shares were issued in series, representing investments at different times in the same portfolio.

4.    The terms of an investment in Falcon, the Company's investment strategy, and the associated risks were set forth in an Offering Memorandum ("Falcon OM") that was distributed to all prospective investors. A copy of the Falcon OM is annexed to this affidavit as Exhibit **A**.

5.    According to Falcon's records, plaintiff Ferguson Family Trust purchased shares in Series 2005-1A during 2005. A copy of the Falcon OM supplement for Series 2005-1A is annexed to this affidavit as Exhibit **B**, and a copy of the Subscription Agreement signed on behalf of the plaintiff, redacted for personal information, is annexed as Exhibit **C**.

6.    Citigroup Alternative Investments LLC ("CAI"), an affiliate of Citigroup Inc. ("Citigroup"), served as Falcon's Investment Manager.

**Information Provided to Investors About the Value of Investments in the Company**

7.    Investors in Falcon have received, and continue to receive, information about the Company's investments, asset values, and returns in regular monthly statements and in quarterly and annual reports.

8.    Each monthly statement received by investors contained information reflecting the most recent available net asset value ("NAV") of the investor's shares. A copy of the relevant portion of plaintiff's April 30, 2008 monthly statement, redacted for personal information, is annexed as Exhibit **D**.

9.    The NAV is computed using independent third-party pricing sources for all assets. The method for calculating the NAV is described on pages 37-38 of the Falcon

Offering Memorandum, a copy of which is annexed as Exhibit **A**. The method of calculating the NAV has not changed since the inception of the Company.

   10. In light of the complexity of valuing many of the instruments held by the Company, valuations for each month-end are not available until late in the following month. Thus, for example, the NAV as of January 31 would be provided on or about February 28.

   11. Consistent with the Company's standard practices, an updated NAV as of April 30, 2008, will be available to investors in the next monthly statements posted online on or about May 28, 2008, and distributed shortly thereafter. An NAV as of May 31, 2008, will be available on or about June 28, 2008.

   12. The quarterly and annual reports contained additional information about the NAV of the investor's shares in the Company and the returns on those shares, as well as information about the value of the Company's assets. Additional information about the Company's assets and returns was set forth in audited financial statements provided to investors each year. Copies of the quarterly report dated June 30, 2005, and the most recent annual financial statement are annexed as Exhibits **E** and **F,** respectively.

   13. The Company does not provide to individual investors information about the value of the Company on an asset-by-asset basis.

   14. For many of the structured assets there is little or no publicly available price information. Moreover, the nature of the assets changes continually as the Company goes through liquidation.

   15. Disclosing proprietary information about the Company's holdings would also be detrimental to the Company and its investors, because it would impede the Company's ability to liquidate its assets at the most favorable possible price.

**The 2007-08 Credit Crisis and Its Impact on Falcon**

16.    Beginning in mid to late 2007, the global credit markets experienced unprecedented volatility.  (See Exhibit G hereto.)  Delinquencies across all types of mortgage-backed securities increased, heightening credit and liquidity problems across many asset classes.

17.    As credit market problems worsened, the Company's cash position and the value of its shares declined precipitously.  For plaintiff's series, for example, net asset value (NAV) declined from 62.95 cents per share at December 31, 2007 to 19.2 cents per share at March 31, 2008.  The NAV of shares in other series as of March 31, 2008, ranges from 19 to 21 cents.  As a result of the decline in value of the Company's assets, its leverage, increased margin requirements, and lack of available financing, the Company was forced to begin selling assets and exploring alternatives to meet variation margin calls.

18.    On February 20, 2008, Falcon, together with certain affiliated funds, entered into a $500 million credit facility with Citigroup Investments Inc., an affiliate of CAI in order to meet margin calls and prevent a forced sale of the funds' assets at fire-sale prices.

19.    On March 20, 2008, in an effort to preserve the Company's liquidity, the Investment Manager suspended redemptions from Falcon and discretionary semi-annual income distributions.  The Investment Manager has commenced liquidating the Company's assets.  The Investment Manager has told investors that it does not believe the Company can be revived or that it will be able to resume redemptions prior to liquidation of the Company.

**The Exchange Offer**

20.    On May 8, 2008, the Company commenced a tender offer available to all of its investors.  A copy of the tender offer solicitation ("Exchange OM") describing the

4

background and terms of the offer is annexed as Exhibit **H**, and a copy of the subscription agreement for the tender offer is annexed as Exhibit **I**.

21. Pursuant to the offer (and as described more fully in the Exchange OM), investors who wish to participate in the offer may tender their shares and receive in exchange a payment of 45 cents per share. Investors who are still accredited investors will also receive a Participation Share for each share tendered that will entitle them to 75 percent of the liquidation value of the portfolio above 45 cents per share, if any, less the cost of capital. To obtain the tender offer consideration, investors must release all legal claims against the Company, CAI, Citigroup, its affiliates, and other individuals and entities.

22. Alternatively, investors may retain their investment, share fully in any gain or loss from the liquidation of the portfolio, and retain all their legal rights. Investors may elect to participate at any time until the expiration of the tender offer on June 30, 2008, and are free to revoke a tender previously given until that date.

23. The Exchange OM sets forth the total asset values for the Company and the percentage value in each of five asset classes as of March 31, 2008. This was the most recent date as of which that information was available when the Exchange OM was distributed.

24. Since the original OM was issued, the Company has twice supplemented the OM, to provide, among other things, additional information about relevant legal proceedings. Copies of these supplemental memoranda are annexed as Exhibits **J** and **K**.

---

James O'Brien

Sworn to before me this
28 day of May, 2008

---

Notary Public

SONIA PLATA
NOTARY PUBLIC-STATE OF NEW YORK
No. 02PL6159382
Qualified in New York County
My Commission Expires January 16, 2011

5

**EXHIBIT A**

# FALCON STRATEGIES TWO LLC
### (a Delaware limited liability company)

### SHARES OF LIMITED LIABILITY COMPANY INTEREST

Falcon Strategies Two LLC (the "**Company**") is a Delaware limited liability company organized to issue Shares of limited liability company interest ("**Shares**") in separate portfolios (each a "**Portfolio**"). Each Portfolio is intended to be a vehicle for sophisticated investors to gain exposure to specific segments of the fixed income markets that the Investment Manager believes to offer enhanced value opportunities. For each Portfolio, the Investment Manager will select a limited number of specific segments of the fixed income market and employ its assets in trading and investment strategies ("**Strategies**") within those markets with the goal of achieving attractive risk-adjusted returns while providing liquidity and cash flow. The Investment Manager believes the Portfolios will offer a viable investment alternative for investors (i) by focusing on certain sectors of the fixed income markets that the Investment Manager believes present profit opportunities, (ii) by employing appropriate directional and non-directional Strategies designed to exploit such opportunities, (iii) by engaging Advisors who are in a position to exploit investment opportunities using the selected Strategies, and (iv) by applying various risk management processes to control Strategy-specific risks as well as overall credit risks, funding/leverage risks, and interest rate risks. The assets and liabilities of each Portfolio will be separate from those of any other Portfolio. While it is expected that each Portfolio will generally employ the same Strategies, it is possible that certain Strategies may be used by less than all Portfolios and that the proportional allocation of a Portfolio's assets among Strategies may vary.

This Offering Memorandum ("**Offering Memorandum**") and a Supplement specific to each offering of Shares (each a "**Supplement**") describe the offering from time to time of the Shares. Shares may be offered in different series (each a "**Series**") which will differ in terms including, but not limited to, fees, subscription dates, Redemption Dates and Redemption Notice Periods, Lock-Up Periods and minimum subscription and redemption amounts. Shares issued on a particular date will be part of a different Series than Shares issued as of any other date but more than one Series of Shares may be issued on the same date. All Shares in each Series will have the same Net Asset Value per Share but Shares in different Series will have different Net Asset Values. Shares may be available to be sold as of the beginning of a calendar month, from time to time, and will be sold at the then-current Net Asset Value of the Portfolio divided by the number of Shares of all Series then outstanding as more fully described herein. The minimum initial subscription by each investor, subject to waiver by the Investment Manager in its discretion, will be specified in the relevant Supplement. The Investment Manager expects that the initial Portfolio will not begin investing unless acceptable subscriptions for at least $200 million in the aggregate have been received, although the Investment Manager may determine to begin investment activities with subscriptions of a lesser amount. The Company expects to begin the investment activities of each Portfolio as soon as practicable after the initial closing of the sale of Shares in the initial Series ("**Initial Closing**").

The Shares are offered to persons who are both "accredited investors" as defined in Rule 501(a) of Regulation D under the Securities Act of 1933 (the "**Securities Act**") and "qualified purchasers" within the meaning of Section 2(a)(51)(A) of the Investment Company Act of 1940 (the "**Investment Company Act**") or the rules and regulations thereunder. The Subscription Agreement contains definitions of those terms and requires investors to represent and warrant that they meet those definitions.

*An investment in Shares is a highly speculative investment that involves significant risks due to, among other things, the Portfolios' investment strategies and policies, the nature of the Portfolios' investments, the lack of a public market for Shares, and the restrictions on redemptions. An investor should not invest in a Portfolio unless the investor is fully able (1) to bear the financial risks of its investment for an indefinite period of time and (2) to sustain the loss of all or a significant part of its investment and realized or unrealized profits.*

**THE SHARES ARE NOT DEPOSITS IN, OBLIGATIONS OF OR GUARANTEED BY CITIBANK, N.A. OR ANY OF ITS AFFILIATES, DO NOT HAVE THE BENEFIT OF DEPOSIT INSURANCE, AND ARE NOT GUARANTEED BY ANY GOVERNMENTAL ENTITY.**

**DISTRIBUTION OR REPRODUCTION OF ALL OR ANY PART OF THIS OFFERING MEMORANDUM, OR DIVULGING ITS CONTENTS OTHER THAN AS SPECIFICALLY SET FORTH HEREIN, IS UNAUTHORIZED.**

## CITIGROUP ALTERNATIVE INVESTMENTS LLC
### Investment Manager

#### The date of this Offering Memorandum is June 2004.

## NOTICES TO ALL INVESTORS

THE SHARES DESCRIBED IN THIS OFFERING MEMORANDUM HAVE NOT BEEN REGISTERED OR QUALIFIED UNDER THE SECURITIES ACT, THE SECURITIES LAWS OF ANY STATE OR THE SECURITIES LAWS OF ANY OTHER JURISDICTION. THIS IS A PRIVATE OFFERING PURSUANT TO EXEMPTIONS PROVIDED BY SECTION 4(2) OF THE SECURITIES ACT, RULE 506 OF REGULATION D THEREUNDER AND APPLICABLE STATE SECURITIES LAWS. NEITHER THE SECURITIES AND EXCHANGE COMMISSION, THE SECURITIES REGULATORY AUTHORITY OF ANY STATE NOR THE SECURITIES REGULATORY AUTHORITY OF ANY OTHER JURISDICTION HAS PASSED UPON THE VALUE OF THE SHARES, MADE ANY RECOMMENDATIONS AS TO THEIR PURCHASE, APPROVED OR DISAPPROVED THIS OFFERING, OR PASSED UPON THE ADEQUACY OR ACCURACY OF THIS OFFERING MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

SHARES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD WITHOUT THE CONSENT OF THE INVESTMENT MANAGER AND COMPLIANCE WITH APPLICABLE SECURITIES LAWS.

THIS OFFERING MEMORANDUM DOES NOT CONSTITUTE AN OFFER TO SELL OR A SOLICITATION OF AN OFFER TO BUY SHARES IN ANY JURISDICTION TO ANY PERSON TO WHOM IT IS UNLAWFUL TO MAKE SUCH OFFER OR SOLICITATION.

IN MAKING AN INVESTMENT DECISION, INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE COMPANY AND THE TERMS OF THE OFFERING. PROSPECTIVE INVESTORS SHOULD NOT CONSTRUE THE CONTENTS OF THIS OFFERING MEMORANDUM AS LEGAL, TAX, INVESTMENT OR OTHER ADVICE. EACH INVESTOR IS STRONGLY URGED TO CONSULT IT'S LEGAL, TAX, FINANCIAL AND OTHER ADVISORS TO ASSIST IT IN ASSESSING THE MERITS AND RISKS OF AN INVESTMENT IN THE COMPANY.

ALL REPRESENTATIONS AND REFERENCES MADE IN THIS OFFERING MEMORANDUM ARE MADE AS OF THE DATE SET FORTH ON THE COVER PAGE HEREOF, AND THE DELIVERY OF THIS OFFERING MEMORANDUM DOES NOT MEAN THAT THE INFORMATION HAS NOT CHANGED AS OF ANY TIME SUBSEQUENT TO THAT DATE.

THIS OFFERING MEMORANDUM CONTAINS A SUMMARY ONLY AND DOES NOT PURPORT TO BE COMPLETE. ACCORDINGLY, REFERENCE IS MADE TO THE AGREEMENTS, DOCUMENTS, STATUTES AND REGULATIONS REFERRED TO HEREIN FOR THE EXACT TERMS OF SUCH AGREEMENTS, DOCUMENTS, STATUTES AND REGULATIONS.

THIS OFFERING MEMORANDUM IS FOR THE EXCLUSIVE USE OF THOSE PERSONS TO WHOM IT IS TRANSMITTED OR DELIVERED BY THE COMPANY IN CONNECTION WITH THIS OFFERING AND THEIR LEGAL, TAX, FINANCIAL AND OTHER ADVISORS, AND MAY NOT BE USED BY ANY OTHER PERSON OR FOR ANY OTHER PURPOSE. IN CONSIDERATION OF THE RECEIPT OF THIS OFFERING MEMORANDUM, THE RECIPIENT AGREES THAT, IN THE ABSENCE OF THE EXPRESS PRIOR WRITTEN CONSENT OF THE INVESTMENT MANAGER, IT WILL NOT REPRODUCE, COPY, USE OR TRANSMIT THIS DOCUMENT OR THE DATA CONTAINED HEREIN, IN WHOLE OR IN PART, OR PERMIT SUCH ACTION BY OTHERS FOR ANY PURPOSE (EXCEPT THAT A PROSPECTIVE INVESTOR MAY PROVIDE COPIES OF THIS OFFERING MEMORANDUM OR PORTIONS HEREOF TO ITS LEGAL, TAX, FINANCIAL AND OTHER ADVISERS FOR THE PURPOSE DESCRIBED ABOVE). THE RECIPIENT FURTHER AGREES TO KEEP STRICTLY CONFIDENTIAL THE INFORMATION CONTAINED HEREIN OR MADE AVAILABLE IN CONNECTION WITH ANY FURTHER INVESTIGATION OF THE COMPANY.

DURING THE COURSE OF THIS OFFERING AND PRIOR TO SALE, EACH OFFEREE OF SHARES AND ITS OFFEREE REPRESENTATIVE(S), IF ANY, ARE INVITED TO QUESTION THE MANAGING MEMBER AND THE INVESTMENT MANAGER CONCERNING THE TERMS AND

i

CONDITIONS OF THE OFFERING AND TO OBTAIN ADDITIONAL INFORMATION, TO THE EXTENT THE INVESTMENT MANAGER AND THE MANAGING MEMBER HAS SUCH INFORMATION OR CAN ACQUIRE IT WITHOUT UNREASONABLE EXPENSE OR EFFORT, CONCERNING THE OFFERING OR TO VERIFY THE ACCURACY OF INFORMATION CONTAINED IN THIS OFFERING MEMORANDUM. SUBJECT TO THE FOREGOING, ANY REPRESENTATION OR INFORMATION NOT CONTAINED HEREIN MUST NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE INVESTMENT MANAGER, THE COMPANY OR ITS MANAGING MEMBER SINCE NO PERSON HAS BEEN AUTHORIZED TO MAKE ANY SUCH REPRESENTATIONS OR TO PROVIDE ANY SUCH INFORMATION. QUESTIONS FOR THE INVESTMENT MANAGER AND THE MANAGING MEMBER MAY BE DIRECTED TO THE ADMINISTRATOR, AS SET FORTH HEREIN.

NOTWITHSTANDING ANYTHING TO THE CONTRARY SET FORTH HEREIN, IN THE LLC AGREEMENT OR IN THE SUBSCRIPTION AGREEMENT, INVESTORS (AND EACH EMPLOYEE, REPRESENTATIVE OR OTHER AGENT OF INVESTORS) MAY DISCLOSE TO ANY AND ALL PERSONS, WITHOUT LIMITATIONS OF ANY KIND, THE TAX TREATMENT AND TAX STRUCTURE OF THE TRANSACTION AND ALL MATERIALS OF ANY KIND (INCLUDING ANY OPINIONS OR OTHER TAX ANALYSES) THAT ARE PROVIDED TO INVESTORS RELATING TO SUCH TAX TREATMENT AND TAX STRUCTURE. THIS AUTHORIZATION OF TAX DISCLOSURE IS RETROACTIVELY EFFECTIVE TO THE COMMENCEMENT OF THE FIRST DISCUSSIONS BETWEEN SUCH INVESTOR AND THE INVESTMENT MANAGER, MANAGING MEMBER, ANY PLACEMENT AGENT OR SELLING AGENT OR THE COMPANY REGARDING THE TRANSACTIONS CONTEMPLATED HEREIN.

YOU SHOULD ALSO BE AWARE THAT THE COMPANY MAY TRADE NON-U.S. FUTURES OR OPTIONS CONTRACTS. TRANSACTIONS ON MARKETS LOCATED OUTSIDE THE UNITED STATES, INCLUDING MARKETS FORMALLY LINKED TO A UNITED STATES MARKET, MAY BE SUBJECT TO REGULATIONS WHICH OFFER DIFFERENT OR DIMINISHED PROTECTION TO THE COMPANY AND ITS MEMBERS. FURTHER, UNITED STATES REGULATORY AUTHORITIES MAY BE UNABLE TO COMPEL THE ENFORCEMENT OF THE RULES OF REGULATORY AUTHORITIES OR MARKETS IN NON-UNITED STATES JURISDICTIONS WHERE TRANSACTIONS FOR THE COMPANY MAY BE EFFECTED.

THE MANAGING MEMBER IS EXEMPT FROM REGISTRATION WITH THE U.S. COMMODITY FUTURES TRADING COMMISSION ("CFTC") AS A COMMODITY POOL OPERATOR BECAUSE THIS POOL IS OPERATED PURSUANT TO THE FOLLOWING CRITERIA: (I) SHARES IN THIS POOL ARE EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933, AND SUCH SHARES ARE NOT OFFERED AND SOLD THROUGH A PUBLIC OFFERING IN THE UNITED STATES; AND (II) (A) EACH NATURAL PERSON PARTICIPANT (INCLUDING SUCH PERSON'S SELF-DIRECTED EMPLOYEE BENEFIT PLAN, IF ANY), IS A "QUALIFIED ELIGIBLE PERSON," AS THAT TERM IS DEFINED IN CFTC REGULATION SECTION 4.7(a)(2); AND (B) EACH NON-NATURAL PERSON PARTICIPANT IS A "QUALIFIED ELIGIBLE PERSON," AS THAT TERM IS DEFINED IN CFTC REGULATION SECTION 4.7, OR AN "ACCREDITED INVESTOR," AS THAT TERM IS DEFINED IN SECTIONS 501(a)(1)-(3), (7) AND (8) OF REGULATION D UNDER THE SECURITIES ACT OF 1933. UNLIKE A REGISTERED COMMODITY POOL OPERATOR, THE MANAGING MEMBER IS NOT REQUIRED TO DELIVER A DISCLOSURE DOCUMENT AND A CERTIFIED ANNUAL REPORT TO PARTICIPANTS IN THE PORTFOLIOS. THE MANAGING MEMBER WILL, HOWEVER, DELIVER THIS MEMORANDUM AND THE PERIODIC AND AUDITED ANNUAL REPORTS DESCRIBED HEREIN. THE INVESTMENT MANAGER IS REGISTERED WITH THE CFTC AS A COMMODITY TRADING ADVISER BUT IS CURRENTLY CONSIDERING CLAIMING AN EXEMPTION AND WITHDRAWING FROM SUCH REGISTRATION ON THE BASIS THAT IT WILL PROVIDE COMMODITY INTEREST TRADING ADVICE ONLY TO POOLS OPERATED BY COMMODITY POOL OPERATORS THAT ARE EXEMPT FROM REGISTRATION AND WILL MEET CERTAIN OTHER REQUIREMENTS.

## STATE SECURITIES LAW LEGENDS

Prospective investors from any of the following states must carefully consider the applicable legend, required by state securities laws, before deciding whether or not to invest in the Portfolios.

FOR RESIDENTS OF ALL STATES:

IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE COMPANY AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE SHARES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT, AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY MAY BE REQUIRED TO BEAR THE FINANCIAL RISK OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

SPECIAL NOTICE TO FLORIDA INVESTORS:

IF THE INVESTOR IS NOT A BANK, A TRUST COMPANY, A SAVINGS INSTITUTION, AN INSURANCE COMPANY, A DEALER, AN INVESTMENT COMPANY AS DEFINED IN THE INVESTMENT COMPANY ACT OF 1940, A PENSION OR PROFIT-SHARING TRUST, OR A QUALIFIED INSTITUTIONAL BUYER (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT OF 1933), THE INVESTOR ACKNOWLEDGES THAT ANY SALE OF A SHARE TO THE INVESTOR IS VOIDABLE BY THE INVESTOR EITHER WITHIN THREE DAYS AFTER THE FIRST TENDER OF CONSIDERATION IS MADE BY THE INVESTOR TO THE ISSUER, OR AN AGENT OF THE ISSUER, OR WITHIN THREE DAYS AFTER THE AVAILABILITY OF THAT PRIVILEGE IS COMMUNICATED TO THE INVESTOR, WHICHEVER OCCURS LATER.

## PRIVACY POLICY STATEMENT

THE COMPANY, THE MANAGING MEMBER AND THE INVESTMENT MANAGER COLLECT NON-PUBLIC PERSONAL INFORMATION ABOUT INVESTORS FROM INFORMATION RECEIVED ON SUBSCRIPTION DOCUMENTS AND OTHER FORMS AND INFORMATION REQUIRED IN CONNECTION WITH A SUBSCRIPTION FOR SHARES AND INFORMATION CONCERNING SHAREHOLDERS' TRANSACTIONS WITH THE COMPANY. THE COMPANY AND THE INVESTMENT MANAGER WILL NOT DISCLOSE ANY NON-PUBLIC PERSONAL INFORMATION RELATING TO CURRENT OR FORMER INVESTORS EXCEPT TO THE EXTENT REQUIRED BY APPLICABLE LEGAL OR REGULATORY REQUIREMENTS OR IN CONNECTION WITH THE ADMINISTRATION, PROCESSING AND SERVICING OF REDEMPTIONS AND SUBSCRIPTIONS OR TO THE COMPANY'S ADMINISTRATOR, ACCOUNTANTS, ATTORNEYS AND AUDITORS – AND, IN EACH SUCH CASE TO THE EXTENT POSSIBLE, SUBJECT TO CUSTOMARY UNDERTAKINGS OF CONFIDENTIALITY. THE COMPANY MAINTAINS PHYSICAL, ELECTRONIC AND PROCEDURAL CONTROLS IN KEEPING WITH U.S. FEDERAL STANDARDS TO SAFEGUARD THE COMPANY'S NON-PUBLIC PERSONAL INFORMATION RELATING TO INVESTORS.

# FALCON STRATEGIES TWO LLC

Offering Memorandum

## DIRECTORY

### COMPANY
Falcon Strategies Two LLC
c/o Citigroup Alternative Investments LLC
399 Park Avenue
7th Floor
New York, NY 10043

### MANAGING MEMBER
AMACAR GP, Inc.
6525 Morrison Boulevard
Charlotte, NC 28211

### INVESTMENT MANAGER
Citigroup Alternative Investments LLC
399 Park Avenue
7th Floor
New York, NY 10043

### ADMINISTRATOR
U.S. Bank, National Association
615 East Michigan Street
Milwaukee, WI 53202

### AUDITORS
KPMG
P.O. Box 493 GT
Century Yard
Grand Cayman, Cayman Islands

### UNITED STATES COUNSEL TO THE INVESTMENT MANAGER
Sidley Austin Brown & Wood LLP
Bank One Plaza
10 South Dearborn Street
Chicago, IL 60603

iv

# FALCON STRATEGIES TWO LLC

Offering Memorandum

### TABLE OF CONTENTS

SUMMARY OF PRINCIPAL TERMS .................................................................................................1

THE INVESTMENT PROGRAM ...................................................................................................

MANAGEMENT OF THE COMPANY ........................................................................................8

FEES, EXPENSES AND INCENTIVE ALLOCATION ............................................................13

RISK FACTORS ..............................................................................................................................16

CONFLICTS OF INTEREST .........................................................................................................18

SUMMARY OF THE LLC AGREEMENT ...................................................................................30

CERTAIN REGULATORY MATTERS.........................................................................................34

CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES................................................40

COUNSEL AND AUDITORS .......................................................................................................43

ANTI-MONEY LAUNDERING AND PRIVACY........................................................................53

ELIGIBILITY REQUIREMENTS AND SUBSCRIPTION PROCEDURES ...........................54

..........................................................................................................................................................55

# FALCON STRATEGIES TWO LLC

Offering Memorandum

### INDEX OF DEFINED TERMS

ABS .................................................................21
Accounting Period ........................................35
Act ....................................................................35
Administration Agreement ..........................15
Administrator ...................................................1
Advisers Act .....................................................7
Advisor ..............................................................1
Advisory Board ..............................................15
Affiliates .........................................................40
Aggregate Investment Expenses ...............45
Benchmark Amount .....................................17
Benchmark Return ........................................17
BHCA ..............................................................28
CAI ...................................................................14
Capital Contribution ......................................2
CEA ....................................................................1
CFC ..................................................................49
CFTC ................................................................ ii
Citigroup ...........................................................1
Citigroup Funds ............................................32
CMBS ...............................................................21
CMO .................................................................21
Code .................................................................26
Company ............................................................i
CPO ..................................................................41
Cumulative Benchmark Return .................17
Cumulative Incentive Allocation Earned .....17
Cumulative Return ........................................16
Distribution and Redemption Adjustment ...17
Eligible Investments .....................................10
ERISA .................................................................7
Fitch .................................................................10
FPHC ................................................................49
Funds .................................................................1
GAAP ...............................................................18
Hurdle Rate ...............................................4, 17
Incentive Allocation .....................................16
Incentive Allocation Percentage ...............17
Incentive Allocation Rate ..............................4
Indemnified Party ...................................14, 40
Initial Capital ................................................17
Initial Closing ...................................................i
Initial O&O Costs .....................................4, 18
Investment Company Act ...............................i
Investment Management Agreement .....1, 14
Investment Manager .................................1, 14

Investment Manager Parties ......................14
IRS ...................................................................28
LLC Agreement ................................................1
Lock-Up Period ...............................................5
Losses .......................................................15, 40
Management Fee ..............................................3
Management Fee Rate .....................................3
Managing Member ..........................................1
MBS .................................................................11
Members ............................................................2
Moody's ..........................................................10
MRS .................................................................21
Non-Section 1256 Contracts ......................47
Non-U.S. Member ..........................................51
Offering Memorandum ...................................i
Period Incentive Allocation ........................17
PFIC .................................................................49
Placement Agent .......................................3, 17
Placement Agents .....................................3, 17
Placement Fee ...........................................3, 18
Plan Assets .....................................................42
Plan Fiduciaries ............................................41
Plans ................................................................41
Portfolio .............................................................i
Portfolio Income ...........................................44
Prior Accounting Period .............................37
QEF ..................................................................50
Redemption and Distribution Amount .....17
Redemption Fee ...............................................5
Regulations ....................................................52
Reportable Transaction Disclosure Statement ...52
S&P ..................................................................10
SEC .....................................................................1
Section 212 Expense .....................................26
Securities Act ....................................................i
Securities Exchange Act .................................7
Series .............................................................i, 2
Shares .................................................................i
Strategies ...........................................................i
Subsequent Closing Date ...............................3
Supplement ........................................................i
Third-Party Fund .............................................1
TOB ..................................................................26
Total Return ...................................................16
UBTI ................................................................50

## SUMMARY OF PRINCIPAL TERMS

The following is a summary of the Company's principal terms. Additional terms and disclosures specific to each Portfolio and Series will be set forth in a Supplement specific to such Series. This Summary and other sections of this Offering Memorandum include descriptions of certain important provisions of the Company's LLC Agreement ("**LLC Agreement**") and Subscription Agreement. Those descriptions are intended to be brief and do not purport to provide a comprehensive explanation of the LLC Agreement and Subscription Agreement. Accordingly, statements made in this Offering Memorandum are subject to the detailed provisions of those agreements, copies of which accompany this Offering Memorandum. Prospective investors are urged to review those agreements in their entirety, as well as Part II of the Investment Manager's Securities and Exchange Commission Form ADV (copies of which are available upon request to the Investment Manager), prior to determining whether to invest in a Portfolio. Once a Portfolio has conducted investment activities for the requisite period, prospective investors may also receive upon request the Company's most recent annual audited financial statements and most recent quarterly performance reports. Prospective investors are also urged to review those documents prior to determining whether to invest in a Portfolio. Capitalized terms that are used but not defined in this Summary are defined elsewhere in this Offering Memorandum or in the LLC Agreement.

The Investment Manager reserves the right to modify any of the terms of the offering prior to the Initial Closing. Accordingly, the information contained in this Offering Memorandum, as well as the terms of the LLC Agreement and the Subscription Agreement, are subject to amendment prior to such Initial Closing. Any such changes that, in the Investment Manager's judgment, may be material to prospective investors will be disclosed to such investors before acceptance of their subscriptions.

| | |
|---|---|
| **The Company** | Falcon Strategies Two LLC, a Delaware limited liability company. The Company has not commenced operations. |
| **Limited Liability** | Notice of the limitation on liabilities of a Portfolio in accordance with Section 18-215(b) of the Delaware Limited Liability Company Act is set forth in the certificate of formation of the Company. Accordingly, all debts, liabilities and obligations and expenses incurred by a particular Portfolio are enforceable against the assets of such Portfolio only, and not against the assets of the Company generally or of any other Portfolios. In addition, separate and distinct records will be maintained for each Portfolio and the assets associated with each Portfolio will be held and accounted for separately from the other assets of the Company generally or any other Portfolios. |
| **The Investment Manager** | Pursuant to an investment management agreement with the Company (the "**Investment Management Agreement**"), Citigroup Alternative Investments LLC (the "**Investment Manager**") will provide investment management services to the Company. The Investment Manager, a subsidiary of Citigroup Inc. ("**Citigroup**"), is registered with the Securities and Exchange Commission ("**SEC**") as an investment adviser. |
| **The Managing Member** | The managing member of the Company is AMACAR GP, Inc., a Delaware corporation (the "**Managing Member**") The Managing Member is unaffiliated with the Investment Manager and Citigroup. The Managing Member will be deemed a "manager" of the Company within the meaning of the Delaware Limited Liability Company Act. Subject to the provisions of the LLC Agreement, the Managing Member will delegate substantially all authority to manage the day-to-day operations and the assets of the Company to the Investment Manager pursuant to the Investment Management Agreement. The Managing Member is exempt from registration with the CFTC as a commodity pool operator pursuant to Rule 4.13(a)(4) promulgated under the Commodity Exchange Act, as amended (the "**CEA**"). |
| **Administrator** | U.S. Bank, National Association (the "**Administrator**"). |
| **Investment Objective and Strategies** | Each Portfolio's investment objective, unless otherwise described in the relevant Supplement, is to generate returns in the fixed income market consistent with a targeted level of risk/volatility over a five-year investment horizon while providing diversification from traditional long-only investments. Each Portfolio will seek to |

1

achieve this objective by investing in one or more second-tier limited liability investment vehicles ("**Funds**"). The Investment Manager will act as Investment Manager to each of the Funds pursuant to an agreement substantially similar to the Investment Management Agreement. Each of the Funds will implement a different fixed income Strategy under the direction of an advisor ("**Advisor**") that may be the Investment Manager, an affiliate of the Investment Manager or an unaffiliated manager. Assets of a Portfolio may be placed under the management of an Advisor either by the Investment Manager's retaining the Advisor as a Sub-Advisor to a Fund or by the Investment Manager's causing the Fund to invest in an investment vehicle managed by the Advisor ("**Third-Party Fund**").

**Unless otherwise specified in the relevant Supplement, each Portfolio's targeted annual return (net of all fees and expenses) over a five-year investment horizon is 7.0%-10.0% and its annual targeted average volatility is 5.0% over a five-year investment horizon. There is no assurance that these targets will be achieved and returns and volatility can be expected to vary significantly over shorter periods.**

The Portfolios may incur indebtedness to leverage their investments as part of their investment strategy and for temporary purposes to fund Redemptions. Such leverage will not exceed 30% of the Portfolio's Net Asset Value. In addition, the Portfolios will invest in Funds that will use leverage as part of their investment Strategies.

For a more complete description of each Portfolio's investment objectives and investment strategies, see "Investment Program" below and the relevant Supplement. There can be no assurance that a Portfolio will achieve its objective or that any Portfolio and the holders of Shares in a Portfolio will not incur losses.

**The Offering**

*Eligible Investors.* The Shares are offered to persons who are both "accredited investors" as defined in Rule 501(a) of Regulation D under the Securities Act and "qualified purchasers" within the meaning of Section 2(a)(51)(A) of the Investment Company Act or the rules and regulations thereunder. The Subscription Agreement contains definitions of those terms and requires investors to represent and warrant that they meet those definitions. Persons who have subscribed for or succeeded to Shares and who have been admitted as Members of the Company are referred to herein as members ("**Members**").

*Series of Shares.* Each Portfolio may offer Shares in various Series ("**Series**"), which may differ in terms of their fees, subscription dates, Redemption Dates and Redemption Notice Periods, Lock-Up Periods, minimum subscription and redemption amounts, and in other respects, all as disclosed in the relevant Supplement. Shares of the initial Series of each Portfolio will be sold at a price per Share set forth in the relevant Supplement. Subsequently, each new Series of Shares will be issued at an initial price per Share equal to the Net Asset Value of the Portfolio as of such Subsequent Closing Date divided by the number of Shares of all Series outstanding as of such subsequent Closing Date.

*Minimum Capital Contribution.* Each person who wishes to become a Member must contribute at least the minimum capital contribution (a "**Capital Contribution**") in exchange for Shares in any Series as specified in such Series' Supplement. The Investment Manager may accept contributions of lesser amounts in its sole discretion.

*Initial Closing.* The Investment Manager expects that the initial Portfolio will not begin investing unless acceptable subscriptions for at least $200 million in the aggregate have been received, although the Investment Manager may determine to begin investment activities with subscriptions of a lesser amount.

*Subsequent Closings.* The Investment Manager may accept subscriptions for Shares in a new Series of a new or existing Portfolio. The relevant Supplement will set forth the dates as of which subsequent closings for such new Series may occur (each a "**Subsequent Closing Date**"). Existing investors will purchase Shares of new Series,

not the same Series, when making a subsequent investment. The Investment Manager may accept subscriptions for Shares in any Portfolio when the Investment Manager believes sufficient subscriptions have been received to operate such Portfolio. The Investment Manager may, however, terminate the offering of Shares in any Portfolio at any time. The Investment Manager will suspend the offering to the extent that, in its judgment, additional capital cannot be effectively managed in accordance with such Portfolio's investment objective and Strategies.

*Placement Fees.* Affiliates of the Investment Manager (each, a **"Placement Agent"** and collectively, the **"Placement Agents"**) may be appointed to act as non-exclusive placement agents for the Company. The Placement Agents may charge investors a placement fee (the **"Placement Fee"**). Any such Placement Fee will be paid by the investor directly, in addition to the investor's subscription amount, and will not be paid from assets of the Company. The Placement Fee will not be payable to or by the Company or to the Investment Manager in connection with the offering of Shares. The Investment Manager or a Placement Agent may enter into arrangements with other selling agents who will receive compensation as agreed by the Investment Manager or a Placement Agent and such selling agents. As additional compensation, the Investment Manager may pay Placement Agents or any such selling agents from its Management Fee or Incentive Allocation. A prospective investor solicited by a selling agent will be advised, and asked to acknowledge its understanding, of any such arrangements.

| | |
|---|---|
| **Subscription Procedures** | Prospective investors who wish to subscribe must complete, execute and deliver the appropriate Subscription Agreement and any other required documents in accordance with the instructions set forth in such Subscription Agreement. All such subscription documents must be delivered by the seventh calendar day prior to the intended date of purchase (subject to waiver by the Investment Manager in its sole discretion). The Investment Manager reserves the right to accept or reject any subscription for Shares, in whole or in part, in its sole discretion. |

Unless a prospective investor has been notified that its subscription has been rejected, such prospective investor must authorize the relevant Placement Agent to debit its account in the amount of its subscription or wire funds in such amount to the relevant Portfolio's account, in accordance with the Investment Manager's instructions, no later than three business days before the relevant investment date (subject to waiver by the Investment Manager in its sole discretion). Interest, if any, earned on subscription funds received prior to the relevant investment date will be credited to the relevant Portfolio.

*The execution of the Subscription Agreement by a prospective investor constitutes a binding offer to purchase Shares and an agreement to hold such investor's offer open until the subscription is accepted or rejected by the Investment Manager. The execution of the Subscription Agreement and its acceptance by the Investment Manager together constitute an agreement by such prospective investor to be bound by the terms of the Subscription Agreement and the LLC Agreement.*

| | |
|---|---|
| **Use of Proceeds** | The net proceeds of this offering will be used as capital for the Portfolios' investment activities and payment of expenses. |
| **Management Fee** | The Investment Manager will be entitled to receive with respect to the Net Assets of each Series, a management fee (the **"Management Fee"**). The Management Fee will be paid monthly in arrears and be appropriately pro rated for partial periods. The Management Fee with respect to each Series will equal 1/12 of the per annum percentage rate specified in the applicable Supplement (the **"Management Fee Rate"**) of the Net Assets of each Series as of the end of each calendar month. No Management Fee will be charged with respect to Eligible Investments. The Management Fee may be paid at the Fund level or the Portfolio level or partly at one level and partly at the other level. The Investment Manager may in its discretion rebate any or all of the Management Fee in respect of any Member, without thereby entitling any other |

3

| | |
|---|---|
| | Member to such a rebate. |
| **Incentive Allocation** | The Investment Manager will also receive, in respect of each Series of Shares, as of each calendar quarter-end, an Incentive Allocation equal to a percentage of the Cumulative Total Return in the Series of Shares specified in the relevant Supplement (**"Incentive Allocation Rate"**), in some cases in excess of a Cumulative Benchmark Return calculated by reference to a **Hurdle Rate** specified in the relevant Supplement. |
| | The Investment Manager may rebate the Incentive Allocation in respect of any investor without entitling any other investor to a similar rebate. |
| **Advisor Fees** | The Investment Manager will pay out of its own resources all compensation to the Advisors in the form of management fees and incentive compensation. |
| **Portfolio and Fund Expenses** | Each Portfolio and each Fund will be responsible for its other operational expenses as well as for expenses related to its investment transactions and its extraordinary expenses. As an investor in the Funds, each Portfolio will bear its allocable portion of the expenses of the Funds, and Funds that invest in Third-Party Funds will bear their allocable portion of the expenses of the Third-Party Funds (other than management and incentive compensation to the relevant Advisors). Further, each Portfolio will be responsible for all organizational costs and expenses and all offering costs and expenses incurred in connection with the offer and sale of Shares sold on the date of the Initial Closing for each Portfolio (**"Initial O&O Costs"**). Each Fund will pay its own Initial O&O Costs. See "Fees and Expenses," below. |
| **Net Assets; Allocation of Profits and Losses** | The Net Assets of each Series shall initially be equal to the aggregate subscription price paid by all Shareholders in subscribing for Shares of such Series. The Net Assets of each Series at the end of each Accounting Period is determined first by allocating the increase or decrease in the Net Assets of the relevant Portfolio (excluding any liabilities specific only to certain Series, such as Management Fees and Incentive Allocations) among the Series in such Portfolio proportionally according to the number of Shares outstanding in each such Series at the beginning of the Accounting Period and second by allocating to, and debiting from the Net Assets of, each Series any liabilities or distributions specific to such Series and any Incentive Allocation with respect to such Series accrued or made during such Accounting Period. The Net Asset Value per Share of Shares of a Series at any time equals the Net Assets of such Series divided by the number of Shares in such Series outstanding on such date. |
| | Because allocation of increases and decreases in the Net Assets of each Portfolio is made to the various Series based on the number of Shares in each Series outstanding while the Net Asset Value per Share of Shares of various Series may be different, allocations of gains and losses among the Series may not be uniform as a proportion of the Net Assets of each Series. |
| **Valuation of Assets** | The Investment Manager will be responsible for valuing the assets of the Funds and of each Portfolio in accordance with the valuation principles described below under "Summary of the LLC Agreement." The valuations established by the Investment Manager will be used not only to determine the Net Asset Value per Share, but also to determine the amount of the Management Fees and of the Incentive Allocation payable in respect of each Series. Absent bad faith or manifest error, the Investment Manager's valuation determinations are conclusive and binding on all Members. |
| **Redemptions** | Unless otherwise specified in the relevant Supplement, a Member may, upon prior written notice to the Investment Manager at least equal to the Redemption Notice Period specified in the relevant Supplement, redeem, as of each Redemption Date specified in the relevant Supplement, any Shares that have been outstanding for at least the **Lock-Up Period, if any,** specified in the relevant Supplement. The Redemption Notice Period and the Lock-Up Period may be waived in the discretion of the Investment Manager. Shares will be redeemed at Net Asset Value per Share net of |

4

Redemption Fees as of the Redemption Date.

*Mandatory Redemptions.* The Investment Manager may at any time require any Member to redeem all or any portion of its Shares as of any month-end. The Investment Manager ordinarily must give a Member at least five days' prior notice of any such required Redemption. In such event, no Redemption Fees will apply.

*Suspensions of Redemptions.* The Investment Manager has the right to suspend Redemptions and Redemption payments in certain circumstances.

*Redemption Fees.* Redemptions of Shares may be subject to a **Redemption Fee** specified in the relevant Supplement. It is expected that any Redemption Fees retained by a Series will be distributed to Members holding Shares in such Series with the next following distribution made to Members holding Shares of that Series. Redemption Fees will not benefit any Members holding Shares in any Series other than the Series of the redeemed Shares.

If a Redemption has been properly requested, the Redemption proceeds (net of any Redemption Fee) will be transferred in U.S. dollars by wire to the account specified by the Member or credited to the Member's account with its Placement Agent as directed in its Redemption request, within thirty calendar days following the applicable quarter-end or other date of Redemption. Redemption proceeds may be distributed in cash or, under certain limited circumstances, in kind. No interest will be paid on Redemption proceeds pending payment.

Notwithstanding anything in this Offering Memorandum to the contrary, in the event that Citibank, N.A. or any of its affiliates (i) acquires Shares by virtue of a Member's default on a loan or any other obligation which is secured in whole or in part by such Shares or (ii) is otherwise entitled to cause a redemption of Shares upon a Member's default on a loan or any other obligation which is secured in whole or in part by such Shares, it may, upon thirty days' prior written notice to the Investment Manager, cause such Shares to be redeemed.

| | |
|---|---|
| **Distributions** | The anticipated distribution policy of each Portfolio is described in the relevant Supplement. |
| **Transfers** | Members will not be able to sell or otherwise transfer their Shares without the prior approval of the Investment Manager, which may grant or withhold such approval in its sole discretion. The Investment Manager intends to approve transfers, if at all, only as of the beginning of a calendar quarter. Any attempt to sell or transfer Shares without prior approval will be void. |
| **Risks; Conflicts of Interest** | The Portfolios are highly speculative investments that involve significant risks due to, among other things, the nature of the Portfolios' investments, the Portfolios' Strategies and policies, the lack of a public market for Shares, and the restrictions on transfer and sales of Shares. An investor should not invest in a Portfolio unless the investor is fully able (1) to bear the financial risks of its investment for an indefinite period of time and (2) to sustain the loss of all or a significant part of its investment and realized or unrealized profits. See "Risk Factors," below. |
| | In addition, the Investment Manager will be subject to certain actual and potential conflicts of interest in managing the investment business of the Company. See "Conflicts of Interest," below. |
| **Indemnification** | The Portfolios will exculpate the Managing Member and the Investment Manager and their associated persons from certain liabilities to which they otherwise may be subject, and indemnify them against certain losses incurred by them in managing the business and affairs of the Portfolios. See "Summary of the LLC Agreement" and "Management of the Company – The Investment Manager." |
| **Amendment of LLC** | The Investment Manager may amend or waive provisions of the LLC Agreement |

5

| | |
|---|---|
| **Agreement** | without Member approval for certain tax, regulatory and ministerial purposes or if, in the Investment Manager's reasonable judgment, such amendment or waiver could not reasonably be expected to have a material adverse effect on the Company or any Member. The Investment Manager may also amend the provisions of the LLC Agreement with Member approval in other circumstances. |
| **Term** | The Company and each Portfolio will have perpetual life, except that the Company and each Portfolio will be dissolved and will commence to wind up its business and affairs upon the first to occur of the following events: |

(a) the Managing Member declares in writing that the Company shall be dissolved and gives written notice of such dissolution to the Members;

(b) the Managing Member's resignation as managing member of the Company, the Managing Member's Bankruptcy or the dissolution of the Managing Member; *provided, however,* that no such event shall cause the dissolution of the Company if at the time of such event there is at least one other managing member of the Company and such other managing member carries on the business of the Company; or

(c) the entry of a decree of judicial dissolution of the Company under Section 18-802 of the Delaware Limited Liability Company Act.

The Investment Manager may terminate any Portfolio and cause all the outstanding Shares of that Portfolio to be redeemed at any date on thirty days' notice to the Members holding Shares in the affected Portfolio.

| | |
|---|---|
| **Fiscal Year End** | December 31. |
| **Reports** | Members will receive with respect to each Portfolio in which they have invested: |

(i) quarterly unaudited performance information, as soon as practicable after the end of each fiscal quarter;

(ii) annual audited financial statements relating to the Company, as soon as practicable after the end of each Fiscal Year; and

(iii) annual information necessary for completion of U.S. federal income tax returns.

| | |
|---|---|
| **Tax Considerations** | Each of the Portfolios will be treated as a partnership for U.S. federal income tax purposes. Members will be subject to income tax each year in respect of their distributive share of the relevant Portfolio's income or gains (if any), even though the Portfolio may not make any distributions, or distributions in an amount equivalent to such distributive share, for the payment of taxes. See "Certain U.S. Federal Income Tax Consequences," below, for a summary of certain significant U.S. federal income tax principles that are likely to apply to the Portfolios and the Members. |

The Portfolios may incur indebtedness to leverage their investments as part of their investment strategy and also may borrow in unusual circumstances, such as for temporary purposes to meet Redemptions. In addition, the Portfolios will invest in Funds that will use leverage as part of their investment Strategies. As a result, the Portfolios can be expected to receive "unrelated business taxable income" which is taxable to otherwise tax-exempt investors. Tax-exempt investors should consult their tax and legal advisors before deciding whether or not to invest in a Portfolio. See "Certain U.S. Federal Income Tax Consequences," below.

**The Managing Member will not have definitive annual U.S. federal tax information for Members until the Portfolios receive definitive annual U.S. federal tax information from the Funds in which the Portfolios have invested. As the Portfolios are not likely to receive such information from the Funds in a timely manner, it is likely that the Portfolios and the Members will be required to obtain extensions for filing tax returns.**

| | |
|---|---|
| **Regulatory Matters** | Neither the Company nor any of the Portfolios is registered as an investment company under the Investment Company Act; however, the Investment Manager is registered as an investment adviser under the Investment Advisers Act of 1940 (the **"Advisers Act"**). The Portfolios will not be "reporting" companies under the Securities Exchange Act of 1934 (the **"Securities Exchange Act"**). See "Certain Regulatory Matters," below. |
| **ERISA Considerations** | Investment in the Portfolios is generally open to institutions, including pension and other funds subject to the Employee Retirement Income Security Act of 1974 (**"ERISA"**). The Investment Manager, however, will make every reasonable effort to ensure that benefit plan investors do not own 25% or more of any class of equity interests of any Portfolio. As a result, the assets of the Portfolios are not expected to be deemed to be "plan assets" under ERISA. See "Certain Regulatory Matters" below. |

# THE INVESTMENT PROGRAM

## *Multi-Strategy Investment Approach*

The Investment Manager believes the Portfolios will offer attractive investment alternatives for investors (i) by focusing on certain sectors of the fixed income markets that the Investment Manager believes present profit opportunities, (ii) by employing appropriate directional and non-directional Strategies designed to exploit such opportunities, (iii) by engaging Advisors who are in a position to exploit investment opportunities using the selected Strategies, and (iv) by applying various risk management processes to control Strategy-specific risks as well as overall credit risks, funding/leverage risks, and interest rate risks.

Each Portfolio seeks to achieve attractive risk-adjusted returns through the allocation of assets among a group of Advisors employing directional and non-directional fixed income Strategies that demonstrate attractive historical returns with low correlations to each other and, as a Portfolio, low correlations to traditional equity and fixed income investment strategies. The Portfolios' assets will be initially allocated to the following five Strategies within the credit, mortgage-backed, and municipal markets: bank loans, preferred securities, municipal arbitrage, long/short mortgage-backed securities and opportunistic mortgage-backed securities. The Investment Manager believes that each of these Strategies demonstrates long-term investment return advantages and that, given the broad universe of securities, the Investment Manager can in a methodical manner exploit such opportunities. Based on the Investment Manager's analysis of historical return and correlation data, the Investment Manager believes that an efficient portfolio allocation among these Strategies within certain investment guidelines will produce a reasonable probability of achieving targeted absolute returns with low volatility over an investment horizon of five years.

**The Investment Manager may, in its sole discretion, at any time and from time to time, invest the Company's assets in other fixed income Strategies that the Investment Manager believes are consistent with the overall investment objectives of the Company.**

Unless otherwise specified in a Supplement, the Investment Manager plans to structure each Portfolio within the following objectives and guidelines:

- A target return of 7% to 10% absolute return per annum over a five-year investment horizon;

- A target average volatility of 5% over a five-year investment horizon;

- A recommended holding period of at least five years;

- Possibility of discretionary semi-annual income and realized capital gains distributions;

- Low correlation of expected returns to those of ten-year U.S. Treasury securities, equities and funds of hedge funds over a five-year investment horizon; and

- A target allocation of no more than 30% of each Portfolio's assets (measured at the time of investment) allocated to any one Strategy.

Annual returns of 7-10% and annual volatility of 5% were determined as a target by examination of the average of the actual rolling twelve-month returns of the Strategies (either actual performance or published index data) and allocations currently intended for use in the Portfolios since September 2002, the earliest date on which return data are available for all Strategies, net of fees. The target annual returns and volatility were confirmed by examination of the average of the rolling five-year returns of the Strategies and allocations currently intended for use in the Portfolios utilizing either actual Advisor performance or index data since June 1992, net of fees. The rolling five-year returns were used because five years is the recommended holding period. Past performance is no guarantee of future results.

The target returns express the Investment Manager's view as to the percentage return a Portfolio may be expected to experience over an investment cycle based on the Portfolio's investment strategies, characteristics and

8

certain defined assumptions. The Portfolio's return targets are neither guarantees nor predictions or projections of future performance. A broad range of risk factors could cause a Portfolio to underperform its performance objectives and experience unanticipated risks. For a description of risk factors that could adversely affect returns, see "Risk Factors" below. Other investment risks could also cause a Portfolio to underperform its performance objectives.

The Investment Manager will employ overall risk management and investment guidelines that are designed to control and/or reduce the Strategy-specific risks while increasing the probability of meeting the Portfolio's investment objective and reducing potential for style drift. Investment guidelines are established based on the Investment Manager's research and analysis on both qualitative and quantitative levels. Allocation among Strategies may be rebalanced at least on a semi-annual basis within established risk management guidelines, taking into consideration Strategy risks and opportunities, the Investment Manager's view of the fixed income market and the general investment objectives of the Portfolios.

The Investment Manager believes that following these objectives and guidelines should provide investors with a favorable risk-adjusted return while providing attractive liquidity, diversification and cash flow over a five-year investment horizon.

*Selection of the Investment Strategies*

In selecting the Strategies, the Investment Manager employs a "top-down" approach that includes, among other things, the following:

1.  Evaluation of asset classes that demonstrate potentially profitable opportunities;

2.  Review of why these potential opportunities and any related inefficiencies may exist;

3.  Review of the investment guidelines and/or Strategies best suited to exploit the inefficiencies;

4.  Conducting qualitative and quantitative risk and return analyses;

5.  Developing investment guidelines, including diversification requirements, hedging strategies and leverage parameters, with the objective of increasing the probability of delivering desired results; and

6.  Identifying and engaging Advisors who the Investment Manager believes can successfully execute the Strategies selected.

In selecting Advisors to execute the Strategies, the Investment Manager will have unconditional discretion in selecting affiliated as well as non-affiliated Advisors. **It is expected that the Investment Manager will select affiliated Advisors unless, with respect to a particular Strategy, the Investment Manager believes that there is a non-affiliated Advisor in a position to more successfully execute such Strategy.** The Investment Manager will employ various steps in analyzing Advisors, including the following:

1.  Analysis of each Advisor's performance and investment style;

2.  Analysis of the Advisor's execution skills;

3.  Analysis of each Advisor's background and track record; and

4.  On-site review of each Advisor's investment process, staffing and operations as required.

9

*Ongoing Portfolio Management*

The Investment Manager will provide active ongoing portfolio management. It will generally conduct frequent reviews of profit and loss at the Advisor and Strategy levels, and monitors compliance with predetermined risk limits. On a semi-annual basis, or more frequently if conditions warrant, the Investment Manager considers rebalancing the portfolio to maintain what it considers to be the appropriate mix of Strategies given its prevailing market views. As part of its responsibilities, the Investment Manager may terminate or add Advisors or implement new Strategies at any time in its sole discretion, based upon, among other things, continuing evaluation of performance and changes in market conditions.

Both the Portfolios and the underlying Funds may employ leverage. Leverage has the effect of magnifying both gains and losses as well as increasing volatility. The Portfolios may incur indebtedness to leverage their investments as part of their investment strategy and for temporary purposes to fund Redemptions. Such leverage will not normally exceed 30% of the Portfolio's Net Asset Value.

The Portfolios will also invest in Funds that will use leverage as part of their investment Strategies. In addition, the Investment Manager in certain circumstances may have and may exercise the ability to increase or decrease the degree of leverage employed by a Fund.

While the Portfolios' primary investment methodology is to invest with Advisors, the Investment Manager may cause the Portfolios to enter into certain direct transactions and investments in Eligible Investments. There are no Management Fees applicable to Eligible Investments held at the Portfolio level. **"Eligible Investments"** means:

(a)    investments not rated less than A3 or P-1 by Moody's Investors Services ("**Moody's**"), not less than A- or A-1 by Standard & Poor's Rating Services ("**S&P**") and not less than A- or F1 by Fitch Ratings Inc. ("**Fitch**"), and with the weighted average duration of within four years (including after giving affect to any over-the-counter interest rate derivatives used for duration management purposes as permitted under clause (b) below), including, without limitation:

    i.    securities backed by the full faith and credit of the U. S. Government; U.S. agency securities, structured agency products, taxable and tax-exempt municipal securities, MBS and asset-backed securities and derivatives thereof;

    ii.    certificates of deposit of, bankers' acceptances issued by or money market accounts in any depositary institution or trust company (including the Administrator) incorporated under the laws of the United States of America, its territories or possessions or any area subject to its jurisdiction (the "United States") or any state thereof and subject to supervision and examination by Federal and/or state banking authorities, so long as the deposits offered by such institution are rated and have a rating of at least F1 if rated by Fitch, P-1 if rated by Moody's and at least A-1 if rated by S&P or it is so rated by any two of the foregoing in the case of split ratings (or, in the case of the principal depository institution in a holding company system whose deposits are not so rated, the long-term debt obligations of such holding company are rated at least "A+" if rated by Fitch, at least A-1 if rated by Moody's and at least A+ if rated by S&P or it is so rated by any two of the foregoing in the case of split ratings);

    iii.    commercial paper issued by any depository institution or trust company incorporated under the laws of the United States or any state thereof and subject to supervision and examination by Federal and/or state banking authorities, or any corporation incorporated under the laws of the United States or any state thereof, so long as such commercial paper is rated at least F1 if rated by Fitch, P-1 if rated by Moody's and at least A-1 if rated by S&P or it is so rated by any two of the foregoing in the case of split ratings; and

    iv.    shares of certain money market funds (including funds managed by Citigroup affiliates).

(b)    over-the-counter interest rate derivatives used for duration management purposes; and

10

(c)     Multi-advisor fixed income funds of funds, not to exceed 10% of such Portfolio's Net Asset Value, that are designated Eligible Investments by the Investment Manager.

*Initial Strategies*

The Investment Manager intends to initially allocate the Portfolios' assets among the Strategies described below. The initial Strategies have been selected because the Investment Manager believes they are capable of generating targeted returns with low correlation among them, resulting in reduced overall volatility. The Investment Manager may, in its sole discretion, at any time and from time to time, invest a Portfolio's assets in other fixed income Strategies, provided that such strategies are consistent with the overall investment objectives of the Portfolios. Such Strategies may include, for example, curve trades, basis trades, directional trades and may also employ significant leverage in connection with trading in corporate securities, mortgage-backed securities ("MBS"), asset-backed securities and municipal securities.

## Bank Loans and Debt Securities

The investment objective of this Strategy is to achieve a high rate of total return, primarily through income generation, and to a limited extent, capital appreciation, over a medium term investment horizon through investments in a diversified portfolio of secured and unsecured loans and other debt securities. Generally, investments will be made in senior secured institutional term loans issued to non-investment grade companies. The Strategy will generally employ up to three times leverage. Investments typically have initial spreads of LIBOR+2.00% and up and average ratings of B-/B3 or better. Purchases are made in such a way as to not cause the Strategy to be deemed to be involved in a primary origination or in the distribution of the purchased loans and debt securities.

The Strategy seeks to maximize economic returns by applying a disciplined risk framework. Credits will be actively managed by applying a bottom-up credit analysis and a top-down macroeconomic view to evaluate risk and security value with adherence to a credit process. The Advisor is expected to utilize a variety of information services to obtain market intelligence on companies in the portfolio and pricing and structuring trends in the market, and to use its industry relationships to facilitate a steady supply of new bank loans to evaluate, obtain efficient secondary market trade execution, and obtain current market intelligence.

The Strategy will generally employ up to three times leverage on capital and will have the discretion to hedge interest rate exposure on any fixed rate obligations.

## Preferred Securities

This Strategy will invest in preferred securities. Preferreds are subordinated securities that historically have provided superior yields and a high level of liquidity. The Strategy will be a broadly diversified and actively managed portfolio of primarily hybrid preferred securities issued by investment grade companies. The Strategy focuses on detailed analyses of credit quality, a high level of diversification and rigorous relative value analysis. The Strategy will seek excess yield through the purchase of subordinated securities of highly rated companies where investors are compensated for their subordinate position in the company's capital structure, as opposed to owning senior debt of weaker companies. The preferred market typically contains the highest yielding investment grade issues in the U.S. capital markets. The significant presence of retail investors creates inefficiencies and trading opportunities.

This Strategy will seek to create value by focusing on fundamental credit analysis, portfolio diversification, and trading opportunities due to the large concentration of retail investors in the market. Buy and sell determinations are based on fundamental and technical research. The security selection process employs top down and bottom up analysis. The primary focus is credit quality (on average Baa3/BBB- and above) and the relative value of the preferred security compared to other securities in the market. Emphasis is also placed on industries with positive and or improving outlooks.

11

The Strategy will generally employ up to three times leverage on capital and will have the discretion to hedge interest rate exposure.

## Mortgage-Backed Strategies

The Investment Manager believes that U.S. MBS markets have inherent inefficiencies that can be exploited through a combination of quantitative techniques and fundamental investment analysis. These Strategies use bottom-up security analysis to identify investment opportunities and isolate rate, yield curve, prepayment and volatility risks. The Strategies focus on the relative value of mortgage assets arising from such conditions as negative investor psychology, supply-demand imbalances, the complexity of MBS valuations and the tendency of many investors to avoid securities that are difficult to analyze. These Strategies will invest in agency (GNMA, FNMA, FHLMC) mortgage pass-through securities, agency collateralized mortgage obligations and a variety of interest rate hedging instruments (swaps, forwards, swaptions, caps, etc.). The complexity of the securities creates occasional price inefficiencies that the Strategy will seek to exploit through successful security selection and hedging strategies.

**Long/Short MBS:** This Strategy will pursue a long/short approach that invests primarily in U.S. government agency MBS while seeking to neutralize the portfolio to interest rate sensitivity and varying prepayment rates. The Strategy seeks to generate uncorrelated excess returns by positioning convergence trades that are designed to capture the price differentials among the different categories of assets. The Strategy uses bottom-up security analysis to identify relative value trades and isolate rate, yield curve, prepayment and volatility risks. The Strategy focuses on three main types of relative value opportunities: Cross-market relative value, curve trades, and MBS relative value. It employs a two-step investment process that governs the entry and exit decision of any trade: (1) identification of relative value opportunities and (2) portfolio optimization, capital allocation and leverage. Quantitative models and analytical tools are used extensively in each step of the investment process. The Strategy is intended to be 'market neutral' where the objective is to generate uncorrelated excess returns with low levels of volatility. A 'market neutral' strategy is defined as one with limited exposure to credit, interest rate, and option (prepayment) risks. Interest rate exposure is kept in check with various duration limits. Prepayment neutrality is achieved by taking the prepayment sensitivity, with respect to market-implied prepayment expectations, close to zero. The Strategy may employ up to fifteen times leverage.

**Opportunistic MBS:** This Strategy will pursue a long-only fixed income strategy that emphasizes investments in complex MBS deemed to offer high absolute returns. The Strategy focuses on fundamentally undervalued MBS. The Strategy's objective is to outperform high quality fixed income indices, net of fees. Fundamental to the Strategy is the belief that complicated MBS are at times undervalued, due to supply-demand imbalances, negative investor psychology, the complexity of the valuation process, and many investors' aversion to assets that are difficult to analyze. These factors may cause inefficiency in the marketplace.

The primary goal is to earn high rates of return, factoring in associated risks, through long-term investments in well-analyzed securities. This Strategy will typically hold about thirty to fifty positions, in assets that the Advisor believes provide the greatest amount of cash flow and total return potential at the least cost. This Strategy uses a two-step investment process. First is selection of individual securities that look attractive compared to other available assets in the market, due to yield and duration characteristics. Second is a sensitivity analysis on that security based on varying assumptions with respect to interest rate movements and prepayment rates, across several time horizons, to gauge how the security will impact the portfolio's reaction to changes in market environment. A security will generally be purchased if it is expected to increase the portfolio's yield without adding incremental sensitivity across market conditions. The Strategy is not expected to employ leverage.

## Municipal Arbitrage

The municipal yield curve has generally been steeper than a hypothetical "efficient tax-exempt curve" (*i.e.*, the taxable yield curve adjusted downward by the highest U.S. federal income tax rate of 35%). The Strategy seeks to take advantage of this inefficiency by purchasing long-term municipal bonds and by hedging interest rate risk in the taxable market, with the objective of locking in spreads and attempting to stabilize portfolio value. The Strategy will seek to mitigate the accompanying interest rate risks through hedging strategies developed by the Advisor.

12

In general, this Strategy is intended to capitalize on dislocations in closely correlated and substantially offsetting positions, while seeking to mitigate much of the directional interest-rate risk to which long municipal securities positions would otherwise be subject. The primary trading approach involves purchasing leveraged investments in medium-term to long-term municipal bonds while hedging long positions in these investments with swaps, swaptions and similar instruments. These combinations of long and short positions will typically be used in an attempt to capitalize on long vs. short-term interest-rate differentials.

The Strategy may employ up to ten times leverage on capital and the Advisors and any sub-advisors will have discretion in hedging interest rate exposure within the Strategy's specified guidelines.

*The Funds*

The Portfolios will access Advisors by making investments in Funds. It is expected that each of the Funds will be a limited liability entity for which the Investment Manager will act as Investment Manager. Each Fund will operate under a different investment mandate and will limit its asset allocations within a single Strategy. Initially, there will be one Fund for each of the current Strategies. In the future, additional Funds may be organized to gain access to new Strategies or for other reasons. No assurance can be given that a Portfolio will invest in a specific Fund.

The Investment Manager may also invest a Portfolio's assets directly (rather than through a Fund), for example, for investment purposes, hedging purposes or to rebalance the Portfolios' investments. In addition, the Investment Manager will normally invest a portion of a Portfolio's assets directly in Eligible Investments.

*Risk Management*

The Investment Manager will employ an ongoing risk management process that will seek to achieve: (i) diversification across trading styles, asset classes and markets; and (ii) discretionary application, where possible, of exposure limits and leverage limits and stop losses. The Investment Manager's regular risk management review will include: (i) a frequent review of trade reports and risk profiles for each Advisor; and (ii) ongoing quantitative and qualitative monitoring of Advisors. From time to time, the Investment Manager may modify or change its risk management system in its sole discretion.

To the extent a Portfolio invests in a Third-Party Fund in order to have access to a particular Advisor or Strategy, the Investment Manager is more limited in its ability to monitor and control risks (*e.g.*, the ability to obtain current investment information and impose and enforce stop loss limits), and the relevant Fund may liquidate its investments in such Third-Party Funds only as permitted by the constituent documents of such Third-Party Funds.

**No risk management process is fail-safe, and no assurances can be given that the Investment Manager's risk management process will achieve its objective.**

**The Portfolios' investment programs are speculative and entail substantial risks. There can be no assurance that the investment objectives of any Portfolio will be achieved or that substantial losses will not be incurred. In fact, certain investment practices to be employed by the Funds and/or the Advisors can, in some circumstances, substantially increase any adverse impact on the Portfolios' investments.   (See "Risk Factors.")**

## MANAGEMENT OF THE COMPANY

*The Managing Member*

The managing member of the Company is AMACAR GP, Inc., a Delaware corporation. The Managing Member is unaffiliated with the Investment Manager and Citigroup. The Managing Member will be deemed a "manager" of the Company within the meaning of the Delaware Limited Liability Company Act. Subject to the provisions of the LLC Agreement, the Managing Member will delegate substantially all authority to manage the day-to-day operations and the assets of the Company and each Portfolio to the Investment Manager pursuant to the

13

Investment Management Agreement. The Managing Member is exempt from registration with the CFTC as a commodity pool operator pursuant to Rule 4.13(a)(4) promulgated under the CEA.

The Managing Member will be entitled to receive from the Company for its service as Managing Member an initial fee and an annual fee as set forth in the LLC Agreement, which may be adjusted from time to time upon the recommendation of the Investment Manager. The Managing Member will be reimbursed for all reasonable out-of-pocket expenses incurred by it in connection with its services.

The Managing Member may resign at any time upon giving ninety days' prior written notice to the Company. Notwithstanding the foregoing, such resignation will not become effective unless and until a successor Managing Member is selected, appointed and admitted as Managing Member to perform the services required under the LLC Agreement.

The Managing Member may be removed by a majority-in-interest of the Members.

### The Investment Manager

Citigroup Alternative Investments LLC (the **"Investment Manager"** or **"CAI"**) is the alternative investment management arm of Citigroup. In connection with its role as Investment Manager to the Company, the Investment Manager will act through its Structured Alternative Investments group. The Investment Manager, a Delaware limited liability company, is an indirectly wholly-owned subsidiary of Citigroup. CAI products include structured alternative investments, hedge funds, private equity, investment grade credit structures, non-investment grade credit structures, managed futures and real estate. The CAI staff is comprised of a select group of senior investment professionals with extensive experience in the securities and investment industry. These individuals have been leading innovators in developing and managing funds for U.S. and non-U.S. investors. As of April 30, 2004, CAI had assets under management in excess of $72.5 billion.

The Company, on behalf of each Portfolio, and each of the Funds has entered into investment management agreements with the Investment Manager (each an **"Investment Management Agreement"**), pursuant to which the Investment Manager will provide investment management services to the Portfolios and the Funds. Generally, any party to an Investment Management Agreement may terminate it as to itself by providing at least ninety days' prior written notice to the other parties. Any of the Company or the Funds may terminate its Investment Management Agreement if the Investment Manager commits a material breach of the Investment Management Agreement. In the event the Investment Management Agreement is terminated with respect to the Company, it is the intention of the Managing Member to dissolve the Company pursuant to the LLC Agreement.

The Investment Management Agreements provide that none of the Investment Manager, any person controlling, controlled by or under common control with the Investment Manager or any of their respective shareholders, members, directors, partners, officers or employees (collectively, **"Investment Manager Parties"**) or the legal representatives of any of them (each, an **"Indemnified Party"**) will be liable to any Member, any Portfolio or any Fund for mistakes of judgment or for action or inaction that did not constitute gross negligence, willful misconduct or bad faith, or for losses due to such mistakes, action or inaction or to the negligence, dishonesty or bad faith of any Advisor, broker or agent of the Portfolio or Fund, provided that such Advisor, broker or agent was selected, engaged or retained by the Investment Manager in accordance with the standard of care set forth above. An Indemnified Party may consult with counsel and accountants in respect of Portfolio or Fund affairs and will be fully protected and justified in any action or inaction which is taken in accordance with the advice or opinion of such counsel or accountants, provided that they were selected in accordance with the standard of care set forth above. The foregoing provisions (as well as the indemnification provisions described below), however, shall not be construed to relieve an Indemnified Party of any liability to the extent that such liability may not be waived, modified or limited under applicable law (including liability under Federal securities laws which, under certain circumstances, impose liability even on persons acting in good faith).

The Investment Management Agreement provides that the Portfolios or the Funds shall indemnify and hold harmless from and against any loss, cost or expense suffered or sustained by an Indemnified Party by reason of the fact that he or it is or was an Indemnified Party, including, without limitation, any judgment, settlement, attorneys' fees and other costs or expenses incurred in connection with the defense of any actual or threatened action or

proceeding (collectively, **"Losses"**), provided that such Losses did not result from the gross negligence, willful misconduct or bad faith of an Indemnified Party. The Portfolios or the Funds will be obligated to advance to any Indemnified Party attorneys' fees and other costs and expenses incurred in connection with the defense of any action or proceeding that arises out of such conduct. The Portfolios and the Funds and the Investment Manager have agreed, and each other Indemnified Party shall agree, that in the event that any such advance is made, such Indemnified Party will be required to reimburse the Portfolios or the Funds for such fees, costs and expenses to the extent that it shall be determined that it was not entitled to indemnification under the Investment Management Agreement.

### Administrator

U.S. Bank, National Association serves as the Administrator of the Company. The Administrator will provide certain accounting and administrative services, including, but not limited to: (i) obtaining performance information from the Funds; (ii) preparing monthly Shareholding information with respect to each Member; (iii) calculating Management Fees and Incentive Allocations; (iv) preparing monthly financial statements for the Company and each Portfolio; (v) maintaining accounting books and records for the Company and each Portfolio; (vi) maintaining subscription information with respect to Members and with respect to the investments of each Portfolio; (vii) assisting the Managing Member and the Investment Manager in preparing communications to Members, including providing performance information for each Portfolio; (viii) processing new subscriptions for Shares and redemptions; and (ix) maintaining a client file for each Member.

Under the Administration Agreement between the Company and the Administrator (**"Administration Agreement"**), the Company has agreed to reimburse, indemnify, and hold harmless the Administrator and the Administrator's officers and employees from and against certain liabilities, costs, fines, damages, expenses, losses and attorneys' fees incurred in connection with the Company,.

The Administration Agreement may be terminated at any time without penalty by any party upon not less than ninety days' written notice.

### Advisory Board

The Company and each Fund may, if necessary, have an Advisory Board (the **"Advisory Board"**) which will be responsible for approving any principal transactions subject to Rule 206(3) of the Advisers Act, significant transactions between a Portfolio or a Fund and the Investment Manager or its affiliates such as securities purchased from or derivatives entered into with the Investment Manager or its affiliates, and similar transactions involving significant conflicts of interest. At all times, all members of the Advisory Board will be unaffiliated with the Investment Manager. The Investment Manager and its affiliates are not required to obtain Advisory Board approval for any transaction unless such approval is required by law. Any single member of the Advisory Board may approve such transactions.

The Portfolios and the Funds may purchase and maintain insurance for the benefit of members of its respective Advisory Board against liabilities incurred in connection with the discharge of their functions. No member of the Advisory Board will incur any liability in respect of any loss arising out of any instruction, advice, or recommendation given by such Advisory Board, unless such loss arises by reason of the gross negligence, bad faith, or willful misconduct of such member. Each member of the Advisory Board will be indemnified out of the assets of the relevant Portfolio or the relevant Fund against any actions, costs, claims, damages, expenses, or demands incurred by them in connection with the exercise or performance of their powers and duties, other than any such action, claims, costs, damages, expenses, or demands incurred by reason of the gross negligence, bad faith, or willful misconduct of such member .

A member of the Advisory Board may be a director or other officer or employee of any company that provides services to the Company or any Fund or in which the Company or any Fund may be interested and, unless otherwise agreed, no such member of the Advisory Board will be accountable to the Company or any Fund for any remuneration or other benefits received thereby.

## FEES, EXPENSES AND INCENTIVE ALLOCATION

*Management Fee*

The Investment Manager will be entitled to receive a Management Fee with respect to the Net Assets of each Series. The Management Fee will be paid monthly in arrears and be appropriately pro rated for partial periods. The Management Fee will equal 1/12 of the Management Fee Rate of the Net Assets of each Series as of the end of each calendar month. No Management Fee will be paid with respect to Eligible Investments. The Management Fee may be paid at the Fund level or the Portfolio level or partly at one level and partly at the other level. The Investment Manager will not receive any other fees with respect to the Net Assets of each Series but will receive the Incentive Allocation described below.

As additional compensation, the Investment Manager may pay the Placement Agents or any other selling agents whose clients have purchased Shares from its Management Fee. The Investment Manager may in its discretion rebate any or all of the Management Fee in respect of any Member, without thereby entitling any other Member to such a rebate.

*Advisor Fees*

Advisors generally will receive both management fees (percentage of allocated assets) and incentive compensation (percentage of profits from the allocated assets). However, Advisors will not charge such fees to the Funds. The Investment Manager will pay all such fees out of the Management Fee.

*Incentive Allocation*

As of the end of each Incentive Allocation Calculation Period in respect of a Series, there will be debited (such debit being referred to as the **"Incentive Allocation"**) from the Net Assets of such Series (after such Series has been credited with its share of any increase in Portfolio Net Assets in accordance with the provisions of the LLC Agreement), an Incentive Allocation. The Incentive Allocation will be calculated as described below and will be payable in arrears.

The Incentive Allocation is designed to provide the Investment Manager the Incentive Allocation Percentage of the increase, if any, during an Incentive Allocation Calculation Period of the excess of aggregate Total Returns to each Series over any applicable Cumulative Benchmark Return. The Incentive Allocation Percentage and any Hurdle Rate applicable to each Series will be set forth in the applicable Series Supplement. Returns to investors in any Series will not be affected by the Incentive Allocation payable in respect of any other Series. The Investment Manager may waive all or any portion of an Incentive Allocation and the portion of any Incentive Allocation that is waived will be treated as having been paid for purposes of calculating subsequent Period Incentive Allocations.

For purposes of the foregoing:

**"Incentive Allocation Calculation Period"** is each calendar quarter, provided that an Incentive Allocation Calculation Period will be deemed to end on the date of Redemption of any Shares redeemed other than on a calendar quarter end with respect to such Shares.

**"Total Return"** of a Series for any period is the amount of increase or decrease in Net Asset Value for such Series during such period, after adding back any Redemption and Distribution Amount for such period.

**"Cumulative Return"** of a Series at any date is the cumulative amount of that Series' Total Return for all periods since inception of such Series through such date.

**"Redemption and Distribution Amount"** for any period is the dollar value of all distribution payments and redemption payments made to such Series during such period.

16

"**Initial Capital**" of a Series is the dollar value of the capital on the date of the inception of such Series.

"**Benchmark Return**" of a Series for any period is the dollar amount of return for the period that would be earned by multiplying the Hurdle Rate by the Benchmark Amount on the prior period end date.

"**Hurdle Rate**" of a Series, is the rate, if any set forth in the Supplement related to such Series.

The "**Benchmark Amount**" of a Series on a period end date is the prior period's Benchmark Amount (which will equal Initial Capital in the first period beginning with the inception of such Series) plus the Benchmark Return for such Series less the Distribution and Redemption Adjustment for such period.

"**Cumulative Benchmark Return**" of a Series at any date is the cumulative amount of Benchmark Return since inception of such Series through such date.

"**Distribution and Redemption Adjustment**" on any period end date is the Redemption and Distribution Amount for such period multiplied by a ratio the denominator of which is Initial Capital plus Cumulative Return and the numerator of which is Initial Capital plus Cumulative Benchmark Return.

"**Cumulative Incentive Allocation Earned**" of a Series at any date equals the Incentive Allocation Percentage, multiplied by the excess of Cumulative Return over Cumulative Benchmark Return.

"**Incentive Allocation Percentage**" is the rate set forth in the Supplement related to a Series.

"**Cumulative Incentive Allocation Paid**" of a Series is the cumulative amount of Period Incentive Allocation paid since inception relating to such Series.

"**Period Incentive Allocation** for any period is the amount of Incentive Allocation payable, as of the period end date. The Period Incentive Allocation equals Cumulative Incentive Allocation Earned through the end of the period less the amount of Cumulative Incentive Allocation Paid, if positive.

Once allocated to the Investment Manager, the Incentive Allocation is not refundable even though the Series may subsequently experience losses.

The Investment Manager may in its discretion rebate any or all of the Incentive Allocation in respect of any Member, without thereby entitling any other Member to such a rebate. As additional compensation, the Investment Manager may pay the Placement Agents or any other selling agents whose clients have purchased Shares from its Incentive Allocation.

*Placement Fees*

Affiliates of the Investment Manager (each, a "**Placement Agent**" and collectively, the "**Placement Agents**") may be appointed to act as non-exclusive placement agents for the Company. The Placement Agents may charge investors a placement fee (the "**Placement Fee**"). Any such Placement Fee will be paid by the investor directly, in addition to the investor's subscription amount, and will not be paid from assets of the Company. The Placement Fee will not be payable to or by the Company or to the Investment Manager in connection with the offering of Shares. The Investment Manager or a Placement Agent may enter into arrangements with other selling agents who will receive compensation as agreed by the Investment Manager or a Placement Agent and such selling agents. As additional compensation, the Investment Manager may pay Placement Agents or any such selling agents from its Management Fee or Incentive Allocation. A prospective investor solicited by a selling agent will be advised, and asked to acknowledge its understanding, of any such arrangements.

17

*Portfolio and Fund Expenses*

The Managing Member and the Investment Manager will each be responsible for the salaries and employee benefit expenses of their employees and those of their respective affiliates involved in the management and conduct of the Company's business and affairs and related overhead (including rent, utilities and other similar items).

Each Portfolio shall pay such other costs and expenses as the Investment Manager shall reasonably determine to be necessary, appropriate, advisable or convenient to effect the formation of the Company and such Portfolio and to carry on the businesses, purposes and activities for which they were formed, such as: (i) organizational costs and expenses, and offering costs and expenses incurred in connection with the organization of the Company and any Portfolio and the offer and sale of Shares sold on the date of the Initial Closing (**"Initial O&O Costs"**); (ii) the costs and expenses incurred in connection with the offer and sale of Shares subsequent to the Initial Closing; (iii) interest expense on Portfolio and Fund borrowings (including repurchase agreements); (iv) insurance and custody costs and expenses; (v) direct operating expenses, including legal, accounting, audit and tax preparation fees and expenses, printing and mailing costs, government fees, and taxes (if any); (vi) fees of third-party service providers engaged to perform accounting or reporting or valuation functions, including the fees of the Administrator; (vii) expenses (including travel expenses) incurred in connection with negotiating agreements with and performing due diligence on Advisors and other service providers; (viii) indemnification obligations; and (ix) extraordinary expenses (if any). Each Fund will pay its own Initial O&O Costs. The Portfolios will bear the expenses of the Funds as investors in the Funds.

Each Portfolio will pay its Initial O&O Costs, which will be amortized by such Portfolio in varying amounts as determined by the Investment Manager over not less than sixty months, beginning with the month in which the Initial Closing occurs, for purposes of determining Net Assets and Total Return. Each Fund may or may not similarly amortize its Initial O&O Costs. In the event a Portfolio is terminated prior to the full amortization of the Initial O&O Costs, any remaining unamortized Initial O&O Costs will be treated as an expense for purposes of calculating Net Assets of such Portfolio. Although the amortization of the Initial O&O Costs is a divergence from U.S. generally accepted accounting principles ("GAAP"), the Investment Manager believes that doing so is more equitable than requiring the initial Members in any Portfolio to bear all of the Initial O&O Costs as would otherwise be required under GAAP. Such divergence may be a cause for qualification in any opinion given to the Portfolios by their auditor.

All fees and expenses shall be charged to the Portfolio and Series in respect of which they are incurred or, where an expense is not considered by the Investment Manager to be attributable to any one Portfolio or Series, the expense will be allocated to each Portfolio and Series *pro rata* in accordance with the relative Shares of such Portfolio and Series. In the case of any fees or expenses of a regular or recurring nature, such as audit fees, the Investment Manager may calculate such fees and expenses as an estimated figure for yearly or other periods in advance and accrue the same in equal proportions over any such period.

## RISK FACTORS

*The Shares are a speculative investment that involves significant risks, and there can be no assurance that any Portfolio will achieve its objective or that a Portfolio and its Members will not incur losses. In considering an investment in any Portfolio, prospective investors should consult their independent legal, tax, financial and other advisors, and should be aware of certain considerations and risk factors, which include, but are not limited to, the risks described below.*

<u>General</u>

**Risk of Loss**

All securities investments risk the loss of capital. The Investment Manager will seek to mitigate this risk through investment restrictions and careful Advisor selection and oversight, but an investment in a Portfolio is nevertheless subject to loss, **including possible loss of the entire amount invested**. No guarantee or representation is made that a Portfolio's investments will be successful, and investment results may vary substantially over time.

18

The past results of the Investment Manager and the Advisors in managing portfolios of investments are not necessarily indicative of any Portfolio's future performance.

## Lack of Investment History

The Company is a newly organized entity and has no performance history. Although the management of each Fund is expected to be guided by an approach that is substantially similar to the approach each Advisor applied in the past, no assurance can be given that the Advisors will be able to replicate past results.

## Reliance on Investment Manager

The Investment Manager will manage the Portfolios. The Members will not be entitled to make decisions with respect to the management, disposition or other realization of any investment made by a Portfolio, or regarding the Portfolios' business and affairs. Consequently, the success of the Portfolios will depend, in large part, upon the skill and expertise of the Investment Manager and the selected Advisors.

The success of the Portfolios' investment activities will depend on the ability of the Investment Manager and Advisors to identify investment opportunities and to exploit price discrepancies in the capital markets. Identification and execution of the investment strategies to be pursued by the Portfolios involves a high degree of uncertainty. No assurance can be given that the Investment Manager and Advisors will be able to locate suitable investment opportunities in which to deploy all of a Portfolio's capital. Changes in the volatility and pricing inefficiency of the markets in which the Portfolios will seek to invest, as well as other market factors, could reduce the scope for the Portfolios' Strategies.

## Reliance on Historical Data

The Investment Manager has selected the initial Strategies (and expects to select any additional or replacement Strategies)because they historically exhibit statistical volatility, return and correlation characteristics and are relatively uncorrelated to each other and to traditional investment strategies. This Strategy allocation is heavily dependent on the Investment Manager's analysis of historical data, and, in particular, statistical volatility, return and correlation characteristics. No assurance can be given that the historical parameters will accurately predict future characteristics. To the extent that future events may vary significantly from these historical parameters upon which the Strategy allocation is based, the allocation to Strategies may not provide the expected levels of risk, return and volatility and may result in a Portfolio experiencing significant losses or failing to achieve its targeted returns.

## Company and Portfolios Not Registered

Neither the Company nor any Portfolio is registered under the Investment Company Act or any other U.S. federal or state securities laws or the laws of any other jurisdiction. Therefore, the Company and the Portfolios will not be required to comply with the provisions of the Investment Company Act, some of which provides certain protections to investors and imposes certain restrictions on registered investment companies, none of which will apply to the Company or any Portfolio.

## Delay in Investing Capital Contributions; Dilution

There will be a significant delay between the time a Portfolio receives a Capital Contribution and the time that such funds can be fully invested in the Strategies. Such delay could extend for from six to nine months or in certain cases longer. The duration of such delay will vary with market conditions. There can be no assurance that assets net yet fully invested in the Strategies will earn any minimum level of return. Hence, there will be a ramp-up period following the Initial Closing of each Portfolio that could adversely affect the returns of the Portfolio. Similarly, Capital Contributions received at Subsequent Closings will have the effect of diluting the exposure of previously issued Series to the Strategies.

19

### Changes in Allocations

The Investment Manager may from time to time change the percentage of a Portfolio's assets allocated to each Fund and may terminate and retain new Advisors from time to time and delete and add Strategies from time to time. These changes will be made in the Investment Manager's sole discretion. Each Portfolio's success will depend on the Investment Manager's ability to identify and allocate such Portfolio's assets among new and existing Strategies and Funds, **including possibly allocating Portfolio assets to Funds managed by the Investment Manager or its affiliates.**

The Portfolios are not restricted in appointing or replacing Advisors. Although not anticipated, the Company's investment policies might result in substantial Advisor turnover. Investments with a particular Advisor or Fund may be replaced for a variety of reasons, such as a more favorable investment opportunity or other circumstances bearing on the desirability of a continued position with such Advisor.

### Illiquidity and Non-Transferability of Shares

The Shares represent highly illiquid investments and should only be acquired by investors able to commit their funds for an indefinite period of time. Members will not be permitted to Transfer their Shares without the consent of the Investment Manager, which may be withheld in its sole discretion, and the satisfaction of certain other conditions, including compliance with applicable securities laws. Investors should not expect the Investment Manager to grant its consent to Transfers. There is currently no market for Shares, and it is not contemplated that one will develop. Members thus may not be able to liquidate their investment in the event of an emergency or for any other reason, and Shares may not be readily accepted as collateral for a loan. Members may generally only redeem Shares in accordance with any Lock-Up Period, subject to Redemption Fees specified in this Memorandum or in the relevant Supplement and only upon substantial prior written notice to the Investment Manager. Furthermore, even such Redemption rights are subject to suspension by the Investment Manager under certain circumstances.

### Investment Risk

### Market Effects

Investments of the kind acquired by a Fund may be affected by, among other things: changing supply and demand relationships; governmental laws, regulations and enforcement activities, trade, fiscal and monetary programs and policies; and national and international political and economic developments. The effect of such factors on the prices of financial assets in general, or a particular asset, is difficult to predict. Each Fund competes with other similar investors in locating suitable securities for investment.

### General Economic Conditions

The success of any investment activity is affected by general economic conditions, which may affect the level and volatility of interest rates and the extent and timing of investor participation in the markets for both credit and interest sensitive instruments. Unexpected volatility or illiquidity in the markets in which a Portfolio (directly or indirectly) holds positions could impair such Portfolio's ability to carry out its business or cause it to incur losses.

### Illiquidity of Underlying Investments

Certain of the Advisors will invest in illiquid investments. Illiquidity increases risk and may make it impossible to close out positions against which the market is moving, as well as cause delays in the payment of withdrawal proceeds to a Portfolio. Lack of liquidity can make it economically unfeasible for a Fund to recognize profits or limit losses on open positions.

In particular, a Fund may from time to time invest in restricted, as well as thinly traded, securities (including privately placed securities, which are subject to resale restrictions). There may be no trading market for these securities, and a Fund might only be able to liquidate these positions, if at all, at disadvantageous prices. As a result,

a Fund may be required to hold such securities despite adverse price movements. In addition, if a Fund makes a short sale of an illiquid security, it may have difficulty in covering the short sale, resulting in a potentially unlimited loss on that position.

Additionally, certain securities that may be traded by a Fund are not listed on any recognized securities exchange or automated quotation system and no regular market has developed for such interests. This illiquidity may restrict the ability of a Fund to dispose of such in a timely fashion and at a fair price. Although an Advisor typically has the discretion to defer redemption requests, it is possible that a Fund will sell securities at unfavorable prices in order to fund redemptions/reallocations from such Fund.

Each Advisor will value the illiquid securities in its Fund's portfolio in its good faith discretion, subject to specified guidelines. Although there can be no assurance that these valuations will accurately predict the price at which an arm's-length buyer would be willing to purchase the securities, these valuations are part of the calculation of the Fund's (and ultimately the Portfolio's) Net Assets.

## Certain Risks Associated with Investing in Debt Securities

The debt securities in which a Fund invests may be subject to price volatility due to various factors including, but not limited to, changes in interest rates, market perception of the creditworthiness of the issuer and general market liquidity. Additionally, a Fund may invest in non-investment grade debt securities, which are typically subject to greater market fluctuations and risks of loss of income and principal than lower yielding, investment grade securities and are often influenced by many of the same unpredictable factors which affect equity prices. In addition to the sensitivity of debt securities to overall interest-rate movements, debt securities involve a fundamental credit risk based on the issuer's ability to make principal and interest payments on the debt it issues. A Fund's investments in debt securities may experience substantial losses due to adverse changes in interest rates and the market's perception of issuers' creditworthiness.

## Certain Risks Associated with Investing in Mortgage, Commercial Mortgage and Asset Backed Securities

Prices of mortgage, commercial mortgage and asset backed securities and their derivatives can be highly volatile. Price movements for such securities are influenced by, among other things, changing supply and demand relationships; government, trade, fiscal and economic events; and changes in interest rates. Mortgage-related securities ("MRS"), commercial mortgage-backed securities ("CMBS") and asset-backed securities ("ABS") are generally traded among broker-dealers and other institutional investors in over-the-counter markets. Such traders are generally not obligated to continue to make markets and may discontinue making markets or make investments only at very wide spreads at any time. A Fund's portfolio may include securities which are not actively and widely traded or which are not registered under U.S. federal and state securities laws and are therefore subject to restrictions on resale. Consequently, it may be relatively difficult for a Fund to dispose of investments rapidly and at favorable prices in connection with redemption requests, adverse market developments or other factors. There is no assurance that a liquid secondary market will exist for mortgage backed securities and related derivatives purchased or sold, and a Fund may be required to maintain a position until exercise or expiration, which could result in losses.

The markets in collateralized mortgage obligations ("CMOs") were developed specifically to reallocate the various risks inherent in MRS and CMBS across various bond classes ("tranches"). For example, CMO "companion" classes typically experience much greater average life variability than other CMO classes or MRS pass-throughs. Interest-only and principal-only pass-through securities experience greater yield variability relative to changes in prepayments. "Inverse floaters" (whose interest payments tend to increase as prevailing market rates decrease, and vice versa) experience greater variability of returns relative to changes in interest rates. To the extent that Funds concentrate their investments in these or other "derivative" securities, the prepayment risks, interest rate risks and hedging risks associated with such securities will be severely magnified.

Investments in subordinated MRS, CMBS and ABS involve greater credit risk of default than the senior classes of the issue or series. Default risks may be further pronounced in the case of MRS, CMBS and ABS secured by, or evidencing an interest in, a relatively small or less diverse pool of underlying mortgage loans. Certain subordinated securities ("first loss securities") absorb all losses from default before any other class of securities is at risk. Such securities therefore possess some of the attributes typically associated with equity investments.

21

**Pre-Payment and Reinvestment Risk**

Prepayments can adversely affect a variety of instruments in which the Portfolios or Funds may invest. The frequency at which prepayments (including voluntary prepayments by the obligors and liquidations due to default and foreclosures) occur on loans underlying MRS, CMBS and ABS will be affected by a variety of factors including the prevailing level of interest rates as well as economic, demographic, tax, social, legal and other factors. Generally, mortgage obligors tend to prepay their mortgages when prevailing mortgage rates fall below the interest rates on their mortgage loans. Certain of the factors that affect the rate of prepayments on MRS and CMBS also affect the rate of prepayments on ABS. However, during any particular period, the predominant factors affecting prepayment rates on MRS, CMBS and ABS may be different.

In general, "premium" securities (securities whose market values exceed their principal or par amounts) are adversely affected by faster than anticipated prepayments, and "discount" securities (securities whose principal or par amounts exceed their market values) are adversely affected by slower than anticipated prepayments. Since many MRS and CMBS will be discount securities when interest rates are high, and will be premium securities when interest rates are low, these MRS and CMBS may be adversely affected by changes in prepayments in any interest rate environment.

The adverse effects of prepayments may impact a Fund in two ways. First, particular investments may experience outright losses, as in the case of an interest-only security in an environment of faster actual or anticipated prepayments. Second, particular investments may underperform relative to hedges that an Advisor may have constructed for these investments, resulting in a loss to the Fund. In particular, prepayments (at par) may limit the potential upside of many MRS and CMBS to their principal or par amounts, whereas their corresponding hedges often have the potential for unlimited loss.

Prepayments can also impact bank loan investments. Pursuant to a bank loan agreement, a borrower may be required in certain circumstances, and may have the option at any time, to prepay the principal amount of a bank loan, generally without incurring a prepayment penalty. The rate of such prepayments may be affected by, among other things, general business and economic conditions, as well as the financial status of the borrower. Should such prepayments occur, it is possible that reinvestment of such amounts may not be on terms as favorable to a Fund as such initial investment.

**Index Risk**

A Fund may also invest in structured notes, variable rate MRS, CMBS and ABS, including adjustable-rate mortgage securities, which are backed by mortgages with variable rates, and certain classes of CMO derivatives, the rate of interest payable under which varies with a designated rate or index. The value of these investments is closely tied to the absolute levels of such rates or indices, or the market's perception of anticipated changes in those rates or indices. This introduces additional risk factors related to the movements in specific indices or interest rates that may be difficult or impossible to hedge, and that also interact in a complex fashion with prepayment risks.

**"Basis" and Hedging Risks**

A Fund is subject not only to the risk of significant changes in the absolute level of interest rates, but also to the "basis" risk of fluctuations in the spread between the price of MRS, CMBS, ABS, or corporate or municipal securities and comparable U.S. Treasury securities. MRS, CMBS, ABS and municipal securities exhibit a characteristic referred to as "negative convexity." "Convexity" is a measure of the rate at which the duration of a security changes with changes in interest rates (the longer the duration of a security, the more it falls in value as interest rates rise and vice versa). Because the duration of MRS, CMBS and ABS is affected by the likelihood of the underlying assets being prepaid (whereas Treasury securities are not, in general, prepayable), mortgage-backed securities fall in value faster than the comparable Treasury when rates rise (because the likelihood of prepayments is diminished and the duration of the security increases). Conversely, MRS, CMBS and ABS increase in value less quickly than do the comparable Treasury securities when interest rates fall (because the decrease in rates increases the likelihood of prepayment). This "negative convexity" creates a significant risk that a Fund's attempt to capture the mortgage backed Treasury spread will fail due to losses of principal incurred when spreads widen. Basis risk

22

may also occur because of trades that arbitrage the spread of similar securities such as MBS and different agencies, or MRS and LIBOR swaps.

To hedge a Fund's exposure to declines in the value of assets as a result of increasing interest rates, a Fund may enter into hedge agreements. Developing an effective interest rate risk management strategy is complex, and no management strategy can completely insulate a Fund against (nor will the Investment Manager or any Advisor attempt to completely eliminate) all potential risks associated with its economically leveraged investment in fixed income assets. For example, a Fund will be exposed to basis or spread risk, in that the price performance of the investment and the hedge agreements may not exactly offset one another. In addition, a Fund may incur significant costs if it is required to terminate a hedge agreement before its stated expiration date. In addition, the hedge agreements will involve transaction costs, which will reduce the Fund's income and Net Assets.

A Fund's hedging policies give substantial discretion to an Advisor in determining the type of hedge agreements to be executed by such Fund, as well as the tenor, notional amount and other terms of those agreements. The decisions made in implementing a Fund's hedging policies may affect significantly a Fund's income and Net Assets, and ineffective hedging could lead to material losses to investors. No assurance can be given that the Advisor will be able to implement a Fund's hedging policies effectively.

## Sensitivity to Interest Rate Changes for Unhedged Investments

When interest rates decline, the value of a portfolio invested in unhedged fixed-rate obligations can generally be expected to rise. Conversely, when interest rates rise, the value of a portfolio invested in fixed-rate obligations can be expected to decline. It is possible that changes in prevailing interest rates will cause some fluctuation in a Portfolio's Net Assets. Although the Investment Manager will attempt to minimize Portfolio duration to no more than that of a four year Treasury obligation, there can be no assurance that such interest rate hedge will be effective. Certain Strategies may not hedge their interest rate exposure.

## Derivatives

A Fund may use derivative instruments, including, without limitation, warrants, options, swaps, notional principal contracts, forward contracts, futures contracts and options thereon, and may use derivative techniques for hedging and for other trading purposes. The use of derivative instruments involves a variety of material risks, including the extremely high degree of leverage often embedded in such instruments and the possibility of counterparty non-performance as well as of material and prolonged deviations between the actual and the theoretical value of a derivative (i.e., due to nonconformance to anticipated or historical correlation patterns). In addition, the markets for certain derivatives are frequently characterized by limited liquidity, which can make it difficult as well as costly for a Fund to close out positions in order either to realize gains or to limit losses.

Many of the derivatives traded by a Fund are expected to be principal-to-principal or "over-the-counter" contracts between the Fund and third parties entered into privately, rather than on an exchange. As a result, a Fund will not be afforded the regulatory and financial protections of an exchange or its clearinghouse (or of the government regulator that oversees such exchange and clearinghouse). In privately negotiated transactions, the risk of the negotiated price deviating materially from fair value can be substantial, particularly when there is no active market available from which to derive benchmark prices.

Many derivatives are valued on the basis of dealers' pricing of these instruments. However, the price at which dealers value a particular derivative and the price which the same dealers would actually be willing to pay for such derivative should a Fund wish or be forced to sell such position may be materially different. Such differences can result in an overstatement of the Net Assets of a Fund (and, accordingly, of a Portfolio) and may materially adversely affect a Fund in situations in which a Fund is required to sell derivative instruments.

A Fund's use of derivatives and other techniques (such as short sales) for hedging purposes involves certain additional risks, including: (i) imperfect correlation between movements in the asset on which the derivative is based and movements in the asset being hedged; and (ii) possible impediments to effective portfolio management or the ability to meet short-term obligations because of the percentage of a Fund's assets segregated to secure its

obligations under derivatives contracts. By hedging a particular position, a Fund limits the potential gain from an increase in value of the position, but may not achieve a commensurate benefit in risk control.

**Credit Default Swaps**

A Fund may purchase and sell credit default swaps, both for hedging and other purposes. The typical credit default swap contract requires the seller to pay to the buyer, in the event that a particular reference entity experiences specified credit events, the difference between the notional amount of the contract and the value of a portfolio of securities issued by the reference entity that the buyer delivers to the seller. In return, the buyer agrees to make periodic payments equal to a fixed percentage of the notional amount of the contract. A Fund may also purchase or sell credit default swaps on a basket of reference entities as part of a synthetic collateralized debt obligation transaction.

As a buyer of credit default swaps, a Fund is subject to certain risks in addition to those described under "Derivatives," above. In circumstances in which a Fund does not own the debt securities that are deliverable under a credit default swap, the Fund is exposed to the risk that deliverable securities will not be available in the market, or will be available only at unfavorable prices, as would be the case in a so-called "short squeeze." In certain instances of issuer defaults or restructurings, it has been unclear under the standard industry documentation for credit default swaps whether or not a "credit event" triggering the seller's payment obligation had occurred. In either of these cases, a Fund would not be able to realize the full value of the credit default swap upon a default by the reference entity.

As a seller of credit default swaps, a Fund incurs leveraged exposure to the credit of the reference entity and is subject to many of the same risks it would incur if it were holding debt securities issued by the reference entity. However, a Fund will not have any legal recourse against the reference entity and will not benefit from any collateral securing the reference entity's debt obligations. In addition, the credit default swap buyer will have broad discretion to select which of the reference entity's debt obligations to deliver to a Fund following a credit event and will likely choose the obligations with the lowest market value in order to maximize the payment obligations of the Fund.

**Non-U.S. Securities**

A Fund may trade and invest in securities in a number of non-U.S. countries. Investing in these securities involves considerations and possible risks not typically involved in investing in securities of companies domiciled and operating in the United States, including instability of some non-U.S. governments, the possibility of expropriation, limitations on the use or removal of funds or other assets, changes in governmental administration or economic or monetary policy (in the United States or abroad) or changed circumstances in dealings between nations. The application of non-U.S. tax laws (e.g., the imposition of withholding taxes on interest payments, income taxes and excise taxes) or confiscatory taxation may also affect such Fund's investment in non-U.S. securities. A Fund may incur higher expenses from investment in non-U.S. securities than from investment in U.S. securities because of the costs that must be incurred in connection with conversions between various currencies and because non-U.S. brokerage commissions may be higher than commissions in the United States. There is generally less government supervision and regulation of exchanges, brokers, and issuers outside the U.S. than there is in the U.S. and there is greater difficulty in taking appropriate legal action in non-U.S. courts. Non-U.S. markets also have different clearance and settlement procedures that in some markets have at times failed to keep pace with the volume of transactions, thereby creating substantial delays and settlement failures that could adversely affect a Portfolio's performance. In addition, less information may be available regarding non-U.S. issuers and non-U.S. companies may not be subject to accounting, auditing, and financial reporting standards and requirements comparable to or as uniform as those of U.S. companies. Further, non-U.S. securities markets may not be as liquid as U.S. securities markets.

**Additional Bank Loan Strategy Risks**

Bank loans and other debt instruments are subject to the risk of nonpayment of scheduled interest and principal payments. Any such nonpayment could result in a reduction in a Fund's income and a decline in the

market value of the particular bank loan so affected. A Fund's ability to receive the principal of and interest on its interest in a bank loan will depend primarily on the financial status of the borrower.

Although many bank loans are structured as senior debt obligations of a borrower and are intended to be fully or partially collateralized by assets of a borrower, in the event of a default, the ability of a lender to have access to the collateral, if any, or otherwise recover its investment may be limited by bankruptcy and other insolvency laws. The value of the collateral may decline subsequent to a Fund's investment in the bank loan. Under certain circumstances, the collateral may be released with the consent of an agent bank and lenders or pursuant to the terms of the underlying credit agreement with the borrower. There is no assurance that the liquidation of the collateral would satisfy the borrower's obligation in the event of nonpayment of scheduled interest or principal, or that the collateral could be readily liquidated. As a result, a Fund might not receive payments to which it is entitled and thereby may experience a decline in the value of the investment.

Interests in bank loans made in connection with leveraged buyouts, recapitalizations and other highly leveraged transactions are subject to enhanced credit risks. These credit risks include the possibility of a default on the bank loan or bankruptcy of the borrower. From time to time, a Fund may consider the acquisition of interests in bank loans that are designed to provide temporary or "bridge" financing to a borrower pending the sale of identified assets or the arrangement of longer-term loans or the issuance and sale of debt obligations. A Fund may also invest in bank loans of borrowers who have obtained bridge loans from other parties. A borrower's use of bridge loans involves a risk that the borrower may be unable to locate permanent financing to replace the bridge loan, which may impair the borrower's perceived creditworthiness.

Although many of the bank loans in which a Fund may invest will generally hold the most senior position in the capitalization structure of the borrower, the capitalization of many borrowers will include non-investment grade subordinated debt. During periods of deteriorating economic conditions, a borrower may experience difficulty in meeting its payment obligations under such bonds and other subordinated debt obligations. Such difficulties may detract from the borrower's perceived creditworthiness, the value and liquidity of the borrower's bank loans or its ability to obtain financing to cover short-term cash flow needs and may force the borrower into bankruptcy or other forms of credit restructuring.

A Fund may invest in unsecured or subordinated bank loans. Unsecured bank loans do not afford the lender recourse to collateral and are thus subject to greater risk of nonpayment in the event of default. Subordinated bank loans are lower in priority of repayment than senior bank loans, and thus carry a greater risk of default, particularly during periods of deteriorating economic conditions.

In addition, a number of judicial decisions in the United States have upheld the right of borrowers to sue lending institutions on the basis of various legal theories (collectively termed "lender liability"). Generally, lender liability is founded upon the premise that the institutional lender has violated a duty (whether implied or contractual) of good faith and fair dealing owed to the borrower or has assumed a degree of control over the borrower resulting in creation of a fiduciary duty owed to the borrower. As an investor in loans, a Fund may be subject to allegations of lender liability.

A pricing agent performs valuation of bank loans where possible based on quotes obtained from other parties. Where quotes are not available, the Advisor values bank loans using other methods. There can be no assurance that any bank loan could be sold at any time for an amount equal to the value assigned to that bank loan.

**Additional Municipal Securities Risk**

Economic conditions can affect issuers of municipal bonds on a regional basis. To the extent possible, a Fund may diversify its direct and indirect interest in municipal bonds with respect to the geographic areas of the issuers of the such municipal bonds in order to mitigate any risk specific to a geographic area. Furthermore, there are only four major municipal bond insurers and a failure by any of these four insurers to pay its obligations related to any municipal bond issuance, due to bankruptcy of the insurer or any other reason, could have a material adverse effect on the value of any municipal bonds that were insured by the defaulting insurer.

**Tax-Exempt Municipal Bonds**

On the date of the initial issuance of any municipal bonds, bond counsel or special tax counsel to the issuer of such bonds will have rendered an opinion that, based on the law in effect on the date of issuance, interest on the municipal bonds is excludable from gross income for U.S. federal income tax purposes. The Internal Revenue Code of 1986, as amended ("**Code**") establishes certain requirements that must be met subsequent to the issuance and delivery of municipal bonds in order that interest on such municipal bonds continues to be excluded from gross income for U.S. federal income tax purposes. Among these continuing requirements are restrictions on the investment and use of proceeds of the municipal bonds. Failure to comply with the continuing requirements of the Code may cause interest on the municipal bonds to be includable in gross income for U.S. federal income tax purposes, retroactive to the date of issuance, regardless of when the noncompliance occurs. Issuers of municipal bonds typically covenant to comply with certain procedures and guidelines designed to insure satisfaction with the continuing requirements of the Code. None of any Portfolio, any Fund, the Investment Manager, any Advisor or their respective counsel has passed or will pass upon, nor assumes any responsibility for, the opinions of counsel on this issue. Moreover, none of any Portfolio, any Fund, the Investment Manager, any Advisor or their respective counsel has made or will make any independent determination as to whether any events or circumstances have occurred or intervened or will occur or intervene after the original issuance of the opinions that would adversely affect such opinions.

The treatment of the income from municipal bonds received by a Fund that is attributable to a Fund's ownership of residual certificates purchased in tender option bond ("**TOB**") programs to which such income relates depends not only on the treatment of such income as being ultimately attributable to tax-exempt municipal bonds but also on the tax treatment of the relationships created by the related residual certificates. As a general proposition, the Investment Manager expects that the tender option bond issuers would be characterized as flow-through entities for U.S. federal income tax purposes and that the character of the income received from the residual certificates issued by the TOB issuers will be excluded from gross income to the same extent as interest on the underlying municipal bonds. The conclusion that the legal relationship relative to the TOB issuers creates these favorable relationships and not other relationships, such as indebtedness, will be the subject of opinions of qualified tax counsel on which a Fund will rely. Although these opinions are not binding on the IRS or a court and, therefore, will not guarantee the desired result, an Advisor will not purchase residual certificates without a high degree of certainty (provided by such opinions) that the particular transaction will produce the desired result.

Members in a Portfolio who are not subject to U.S. federal income taxation will not receive the same advantages received by U.S. taxpayers with respect to the tax exemption related to the interest earned on municipal bonds. Additionally, non-U.S. taxpayers should be aware that portfolio management decisions may be impacted by a Fund's objective to maximize after-tax returns when investing in municipal securities, for the benefit of U.S. taxpayers. Such objectives, in certain circumstances, may be contrary to their interests.

For U.S. Members that are individuals or individuals owning a beneficial interest in Shares through a partnership, trust or other flow-through entity, section 265(a)(1) of the Code disallows deductions for expenses or losses allocable to interest income wholly exempt from tax that are otherwise deductible under section 212 of the Code (regarding allowance of deductions for certain expenses for production of income) (a "**Section 212 Expense**") which is allocable to a tax-exempt interest. Accordingly, Section 212 Expenses may be nondeductible for U.S. federal income tax purposes if allocable to tax-exempt interest. The determination of whether the municipal arbitrage Fund's Section 212 Expenses would be allocable to its municipal bonds (or certificates that represent ownership in them) is inherently factual in nature. The municipal arbitrage Fund anticipates that a substantial portion of the ordinary expenses of the Fund will be allocable to the tax-exempt interest income.

The municipal arbitrage Strategy follows capital loss parameters that may restrict the Advisor's choice at any time of new or replacement hedge agreements. Compliance with the capital loss parameters with respect to a hedge agreement is intended to result in any loss realized with respect to the hedge agreement being characterized as a capital loss (rather than an expense that may be treated as a Section 212 Expense) for U.S. federal income tax purposes.

## Use of Leverage

The investment Strategies utilized by the Advisors will from time to time require the use of substantial leverage. Such leverage may be achieved through, among other methods, borrowing funds, purchases of securities on margin and the use of options, futures, forward contracts, repurchase and reverse repurchase agreements, credit derivatives and swaps. The use of leverage magnifies the degree of risk. Furthermore, the Portfolios and the Funds may incur indebtedness as part of their investment strategies as well as for temporary purposes to meet Redemptions.

As a general matter, the banks and dealers that provide financing to Advisors will be able to apply discretionary margin, "haircut," financing and security and collateral valuation policies. Changes by banks and dealers in one or more of these policies, or the imposition of other limitations or restrictions, whether due to market circumstances or government action, may result in large margin calls, loss of financing, forced liquidations of positions at disadvantageous prices, termination of swap and repurchase agreements and cross-defaults to agreements with other banks and dealers. Any such adverse effects may be exacerbated in the event that such limitations or restrictions are imposed suddenly and/or by multiple market participants simultaneously. The imposition of any such limitations or restrictions could compel a Fund to liquidate all or part of its portfolio at disadvantageous prices.

## Short Selling

Some Advisors may engage in selling securities short, which involve the sale of borrowed securities. In the case of uncovered short sales, since the borrowed securities sold short must later be replaced by market purchases, any appreciation in the market price of these securities results in a loss. Purchasing securities to close out the short position can itself cause their market price to rise further, increasing losses. Furthermore, a short seller may be prematurely forced to close out a short position if a counterparty demands the return of borrowed securities.

## Dilution of Investments

Additions of cash to a Portfolio resulting from the offering of additional Shares will have the effect of diluting the participation by the Portfolio and possibly a Fund or Funds in their investments . Although the Investment Manager will endeavor to invest such additional cash as soon as practicable, there can be no assurance that the additional investments will be available on favorable terms. As a result, such additions of cash could have the effect of reducing returns to investors in the Portfolio.

## Low Credit Quality Securities

Certain Advisors may make particularly risky investments that also may offer the potential for correspondingly high returns. As a result, a Fund may lose all or substantially all of its investment in any particular instance. In addition, there may be no minimum credit standard that is a prerequisite to a particular Advisor's investment in any security. The securities in which an Advisor is permitted to invest may be rated lower than investment grade and hence may be considered to be "junk bonds" or distressed securities.

## Valuations

The Investment Manager will be required to rely on the Advisor's valuation of a Third-Party Fund's investments. Advisors from time to time revise their valuations and valuation methods, sometimes materially. Investments for which market quotations are not available will be valued by the Advisors at such values as it may reasonably determine and may not be independently valued or verified by a third party. Such valuations may affect the amount of the Management Fees and Incentive Allocation to the Investment Manager.

## Redemption Date Valuation of Funds without Corresponding Withdrawal Rights

When Shares of a Portfolio are redeemed the Redemption value will reflect, among other things, the net asset values of the Portfolio's investments in Funds as of such date. However, certain Funds may not permit the

27

Portfolio itself to redeem its investments in those Funds at the same valuations that have been used in calculating the Redemption price of the Shares. The Portfolio (and the non-redeeming Members) will bear the risk of any declines, as well as have the profit potential of any increases in the net asset value of its existing investments in such Funds from the date as of which a redeeming Member's Shares are valued until the Portfolio is itself able to withdraw capital from such Funds to reflect such Redemption.

**Contingent Liabilities**

The LLC Agreement authorizes the Company to establish such reserves for unknown or contingent liabilities as the Investment Manager in its sole discretion deems advisable. Under authority delegated by the Managing Member, the Investment Manager from time to time may find it necessary, upon Redemption by a Member, to set up a reserve for contingent liabilities and withhold a certain portion of the value such Member's redeemed Shares. These provisions could be invoked, for example, if a Portfolio or one of the Funds were involved in litigation or subject to an investigation or audit by the Internal Revenue Service ("IRS"), which could involve expenses to the Portfolio.

**Banking Regulation**

The Investment Manager, Citigroup and its other affiliates are subject to certain U.S. banking laws, including the Bank Holding Company Act of 1956, as amended (the "**BHCA**"), and to regulation by the Federal Reserve. Banking laws, rules and regulations may restrict the transactions and relationships between the Investment Manager, Citigroup, and their affiliates, on the one hand, and the Portfolios and the Funds, on the other hand, and may restrict the investments and transactions by the Portfolios and the Funds. The Investment Manager does not anticipate that any such restrictions will have a material effect on the Portfolios or other investments. However, in the future, if banking laws, rules and regulations change, , the activities of the Portfolio may be limited and restricted in certain ways.

**Possible Adverse Tax Consequences**

An investment in a Portfolio involves a number of tax-related risks. See "Certain U.S. Federal Income Tax Consequences."

**No Internal Revenue Service Rulings**

The Company will not seek rulings from the IRS with respect to any of the U.S. federal income tax considerations discussed in this Offering Memorandum. Thus, positions to be taken by the IRS as to tax consequences could differ from positions taken by either a Portfolio or the Funds.

**Members Subject to Tax on Income of Portfolio**

A Member is subject to tax in each year in respect of their allocable share of any taxable income of a Portfolio in which such Member has invested, even though the Portfolios do not anticipate making any distributions. Due to differences in the computation of Net Assets and taxable income, an investor could recognize taxable income even though Net Assets did not increase or decline. The tax liability due in respect of a Portfolio's taxable income (if any) could be substantial.

**Unrelated Business Taxable Income**

Tax-exempt investors in a Portfolio, including corporate pension and profit-sharing plans, simplified employee pension plans, Keogh plans, IRAs and charitable and educational institutions, should be aware that a Portfolio (and the various entities in which a Portfolio may invest) may use leverage or make investments in entities the income of which constitutes "unrelated business taxable income," and that a portion, perhaps a substantial portion, of a Portfolio's income may therefore be treated as "unrelated business taxable income." Consequently, such a tax-exempt organization will be required to report and pay tax on its share of such unrelated business taxable

28

income. Tax-exempt investors should consult with their own legal and financial advisors regarding the tax and other considerations involved in an investment in a Portfolio.

**Tax Shelter Status**

Neither the Company nor any Portfolio is expected to be registered as a "tax shelter" pursuant to section 6111 of the Code because the Managing Manager believes that the operations of the Company, the Portfolios and the Funds, respectively, will not cause them to be classified as a "tax shelter" for purposes of section 6111 of the Code. Under regulations, however, the activities of a Portfolio may create one or more "reportable transactions," requiring such Portfolio and each Member in such Portfolio, respectively, to file information returns with the IRS. Members should consult with their own advisors concerning the application of these reporting obligations and any similar state tax reporting requirements to their specific situations.

<u>**Advisor Risk**</u>

**Use of Advisors**

Although the Investment Manager generally will be given access to information regarding the actual investments made by Third-Party Funds, the Investment Manager may not learn of significant structural events with respect to any Advisor, such as personnel changes, major asset withdrawals or substantial capital growth, until after the fact. The Investment Manager will have limited ability to protect the Funds from the risk of Advisor fraud, misrepresentation or material strategy alteration. Only one or a limited number of principals may manage some of the Advisors. If the services of any of such principals became unavailable, the Advisors may not be able to replace them effectively, and the performance of the related Funds might be adversely affected.

**Risk of Litigation**

Advisors utilized by the Funds might become involved in litigation as a result of investments made by Funds. Under such circumstances, the relevant Portfolio and/or the Funds could be named as a defendant in a lawsuit or regulatory action.

**Conflicts of Interest**

The Investment Manager and the Advisors utilized by the Funds are subject to certain conflicts of interest. See "Conflicts of Interest."

**Increase in Amount of Assets Under Management**

In selecting Advisors, the Investment Manager will give substantial weight to their past investment results. The selection of an Advisor could substantially increase the assets under the Advisor's management. It is not known what effect, if any, an increase in the amount of assets under management will have on the trading Strategies utilized by the Advisors or their investment results. No assurance can be given that their Strategies will continue to be successful in light of such an increase.

**Other Clients of Advisors**

In addition to the Funds, the Advisors generally will manage other accounts (including other accounts in which the Advisors may have an interest) and may have financial and other incentives to favor such accounts over the Funds. In investing on behalf of a number of different clients, Advisors may face limits on their management resources, as well as limited market opportunities. These limitations not only could increase the level of competition for the same investments the Funds might seek to make, but also could make it difficult or impossible for a Fund to take or liquidate a particular position at a price indicated by an Advisor's strategy.

29

**Incentive Compensation**

Certain Advisors may receive performance compensation and, in certain cases, such compensation may be determined separately year to year without regard to prior losses. Such arrangements may give such Advisors incentives to make investments for the Funds that are more risky or speculative than might be the case if no performance compensation were paid.

## Forward-Looking Statements

This Offering Memorandum includes forward-looking statements. Forward-looking statements may be identified by the presence in such statements of the words "may," "will," "expect," "intend," "anticipate," "believe," "attempt," "seek," or "project" or the negatives, derivatives, and variations of such words or comparable terminology. The Company has based these forward-looking statements on the Company's current expectations and projections about future events. These forward-looking statements are subject to risks, uncertainties and assumptions about the Company, the Portfolios and their investments. Additionally, some forward-looking statements are based on the assumption that the volatility of market conditions in the future will generally not deviate materially from the volatility of market conditions seen over the past decade. Such assumptions would be invalidated in the event of an extended market disruption.

The Company undertakes no obligation to publicly update or revise any forward-looking statements, whether as a result of new information, future events or otherwise. In light of these risks, uncertainties and assumptions, the prospective events discussed in this Offering Memorandum may not occur.

THE FOREGOING SUMMARY OF RISK FACTORS DOES NOT PURPORT TO BE A COMPLETE EXPLANATION OF THE RISKS INVOLVED IN THIS OFFERING. PROSPECTIVE INVESTORS SHOULD READ THIS ENTIRE OFFERING MEMORANDUM, AS WELL AS THE LLC AGREEMENT, BEFORE DETERMINING TO INVEST IN THE COMPANY.

## CONFLICTS OF INTEREST

Citigroup Inc. and its affiliates (collectively, for purposes of this section, "**Citigroup**") engage in a broad spectrum of activities, including insurance, banking, underwriting, private equity and financial advisory activities, and have extensive investment activities that are independent from, and may from time to time conflict with those of, the Portfolios. There may also be instances where the interests of Citigroup conflict with the interests of the Portfolios or Advisors. Certain affiliates of the Investment Manager may engage in transactions with, and may provide services to, the Advisors or to companies in which the Portfolios have invested or may potentially invest, and will receive compensation from such entities. The Investment Manager and its affiliates may also provide services to, invest in, advise, sponsor or act as investment manager to investment vehicles and other persons or entities that may have similar structures and investment objectives and policies to those of the Portfolios, that may compete with the Portfolios and Advisors for investment opportunities and that may coinvest with the Portfolios in certain transactions.

In addition, Citigroup and its respective clients may themselves invest in securities that would be appropriate for the Portfolios and may compete with the Portfolios and Advisors for investment opportunities. There can be no assurance that an investment opportunity that comes to the attention of Citigroup will be referred or otherwise made available to the Portfolios. Citigroup is not obligated to refer any investment opportunity to the Portfolios or to any Advisor. The activities of Citigroup may also restrict or preclude the Investment Manager, and therefore the Portfolios, from pursuing certain investment opportunities and from taking certain actions with respect to a particular investment. In addition to investment management services, affiliates of the Investment Manager may provide services to the Portfolios or to the Advisors, including, without limitation, brokerage and custodial services and moneys held by the Portfolios may be invested in instruments issued by Citigroup and money market funds managed by Citigroup.

Certain risks and conflicts of interest may arise as a result of the Investment Manager's involvement with the Portfolios and the Funds.

**Affiliated Advisors**

In selecting Advisors to execute the Strategies, the Investment Manager will have unconditional discretion in selecting affiliated as well as non-affiliated Advisors. It is expected that the Investment Manager will select affiliated Advisors unless, with respect to a particular Strategy, the Investment Manager believes that there is a non-affiliated Advisor in a position to more successfully execute such Strategy. The Investment Manager and its affiliates will retain a higher portion of Management Fees to the extent they are selected as Advisors.

**Advisory Time**

Although the officers and employees of the Investment Manager will devote as much time to each Portfolio as the Investment Manager believes is necessary to assist the Portfolios in achieving their investment objectives and to administer the Portfolios' operations, they will not devote substantially all or any specific portion of their working time to the affairs of any Portfolio. The officers and key employees of the Investment Manager may not have or may terminate employment agreements, and the loss of their services of one or more of them may have an adverse effect on the Portfolios.

**"Soft Dollar" Payments**

The brokers utilized by a Fund will be selected by the Investment Manager or an Advisor. Any Advisor of a Fund may engage in "soft dollar" practices whether or not such practices fall within the soft dollar safe harbor established by Section 28(e) of the Securities Exchange Act. Thus, an Advisor may receive "brokerage and related services" covered by such safe harbor as well as office space, overhead expense reimbursement and similar benefits not covered by such safe harbor. In electing to receive those services or benefits, the Advisor may pay higher commissions than those charged by brokers that do not provide them. To the extent that the Investment Manager selects brokers to effect transactions with or for any Fund, the Investment Manager, subject to its overall duty to obtain "best execution" of transactions, will have authority to and may consider the full range and quality of the services and products provided by various brokers, including factors such as the ability of the brokers to execute transactions efficiently, the responsiveness to the Investment Manager's instructions, their facilities, reliability, and financial responsibility, and the value of any research or other services or products they provide. As long as the services or other products provided by a particular broker (whether directly or through a third-party) qualify as "brokerage and research services" within the meaning of Section 28(e) of the Securities Exchange Act and regulations thereunder, and the Investment Manager determines in good faith that the amount of commission charged by such broker is reasonable in relation to the value of such brokerage and research services, the Investment Manager may utilize the services of that broker to execute transactions for the Portfolios on an agency or riskless principal basis even if (i) a Portfolio would incur higher transaction costs than it would have incurred had another broker been used and (ii) a Portfolio does not necessarily benefit from the research services or products provided by that broker. In addition, the Investment Manager or an Advisor may utilize a broker affiliated with the Investment Manager, such as a Placement Agent. The Investment Manager has policies and procedures designed to ensure that any portfolio transactions executed on behalf of client accounts with a related broker-dealer acting as agent comply with applicable law. If any client portfolio transaction is executed with a broker-dealer affiliated with the Investment Manager, the broker-dealer will be entitled to charge a commission so long as it does not exceed the usual and customary commission that the broker-dealer would charge its other customers.

**Allocation of Investment Opportunities**

The Investment Manager and its affiliates have other investment advisory clients and investment vehicles and have discretion to allocate investment opportunities and dispositions fairly among all clients or vehicles, including the various Portfolios and other investment funds managed or advised by the Investment Manager or its affiliates ("Citigroup Funds"). The Investment Manager may determine that an investment opportunity is appropriate for a particular fund or account that it manages, including the Citigroup Funds, or for itself, but not for a particular Portfolio. Situations may arise in which the Citigroup Funds have made investments that might have been suitable for investment by a Portfolio but, for various reasons, were not pursued by, or available to, the Portfolio. To the extent that entities affiliated with the Investment Manager invest in Third-Party Funds, the ability of the Portfolios to invest in the same Third-Party Funds may be limited, and the Investment Manager may be required to

choose between a Portfolio and other advisory clients, including the Citigroup Funds, in allocating investments in Third-Party Funds.

## Preferential Terms

The Investment Manager, its affiliates, or accounts other than the Portfolios or Funds managed by the Investment Manager or its affiliates may invest in Third-Party Funds on terms more favorable than those available to the Funds and, as investors in such Third-Party Funds, may act in ways adverse to the interests of the Funds.

## Cross Trades with other Investment Manager Clients

The Investment Manager or its affiliates may cause the Portfolios or Funds to purchase securities from or sell securities to other Citigroup Funds when the Investment Manager believes such transactions are appropriate and in the best interests of the relevant Portfolio. In the event the Investment Manager wishes to reduce the investment of one or more Citigroup Funds in a security and increase the investment of other Citigroup Funds in such security, it may effect such transactions by directing the transfer of the security between Citigroup Funds. Any incremental costs and expenses associated with any such investment will be borne by all such Citigroup Funds (including the Portfolios) on a *pro rata* basis. In addition, the Investment Manager may recommend that a Portfolio purchase an investment that is being sold or sell and investment that is being purchased by the Investment Manager, an affiliate or another advisory client.

## Agency Cross Trades

The Investment Manager and its affiliates are authorized to execute agency cross transactions between the Portfolios and Funds and other clients and may receive commissions from both parties to such transactions when the Investment Manager believes such transactions are in the best interests of a Portfolio, although all cross trades will be done in compliance with applicable law. The Portfolios may at any time, upon written notice to the Investment Manager, revoke their consent to such transactions.

## Credit and Hedging Facilities

Certain conflicts of interest may arise should a Portfolio enter into credit facilities or hedging facilities with the Investment Manager or its affiliates. In such situations, the Investment Manager may have a conflict between its obligation to act in the best interests of Members in such Portfolio and any interest it may have in generating revenues and fees for itself or its affiliates. The Investment Manager and its affiliates may also have conflicts in enforcing their rights against a Portfolio in such facilities. The Portfolio will not be entitled to, and may not receive, any special consideration or forbearance by such affiliate in the exercise of such affiliate's rights as a result of the Portfolios' relationships with the Investment Manager.

## Principal Trades

The Investment Manager may cause the Portfolios or the Funds to purchase securities from or sell securities to Citigroup and its affiliates when the Investment Manager believes such transaction are in the best interests of a Portfolio or Fund, although all such principal trades will be completed in compliance with applicable law and only if approved by the Advisory Board on behalf of a particular Portfolio or Fund. In analyzing such principal trades, the Investment Manager may have a conflict between acting in the best interests of a Portfolio or Fund and assisting its affiliate by selling or purchasing a particular security.

## Fees and Incentive Allocation

The Management Fee and Incentive Allocation have not been negotiated at arm's-length and may be higher than advisory fees or performance fees charged by the Investment Manager to other clients or the fees that would be charged by another investment manager. The Incentive Allocation allocable to the Investment Manager is based on Total Return. This arrangement may create an incentive for the Investment Manager to invest Portfolio assets in investments that are riskier or more speculative than would be the case if the Investment Manager were not eligible

to receive the Incentive Allocation. In addition, the Incentive Allocation is determined on the basis of Total Return allocated to each Series, including value attributable to gains in the value of portfolio securities. Any securities traded directly by a Portfolio or by a Fund for which market quotations are not available may be valued by the Investment Manager at such value as it may reasonably determine and may not be independently valued or verified by a third party. The Investment Manager has an incentive to place the highest reasonable value on the Portfolios' or Funds' investments. Advisors may be subject to substantially similar conflicts of interest with respect to performance based compensation.

## Funds' and Third-Party Funds' Transactions with Affiliates

Affiliates of the Investment Manager, including Citigroup and its brokerage subsidiaries, may invest in and have other relationships with the Funds and the Third-Party Funds that may give rise to potential conflicts. Affiliates of the Investment Manager may, for example, enter into transactions, as principal, with any of the Funds or Third-Party Funds, including derivative transactions, or perform routine broker-dealer transactions. Other relationships may include, but are not limited to, providing seed capital, acting as lender, placement agent, prime broker or swap counterparty, or providing advisory services to a Fund or Third-Party Fund. Accordingly, the Investment Manager may face a conflict of interest in evaluating investments in and withdrawals from Funds or Third-Party Funds (e.g., a withdrawal from a Third-Party Fund could adversely impact the business relationships between Citigroup and such Third-Party Fund). In addition, situations may arise in which an affiliate believes that, to protect its own commercial interests, it must take action that may be detrimental to a Fund or Third-Party Fund (e.g., terminating a trading facility or foreclosing on collateral), and therefore detrimental to the Portfolios. Citigroup and its affiliates will be entitled to keep any profits, commissions and fees arising from transactions with a Fund or Third-Party Fund, and the Investment Manager's compensation from the Portfolios will not be reduced thereby.

## Material Non-Public Information

Affiliates of the Investment Manager may have access to material non-public information regarding securities in which the Portfolios invest. Investors should be aware, however, that the Investment Manager will generally be unable to access such information due to confidentiality restrictions or other legal considerations. As a result, the Investment Manager may sometimes make investment decisions different than those it would have made if it had such access, and such decisions may be detrimental to a Portfolio. The Investment Manager's affiliates are not permitted to afford the Investment Manager access to all relevant information they may possess. Moreover, even if the Investment Manager were to receive such material non-public information from an affiliate, it might be prohibited from using such information in managing the Portfolios. Further, by reason of the advisory, due diligence, committee participation and other activities of the Investment Manager and its affiliates, the Investment Manager or related persons may acquire confidential or material non-public information or be restricted from initiating transactions in certain securities. The Investment Manager and related persons will not be free to divulge, or to act upon, any such confidential or material non-public information and, due to these restrictions, the Investment Manager may not initiate a transaction for a Portfolio's account that the Investment Manager otherwise might have initiated.

## Underwriting

A Fund or Third-Party Fund may purchase investments that are issued, or are the subject of an underwriting or other distribution, by an affiliate of Citigroup. A Fund or Third-Party Fund may invest, directly or indirectly, in the securities of companies affiliated with Citigroup or in which Citigroup has an equity or participation interest. The purchase of such investments by a Fund or Third-Party Fund may generate revenues for Citigroup or enhance the profitability of Citigroup's own investments in such companies.

## Proprietary Trading

Citigroup and its affiliates are major participants in the fixed-income markets. As such, Citigroup and its affiliates, including the Investment Manager, are actively engaged in transactions in the same securities and other instruments in which the Portfolios, the Funds and the Third-Party Funds may invest. Citigroup and its affiliates are not under any obligation to share any investment opportunity, idea or Strategy with a Portfolio or a Fund or Third-

Party Fund. As a result, Citigroup and its affiliates may compete with the Portfolios and the Funds or Third-Party Funds for appropriate investment opportunities.

The Investment Manager, the Advisors and their respective principals, affiliates, and employees may trade in the securities and derivatives markets for their own accounts and the accounts of their clients, and in doing so may take positions opposite to, or ahead of, those held by the Portfolios, Funds or Third-Party Funds or may be competing with the Portfolios, Funds or Third-Party Funds for positions in the marketplace. Such trading may create other conflicts of interest on behalf of one or more such persons in respect of their obligations to the Portfolios and the Funds. Records of this trading will not be available for inspection by Members.

## SUMMARY OF THE LLC AGREEMENT

The following summary of certain terms of the LLC Agreement is not intended to be complete and is subject in its entirety to the actual provisions of the LLC Agreement, a copy of which accompanies this Offering Memorandum. Each prospective investor should carefully read the entire LLC Agreement.

### Withdrawal, Removal of the Managing Member

The Managing Member may withdraw from the Company and cease to be the Managing Member by giving not less than ninety days' prior written notice to the Members. Additionally, a majority-in-interest of the Members may remove or replace the Managing Member at any time, with or without cause, upon ninety days' prior written notice. The Investment Manager has the right to select a replacement Managing Member if the one acting resigns, is bankrupt, or defaults.

### Duration

The Company shall continue until the cancellation of its Certificate of Formation as filed in the office of the Secretary of State of the State of Delaware.

### Admission

Subject to the condition that each new Member shall execute a Subscription Agreement or other documentation pursuant to which it agrees to be bound by the terms and provisions of the LLC Agreement, and subject to the Investment Manager's discretion to reject or accept subscriptions from prospective new Members, the Investment Manager may admit one or more new Members as of any date.

### Segregation of Portfolio Assets

Subject to the Delaware Limited Liability Company Act, all debts, liabilities, and obligations and expenses incurred by a particular Portfolio are enforceable against the assets of such Portfolio only, and not against the assets of the Company generally or of any other Portfolio. In addition, separate and distinct records will be maintained for each Portfolio and the assets associated with each Portfolio are held and accounted for separately from the other assets of the Company generally or any other Portfolios.

### Assignability of Member's Shares

Without the prior written consent of the Investment Manager, which may be withheld in its sole discretion, a Member may pledge, Transfer or assign its Shares only by operation of law pursuant to the death, Bankruptcy or dissolution of such Member, or a corporate reorganization or merger. Transfer or assignment not made in accordance with the above standards shall be wholly null and void *ab initio*.

*Limited Liability*

Except as otherwise expressly provided in the Delaware Limited Liability Company Act (the **"Act"**), no Member will be obligated personally for any debt, obligation or liability of the Company, whether arising in contract, tort or otherwise, solely by reason of being a Member unless such Member expressly agrees otherwise.

*Net Assets; Allocations of Profits and Losses*

The Net Assets of each Series shall initially be equal to the aggregate subscription price paid by all Shareholders in subscribing for Shares of such Series. The Net Assets of each Series at the end of each Accounting Period is determined first by allocating the increase or decrease in the Net Assets of the relevant Portfolio (excluding any distributions or liabilities specific only to certain Series, such as Management Fees and Incentive Allocations) among the Series in such Portfolio proportionally according to the number of Shares outstanding in each such Series at the beginning of the Accounting Period and second by allocating to and debiting from or crediting to, as appropriate, the Net Assets of each Series any liabilities or distributions specific to such Series, any Incentive Allocation with respect to such Series accrued or made during such Accounting Period and any Redemption Fees deducted from the Redemption proceeds to Shareholders that have redeemed Shares of such Series. The Net Asset Value per Share of Shares of a Series at any time equals the Net Assets of such Series divided by the number of Shares in such Series outstanding on such date. A New Profits Memo Account shall be established for the Investment Manager and any Incentive Allocation with respect to a Series will be allocated to the New Profits Memo Account. The term **"Accounting Period"** shall mean the following periods: The initial Accounting Period shall begin as of the date of the Initial Closing and each subsequent Accounting Period shall begin on the date immediately after the close of the next preceding Accounting Period. Each Accounting Period shall end on the earlier of the last day of each month, the effective date of any resignation or expulsion from the Company of a Member, the effective date of any Transfer of a Share, the day preceding the effective date of any additional Capital Contribution, the day of any Redemption, or such other day as may be determined by the Managing Member. At the end of each Incentive Allocation Calculation Period, an Incentive Allocation may be made from the relevant Series to the New Profits Memo Account of the Investment Manager.

Because allocation of increases and decreases in the Net Assets of each Portfolio is made to the various Series based on the number of Shares in each Series outstanding while the Net Asset Value per Share of Shares of various Series may be different, allocations of gains and losses among the Series may not be uniform as a proportion of the Net Assets of each Series.

*Allocations for Tax Purposes*

As of the end of each Fiscal Year, each Series' items of income, deduction, gain, loss or credit will be allocated among its Members in accordance with the amounts credited or debited to the Net Asset Value per Share of Shares of each Member with respect to such Series for the current and prior Fiscal Years. Each Member subject to U.S. federal income tax will be required to include in its U.S. federal income tax return its share of such items allocated to it.

A "tax account" will be established for each Member with respect to its Shares in a Series, the balance of which shall be equal to such Member's initial Capital Contribution to such Series, increased by such Member's share of the taxable and tax-exempt income allocated to such Series and additional Capital Contributions, and decreased by such Member's share of the taxable losses, nondeductible items, distributions and Redemptions of or from such Series.

As of the end of each Fiscal Year, a Series' net realized capital gains will be allocated first to each Member participating in such Series which has redeemed Shares of such Series during the taxable year to the extent that the amount it received on Redemption exceeds the tax account with respect to the portion of its Shares redeemed. The tax account with respect to any Shares that are redeemed will be eliminated. Net realized capital gains remaining after such allocation will be allocated next to the Investment Manager to the extent the aggregate Incentive Allocation allocated to the New Profits Memo Account with respect to such Series exceeds its tax account and then to the other Members holding Shares in such Series in accordance with the amounts credited or debited to the Net Asset Values per Share of each such Member. A corresponding provision operates to allocate a Series' realized

35

capital losses. All of such allocations are intended to eliminate disparities between the Net Asset Value per Share of a Member's Shares and the tax basis of the Portfolio's property attributable to such Member, consistent with the principles set forth in Section 704(c) of the Code.

*Distributions*

The Managing Member may, in its sole discretion, make distributions in cash or in kind or partly in cash and partly in kind at any time *pro rata* among the Members of all Series of a Portfolio in accordance with the number of Shares held by such Members.

*Redemptions*

A Member may redeem Shares on any **Redemption Date** subject to any Lock-Up Period, Redemption Notice Period and Redemption Fee specified in the relevant Supplement. If a Member requests redemption of Shares, the Managing Member will cause the Portfolio, to the extent reasonably practicable, to distribute the redemption amount in one or more installments generally within thirty days following the effective date of Redemption.

Notwithstanding the foregoing, the Managing Member may suspend the determination of Net Assets and/or suspend Redemptions for any Portfolio for the whole or any part of any period during which by reason of the closure of or the suspension of trading on any money or foreign exchange market, commodities exchange or stock exchange, or of a break-down in any of the means normally employed by the Managing Member in ascertaining the value of such Portfolio's assets, or for any other reason the value of the Portfolio's assets cannot in the opinion of the Managing Member be reasonably ascertained, or circumstances exist as a result of which, in its opinion, it is not reasonably practicable for such Portfolio to realize a material proportion of such Portfolio's overall assets. The Managing Member may also temporarily suspend Redemptions in order to effect orderly liquidation of such Portfolio's assets necessary to effect Redemptions. Redemptions of Shares in any Portfolio shall be suspended following the Managing Member's giving written notice to the Members of the dissolution of the Company or the termination of such Portfolio. A Portfolio may withhold payment to any person until after any suspension has been lifted. Notice of any suspension will be given to any Member who has requested a Redemption and to whom full payment of the Redemption has not yet been remitted. If a Redemption request is not withdrawn by a Member following Notification of a suspension, the Redemption will be completed as of the next month-end following the end of the suspension.

In general, Redemption proceeds will not bear interest to the holder of the Shares being redeemed from the Redemption Date to the date of payment. However, a Member who redeems Shares may be credited with interest in respect of payments deferred pursuant to the foregoing to the extent that doing so would, in the Investment Manager's sole and absolute discretion, be equitable.

Redemptions occurring at times which are expressly contemplated under "Redemptions," above, will be subject to any Redemption Fee specified in the relevant Supplement. The amount of any Redemption Fee will be retained by the relevant Series, will increase the Net Assets of such Series and will be available for distribution to the holders of outstanding Shares in such Series. The Managing Member may in its sole discretion permit a Member to redeem Shares other than as of the applicable Redemption Date and/or upon notice shorter than the applicable Redemption Notice Period. The fact that such an exception is permitted in respect of one or more Members will not restrict the Managing Member's discretion to refuse to allow such an exception to any or all other Members. In order to provide for equitable treatment among Members redeeming Shares at times other than those expressly contemplated above (assuming the Investment Manager in its discretion permits such Redemption), the redemption proceeds may, in the discretion of the Investment Manager, be subject to a charge in an amount determined by the Investment Manager reflecting transaction costs (including commissions and dealer spreads) actually incurred by the Portfolio in connection with selling assets to fund the Redemption or that, in the event that the Portfolio does not sell assets to fund the Redemption, would have been incurred by the Portfolio had it sold such assets for that purpose. The amount of any such charge will be allocated to the relevant Series. In addition, Third-Party Funds in which a Fund may invest may impose withdrawal or redemption charges. Any such withdrawal or redemption charge will be paid by the Portfolio but may be charged to the redeeming Member and reduce a Member's Redemption proceeds if incurred in connection with such Member's Redemption of Shares. Finally, if a

36

Member redeems or is deemed to redeem substantially all of its Shares, the Redemption proceeds may be reduced by the proportional amount of the then unamortized Initial O&O Costs.

The Managing Member may at any time require any Member to redeem all or any portion of its Shares or withdraw as a Member as of any month-end on five days' notice or on no notice in certain circumstances as described in the LLC Agreement.

### Obligation to Return Certain Distributions to the Company

The Managing Member may determine to treat any liability or expenditure of a Portfolio which becomes fixed or is incurred in an accounting period subsequent to the accounting period to which such liability or expenditure relates (the "**prior accounting period**") as either (i) arising in the accounting period in which such liability becomes fixed or such expenditure is incurred or (ii) arising in such prior accounting period, in which case such liability or expenditure will be charged to persons who were Members during such prior accounting period (whether or not such persons are Members during the accounting period in which such liability is fixed or such expenditure is incurred) in accordance with their Shareholdings as of the beginning of such prior accounting period, and the Company may collect such charges from the affected Members or former Members, together with interest thereon.

In addition, under no circumstance may the Managing Member cause a Portfolio to make any distribution to a Member or return to a Member any part of any Capital Contribution of such Member to the extent that, after giving effect to such distribution or return, the Portfolio's liabilities (other than (i) liabilities to Members on account of their Shares and (ii) liabilities for which the recourse of creditors is limited to specified property of the Portfolio), would exceed the fair value of the Portfolio's assets. A Member who receives a distribution or return in violation of the foregoing generally will be liable to the Portfolio for the amount of such distribution or return, regardless of whether such Member had knowledge of such violation at the time of such distribution or return. Further, if the Portfolio's Net Assets as of the Redemption Date are adjusted downwards after the date on which the redemption proceeds are paid, the Member will be liable to the Portfolio for the amount of any excess payment.

### Management of the Company

The management of the Company is vested exclusively in the Managing Member, except to the extent of the powers of the Advisory Board described herein. No Member who is not a Managing Member shall have any part in the management of the Company or shall have any authority or right to act on behalf of the Company in connection with any matter. A majority-in-interest of the Members has the ability to remove or replace the Managing Member, with or without cause, upon ninety days' prior written notice. Subject to the provisions of the LLC Agreement, the Managing Member will delegate substantially all authority to manage the day-to-day operations and the assets of the Portfolios to the Investment Manager pursuant to the Investment Management Agreement.

### Valuation

The Investment Manager will determine the Portfolios' Net Assets, and thus the Net Assets of each Series and the Net Asset Value per Share of any Series, for purposes of determining the Management Fees and Incentive Allocation payable in respect of each Portfolio and Series and the Redemption value of Shares of each Series, as of the end of each Accounting Period.

The Investment Manager will keep or delegate the keeping of the Company's accounting books and records in accordance with the provisions of the LLC Agreement, generally under the accrual method of accounting, and, as to matters not specifically covered in the LLC Agreement, in accordance with GAAP (except that Initial O&O Costs may be amortized in the manner described below, notwithstanding GAAP). All matters concerning accounting practices not specifically and expressly provided for by the LLC Agreement will be determined by the Investment Manager in good faith.

37

In determining the value of each Portfolio's assets for purposes of determining Net Assets, the Investment Manager will employ the following valuation principles: (i) if the asset being valued is an interest in a Fund, the value of such interest as of the end of each Accounting Period shall be as determined in accordance with either the unaudited financial statements of said Fund as of the end of such Accounting Period, or an estimate made by the Investment Manager in consultation with said Fund or other entity or the Advisor, and the Investment Manager may rely on such valuations for all purposes hereunder; and (ii) securities shall be valued based on market quotations whenever market quotations which reflect current market activity are available. Securities (other than exchange-traded options) that are valued based on exchange prices will generally be valued at the last sale price on the exchange prior to valuation, while exchange-traded options and holdings that trade principally over the counter will generally be valued at the most recent "bid" price (or, in the case of short positions, the most recent "ask" price). Market quotations may be provided by independent pricing services or by dealers who make markets in the Portfolio's holdings. Securities that are traded both in the over the counter market and on a stock exchange are valued according to the broadest and most representative market as determined by the Investment Manager; (iii) all other financial instruments for which market quotations are not readily available will be valued at fair value as reasonably determined in good faith by the Investment Manager; and (iv) any assets or liabilities initially expressed in terms of currencies other than U.S. dollars will be translated into U.S. dollars at spot conversion rates as quoted on the day of such translation.

If the Investment Manager determines in good faith that (i) it is advisable to modify the foregoing valuation principles in order to reflect restrictions upon marketability or other factors affecting the value of an asset or (ii) it is not able to value a security or other instrument in accordance with such valuation principles, it shall value the asset in question in good faith on the basis of such factors as it reasonably determines to be pertinent. Without limiting the generality of the foregoing, the valuation of an asset by the Investment Manager may reflect the amounts invested by a Portfolio in such asset, notwithstanding that such amounts may not represent the market value of such asset.

Absent bad faith or manifest error, the Investment Manager's valuation determinations are conclusive and binding on all Members.

In determining the amount of a Portfolio's liabilities for purposes of determining Net Assets, the Investment Manager may estimate expenses that are incurred on a regular or recurring basis over yearly or other periods and treat the amount of any such estimate as accruing in equal proportions over any such period. The Investment Manager may also determine to establish such reserves for the Portfolio for contingent, unknown or unfixed debts, liabilities or obligations of the Portfolio as the Investment Manager may reasonably deem advisable. In this regard, the Investment Manager may from time to time find it necessary, upon Redemption by a Member, to set up a reserve for contingent liabilities.

For purposes of determining Net Assets and Total Return, Initial O&O Costs will be amortized over a period of not less than sixty months commencing as of the end of the month in which the Initial Closing occurs.

*Amendments to LLC Agreement*

The terms and provisions of the LLC Agreement may be modified or amended at any time and from time to time, to the extent that any such modification or amendment does not affect only a particular Portfolio, with the written consent of the Members having in excess of 50% of the outstanding Shares of all Series of all Portfolios and, to the extent that any such modification or amendment affects less than all Portfolios, the written consent of the Members having in excess of 50% of the outstanding Shares in respect of such affected Portfolios and, in any case, together with the written consent of the Investment Manager. Without the consent of the other Members, however, the Investment Manager may amend the LLC Agreement or the books and records of the Portfolios to: (i) reflect changes validly made in the membership of the Portfolios and the Capital Contributions and Shareholdings of the Members; (ii) reflect a change in the name of the Company or the Portfolios; (iii) make a change that is necessary or, in the opinion of the Investment Manager, advisable to qualify the Company as a limited liability company or a company in which the Members have limited liability under the laws of any State, or ensure that none of the Company nor any of the Portfolios will be treated as an association taxable as a corporation or a "publicly traded partnership" taxable as a corporation for U.S. federal income tax purposes; (iv) make any change that does not adversely affect the Members; that is necessary or desirable to cure any ambiguity, to correct or supplement any

38

provision in the LLC Agreement that would be inconsistent with any other provision in the LLC Agreement, or to make any other provision with respect to matters or questions arising under the LLC Agreement that will not be inconsistent with the provisions of the LLC Agreement, in each case so long as such change does not adversely affect the Members; (v) make any change that is necessary or desirable to satisfy any requirements, conditions or guidelines contained in any opinion, directive, order, statute, ruling or regulation of any federal, State or foreign governmental entity, or that the Investment Manager otherwise determines to be appropriate to comply with U.S. laws; (vi) make any change that is required or contemplated by the LLC Agreement; (vii) make a change in any provision of the LLC Agreement that requires any action to be taken by the Investment Manager or the Company pursuant to applicable Delaware law if the provisions of applicable Delaware law are amended, modified or revoked so that the taking of such action is no longer required; (viii) make any change necessary to prevent the Company, any Portfolio or the Investment Manager from in any manner being deemed an "investment company" subject to the provisions of the Investment Company Act; or (ix) make any other amendments similar to the foregoing.

In addition, upon giving Notification to the Members, but without obtaining the authorization or approval of any Member, the Investment Manager may amend the LLC Agreement at any time and from time to time, whether by changing any one or more of the provisions hereof, removing any one or more provisions or adding one or more provisions, for such purpose or purposes as the Investment Manager may deem necessary, appropriate, advisable or convenient, provided that, in the Investment Manager's reasonable judgment, such amendment could not reasonably be expected to have a material adverse effect on the Company, any Portfolio or any Member. The Investment Manager may also amend the provisions of the LLC Agreement with respect to any Portfolio by giving written notice to the Members a period of time prior to the end of a calendar quarter at least equal to the Redemption Notice Period of the relevant Portfolio, provided that that no such amendment will become effective earlier than the first day of the next succeeding quarter. This provision is designed to enable Members who might object to the amendment to redeem their Shares prior to the time such amendment becomes effective. Finally, provisions of the LLC Agreement may be amended or waived (i) with the consent of the Investment Manager and a majority-in-interest of the Members who are not affiliated with the Investment Manager or (ii) by way of "negative consent," i.e., written notice to all Members who are not affiliated with the Investment Manager which is given to such Members at least thirty days prior to the implementation of such waiver or amendment and which is not objected to in writing by a majority-in-interest of such Members prior to the implementation of such waiver or amendment.

Each Member, however, must consent to any amendment that would: (i) reduce its Shareholding or rights of contribution or redemption in respect of any Portfolio or Series; or (ii) amend the provisions of the LLC Agreement relating to amendments.

### Company Consent

The LLC Agreement provides that certain actions require the approval of a majority-in-interest of the Members who are not affiliated with the Investment Manager. These actions include: (i) so-called "principal trades" (unless the Investment Manager obtains the approval of the Advisory Board) to which a Portfolio or Fund, on the one hand, and the Investment Manager or an affiliate of the Investment Manager, on the other hand, are parties, as described in Section 3.1(b)(v) of the LLC Agreement; (ii) certain transactions in which the Investment Manager is deemed to "assign" its interest in a Portfolio for purposes of the Advisers Act, as described in Section 4.9(c) of the LLC Agreement; and (iii) certain "extraordinary" actions, such as merger of the Company or a conversion of the Company from a limited liability company to another form of business organization, as described in Section 12.7 of the LLC Agreement. In addition, the LLC Agreement provides that the Managing Member may submit to the Members, for their approval, certain actions that do not, under the terms of the LLC Agreement, require Member approval. In these cases, the Managing Member may obtain the requisite consent of the Members by way of "negative consent," as described above.

### Exculpation

No **"Indemnified Party"** (as defined herein) shall be liable to any Member or any Portfolio: (i) for mistakes of judgment or for action or inaction by the Indemnified Party, unless such mistakes, action or inaction arise out of, or are attributable to, the gross negligence, willful misconduct or bad faith of such Indemnified Party; or (ii) for losses due to the negligence, dishonesty or bad faith of any employee, broker or other agent of the Portfolio, provided that such employee, broker or agent was selected, engaged or retained by the Portfolio with reasonable

care. Each Indemnified Party may consult with counsel and accountants in respect of Portfolio affairs and be fully protected and justified in any action or inaction which is taken in accordance with the advice or opinion of such counsel or accountants, provided that they shall have been selected with reasonable care. Notwithstanding any of the foregoing to the contrary, the provisions of the LLC Agreement shall not be construed so as to relieve (or attempt to relieve) any Indemnified Party of any liability, to the extent (but only to the extent) that such liability may not be waived, modified or limited under applicable law, but shall be construed so as to effectuate the provisions of the LLC Agreement to the fullest extent permitted by law.

*Indemnification*

To the fullest extent permitted by law, each Portfolio shall indemnify and hold harmless the Managing Member, any person who controls, is controlled by, or is under common control therewith (collectively, **"Affiliates"**), each other member, partner, manager, officer, director or agent thereof, and each member of the Advisory Board (each, an **"Indemnified Party"**) from and against any and all: (i) losses, claims, damages, liabilities, costs and expenses (including legal fees and related charges and disbursements), taxes and interest and penalties thereon, judgments, fines, settlements and other amounts, actions, proceedings, arbitrations or investigations or threats thereof of any kind and nature whatsoever, which may be imposed on, incurred by or asserted or threatened at any time against such Indemnified Party (whether or not indemnified against by other parties), by reason of being or having been a Managing Member, an Affiliate thereof, any other member, partner, manager, officer, director or agent thereof, or any member of the Advisory Board, in any way based upon, relating to or arising out of the past or present services for the Company or any Portfolio by such Indemnified Party (collectively, **"Losses"**), except to the extent such Losses shall have been finally determined in a decision on the merits in any such action, suit, investigation or other proceeding to have been incurred or suffered by such Indemnified Party by reason of willful misfeasance, bad faith, gross negligence or reckless disregard of the duties involved in the conduct of such Indemnified Party; and (ii) Losses due to the negligence, dishonesty or bad faith of any broker or other agent of any Indemnified Party provided that such broker or agent was selected, engaged or retained by the Indemnified Party with reasonable care. Each Portfolio shall in the sole discretion of the Managing Member, advance to such Indemnified Party from the assets of the Portfolio, reasonable attorneys' fees and other costs and expenses incurred in connection with the investigation or defense of any such action, suit or proceeding which arises out of such conduct. Each such Indemnified Party shall agree that in the event such Indemnified Party receives any such advance, such Indemnified Party shall reimburse the Portfolio for such fees, costs and expenses to the extent that it shall be finally determined that such Indemnified Party was not entitled to indemnification pursuant hereto.

The indemnification discussed above shall not be deemed to be exclusive of any other rights to which each Indemnified Party may be entitled under any agreement, or as a matter of law, or otherwise, both as to action in each Indemnified Party's official capacity and as to action in another capacity, and shall continue as to each Indemnified Party who has ceased to have an official capacity for acts or omissions during such official capacity or otherwise when acting at the request of the Managing Member and shall inure to the benefit of the heirs, successors and administrators of each Indemnified Party.

The Managing Member has the power to purchase and maintain commercially reasonable insurance on behalf of itself and each Indemnified Party, at the expense of the Portfolios, against any liability which may be asserted against or incurred by them in any such capacity, whether or not the Portfolios would have the power to indemnify such persons against such liability under the provisions of the LLC Agreement.

## CERTAIN REGULATORY MATTERS

The discussion of U.S. regulatory matters contained herein is based on existing law as of the date of this Memorandum. No assurance can be given that future legislation, administrative rulings or court decisions will not modify the conclusions set forth in this summary (possibly with retroactive effect).

*Securities Act of 1933*

The Shares have not been and will not be registered under the Securities Act. The Shares are being offered in reliance on the exemption from registration provided by Section 4(2) of the Securities Act and Regulation D

40

promulgated thereunder. Each prospective investor will be required to represent, among other customary private placement representations, that it is an "accredited investor" as defined in Regulation D, and is acquiring Shares for its own account for investment purposes only and not for resale or distribution. As the Shares will not be registered under the Securities Act, they may not be Transferred or resold except pursuant to an exemption from such registration, and then only as permitted under the LLC Agreement.

*Securities Exchange Act of 1934*

The Company will limit the number of its investors such that it will not be required to register the Shares under the Securities Exchange Act. As a result, although the Company will provide certain reports to Members as described above under "Summary of Principal Terms – Reports," those reports will not include all information required to be provided to holders of securities issued by companies that are subject to the reporting requirements of the Securities Exchange Act.

*Investment Company Act of 1940*

The Company and each Portfolio will rely on an "exclusion" to the definition of "investment company" provided by the Investment Company Act and therefore will not register as investment companies under that Act. As a result, certain protections of the Investment Company Act will not be afforded to the Company, any Portfolio or their Members.

*Investment Advisers Act of 1940; Commodity Exchange Act*

While the Investment Manager is registered as an investment adviser under the Advisers Act, such registration does not imply that the Investment Manager has been sponsored, recommended or approved, or that the Investment Manager's abilities or qualifications have in any respect been passed upon, by the SEC or any other governmental agency.

Some of the Funds in which a Portfolio may invest may trade futures and/or options contracts in the course of pursuing their trading strategies. For this reason, the Company, the Portfolios and such Funds are deemed to be commodity pools and the Managing Member is deemed to be a commodity pool operator (**"CPO"**) within the definition of that term under the CEA. The Managing Member filed, with respect to the Company and the Portfolios, a claim for an exemption from registration as a CPO. Such exemption is available to CPOs with respect to commodity pools whose participants are all qualified purchasers. The Investment Manager is registered as a commodity trading advisor and CPO with the CFTC under the CEA. The Investment Manager is currently considering withdrawing such registrations pursuant to an exemption from the requirement to so register.

*Employee Retirement Income Security Act of 1974*

General. The following section sets forth certain consequences under ERISA and the Code, which a fiduciary of an "employee benefit plan" as defined in and subject to ERISA or of a "plan" as defined in and subject to Section 4975 of the Code who has investment discretion should consider before deciding to invest the plan's assets in a Portfolio (such "employee benefit plans" and "plans" being referred to herein as **"Plans,"** and such fiduciaries with investment discretion being referred to herein as **"Plan Fiduciaries"**). The following summary is not intended to be complete, but only to address certain questions under ERISA and the Code that are likely to be raised by the Plan Fiduciary's own counsel.

In general, the terms "employee benefit plan" as defined in ERISA and "plan" as defined in section 4975 of the Code together refer to any plan or account of various types that provide retirement benefits or welfare benefits to an individual or to an employer's employees and their beneficiaries. Such plans and accounts include, but are not limited to, corporate pension and profit-sharing plans, "simplified employee pension plans," KEOGH plans for self-employed individuals (including members), individual retirement accounts described in Section 408 of the Code and medical benefit plans.

41

Each Plan Fiduciary must give appropriate consideration, to the extent applicable, to the facts and circumstances that are relevant to an investment in a Portfolio, including the role an investment in a Portfolio plays in the Plan's investment portfolio. Each Plan Fiduciary, before deciding to invest in must be satisfied, to the extent applicable, that investment in such Portfolio is a prudent investment for the Plan, that the investments of the Plan, including the investment in such Portfolio, are diversified so as to minimize the risks of large losses and that an investment in such Portfolio complies with the documents of the Plan and related trust.

EACH PLAN FIDUCIARY CONSIDERING ACQUIRING SHARES MUST CONSULT ITS OWN LEGAL AND TAX ADVISERS BEFORE DOING SO.

Restrictions on Investments by Benefit Plan Investors. A regulation issued under ERISA contains rules for determining when an investment by a Plan in a company will result in the underlying assets of the company being assets of the Plan for purposes of ERISA or Section 4975 of the Code (i.e., "plan assets"). Those rules provide that assets of a company will not be plan assets of a Plan that purchases an interest therein if the investment by all "benefit plan investors" is not "significant" or certain other exceptions apply. The term "benefit plan investors" includes all Plans (i.e., all "employee benefit plans" defined in and subject to ERISA and all "plans" as defined in and subject to Section 4975 of the Code), all "employee benefit plans" and "plans" that are defined in but not subject to either ERISA or Section 4975 of the Code, including non-U.S. and governmental plans, and also all entities that hold "plan assets" due to investments made in such entities by already described benefit plan investors. In addition, all or a portion of an investment made by an insurance company using assets from its general account may be treated as a benefit plan investor. Investments by benefit plan investors will be deemed not significant if benefit plan investors own, in the aggregate, less than 25% of the total capital of each class of equity interest of the company (determined by not including the investments of persons with discretionary authority or control over the assets of such company, any person who provides investment advice for a fee (direct or indirect) with respect to such assets, and "affiliates" (as defined in the regulations issued under ERISA) of such persons).

In order to avoid causing assets of any Portfolio to be plan assets, the Investment Manager intends to restrict the aggregate investment by benefit plan investors to under 25% of the total capital of each class of equity interest of each Portfolio (not including the investments of the Investment Manager, any person who provides investment advice for a fee (direct or indirect) with respect to a Portfolio, and any entity that directly or indirectly through one or more intermediaries controls, is controlled by or is under common control with any of such entities (including a company for which the Investment Manager acts as the investment manager or provides investment advice), and each of the principals, officers and employees of any of the foregoing entities who has the power to exercise a controlling influence over the management or policies of such entity or of a Portfolio). Because the 25% test is ongoing, it not only restricts initial and additional investments by benefit plan investors, but also can cause the Investment Manager to withhold consent to Transfers or require that existing benefit plan investors withdraw from a Portfolio in the event that other investors withdraw. If rejection of subscriptions or such mandatory redemptions are necessary, as determined by the Investment Manager, to avoid causing the assets of a Portfolio to be "plan assets," the Investment Manager will effect such rejections or redemptions in such manner as the Investment Manager, in its sole discretion, determines.

Ineligible Purchasers. In general, Shares may not be purchased with the assets of a Plan if the Investment Manager, any Advisor, any placement agent or any of their respective affiliates either: (a) has investment discretion with respect to the investment of such plan assets; (b) has authority or responsibility to give or regularly gives investment advice with respect to such plan assets, for a fee, and pursuant to an agreement or understanding that such advice will serve as a primary basis for investment decisions with respect to such plan assets and that such advice will be based on the particular investment needs of the Plan; or (c) is an employer maintaining or contributing to such Plan. A party that is described in clause (a) or (b) of the preceding sentence is a fiduciary under ERISA and the Code with respect to the Plan, and any such purchase might result in a "prohibited transaction" under ERISA and the Code.

Except as otherwise set forth herein, the foregoing statements regarding the consequences under ERISA and the Code of an investment in a Portfolio are based on the provisions of the Code and ERISA as currently in effect, and the existing administrative and judicial interpretations thereunder. No assurance can be given that administrative, judicial, or legislative changes will not occur that will not make the foregoing statements incorrect or incomplete.

42

ACCEPTANCE OF SUBSCRIPTIONS ON BEHALF OF PLANS IS IN NO RESPECT A REPRESENTATION BY THE INVESTMENT MANAGER OR ANY OTHER PARTY RELATED TO THE COMPANY THAT THIS INVESTMENT MEETS THE RELEVANT LEGAL REQUIREMENTS WITH RESPECT TO INVESTMENTS BY ANY PARTICULAR PLAN OR THAT THIS INVESTMENT IS APPROPRIATE FOR ANY PARTICULAR PLAN. THE PERSON WITH INVESTMENT DISCRETION SHOULD CONSULT WITH HIS OR HER ATTORNEY AND FINANCIAL ADVISERS AS TO THE PROPRIETY OF AN INVESTMENT IN ANY PORTFOLIO IN LIGHT OF THE CIRCUMSTANCES OF THE PARTICULAR PLAN.

## CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES

The following is a summary of the material federal income tax considerations that may be relevant to an investor that makes an investment in a Portfolio, based upon the Code, judicial decisions and administrative regulations and rulings of the IRS as of the date of this Memorandum, all of which are subject to change. Although this summary is considered to be a correct interpretation of existing laws in force on the date of this Offering Memorandum, no assurance can be given that courts or fiscal authorities responsible for the administration of such laws will agree or that changes in such laws will not occur. In addition, changes in the tax laws or procedures in foreign jurisdictions where a Fund or Third-Party Fund invests may result in adverse tax consequences to such investments and thus an increase in the tax burden associated with an investment in a Portfolio. Because the tax consequences of an investment in a Portfolio will vary from investor to investor, depending upon their income tax circumstances, this summary does not attempt to discuss all the federal income tax consequences of such an investment. Prospective Members should not consider the contents of this Memorandum as legal or tax advice and should consult their own tax advisers about the tax consequences of investing in a Portfolio.

IN GENERAL, THIS SUMMARY DESCRIBES CERTAIN FEDERAL INCOME TAX CONSEQUENCES THAT MAY ARISE BY REASON OF A PORTFOLIO INVESTING IN OTHER ENTITIES, SUCH AS PARTNERSHIPS AND OFFSHORE CORPORATIONS BUT DOES NOT DESCRIBE THE TAX CONSEQUENCES OF ANY PARTICULAR FUND ANY OF WHICH COULD HAVE ADDITIONAL TAX CONSEQUENCES NOT DESCRIBED IN THIS SUMMARY.

### Taxation of Each Portfolio and the Members

*Classification of the Portfolios.* The Managing Member believes that 90% or more of the income expected to be generated by each Portfolio will constitute "qualifying income" for purposes of the Code provisions applicable to "publicly traded partnerships" and has so advised Sidley Austin Brown & Wood LLP. In reliance thereon, Sidley Austin Brown & Wood LLP has advised the Managing Member that each Portfolio will not be subject to tax as a corporation under the provisions applicable to "publicly traded partnerships."

This conclusion is not binding on the IRS or on any court, and there can be no assurance that the IRS will not assert that a Portfolio should be treated as an association taxable as a corporation or as a publicly traded partnership taxable as a corporation. If the IRS were to take either position and prevail with respect to a Portfolio, neither such Portfolio nor its Members would be entitled to the tax treatment outlined below; rather, the Portfolio would be subject to tax on its taxable income, distributions to its Members would be taxable to them as dividends to the extent of the current and accumulated earnings and profits of the Portfolio, its Members would not be entitled to report their share of any deductions or losses of the Portfolio on their federal income tax returns, and a change in the Portfolio's status for tax purposes may be viewed as a taxable event. The following discussion assumes that each Portfolio will be treated as a partnership for federal income tax purposes.

*Taxation of Members.* As partnerships, each Portfolio will not be subject to federal income tax. With the exception of Members who generally are not subject to United States income taxation, each Member will be required to report on its federal income tax return its distributive share of each item of income, gain, loss, deduction, and credit of each Portfolio in which such Member has invested for its taxable year with which or within which any such Portfolio's taxable year ends (including each item of income, gain, loss, deduction, or credit for such year that is allocated to a Portfolio by any partnership in which such Portfolio invests as a partner). A Member's share of the taxable income of a Portfolio will likely differ from the Member's share of any cash or non-cash distributions by such Portfolio during the year. Consequently, it is likely that the tax incurred by a Member with respect to its share

of the taxable income of a Portfolio for any year could exceed the amount of such distributions received by the Member during such year.

A Member's distributive share of such items for federal income tax purposes generally is determined by the allocations made pursuant to the LLC Agreement, unless such items so allocated do not have "substantial economic effect" or are not in accordance with Members' interests in a Portfolio. Under the LLC Agreement allocations are generally made in proportion to Members' Shareholdings and therefore should have substantial economic effect or be in accordance with Members' interests in a Portfolio. However, the allocations required by the LLC Agreement when redemptions of Shares occur generally will not be in proportion to Shareholdings. Nonetheless, the Managing Member believes such allocations are permitted for tax purposes. If such allocations are not sustained, each Member's distributive share of the items that are the subject of such allocations may be redetermined by the IRS based upon such Member's interest in a Portfolio by taking into account all relevant facts and circumstances. Such a redetermination might result in a larger share of a Portfolio's income being allocated (solely for federal income tax purposes) to the Members in such Portfolio who had not redeemed Shares during the taxable year than was allocated to them pursuant to the LLC Agreement.

*Basis Limitation on the Deductibility of Portfolio Losses.* In general, a Member will be entitled to report, on its federal income tax return, its distributive share of the deductions and losses (ordinary or capital), if any, of a Portfolio in which such Member invested for any year. However, any such losses and deductions will be limited to the adjusted basis of the Member's Shares in such Portfolio at the end of such Portfolio's taxable year. Generally, a Member's adjusted basis for its Shares as of any date will be equal to the cash previously contributed by it to the capital of such Portfolio, increased by its total distributive share of Portfolio income and gain to such date, reduced (but not below zero) by its distributive share of Portfolio losses and expenses to such date, and further reduced by previous redemptions by, or distributions to, the Member. Losses that exceed the adjusted basis of a Member's Shares may be carried forward indefinitely and, subject to other applicable limitations, deducted in a succeeding year to the extent that the adjusted basis in that succeeding year exceeds zero before reduction for any loss in that year. Because of the limitations imposed upon the deductibility of capital losses (see "—Treatment of Capital Gains and Losses," below), a Member's distributive share of any net capital losses of a Portfolio may not materially reduce the federal income tax on its ordinary income.

*At-Risk Limitation on the Deductibility of Portfolio Losses.* A Member who is an individual or closely-held corporation meeting certain tests will not be able to deduct currently its distributive share of the tax losses of a Portfolio in which it invests, if any, for any year to the extent such tax losses exceed the amount such Member is deemed to be economically "at risk" with respect to the Portfolio's activities. A Member in a Portfolio is expected to be considered "at-risk" with respect to its investment in the Portfolio to the extent of the adjusted basis of the Member's Shares, less any amounts borrowed by the Member in connection with the acquisition of its Shares for which the Member is not personally liable and for which it has not pledged any unrelated property as security. Any losses not currently allowable under this "at-risk" limitation may be carried forward indefinitely to future taxable years to be used if and to the extent the Member's amount "at risk" with respect to a Portfolio increases (and may also be used to offset gain on the sale of its Shares in such Portfolio).

*Passive Activity Rules.* The Code contains rules designed to prevent the deduction of losses from "passive activities" against income not derived from such activities, including income from investment activities not constituting a trade or business, such as interest (**"Portfolio Income"**) and salary. The trading activities of each Portfolio will not constitute a "passive activity," with the result that income derived from a Portfolio's activities will constitute Portfolio Income or other income not from a passive activity. Thus, losses resulting from a Member's "passive activities" cannot be offset against such income, and net losses from a Portfolio's operations will be deductible in computing the taxable income of a Member (subject to other limitations on the deductibility of such losses).

*Investment Interest.* Interest paid or accrued on indebtedness properly allocable to property held for investment is "investment interest." Interest expense incurred by a Member to purchase or carry Shares in a Portfolio (as well as other investments) or incurred by such Portfolio (or any partnership in which such Portfolio invests) to purchase or carry property held for investment will generally constitute investment interest. Investment interest is generally deductible by noncorporate taxpayers only to the extent that it does not exceed net "investment income" (that is, generally, the excess of (i) gross income from investment property (excluding gains from

44

disposition of investment property), interest, rents and royalties, which would include a Member's share of a Portfolio's interest income, and (ii) certain gains from the disposition of investment property, over the expenses directly connected with the production of such investment income). A noncorporate Member's net capital gain from the disposition of investment property will be included in clause (ii) of the preceding sentence only to the extent such Member elects to make a corresponding reduction in the amount of net capital gain that is subject to the lower capital gain rate described below (see "—Treatment of Capital Gains and Losses"). Any investment interest expense disallowed as a deduction in a taxable year solely by reason of the above limitation is treated as investment interest paid or accrued in the succeeding taxable year.

*Limitation on Deductibility of Miscellaneous Deductions.* The Code disallows deductions for expenses or losses allocable to interest income wholly-exempt from tax that are otherwise deductible under Section 212 of the Code. Expenses or losses otherwise deductible under Section 212 of the Code include, among other expenses and losses, "investment advisory fees." Moreover, the Code provides that, for noncorporate taxpayers who itemize deductions when computing taxable income, expenses of producing income not allocable to interest income wholly-exempt from tax, including investment advisory fees, are to be aggregated with unreimbursed employee business expenses and other expenses of producing income (collectively, the **"Aggregate Investment Expenses"**), and the aggregate amount of such expenses will be deductible only to the extent such amount exceeds 2% of a noncorporate taxpayer's adjusted gross income. In addition, Aggregate Investment Expenses in excess of the 2% threshold, when combined with certain of a taxpayer's other deductions, are subject to a reduction equal to, generally, 3% of the noncorporate taxpayer's adjusted gross income in excess of a certain threshold amount. Moreover, Aggregate Investment Expenses are not deductible by a noncorporate taxpayer in calculating his alternative minimum tax.

Assuming that the direct trading activities of the Funds are conducted as contemplated in this Offering Memorandum, Sidley Austin Brown & Wood LLP has advised the Investment Manager that Management Fees of such Funds should be deductible. However, Management Fees incurred by a Fund that is not engaged in active direct trading may be subject to the foregoing limitations. Sidley Austin Brown & Wood LLP does not express any opinion regarding Funds that are not engaged in direct trading.

It should also be noted that the IRS might attempt to recharacterize the Incentive Allocation as a partnership expense rather than as an allocation of partnership profits. If the IRS prevailed, the effect would be to increase a Member's distributive share of the income of a Portfolio in which such Member invested by its distributive share of the Incentive Allocation (without any increase in the amount it is entitled to withdraw from such Portfolio), and subject its distributive share of these additional expenses to the aforementioned limitations.

PROSPECTIVE INVESTORS MUST CONSULT THEIR OWN TAX ADVISERS CONCERNING THE FOREGOING "INVESTMENT ADVISORY FEES" ISSUE, WHICH IS A MATTER OF UNCERTAINTY AND COULD HAVE A MATERIAL IMPACT ON AN INVESTMENT IN A PORTFOLIO, IN TERMS OF THE TOTAL TAX PAYABLE.

Pursuant to Section 265(a)(2) of the Code, interest on indebtedness incurred or continued to purchase or carry tax-exempt obligations is nondeductible. For this purpose, subject to certain limited exceptions, interest includes any amount paid or incurred by a person making a short sale in connection with personal property used in such short sale or by any other person for the use of any collateral with respect to such short sale. Therefore, to the extent that a Portfolio either incurs or continues borrowings for the purpose of purchasing or carrying tax-exempt obligations or enters into certain short sales, interest on such borrowings and expenses paid or incurred by any such Portfolio in connection with such short sales would likely not be deductible by a Member. Investors are urged to consult their own tax advisors regarding the application of Section 265 of the Code to the interest expense information to be provided by a Portfolio, and regarding the application of this provision to their particular circumstances.

*Cash Distributions and Withdrawals.* Cash received from a Portfolio by a Member as a distribution with respect to its Shares in such Portfolio or as a withdrawal of less than all of such Shares generally is not reportable as taxable income by a Member. Rather, such distribution reduces (but not below zero) the total tax basis of the Shares in such Portfolio held by the Member after the distribution or withdrawals. Any cash distribution in excess of a Member's adjusted tax basis for its Shares in a Portfolio is taxable to the Member as gain from the sale or exchange

of such Shares and, assuming that the Member has held such Shares for more than one year, will be long-term capital gain.

Redemption for cash of all of the Shares in a Portfolio held by a Member will result in the recognition of gain or loss for federal income tax purposes. Such gain or loss will be equal to the difference between the amount received upon redemption and the Member's adjusted tax basis for such Shares. Assuming that the Member has held such Shares for more than one year, any gain or loss on its redemption will be long-term capital gain or loss. Under Section 751 of the Code, however, the redeeming Member will recognize ordinary income to the extent the relevant Portfolio holds certain short-term obligations or market discount bonds, the discount on which has not been included in such Portfolio's taxable income, regardless of whether the Member would otherwise recognize a gain on such withdrawal. A Member's adjusted tax basis for its Shares in a Portfolio includes, for this purpose, its distributive share of such Portfolio's income or loss for the year of such withdrawal.

*Distributions in Kind.* A Portfolio may pay withdrawal proceeds in kind rather than in cash. In general, a Member will not recognize gain or loss on the distribution of property (other than cash) and the tax basis of any property will be the same as the Portfolio's tax basis but not in excess of the Member's tax basis for its Shares in such Portfolio. A Member who receives an in kind distribution of property in liquidation of its Shares in a Portfolio will have a basis in such property equal to such Member's adjusted basis in its Shares in such Portfolio, reduced by any cash distributed in the transaction. Under certain circumstances, distributions of "marketable securities" are treated for federal income tax purposes as though they were distributions of cash in an amount equal to their fair market value as of the date of distribution. However, it is likely that a Portfolio would qualify for an exception to such treatment available for investment partnerships.

## Syndication Fees

Neither a Portfolio nor the Members will be entitled to any deduction for any syndication fees (*e.g.*, Placement Fees, finders' fees or Initial O&O Costs) incurred in connection with a Portfolio.

## Timing and Character of Portfolio Income, Gains, Losses, and Expenses

*Gain or Loss on Securities Dispositions.* In general, gain or loss with respect to securities will be taken into account for tax purposes only when realized.

The Code contains special rules that apply to "straddles," defined generally as the holding of "offsetting positions with respect to personal property." In general, investment positions will be offsetting if there is a substantial diminution in the risk of loss from holding one position by reason of holding one or more other positions. Each Portfolio is generally authorized to enter into investments that may constitute positions in a straddle when considered in conjunction with the other investments of a Portfolio.

If two or more positions constitute a straddle, recognition of a realized loss from one position must be deferred to the extent of unrecognized gain in an offsetting position. In addition, long-term capital gain may be recharacterized as short-term capital gain, or short-term capital loss as long-term capital loss. Interest and other carrying charges allocable to personal property that is part of a straddle are not currently deductible but must instead be capitalized.

Any loss incurred by a Portfolio with respect to an "identified straddle" is treated as sustained not earlier than the day on which such Portfolio disposes of all positions comprising the identified straddle. Such loss is not deferred even though such Portfolio continues to hold other positions that offset the loss portion of the identified straddle. An "identified straddle" is one which was clearly identified as such on a Portfolio's records on the day on which the straddle was acquired, which is not part of a larger straddle and in which all of the original positions were acquired on the same day and were either disposed of on the same day during the taxable year or remained intact as of the close of the taxable year.

"Wash sale" rules will apply to prevent the recognition of loss by a Portfolio from the disposition of securities at a loss in a case in which identical or substantially identical securities (or an option to acquire such property) is or has been acquired within a prescribed period.

The extent to which the rules above would apply to straddles consisting of a Portfolio's transactions and transactions by a Member that has invested in such Portfolio in its individual capacity is unclear. The IRS could contend that positions held by a Portfolio and positions held by a Member that has invested in such Portfolio in its individual capacity should be aggregated and that such positions, when viewed in the aggregate, constitute a straddle. A prospective Member should review the application of these rules to its individual tax situation, giving special consideration to the potential interaction between Portfolio operations and transactions entered into by a prospective Member in its individual capacity.

*Constructive Sales.* The Code treats certain common financial transactions as "constructive sales" of related appreciated property that is a partnership interest or certain debt instruments. A futures or forward transaction or a total return swap may also give rise to a constructive sale of the related appreciated property. A constructive sale will accelerate gain but not loss. Special rules apply to prevent the application of the constructive sale rule if (i) the transaction is closed within 30 days after the end of the taxable year (*i.e.*, the offsetting positions are closed); (ii) the appreciated financial position is held for 60 days following the date the transaction is closed; and (iii) at no time during such 60 day period is the holder's risk of loss with respect to such financial position reduced. If applicable to a Portfolio, the constructive sale provision would accelerate any gains inherent in Portfolio property treated as constructively sold under the foregoing rules.

*Gain or Loss on Section 1256 Contracts.* The Code distinguishes between so-called "Section 1256 Contracts" and other interests in property (**"Non-Section 1256 Contracts"**). Section 1256 Contracts include any regulated futures contract, certain forward contracts on non-U.S. currencies, and certain commodity options, including certain stock index options. Under the mark-to-market system of taxation of Section 1256 Contracts, gain or loss on a Section 1256 Contract is generally deemed to consist of 60% long-term capital gain or loss and 40% short-term capital gain or loss regardless of the period the Section 1256 Contract is held and regardless of whether the Section 1256 Contract is a long or short position. Under the "mark-to-market" system of taxing Section 1256 Contracts, any unrealized profit or loss on positions in such contracts that are open as of the end of a taxpayer's fiscal year is treated as if such profit or loss had been realized for tax purposes as of such time (even though the positions in fact remain open). If an open position on which profit has been realized as of the end of a Fiscal Year declines in value after such year-end and before the position is in fact offset, a loss will be recognized for tax purposes (irrespective of the fact that the trader may actually have realized a gain on the position considered from the time that such position was initiated). The converse is the case with an open position on which a mark-to-market loss was recognized for tax purposes as of the end of a Fiscal Year but that subsequently increases in value prior to being offset.

*Original Issue Discount.* A Portfolio may hold or purchase debt instruments that are issued with "original issue discount" that will be includable in the taxable income of the Portfolio's Members in each year that such Portfolio owns such debt instruments. The rules concerning original issue discount (Sections 1271-1275 of the Code) are complex, and a complete discussion of such rules is beyond the scope of this summary. Generally, the term "original issue discount" means the excess of the stated redemption price at maturity of the debt obligation (*i.e.*, all payments due under the debt obligation other than payments of stated interest meeting certain requirements) over its issue price. The amount of original issue discount required to be included in the gross income of a Member in a taxable year will equal the sum of the "daily portions" of original issue discount for each day during the taxable year on which a Portfolio in which the Member invested holds such debt instrument. A Member will be required to include in income its allocable share of the amount of original issue discount accrued, on a constant yield basis, with respect to a debt obligation held by such Portfolio.

*Market Discount.* A Portfolio may hold or purchase bonds that are subject to the "market discount" provisions contained in Sections 1276-1278 of the Code. These rules generally provide that if a holder acquires a debt instrument at a discount from, in general, its stated redemption price at maturity, which discount equals or exceeds one-fourth of one percent (0.25%) of the principal amount times the number of remaining complete years to maturity, or weighted average maturity in some cases, and thereafter disposes of such an instrument, the lesser of (a) the gain realized or (b) the portion of the market discount that accrued while the debt instrument was held by such

47

holder will be treated as ordinary income at the time of the disposition. For these purposes, market discount equals the amount by which the basis of the debt instrument in the hands of the holder immediately after its acquisition is less than the issue price of such instrument plus any original issue discount includable in the gross income of all holders (without deduction or limitation on account of any acquisition premium) for periods before such acquisition.

The market discount rules also provide that a holder of any debt instrument who acquired such instrument at a market discount may be required to defer the deduction of a portion of the interest on any indebtedness incurred or continued to purchase or carry such instrument until the market discount is recognizable upon a subsequent disposition of the debt instrument.

*Amortizable Bond Premium.* If a Portfolio purchases a bond (the interest on which is subject to federal income taxation) at a cost that, generally, is in excess of the amount payable on maturity, the excess may constitute amortizable bond premium that is treated as a reduction in interest income. If a Portfolio that purchased a bond with amortizable bond premium makes an election under Section 171 of the Code, such Portfolio generally will allocate amortizable bond premium among the interest payments on the bond and the amount so allocated generally will be applied against (and operate to reduce) the amount of such interest payments. The Managing Member has not yet determined whether to make such election.

*Distributions on Stock.* Cash distributions received by a Portfolio (directly or through a Fund) with respect to stock held by it will be taxable as ordinary income to the extent that the distributing corporation has either current or accumulated earnings and profits for tax purposes. Distributions in excess of the distributing corporation's current or accumulated earnings and profits will be treated as a return of capital and will reduce the basis in such stock, thus increasing the gain (or decreasing the loss) that may be realized on a sale, redemption, or exchange of such stock. To the extent such distributions exceed the basis in the stock, such excess will be taxed as capital gain. Generally, a distribution paid in stock of the distributing corporation with respect to common stock does not result in the recognition of gross income by the recipient.

*Short Sales.* Each Portfolio will be subject to certain short sale rules that may affect the character and timing of gain or loss recognized by a Portfolio for federal income tax purposes. Under these rules a short sale not otherwise covered by the wash sale rules, constructive sale rules, or straddle rules remains open until the short seller delivers the property to the lender and closes the transaction. Any gain from closing a short sale is generally treated as gain from the sale or exchange of a short-term capital asset if the taxpayers hold substantially identical property for not more than one year at the time of the short sale (or acquired any such property after the short sale and on or before the date of the closing thereof), and any loss sustained on closing the short sale is long-term capital loss if the taxpayer holds at the time of the short sale substantially identical property for more than the long-term holding period. If a short sale is entered into as part of a straddle, the "modified short sale rule" applies in lieu of the normal short sale provision and certain carrying charges properly allocable to positions of the straddle must be capitalized. Under the modified short sale rule, the holding period of any position that is part of a straddle is suspended and does not begin to run again until the offsetting position is disposed of. Thus, in the case of a taxpayer that is not a dealer, any gain from the disposition of the short position is generally short-term capital gain. However, any loss on one position of a straddle is long-term capital loss if, at the time the straddle was established, the other position was held for the long-term holding period.

To the extent that expenditures made in connection with a short sale are deductible, rather than capitalized, such expenditures are treated as "investment interest" subject to the investment interest expense limitations discussed above.

*Foreign Taxes and Foreign Tax Credits.* Interest paid on securities of foreign issuers held by a Portfolio may be subject to taxes imposed by a foreign country. Pursuant to the Treasury Regulations under Section 704(b) of the Code, a Portfolio's foreign tax credits must be allocated in accordance with the interests of the Members in such Portfolio. Subject to the requirements and limitations imposed by the Code, Members may elect to claim their allocable share of any such foreign taxes paid by a Portfolio as a foreign tax credit against their U.S. federal income tax liability. Members who do not elect to claim a foreign tax credit may claim a deduction for their allocable share of such foreign taxes (subject to other applicable limitations on the deductibility of such taxes).

48

*Taxation of Foreign Currency Transactions Relating to Investment in Foreign Securities.* Certain trading by a Portfolio in securities of foreign issuers and in certain forward and option contracts with respect to foreign currencies may constitute "Section 988 transactions." Section 988 transactions include entering into transactions in which the amount paid or received is denominated in terms of a nonfunctional currency (or determined by reference to the value thereof) other than the taxpayer's "functional" currency (*i.e.*, the U.S. dollar in the case of a Portfolio). In general, foreign currency gain or loss on Section 988 transactions is treated as ordinary income or loss except that gain or loss on regulated futures contracts on foreign currencies that are Section 1256 Contracts is characterized as capital gain or loss. Various tax elections relating to the characterization of gains or losses attributable to such transactions may be available to a Portfolio.

*Treatment of Capital Gains and Losses.* The maximum federal income tax rate for noncorporate taxpayers on adjusted net capital gain is 15% for most gains recognized on or after May 6, 2003 and in taxable years beginning on or before December 31, 2008. Adjusted net capital gain is generally the excess of net long-term capital gain (the net gain on capital assets held for more than 12 months, including 60% of gain on Section 1256 Contracts) over net short-term capital loss (the net loss on capital assets held for 12 months or less, including 40% of loss on Section 1256 Contracts). See "—Investment Interest" above (for a discussion of the reduction in the amount of a noncorporate taxpayer's net capital gain for a taxable year to the extent such gain is taken into account by such taxpayer in computing its interest deduction). Net short-term capital gain (net gain on assets held for 12 months or less, including 40% of gain on Section 1256 Contracts) is subject to tax at the same rates as ordinary income. Capital losses are deductible by noncorporate taxpayers only to the extent of capital gains for the taxable year plus $3,000.

Ordinarily, an individual taxpayer is not permitted to carry a capital loss back to prior taxable years. However, if an individual taxpayer incurs a net capital loss for a year, the portion thereof, if any, that consists of a net loss on Section 1256 Contracts may, at the election of the taxpayer, be carried back three years and deducted only against net capital gain for such year to the extent that such gain includes net capital gains on Section 1256 Contracts included in the taxpayer's income for such year. Losses so carried back are deemed to consist of 60% long-term capital loss and 40% short-term capital loss. To the extent that such losses are not used to offset gains on Section 1256 Contracts in a carryback year, they will carry forward indefinitely as losses on Section 1256 Contracts in future years.

*Controlled Foreign Corporations, Foreign Personal Holding Companies and Passive Foreign Investment Companies.* A Portfolio or a Fund may invest in the stock of non-U.S. corporations that are characterized as "controlled foreign corporations" ("CFCs"), "foreign personal holding companies" ("FPHCs") or "passive foreign investment companies" ("PFICs"), depending on the percentage of stock of such non-U.S. corporations which is owned, directly or indirectly, by a Portfolio and certain other "United States shareholders". PFICs and FPHCs generally are classified as such for federal income tax purposes because of the type of assets that they hold, and the nature of the income that they earn. However, the rules applicable to CFCs usually override those applicable to PFICs. If a Portfolio and such other "United States shareholders" (if any) own, directly or indirectly, more than 50% of the stock of a non-U.S. corporation, such non-U.S. corporation will be treated for federal income tax purposes as a CFC. A shareholder that is a 10% "United States shareholder" in a CFC will be required to include in its gross income each year its pro rata share of the "Subpart F income" of such CFC for such year, which is treated as ordinary income, and will not be entitled to deduct currently any net loss realized by such CFC. Thus, even if a CFC were to realize trading losses, Members in a Portfolio invested in such CFC would not currently recognize loss for federal income tax purposes because such losses would not flow through to such Portfolio. The Investment Manager generally does not expect the Portfolios to invest in the stock of non-U.S. corporations that will be taxed as CFCs or FPHCs.

To the extent feasible, each Portfolio intends to make an election with respect to each PFIC in which it invests to have the PFIC treated as a "qualified electing fund" ("QEF"), although in some cases a PFIC may not agree to provide the information necessary for such election. Every shareholder, including a Portfolio, that owns stock of a QEF includes in gross income for each taxable year (1) as ordinary income, such shareholder's *pro rata* share of the ordinary earnings of the QEF for such year and (2) such shareholder's *pro rata* share of the net capital gain of the QEF for such year. (See "—Treatment of Capital Gains and Losses" above.) These amounts will be included in the gross income of a shareholder that has invested in the QEF even though the QEF does not distribute to such shareholder any cash or other property in respect of such income. When a Portfolio receives a distribution

49

from a PFIC of earnings previously included in the Portfolio's taxable income, the distribution should not be considered a taxable dividend. In general, each Member may, by filing an election with such Member's return for the taxable year, elect to extend the time for payment of federal income tax on the undistributed earnings of the QEF until the earnings are distributed. Any Member making such an election must pay the statutory rate of interest on underpayments of tax during the period the payment is extended. A Member may be required to file IRS Form 926 if the Member's *pro rata* share of the amount of cash transferred by a Portfolio in which such Member has invested, to a PFIC, exceeds $100,000 during the 12-month period ending on the date of the transfer.

If a shareholder of a PFIC, such as a Portfolio, does not or cannot elect to treat the PFIC as a QEF, it is required to pay tax on distributions that are treated as dividends. In addition, a shareholder of a PFIC that does not elect to treat the PFIC as a QEF must pay a tax on any distributions from the PFIC that constitute "excess distributions" (which includes a portion of the gain it realizes on the disposition of stock in the PFIC), plus an interest charge thereon (at the rate at which interest is computed for underpayments of tax). A shareholder receives an excess distribution from a PFIC in any taxable year in which it receives from the PFIC distributions that, in the aggregate, exceed 125% of the average amount of distributions received by such shareholder from the PFIC during the preceding three taxable years. Such excess distributions are allocated to each day in the shareholder's holding period without regard to whether the PFIC actually derived earnings and profits during such holding period.

No Portfolio or any Member will be entitled to deduct currently any net loss realized by a PFIC. Thus, even if a PFIC were to realize trading losses, Members in a Portfolio invested in such PFIC would not currently recognize loss for federal income tax purposes because such losses would not flow through to such Portfolio. Any such Member would recognize a capital loss only upon complete redemption from such Portfolio.

**Investment by Tax-Exempt Investors**

A Portfolio may incur debt to finance its investment and trading activities, as may certain of the Funds and Third-Party Funds selected by the Investment Manager that are treated as partnerships for federal income tax purposes. Consequently, certain of the income or capital gain recognized by a Portfolio is likely to constitute "unrelated debt-financed income" under Section 514 of the Code. To the extent that a Portfolio's income or gain is characterized as "unrelated debt-financed income," a tax-exempt investor in such Portfolio is required to report such income or gain as "unrelated business taxable income" ("UBTI") and may be required to pay federal income taxes on such UBTI at the same rate as applicable to corporations or trusts. UBTI will also result should a tax-exempt investor borrow funds that constitute "acquisition indebtedness" (within the meaning of Section 514 of the Code) in connection with its investment in a Portfolio. It is also possible that the IRS could assert that the amount of "unrelated debt-financed income" allocable to a tax-exempt investor exceeds the amount of net income allocable to such investor because, in general, only certain portions of a Portfolio's trading activities are debt-financed, and losses on other trading might not be allowed to offset gains on debt-financed trading.

It is unclear whether any short sales of securities other than publicly traded stock will generate UBTI. Prospective tax-exempt investors must consult their own tax advisors on this issue.

Any UBTI generated by Funds, including UBTI generated by Third-Party Funds, and that are organized as partnerships will pass through to a Portfolio that has invested in such Funds and their Members.

U.S. tax-exempt investors should not be taxed on income from an investment by a Portfolio in a PFIC for which a corresponding QEF election is made (see "—Income from Passive Foreign Investment Companies" above).

**Investment by Non-U.S. Members**

A Member who is a nonresident alien individual, foreign corporation, foreign partnership, foreign trust or foreign estate (a "**Non-U.S. Member**") generally is not subject to U.S. federal income taxation on capital gains from securities, commodities or derivatives trading activities for a tax year, provided that such Non-U.S. Member (in the case of an individual) does not spend more than 182 days in the United States during his taxable year, and provided, further, that such Non-U.S. Member is not engaged in a trade or business within the United States during a taxable year to which income, gain, or loss from the securities, commodities or derivatives trading is treated as effectively

connected. An investment in a Portfolio should not, by itself, cause a Non-U.S. Member to be engaged in a trade or business within the United States for the foregoing purposes, assuming that the Portfolio in which such Member has invested is not considered so engaged. Pursuant to a "safe harbor" under the Code, a Portfolio should not be considered to be engaged in a U.S. trade or business for the foregoing purposes provided that (i) the U.S. business activities of the Portfolio consist solely of trading in securities, commodities or derivatives for its own account (and, in the case of commodities, is limited to trading in commodities of a kind customarily dealt in on an organized exchange in transactions of a kind customarily consummated at such place), (ii) such Portfolio is not a dealer in securities or commodities and does not regularly offer to enter into, assume, offset, assign or otherwise terminate positions in derivatives with customers and (iii) any entity which is treated as a partnership for U.S. federal income tax purposes in which such Portfolio invests is not deemed to be engaged in a U.S. trade or business. The Managing Member intends to conduct each Portfolio's affairs in a manner that meets such requirements. In the event a Portfolio were found to be engaged in a U.S. trade or business, a Non-U.S. Member that had invested in such Portfolio would be required to file a U.S. federal income tax return for such year and pay tax at full U.S. rates and, in the case of a Non-U.S. Member which is a foreign corporation, an additional 30% branch profits tax might be imposed. In addition, such Portfolio would be required to withhold taxes from the income or gain allocable to such a Non-U.S. Member under Section 1446 of the Code.

An individual Non-U.S. Member who spends more than 182 days in the United States during the taxable year may be subject to a 30% U.S. tax on any U.S. source capital gains including any gain on the sale of his or her Shares. *Each prospective Non-U.S. Member who anticipates being present in the United States for 183 days or more (in any taxable year) should consult his or her tax adviser with respect to the possible application of this rule.*

Even assuming a Portfolio satisfies the safe harbor, Non-U.S. Members will be subject to a 30% U.S. withholding tax on their respective shares of a Portfolio's U.S. source interest income (unless such interest income is either "portfolio interest" or is received by a Portfolio on U.S. bank deposits, certificates of deposit or discount obligations with maturities (from original issue) of 183 days or less), and any other U.S. source fixed or determinable annual or periodic gains, profits or income. In general, "portfolio interest" is interest (other than certain contingent interest) on an obligation issued after July 18, 1984 that (i) if in bearer form, is issued under arrangements reasonably designed to ensure that such obligation will be sold only to non-U.S. persons, is payable only outside the United States, and bears a legend on its face that any U.S. person who holds such obligation is subject to certain limitations under the U.S. income tax laws, and (ii) if in registered form, the U.S. person responsible for paying interest received a statement either from the beneficial owner of such obligation or from certain qualifying agents of the beneficial owner of such obligation that such owner is not a U.S. person. Each Portfolio intends to provide such a statement as required by applicable law to such U.S. persons and will obtain from each of its Non-U.S. Members a statement documenting his, her or its foreign status on IRS Form W-8BEN or other applicable form. A Non-U.S. Member will not qualify for the portfolio interest exception with respect to a debt instrument issued by an entity if such Non-U.S. Member (i) actually or constructively owns 10% or more of the voting stock interest in or capital and profits of any issuer or (ii) is a bank receiving interest described in section 881(c)(3)(A) of the Code. The 30% withholding tax rate may be reduced for certain Non-U.S. Members by applicable income tax treaty.

A Portfolio's tax return, as filed with the IRS, will be required to include a list of all Members, including Non-U.S. Members.

## Portfolio Tax Returns and Audits

Although no federal income tax is required to be paid by a Portfolio, each Portfolio will be required to file a federal income tax information return. In addition, each Portfolio will provide its Members with Schedules K-1 setting forth the federal income tax information necessary for them to file their individual tax returns. Each Member is required to treat partnership items on its federal income tax returns consistently with the treatment of the items on the relevant Portfolio's return, as reflected on the Schedules K-1. Thus, as a practical matter, a Member will not be able to complete and file its federal income tax return for any year until it receives a Schedule K-1 from the relevant Portfolio for that year.

As noted above, each Portfolio will prepare its returns on the basis of a calendar taxable year, which means that each Portfolio's tax return will be due on April 15 of each year, unless an extension is obtained. No Portfolio

51

will be able to complete and file its partnership income tax return for any year or deliver Schedules K-1 for the year to its Members until such Portfolio has received a Schedule K-1 for that year from each of the Funds and Third-Party Funds in which it invests, and has received other necessary information from each of its Funds. **Thus, it is possible that each Portfolio and Member will need to obtain an extension of the filing date for its return for each year.**

The tax treatment of Portfolio items is generally determined at the Portfolio level rather than at the Member level. The Managing Member has been selected as "tax matters partner" with the authority to determine any Portfolio's response to an audit. The limitations period for assessment of deficiencies and claims for refunds with respect to items related to a Portfolio is three years after the Portfolio's return for the taxable year in question is filed, and the Managing Member has the authority to, and may, extend such period with respect to all Members. If an audit results in an adjustment, all Members may be required to pay additional taxes, interest and possibly penalties and additions to tax. There can be no assurance that a Portfolio's tax return will not be audited by the IRS or that no adjustments to such return will be made as a result of such an audit.

**Tax Shelter Regulations**

The IRS has issued final regulations (the **"Regulations"**) that may require a Portfolio or its Members to report their direct or indirect participation in certain "reportable transactions" by filing IRS Form 8886 (**"Reportable Transaction Disclosure Statement"**).

A "reportable transaction" includes a transaction that results in a loss claimed under Section 165 of the Code by a taxpayer (computed without taking into account offsetting income or gain items, and without regard to limitations on its deductibility) in excess of the thresholds described below, unless the transaction has been exempted from reporting by the IRS. Disclosure is required if a Portfolio incurs losses of at least $2 million in any single taxable year or $4 million for the taxable year the transaction is entered into and the five succeeding taxable years. Members that are individuals, S corporations or trusts, similarly are required to disclose transactions if they individually incur losses which are equal to the same thresholds. Note, however, that the annual threshold applicable to losses from a "section 988 transaction" (relating to foreign currency transactions) allocable to a Member that is an individual or trust is reduced to $50,000. For Members that are C corporations the thresholds generally will be losses of at least $10 million in any single taxable year or $20 million for the taxable year the transaction is entered into and the five succeeding taxable years.

Published guidance from the IRS has exempted certain loss transactions from the reporting requirements. A transaction will be exempt if the assets underlying the transaction have a "qualifying basis," which includes, among others, an asset purchased for cash; provided however that each of the following remains subject to reporting requirements unless the loss generated in the transaction arises from mark to market treatment under the Code: (i) a transaction involving an asset that is, or was, part of a straddle (other than a mixed straddle), (ii) a transaction involving certain "stripped" instruments, (iii) the disposition of an interest in a pass-through entity (such as a Fund), and (iv) a foreign currency transaction which generates an ordinary loss.

The Regulations describe several other categories of "reportable transactions" in addition to the transactions described above, including a transaction with a significant book-tax difference. This is applicable to a taxpayer that is a business entity with gross assets of $250 million or more or a reporting entity under the Securities Exchange Act. Generally, a transaction with a significant book-tax difference is one where such a taxpayer's treatment for U.S. federal income tax purposes of one or more items from the transaction differs by more than $10 million on a gross basis from its treatment of the item(s) for book purposes in any taxable year. Note, however, that the IRS has published guidance exempting book-tax differences that occur solely because the taxpayer marks to market its positions for book purposes but not for tax purposes.

At this time none of the Portfolios can predict whether any of their investments will require them or any of their Members to file a Reportable Transaction Disclosure Statement. If a Portfolio later determines that one or more investments require its Members to file a Reportable Transaction Disclosure Statement, such Portfolio will provide each of its Members with the information required to complete and file the form. In addition, if a Portfolio participates in a transaction that requires reporting to the IRS, such Portfolio is required to maintain certain information including a list of its Members and a detailed description of the Portfolio, its activities and the expected

U.S. federal income tax consequences to its Members. This information must be available to the IRS for inspection upon its written request. None of the Portfolios anticipate registering with the IRS as a tax shelter.

The Regulations generally only apply to transactions entered into on or after February 28, 2003.

The state of California recently enacted legislation establishing requirements applicable to the reporting, registration of tax shelters and listing of reportable and other transactions for purposes of California income and franchise tax purposes. While these requirements generally incorporate the federal rules discussed above, the new legislation does contain differences. **Prospective investors must consult their own tax advisers concerning the applicability of this recent California legislation to their income tax circumstances.** Other states may enact similar legislation.

### State and Local Taxes

In certain circumstances, a Portfolio may be subject to entity-level state and local taxes in state or local jurisdictions in which the profits of such Portfolio are deemed to be sourced.

Investors should be aware that Funds and Third-Party Funds in which a Portfolio may invest could take the position that the income of such Fund is "business income" and that such income has a source in the state in which the Fund is doing business or owns property. In such cases, a Portfolio generally would be required to file an information return in such state showing the amount of the income sourced in the state and each Member's share of such income. Each Member of such Portfolio may be required to file an income tax return in each such state (even if a loss is derived from such state) and to pay tax on such Member's share of the income derived from each such state in addition to the state in which such Member resides (with appropriate credit for taxes paid to such other states). It is possible that one or more states may also tax other income of a Member. Members must consult their own tax advisers regarding the possible applicability of state, local or municipal taxes to an investment in a Portfolio.

State and local taxing authorities may assert that the income of a Portfolio should be sourced in a manner that differs from the manner in which a Portfolio reports the source of income for state and local purposes; as a result, Members may be required to pay additional state and local taxes, interest and possibly penalties. Members also may be subject to such taxes, interest and penalties as a result of being unable to file state and local tax returns on a timely basis.

---

The foregoing discussion is not intended as a substitute for careful planning, particularly since certain of the income tax consequences of an investment in a Portfolio may not be the same for all taxpayers.

EACH PROSPECTIVE INVESTOR MUST CONSULT WITH ITS OWN TAX ADVISERS IN ORDER TO FULLY UNDERSTAND THE FEDERAL, STATE AND LOCAL TAX CONSEQUENCES OF AN INVESTMENT IN A PORTFOLIO.

### COUNSEL AND AUDITORS

The Investment Manager has retained Sidley Austin Brown & Wood LLP, an Illinois limited liability partnership, to serve as counsel to the Investment Manager with respect to matters relating to the Company and the Portfolios. In its capacity as counsel to the Managing Member, Sidley Austin Brown & Wood LLP has assisted the Investment Manager in the preparation of this Memorandum and has advised, and may continue to advise, the Investment Manager regarding its duties and responsibilities – including, without limitation, the scope and nature of its fiduciary duties to the Company and the Members. Sidley Austin Brown & Wood LLP may act as counsel to the Investment Manager in connection with investments made by the Portfolios. Sidley Austin Brown & Wood LLP does not represent and has not represented the Company, the Portfolios, the Funds or the Members in organizing the Company, the Portfolios or the Funds, negotiating their business terms or in connection with the offering of Shares. It is not anticipated that, in connection with the organization or general operation of the Company or the Funds, the Company or the Funds will engage separate counsel.

KPMG, an independent public accounting firm, will act as the auditor for the Company and prepare the Company's federal and state tax returns.

The Investment Manager may remove Sidley Austin Brown & Wood LLP or KPMG at any time without the consent of, or notice to, the Members.

## ANTI-MONEY LAUNDERING AND PRIVACY

### Anti-Money Laundering Program

As part of the USA PATRIOT Act of 2001, the Company is required to comply with stringent anti-money laundering provisions. In this regard, each investor, as a condition to becoming a Member, will be required to represent:

(i)      that it will provide any information deemed necessary by the Managing Member in its sole discretion to comply with its anti-money laundering programs and related responsibilities from time to time;

(ii)      that it, and each of its beneficial owners, is (a) not an individual, entity or organization on any U.S. Office of Foreign Assets Control "watch list" and does not have any affiliation of any kind with such individual, entity or organization; (b) not a foreign shell bank; and (c) not a person or entity resident in or whose subscription funds are transferred from or through a jurisdiction identified as non-cooperative by the Financial Action Task Force;

(iii)      that the monies to be invested in the Company were not derived from any activities that may contravene U.S. or non-U.S. anti-money laundering laws or regulations; and

(iv)      that it is not, and none of its beneficial owners are, a senior foreign political figure, an immediate family member of a senior foreign political figure or a close associate of a senior foreign political figure.

The Company may adopt additional procedures as the rules under the law are further clarified.

### Disclosure and Privacy

This privacy statement is issued by the Company, the Managing Member and their affiliates. The Company and the Managing Member consider privacy to be fundamental to their investor relationships and adhere to the policies and practices described below to protect current and former investors' nonpublic personal information.

The Company and the Managing Member do not disclose nonpublic personal information about their investors or former investors to third parties other than as described herein and subject to applicable law. The Company and the Managing Member never sell investor lists or individual investor information. Internal policies are in place to protect confidentiality, while allowing investor needs to be served. Only individuals who need to do so in carrying out their professional responsibilities may access investor information. The Company and the Managing Member maintain physical, electronic, and procedural safeguards that comply with federal standards to protect confidentiality. These safeguards extend to all forms of interaction with the Company and the Managing Member, including the internet.

In the normal course of business, investors give the Company and the Managing Member personal information on subscription documents and other forms, on websites, and through transactions with affiliates. The Company and the Managing Member collect information about investors (such as name, address, birth date, social security number, educational and professional background, assets, and income) and investors' transactions with the Company and the Managing Member, and their affiliates (such as investments, performances, and account balances). To enable the Company and the Managing Member to serve investors, information may be shared with affiliates and third parties that perform various services for the Company and the Managing Member, such as transfer agents, lawyers, custodians, administrators, and broker-dealers. The Administrator may also share such

information with the Managing Member. The shared information includes identification information (*e.g.*, name and address), transaction and experience information (*e.g.*, account balance), and other information necessary to accomplish transactions. This information may be shared with affiliates, with companies with which the Company and the Managing Member have marketing agreements, or with other parties only as permissible by law. Any organization receiving client information may only use it for the purpose designated by the Managing Member or its affiliates.

By executing a Subscription Agreement investors agree and consent to the Company and the Managing Member disclosing their names and other information to U.S. and non-U.S. regulators, government agencies and instrumentalities upon their request or order.

## ELIGIBILITY REQUIREMENTS AND SUBSCRIPTION PROCEDURES

The Company intends to comply with Section 3(c)(7) of the Investment Company Act and sell its Shares, on a private placement basis, only to "qualified purchasers" and "knowledgeable employees" as defined under the Investment Company Act. Furthermore, the Shares are offered only to investors that are "accredited investors," as defined in Rule 501 under the Securities Act. Such terms are further defined in the Subscription Agreement.

Shares in the Portfolios will be sold as of the Initial Closing Date for each Portfolio and thereafter as of each Subsequent Closing Date. All prospective Members will be required to complete and deliver the Subscription Agreement to the Placement Agent or Administrator by the date preceding the closing date specified in the relevant Supplement and wire the appropriate subscription amount in cash by the date prior to the Subsequent Closing Date specified in the relevant Supplement. If requested by the Managing Member, each prospective Member that is an entity must provide evidence that its constitutional documents permit it to make an investment in the Shares and that all appropriate actions have been taken by or on behalf of such prospective Member. No sale of Shares is valid unless accepted in writing by the Managing Member.

Subscription Agreements are not binding on the Company until accepted by the Managing Member, subject to the review and approval of the Managing Member. The Managing Member reserves the right to reject, in whole or in part, in its sole discretion, any subscription.

All cash received from prospective Members prior to the acceptance of their respective subscriptions will be placed in an account at a commercial banking institution or brokerage firm selected by the Managing Member, which may be an affiliate of the Investment Manager. Any interest earned on subscription funds received prior to the relevant investment date will be credited to the relevant Portfolio. Cash payments will be returned to prospective Members whose subscriptions are not accepted as promptly as practicable and in any event within thirty days of receipt by the Portfolio.

**EXHIBIT B**

# OFFERING MEMORANDUM SUPPLEMENT

# FALCON STRATEGIES TWO LLC – SERIES 2005-1A SHARES

This Offering Memorandum Supplement relates to the offering by Falcon Strategies Two LLC (the "Company"), a Delaware limited liability company, of a separate series ("Series 2005-1A") of Shares in Portfolio A. Capitalized terms used but not defined herein have the meanings specified in the Company's Offering Memorandum dated June 2004 (the "Offering Memorandum"). The information herein supplements and, to the extent indicated, updates certain information set forth in the Offering Memorandum and should be read in conjunction therewith

**THIS SUPPLEMENT MAY BE USED TO OFFER AND SELL SHARES ONLY IF ACCOMPANIED BY THE OFFERING MEMORANDUM RELATING TO THE SHARES.**

The following is a summary of the relevant terms applicable to the Series 2005-1A Shares:

| | |
|---|---|
| Portfolio | Portfolio A. Portfolio A will allocate its assets among all the Strategies described in the Offering Memorandum by investing its assets among the relevant Funds. |
| Series | Series 2005-1A |
| Series Issuance Date | March 31, 2005. The Series Issuance Date may be extended at the option of the Investment Manager, but in no event to a date later than the last calendar day of the next following month. |
| Minimum Subscription Amount | U.S. $500,000 |
| Additional Subscriptions into other Series | The Company, at the sole discretion of the Investment Manager, may accept additional subscriptions from time to time. Any additional subscriptions will be to the then-offered Series of the Company, and will not be to the Series 2005-1A shares. |
| Price per Share upon Issuance | The Net Asset Value per Share of Portfolio A as of the Series Issuance Date |
| Redemption Date | The last day in each calendar quarter |
| Redemption Notice Period | Sixty calendar days prior to the Redemption Date, which may be waived by the Investment Manager in its sole discretion |
| Redemption Fee | Redemptions made after the Lock-Up Period but on or before the second anniversary of the issuance of the redeemed Shares will be subject to a Redemption Fee of 3% of the Redemption amount. The Redemption Fee declines to 1.5% for Redemptions made after the second but on or before the third anniversary of the issuance of the redeemed Shares. |
| Lock-Up Period | The first Redemption Date following the one year anniversary of the Series Issuance Date. |
| Management Fee Rate | 2.25% per annum |
| Incentive Allocation Rate | 15.00% per annum |
| Hurdle Rate | None |
| Distribution Policy | The Investment Manager currently intends to distribute to holders of Shares, on a semi annual basis following March and September, a portion or all of the realized income and gain for such period. The distribution date is expected to be each April 20th and October 20th. The Investment Manager in its sole discretion may change this distribution policy. |
| Anticipated Ramp-Up Period | 180 Business Days. |

**The date of this Offering Memorandum Supplement is February 2005.**

**EXHIBIT C**

Investor Name: DAVID P FERGUSON

Book #: 2057
FC Name: PAUL MILLER/ERIC ERVIN
FALCHNWUS

**FALCON STRATEGIES TWO LLC**
Subscription Agreement for U.S. Investors

#2057

To:    Falcon Strategies Two LLC
       388 Greenwich Street,
       CAI Investing Services - 16th Floor
       New York, NY 10013
       Attention: Casey Hogan

Telephone Numbers:
Sales Desk -           (212) 816 – 4999
Investing Services -   (212) 816 – 5865
Fax -                  (212) 816 - 1333

Minimum Initial Subscription Amount:                    $ 500,000

Subscription Amount:                                    $ 500,000

Placement Fee (      %)*:                               $ 0

Total Remittance Amount (Subscription Amount +          $ 500,000
Placement Fee):

The undersigned ("Subscriber") hereby subscribes to purchase **Series 2005-____** Shares ("Shares") of Falcon Strategies Two LLC, a Delaware limited liability company (the "Company"), for the subscription amount stated above, subject to the terms and conditions set forth herein, in the Company's Limited Liability Company Agreement, as amended from time to time (the "LLC Agreement"), and in the Company's Offering Memorandum dated June 2004, as amended from time to time (the "Offering Memorandum," which term also includes any supplements relating to the Shares). Subscriptions will be accepted on the Series Issuance Date as detailed in the Offering Memorandum Supplement for this series. The Series Issuance Date may be extended at the option of the Company, but in no event to a date later than the last calendar day of the next following month. The subscription price per Share will be determined as described in the Offering Memorandum, as of the Series Issuance Date.

One executed copy of this Subscription Agreement (the "Agreement") must be received by the Company at least six Business Days prior to the Series Issuance Date, subject to the discretion of the Company's Investment Manager (the "Investment Manager"), to reduce or waive such period. Payment of the Total Remittance Amount for such Subscription must be received by the Company at least four Business Days prior to the Series Issuance Date. All payments shall be made in US Dollars for the Total Remittance Amount by (check one):

| Fed Wire Transfer to: | Account Debit: |
|---|---|
| [   ]<br>ABA #[   ]<br>A/C # _____<br>N/O: _____<br>F/F/C A/C# _____<br>N/O: _____<br>Reference: [name of Subscriber, social security #] | subscriber authorizes Smith Barney to cause subscriber's account with Smith Barney (no. ▓▓▓▓▓▓▓▓ to be debited for the Total Remittance Amount and wired to the Company per the noted Fed wire transfer instructions. |

Subscriptions cannot be accepted until the Total Remittance Amount is received.

"Business Day" shall mean any day excluding Saturday, Sunday and any day which is in New York City a legal holiday or a day on which banking institutions are authorized by law or other governmental action to close. Capitalized terms used but not defined herein shall have the respective meanings ascribed to them in the Offering Memorandum.

Should the Company, in the sole discretion of its Investment Manager or Citigroup Global Markets Inc. (the "Placement Agent"), reject or rescind the acceptance of this subscription, subscription payments by Subscriber will be promptly refunded, without interest. This Agreement is irrevocable by Subscriber.

---

*Placement Fee can be reduced at the discretion of the Placement Agent

## REPRESENTATIONS, WARRANTIES AND COVENANTS

As of the date of this Application and as of the Series Issuance Date, Subscriber hereby represents and warrants to, and covenants and agrees with, the Company and its Placement Agent, as follows:

Subscriber represents and agrees as follows:

1) Subscriber is an "accredited investor" within the meaning of Rule 501(a) of Regulation D promulgated under the United States Securities Act of 1933, as amended (the "Securities Act"), and has completed Part II of the Investor Questionnaire attached as Appendix A to this Subscription Agreement. Subscriber is aware that the sale of such Shares is being made in reliance on the exemption from registration provided by Regulation D ("Regulation D") under the Securities Act. Subscriber's Shares have not been and will not be registered under the Securities Act, and, if in the future Subscriber decides to offer, resell, pledge or otherwise transfer the Shares, such Shares may be offered, resold, pledged or otherwise transferred only in accordance with an exemption from the registration requirements of the Securities Act. Subscriber acknowledges that no representation is made by the Company as to the availability of any exemption under the Securities Act or any U.S. state securities laws for resale of the Shares. Subscriber also acknowledges that the Shares are subject to additional transfer restrictions as described in the Offering Memorandum.

2) Subscriber is not purchasing the Shares with a view to the resale, distribution or other disposition thereof in violation of the Securities Act. Subscriber understands that an investment in the Shares involves certain risks, including the risk of loss of all or a substantial part of Subscriber's investment. Subscriber has had access to such financial and other information concerning the Company and the Shares as Subscriber deemed necessary or appropriate in order to make an informed investment decision with respect to the purchase of the Shares. Subscriber has received, read carefully and understands (i) the Offering Memorandum including, without limitation, the information included under the caption "Risk Factors," and (ii) the LLC Agreement. Any special acknowledgment set forth below with respect to any statement contained in the Offering Memorandum or in the LLC Agreement shall not be deemed to limit the generality of this representation and warranty.

3) Subscriber is a "qualified purchaser," as defined in Section 2(a)(51)(A) of the Investment Company Act of 1940, as amended (the "Investment Company Act"), and the related rules promulgated thereunder. Subscriber has also completed Parts I, and III of the Investor Questionnaire attached as Appendix A to this Subscription Agreement. Subscriber authorizes the Company, the Placement Agent, the Investment Manager and their respective agents and attorneys to rely on the contents of the Investor Questionnaire attached as Appendix A to this Subscription Agreement, and certifies that Subscriber's responses to the Investor Questionnaire are complete and correct.

4) In connection with the purchase of the Shares: (i) (a) none of the Company, the Investment Manager or the Managing Member is acting as a fiduciary or financial or investment advisor for Subscriber, and (b) neither the Placement Agent nor any selling agent is acting as a fiduciary or financial or investment advisor for Subscriber arising solely from the purchase of Shares or the execution of the Agreement; (ii) Subscriber is not relying (for purposes of making any investment decision or otherwise) upon any advice, counsel or representations (whether written or oral) of the Company, the Investment Manager, the Managing Member, the Placement Agent or any sub-distributor other than any in the Offering Memorandum, the LLC Agreement and any supplements thereto, and Shares were not offered to Subscriber by means of any advertising or solicitation made to the general public; (iii) none of the Company, the Investment Manager, the Managing Member, the Placement Agent or any sub-distributor has given Subscriber (directly or indirectly through any other person) any assurance or guarantee whatsoever as to the expected or projected success, profitability, return, performance, result, effect, consequence, or benefit of investment in the Shares; (iv) Subscriber has consulted with Subscriber's own legal, tax, investment, financial, and accounting advisors to the extent Subscriber has deemed necessary, and Subscriber has made Subscriber's own investment decisions (including decisions regarding the suitability of any transaction pursuant to the Offering Memorandum) based upon Subscriber's own judgment and upon any advice from such advisors as Subscriber has deemed necessary and not upon any view expressed by the Company, the Placement Agent or any sub-distributor or any affiliate thereof; (v) Subscriber is purchasing the Shares with a full understanding of all of the terms, conditions and risks thereof (economic and otherwise), and Subscriber is capable of assuming and willing to assume (financially and otherwise) those risks; (vi) Subscriber has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and

2

risks of an investment in the Shares, and Subscriber is able to bear the economic risk of its investment; (vii) Subscriber is a sophisticated investor; and (vii) Subscriber's aggregate investment in the Shares does not constitute more than 10% of Subscriber's net worth.

5)      If Subscriber is not an individual and if Subscriber relies on the exemptions provided in Sections 3(c)(1) or 3(c)(7) of the Investment Company Act as a basis for not being required to register as an investment company, Subscriber has obtained the consent to its treatment as a "qualified purchaser" from the appropriate owners of its outstanding securities, to the extent required by Section 2(a)(51) of the Investment Company Act and the related rules.

6)      Subscriber represents that Subscriber:

☒       is not, and for so long as Subscriber holds Shares, will not be a "benefit plan investor" (as defined below).

☐       is a "benefit plan investor" that is NOT subject to the Employee Retirement Income Security Act of 1974, as amended ("ERISA") or Section 4975 of the Internal Revenue Code of 1986, as amended (the "Code").

☐       is a "benefit plan investor" that is subject to ERISA or Section 4975 of the Code.

        *(check one of the foregoing)*

For these purposes, a "benefit plan investor" is (i) a "plan" within the meaning of ERISA or Section 4975 of the Code, whether or not subject to ERISA (and whether or not a U.S. plan) or (ii) an entity whose underlying assets include (for purposes of Section 2510.3-101(f)(2)(iii) of the Regulations) of the Regulations issued by the U.S. Department of Labor (the "Regulations"), whether or not such Regulations apply) the assets of such a plan by reason of the plan's investment in the entity.

Subscriber:

☒       is not a "controlling person" (as defined below).

☐       is a "controlling person" (as defined below).

        *(check one of the foregoing)*

A "controlling person" is any person or entity (other than a benefit plan investor) that has discretionary authority or control with respect to the assets of the Company, or a person who provides investment advice for a fee (direct or indirect) with respect to the assets of the Company, or any "affiliate" (within the meaning of Section 2510.3-101(f)(3)) of the Regulations) of any such person. **Employees of Citigroup Inc. or any of its affiliates should check the "controlling person" box.**

7)      If any part of the assets to be used by Subscriber to acquire and hold the Shares constitutes or, while the Shares are held by such Subscriber, may constitute assets of any employee benefit plan subject to Section 406 of ERISA, Section 4975 of the Code or any substantially similar U.S. federal, state, local or foreign law (a "Similar Law"), then the Subscriber has determined that the acquisition and holding of such Shares by such owner does not and will not constitute or otherwise result in a non-exempt prohibited transaction in violation of Section 406 or 407 of ERISA, Section 4975 of the Code or Similar Law.

8)      If the Subscriber is, or is acting on behalf of, an "employee benefit plan," as defined in and subject to ERISA, or any "plan," as defined in and subject to Section 4975 of the Code (a "Plan"), the individual signing this Subscription Agreement on behalf of the Subscriber hereby further represents and warrants as, or on behalf of, the fiduciary of the Plan responsible for purchasing Shares (the "Plan Fiduciary") that: (a) the Plan Fiduciary has considered an investment in the Company for such Plan in light of the risks relating thereto; (b) the Plan Fiduciary has determined that, in view of such considerations, the investment in the Company is consistent with the Plan Fiduciary's responsibilities under ERISA; (c) the Plan's investment in the Company does not violate and is not otherwise inconsistent with the terms of any legal document constituting the Plan or any trust agreement thereunder; (d) the Plan's investment in the Company has been duly authorized and approved by all necessary parties; (e) none of the Investment Manager, any Advisor, the Placement Agent, any sub-distributor, any of their respective affiliates or any of their respective agents

3

or employees: (i) has investment discretion with respect to the investment of assets of the Plan used to purchase Shares; (ii) has authority or responsibility to or regularly gives investment advice with respect to the assets of the Plan used to purchase Shares for a fee and pursuant to an agreement or understanding that such advice will serve as a primary basis for investment decisions with respect to the Plan and that such advice will be based on the particular investment needs of the Plan; or (iii) is an employer maintaining or contributing to the Plan; and (f) the Plan Fiduciary (i) is authorized to make, and is responsible for, the decision to invest in the Company, including the determination that such investment is consistent with the requirement imposed by Section 404 of ERISA that Plan investments be diversified so as to minimize the risks of large losses, (ii) is independent of Investment Manager, each Advisor, the Placement Agent, each sub-distributor and each of their respective affiliates, and (iii) is qualified to make such investment decision. The undersigned will, at the request of the Investment Manager, furnish the Investment Manager with such information as the Investment Manager may reasonably require to establish that the purchase of the Shares by the Plan does not violate any provision of ERISA or the Code, including without limitation, those provisions relating to "prohibited transactions" by "parties in interest" or "disqualified persons" as defined therein. **Notwithstanding the above, if the selling agent notifies the Plan that it has waived or rebated receipt of all selling commissions from the Investment Manager with respect to the Plan's purchase of Shares, in general, the Plan may purchase Shares even if the selling agent is described in clause (e) (i) or (e) (ii) of this paragraph.**

9) If Subscriber is an individual, Subscriber is at least 21 years of age and has the legal capacity and authority to execute and deliver this Agreement and invest in Shares as herein contemplated. If Subscriber is an entity, Subscriber is validly existing and authorized to execute and deliver this Agreement and invest in Shares as herein contemplated.

10) SUBSCRIBER UNDERSTANDS THAT THE SHARES WILL BE SUBJECT TO THE RESTRICTIONS ON TRANSFER SET FORTH IN THE LLC AGREEMENT, AND THE RESTRICTIONS ON TRANSFER DESCRIBED IN THE OFFERING MEMORANDUM, INCLUDING THOSE DESCRIBED UNDER THE HEADINGS "RISK FACTORS – GENERAL – ILLIQUIDITY AND NON-TRANSFERABILITY OF SHARES."

11) Shares were not offered to Subscriber by means of any solicitation or advertising made to the general public, including, but not limited to, any advertisement, article, notice or other communication published in any newspaper, magazine or similar medium or any solicitation made at a meeting whose attendees were invited by solicitation or advertising made to the general public.

12) Subscriber acknowledges that the Offering Memorandum is personal to Subscriber and does not constitute an offer to any other person or to the public generally to subscribe for or otherwise acquire the Shares, other than pursuant to Regulation D or in accordance with another exemption from the registration requirements of the Securities Act. Subscriber agrees that, if Subscriber does not purchase the Shares or the offering is terminated, Subscriber will return the Offering Memorandum and all documents referred to therein to the Placement Agent or sub-distributor or certify to the Placement Agent or sub-distributor that the aforesaid have been destroyed.

13) Subscriber acknowledges that Subscriber, the Company, the Investment Manager, the Managing Member and each employee, representative and other agent of the foregoing may disclose to any and all persons, without limitation of any kind, the U.S. tax treatment and tax structure of the transaction and all materials of any kind (including opinions or other tax analyses) that are provided to Subscriber and the other parties to the transaction relating to such U.S. tax treatment and tax structure and that no part of the information related to the Company is claimed to be proprietary or exclusive to the Company or any other person.

14) Subscriber acknowledges that the Investment Manager has determined that the Company's activities may create one or more "reportable transactions" under Treasury Regulations, that the Company will disclose its participation in a reportable transaction by completing and filing Form 8886 with the Company's U.S. federal information return and filing a copy of such form with the IRS's Office of Tax Shelter Analysis, that Subscriber may also be required to file such form with its U.S. federal income tax return and to submit a copy to the Office of Tax Shelter Analysis, and that the Company and its material advisors will be required to maintain a list of Subscribers, a detailed description of the structure of the Company, its activities and the expected U.S. federal income tax consequences to the Members and any additional

4

written materials relating to the Company that have been provided to potential investors or their agents and to make such list and information available for inspection upon request by the IRS.

15) Subscriber acknowledges that the Placement Agent (or a selling agent designated by the Placement Agent) will receive the Placement Fee specified in this Agreement and remitted by Subscriber. The Placement Agents may receive additional compensation in respect of the Shares placed by them; this compensation may include the sharing of incentive fees, management fees and the net operating profits of the Managing Agent. In most instances, the Placement Agents (and their financial consultants and other representatives) receive higher compensation for selling investment products sponsored or managed by Citigroup affiliates, such as the Shares, than they would receive for selling similar investment products of an unaffiliated entity. This additional compensation provides an incentive for the Placement Agents to choose such Citigroup-sponsored products over the products of unaffiliated sponsors or managers and represents a conflict of interest that potential investors should consider carefully.

16) Subscriber understands and agrees that upon delivery of payment and issuance of the Shares, Subscriber will become a Member of the Company entitled to the benefits of, and subject to the restrictions contained in, the LLC Agreement.

17) The representations, warranties and agreements made by Subscriber herein or in any certificate or other instrument delivered pursuant hereto shall survive the delivery of payment for the Shares.

18) This Agreement constitutes the entire agreement and understanding of the parties hereto with respect to the matters and transactions contemplated hereby and supersedes all prior agreements and understandings whatsoever relating to such matters and transactions.

19) Subscriber recognizes that the offer of the Shares has been made in reliance upon Subscriber's representations and agreements set forth above. Subscriber agrees to provide, if requested, any additional information that may reasonably be required to determine the eligibility of Subscriber to purchase the Shares. Neither the Company, the Investment Manager, the Managing Member nor the Placement Agent is required to make an independent verification of Subscriber's eligibility to invest in the Company and may rely on the representations of Subscriber contained in this Subscription Agreement. Subscriber hereby agrees to indemnify the Company, the Investment Manager, the Managing Member and any of the Placement Agent and any of their affiliates and controlling persons and any officers, directors, employees or agents of any of them (the "Indemnified Persons") and to hold each of them harmless from and against any loss, damage, claim, expense, cost or liability ("Damages") due to or arising out of a breach of any representation, warranty or agreement of Subscriber contained in this Subscription Agreement or in any other document provided by Subscriber to the Company in connection with Subscriber's investment in the Shares. Notwithstanding any provision of this Subscription Agreement to the contrary, this Subscription Agreement shall not constitute a waiver by Subscriber of any rights granted to Subscriber under applicable securities laws.

20) This Agreement shall survive (i) changes in the transaction, documents and instruments described in the Offering Memorandum which in the aggregate are not material or which are contemplated by the Offering Memorandum and (ii) the death or disability of Subscriber; provided, however, that if the Company shall not have accepted this subscription on or before the Series Issuance Date (which date may be extended as noted above), upon notice of such death or disability this subscription and all agreements of Subscriber hereunder shall be cancelled.

21) ANY CLAIM, CONTROVERSY, DISPUTE OR DEADLOCK ARISING UNDER THIS AGREEMENT (COLLECTIVELY, A "DISPUTE") SHALL BE SETTLED BY ARBITRATION ADMINISTERED UNDER THE RULES OF THE NATIONAL ASSOCIATION OF SECURITIES DEALERS ("NASD") IN NEW YORK, NEW YORK. ANY ARBITRATION AND AWARD OF THE ARBITRATORS, OR A MAJORITY OF THEM, SHALL BE FINAL AND THE JUDGMENT UPON THE AWARD RENDERED MAY BE ENTERED IN ANY STATE OR FEDERAL COURT HAVING JURISDICTION. NO PUNITIVE DAMAGES SHALL BE AWARDED.

Subscriber hereby agrees to the terms of, and agrees to be bound by, this Agreement and the LLC Agreement of the Company.

By: _David P Ferguson_

Signature

Name: David P Ferguson

Title (if applicable): Trustees

Date: 3-21-05

Taxpayer type (circle one):   individual   (trust)   partnership   other: _____

Subscriber's Residence or Business Address (as applicable):

████████████████████████████████

Telephone No.:

Facsimile No.:

E-mail Address:

Tax ID #:

Subscriber's Mailing Address (if different from residence or business address):

████████████████████████████

Signature Verification:

By: _Paul Miller_     Dated: 3-21-05

(Subscriber must also sign the attached Investor Questionnaire)

---

### Section to be completed by your Smith Barney Financial Consultant

Subscriber: Ferguson Family Trust   Smith Barney Account No(s).: ████████

Financial Consultant: Paul Miller     Financial Consultant No.: 097

Financial Consultant: Eric Erwin     Financial Consultant Tel. No.: 858-597-7744

FC Address 4350 La Jolla Village Dr. #1000   FC Facsimile No.: 858-597-0455
San Diego CA 92122

PIF Consulting Platform ✓   Transactional Platform ____

*Account in which investment will be posted. For PIF Consulting, do not list "Debit Account."

6

| Section to be completed by Branch Manager |
| --- |

**BRANCH MANAGER CONFIRMATION:** I hereby confirm:

(a)     If the account is a partnership, corporation, trust or other entity, the Financial Consultant has reviewed the governing documents of the client and confirms that an investment in the Fund is permitted thereunder;

(b)     The Financial Consultant has informed the client of facts relating to the illiquidity and lack of marketability of an interest in the Fund;

(c)     The client meets the suitability requirements for acquiring an interest in the Fund and the branch maintains records containing the basis for this determination.

Branch Manager's Signature: _____

Print BOM Name: _Cira Nickerson_____

7

**Falcon Strategies Two LLC**
**Membership Interests**

**Investor Questionnaire**

Shares will be sold only to Eligible Investors (as defined in the Offering Memorandum).

For the purpose of determining your status as a "qualified purchaser" and making the representation in the Subscription Agreement, please refer to Sections 3(c)(7) and 2(a)(51)(A) of the Investment Company Act and their related rules (including Rule 2a51-1). For the purpose of determining your status as a non-U.S. person and making the representation in the Subscription Agreement, please refer to Rule 902 of Regulation S promulgated under the Securities Act. For the purpose of determining your status as an "accredited investor" and making the representation in the Subscription Agreement, please refer to Rule 501(a) of Regulation D promulgated under the Securities Act and related Rule 506 as well as Section 4(2) of the Securities Act. Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to them in the Subscription Agreement to which this Investor Questionnaire is attached.

- Please indicate the basis of your status as a "qualified purchaser" by answering the relevant questions in Part I below.

- Please indicate your status as an "accredited investor" or a non-U.S. person by answering the relevant questions in Part II below.

- In addition, please complete Part III below.

When you have answered the relevant questions in each of Parts I and II and have read and initialed Part III, please sign this Investor Questionnaire.

8

**Part I**

***Instructions:*** *Listed below are the categories of qualified purchasers, as defined in Section 2(a)(51)(A) of the Investment Company Act and the related rules promulgated thereunder. Check the box or boxes that describe the Subscriber.*

*When answering the following questions the Subscriber should:*

♦  *Include all amounts held under a joint, community property or similar shared ownership interest with your spouse. In determining whether spouses who are making a joint investment are "qualified purchasers," each jointly investing spouse may include the investments owned by the other spouse (whether or not such investments are held jointly).*

♦  *Include investments held in any IRA, 401(k) or similar retirement account so long as such account is directed by you and held for your benefit.*

♦  *Value investments based upon either their fair market value on the most recent date practicable or their cost.*

♦  *When reporting the value of an asset, subtract the principal amount of any outstanding debt incurred to acquire, or for the purpose of acquiring, the asset.*

♦  *See the endnotes at the end of this Questionnaire.*

☐ The Subscriber is a natural person who owns investments ("Qualified Purchaser Investments") of the following types worth in the aggregate $5 million or more:

•  securities of public companies[1]

•  securities of non-public companies that have shareholders' equity[2] of at least $50 million

•  securities of non-public companies that the Subscriber does not control[3]

•  shares in registered investment companies, such as mutual funds (including money market funds) and publicly-traded closed-end funds

•  shares in private investment companies that are exempt from the Investment Company Act by Section 3(c)(1) or 3(c)(7) of the Investment Company Act[4]

•  cash and cash-equivalents[5] (including foreign currencies) held for investment purposes

•  real estate held for investment purposes[6]

•  the following types of investments (in each case held for investment purposes)

•  commodity futures contracts, options on commodity futures contracts and options on physical commodities traded on or subject to the rules of (i) a contract market designated under the Commodity Exchange Act and the rules promulgated thereunder or (ii) a non-US board of trade or exchange as contemplated in the rules promulgated under the Commodity Exchange Act (collectively, "Commodity Interests")[7]

•  physical commodities with respect to which a Commodity Interest is traded on a market described in the immediately preceding bullet point, including certain precious metals

•  swaps and other financial contracts[8]

☐  The Subscriber is a company (i) that owns $5,000,000 or more in Qualified Purchaser Investments, (ii) that is owned directly or indirectly by or for two or more natural persons who are related as siblings or spouses (including former spouses), or direct lineal descendants by birth or adoption, spouses of such persons (including former spouses), the estates of such persons, or foundations, charitable organizations, or trusts established by or for the benefit of such persons, and (iii) that was not formed for the specific purpose of investing in the Company.

9

☒ The Subscriber is a trust that was not formed for the specific purpose of investing in the Company, and each of the trustees or other persons that are authorized to make decisions for the trust, and each of the settlors or other persons (e.g., grantors) that have contributed assets to the trust, is a "qualified purchaser." *(If this box is checked, the Company may request additional information concerning the trustees, settlors and/or other persons that are authorized to make decisions or have contributed assets to the Subscriber.)*

☐ The Subscriber is a natural person or entity, acting for its own account or the accounts of other "qualified purchasers," (i) that in the aggregate owns and invests on a discretionary basis $25,000,000 or more in Qualified Purchaser Investments and (ii) that was not formed for the specific purpose of investing in the Company.

☐ The Subscriber is an entity, e.g., a private company, partnership or limited liability company, and each beneficial owner of the Subscriber's securities is a "qualified purchaser." *(If this box is checked, the Company may request additional information concerning the beneficial owners of the Subscriber's securities.)*

☐ None of the boxes above in this Part I accurately describes the Subscriber. **If this box is checked, the Subscriber must contact the Company.**

10

Part II

*Instructions:* Please confirm the Subscriber's status as an accredited investor or a non-U.S. person. Listed below are the categories of accredited investors, as defined in Rule 501(a) of Regulation D promulgated under the Securities Act. If Subscriber is an accredited investor, check the box or boxes below under "accredited investor categories" which describe the Subscriber. If Subscriber is a non-U.S. person, check the box below under "non-U.S. persons."

☐　The Subscriber is a natural person whose net worth as of the date hereof (including the net worth of the Subscriber's spouse if the undersigned is married) exceeds $1,000,000.

☐　The Subscriber is a natural person who had an individual "income" exceeding $200,000 in each of the two most recently completed calendar years (or a joint income with the Subscriber's spouse in excess of $300,000 in each of those years) and who has a reasonable expectation of reaching the same income level in the current calendar year. The term "income" means adjusted gross income reported or to be reported on a U.S. federal income tax return.

☐　The Subscriber is a bank, a savings and loan association, or other institution described in section 3(a)(5)(a) of the Securities Act acting in its fiduciary capacity. This includes a trust for which a bank acts as trustee and exercises investment discretion with respect to the trust's decision to invest in the Company.

☐　The Subscriber is a trust, partnership, corporation or other entity, not formed for the specific purpose of investing in the Company, that has total assets in excess of $5,000,000 and is directed by a person who has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of investing in the Company.

☒　The Subscriber is a revocable trust (including a revocable trust formed for the specific purpose of investing in the Company), and the grantor or settlor of such trust is an "accredited investor."

☐　The Subscriber is an entity in which each equity owner is an "accredited investor." *(If this box is checked, the Company may request additional information concerning the equity owners of the Subscriber.)*

☐　The Subscriber is a broker or dealer registered under the Securities Exchange Act of 1934, as amended, and the rules and regulations thereunder.

Non-U.S. persons:

☐　The Subscriber is not a "U.S. person," as defined in Regulation S. (For purposes of Regulation S, a "U.S. person" means (i) any natural person resident in the United States, (ii) any partnership or corporation organized under the laws of the United States, (iii) any estate of which any executor or administrator is a U.S. person, (iv) any trust of which any trustee is a U.S. person, (v) any agency or branch of a foreign entity located in the United States, (vi) certain accounts held for the benefit or account of a U.S. person, (vii) certain accounts held by a dealer or fiduciary organized, incorporated or resident in the United States and (viii) certain foreign partnerships or corporations formed by a U.S. person principally for the purpose of investing in securities not registered under the Securities Act.)

11

**Part III**

**Please check the Office of Foreign Assets Control website at <u>http://www.treas.gov/ofac</u> before answering this Part III.**

Federal regulations and Executive Orders administered by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC") prohibit, among other things, the engagement in transactions with, and the provision of services to, certain foreign countries, territories, entities and individuals. The lists of OFAC prohibited countries, territories, persons and entities can be found on the OFAC website at http://www.treas.gov/ofac. In addition, the programs administered by OFAC ("OFAC Programs") prohibit dealing with individuals or entities in certain countries regardless of whether such individuals or entities appear on the OFAC lists.

The Subscriber represents that the amounts to be contributed by it to the Company have not been directly or indirectly derived from activities that contravene federal, state or international laws and regulations, including anti-money laundering laws and regulations.

The Subscriber represents and warrants that, to the best of the Subscriber's knowledge, none of:

    (i)  the Subscriber;

    (ii)  any person controlling or controlled by the Subscriber;

    (iii) if the Subscriber is a privately held entity, any person having a beneficial interest in the Subscriber; or

    (iv) any person for whom the Subscriber is acting as agent or nominee in connection with this investment

is a country, territory, individual or entity named on an OFAC list, nor is a person or entity prohibited under the OFAC Programs.

The Subscriber agrees promptly to notify the Company should the Subscriber become aware of any change in the information set forth in these representations. The Subscriber is advised that, by law, the Company may be obligated to "freeze the account" of such Subscriber, by declining any redemption requests and/or by segregating the assets in the account in compliance with governmental regulations, and the Company may also be required to report such action and to disclose the Subscriber's identity to OFAC. The Subscriber further acknowledges that the Investment Manager may, by written notice to the Subscriber, suspend the redemption rights of such Subscriber if the Investment Manager reasonably deems it necessary to do so to comply with anti-money laundering regulations applicable to the Company, the Investment Manager or any of the Company's other service providers.

(Part III is continued on the following page.)

---

These individuals include specially designated nationals, specially designated narcotics traffickers and other parties subject to OFAC sanctions and embargo programs.

The Subscriber represents and warrants that, to the best of the Subscriber's knowledge, none of:

> (i)   the Subscriber;

> (ii)  any person controlling or controlled by the Subscriber;

> (iii) if the Subscriber is a privately held entity, any person having a beneficial interest in the Subscriber; or

> (iv)  any person for whom the Subscriber is acting as agent or nominee in connection with this investment

is a senior foreign political figure,[*] or any immediate family member[**] or close associate[***] of a senior foreign political figure, as such terms are defined in the footnotes below.

If the Subscriber receives deposits from, makes payments on behalf of, or handles other financial transactions related to a non-U.S. banking institution (a "Foreign Bank"), the Investor represents and warrants to the Company that, to the best of the Subscriber's knowledge:

> (1)   the Foreign Bank has a fixed address, other than solely an electronic address, in a country in which the Foreign Bank is authorized to conduct banking activities;

> (2)   the Foreign Bank employs one or more individuals on a full-time basis;

> (3)   the Foreign Bank maintains operating records related to its banking activities;

> (4)   the Foreign Bank is subject to inspection by the banking authority that licensed the Foreign Bank to conduct banking activities; and

> (5)   the Foreign Bank does not provide banking services to any other Foreign Bank that does not have a physical presence in any country and that is not a regulated affiliate.

**Please initial in the following space to indicate the Subscriber's agreement with the representations and warranties and agreements of the Subscriber in this Part III:** _(initials)_

**If the Subscriber cannot make any of the representations, warranties or agreements in this Part III, the Subscriber must contact the Company.**

---

[*] A "senior foreign political figure" is defined as a senior official in the executive, legislative, administrative, military or judicial branches of a non-U.S. government (whether elected or not), a senior official of a major non-U.S. political party, or a senior executive of a non-U.S. government-owned corporation. In addition, a "senior foreign political figure" includes any corporation, business or other entity that has been formed by, or for the benefit of, a senior foreign political figure.

[**] "Immediate family" of a senior foreign political figure typically includes the figure's parents, siblings, spouse, children and in-laws.

[***] A "close associate" of a senior foreign political figure is a person who is widely and publicly known to maintain an unusually close relationship with the senior foreign political figure, and includes a person who is in a position to conduct substantial U.S. and non-U.S. financial transactions on behalf of the senior foreign political figure.

The undersigned Subscriber confirms that the Subscriber's answers to this Investor Questionnaire are correct.

Ferguson Family Trust
David P. Ferguson

NAME OF SUBSCRIBER

Signature(s):

14

## ENDNOTES

[1] A "company" is a corporation, partnership, association, partnership, trust, fund or other entity. A "public company" is any company that (i) files reports pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934, as amended, or (ii) has a class of securities that are listed on a "designated offshore securities market" as such term is defined by Regulation S under the Securities Act of 1933, as amended. For example, a company whose equity securities are listed on a national securities exchange or traded on the Nasdaq Stock Market would be a "public company."

[2] "Shareholders' equity" should be the amount reflected as such on the relevant company's most recent financial statements prepared in accordance with generally accepted accounting principles, but in no event more than 16 months old.

[3] For purposes of this question, a person is deemed to "control" a company if (i) the person is an officer or director of the company and owns directly any voting securities of the company or (ii) the person owns directly or indirectly more than 25% of the voting securities of the company.

[4] The Subscriber may also include interests in companies that are (i) exempt from the Investment Company Act by Section 3(c)(2), (3), (4), (5), (6), (8), or (9) of the Investment Company Act, (ii) exempt from the Investment Company Act by Rule 3a-6 or 3a-7 under the Investment Company Act, or (iii) commodity pools.

[5] Cash and cash-equivalents include bank deposits, certificates of deposit, bankers' acceptances and similar bank instruments held for investment purposes and the net cash surrender value of an insurance policy.

[6] Real estate held for investment purposes excludes real estate used by the Subscriber or the Subscriber's (or in the case of a "family company," the Subscriber, its owner and its owners') "related persons" (a spouse or former spouse, sibling, direct lineal descendent or ancestor by birth or adoption or a spouse of such descendant or ancestor) as follows: (i) for personal purposes, (ii) as a place of business, or (iii) in connection with a trade or business (unless the Subscriber is engaged primarily in the business of investing, trading or developing real estate and the real estate in question is part of such business). Residential real estate may be considered "held for investment" if deductions on the property are not disallowed by Section 280A of the Internal Revenue Code of 1986, as amended.

[7] Commodity Interests should be valued at their initial margin or option premium.

[8] "Financial contracts" are defined in Section 3(c)(2) of the Investment Company Act as any arrangement that (i) takes the form of an individually negotiated contract, agreement or option to buy, sell, lend, swap or repurchase, or a similar individually negotiated transaction commonly entered into by participants in the financial markets, (ii) is in respect of securities, commodities, currencies, interest (or other) rates, other measures of value, or other financial or economic interests similar in purpose or function to any of the foregoing, and (iii) is entered into in response to a request from a counterparty for a quotation, or is otherwise entered into and structured to accommodate the objectives of the counterparty to such arrangement.

**FALCON STRATEGIES TWO LLC**
**Privacy Notice**

We, Citigroup Alternative Investments LLC, act as the Investment Manager of Falcon Strategies Two LLC (the "Company"). On behalf of ourselves and the Company we are sending this notice to customers who have invested in the Company to tell you how we handle, protect and limit the use of certain nonpublic personal information that we collect in order to conduct and process your business with the Company. The provisions of this notice apply to former customers as well as current ones.

- We believe that protecting the privacy of your personal nonpublic information is of the utmost importance and we are committed to maintaining the privacy of any such information in our possession or that of our agents.

- We collect nonpublic personal information about you from the following sources:

    (i)    Information we receive from you on subscription documents and related forms (for example, name, address, Social Security number, telephone and fax numbers); and

    (ii)   Information about your transactions with us (for example, account activity and balances).

We maintain physical, electronic and procedural controls in keeping with federal standards to safeguard your nonpublic personal information. We do not disclose any nonpublic personal information about you to others except as you have specifically authorized or as legally permitted in connection with the administration, processing and servicing of customer accounts and to our accountants, attorneys and auditors. We require such third parties to use this information only for the purposes for which we hired them and not for any other purpose.

CH1 2967466v2

16

Form **W-9**
(Rev. January 2003)
Department of the Treasury
Internal Revenue Service

**Request for Taxpayer
Identification Number and Certification**

Give form to the
requester. Do not
send to the IRS.

Name
*Ferguson Family Trust DTD, 11/24/1999* (DAVID P. Ferguson

Business name, if different from above

Check appropriate box:  ☐ Individual/Sole proprietor  ☐ Corporation  ☐ Partnership  ☑ Other ▶ *TRUST*   ☐ Exempt from backup withholding

Address (number, street, and apt. or suite no.)

Requester's name and address (optional)

City, state, and ZIP code

List account number(s) here (optional)

*Print or type — See Specific Instructions on page 2.*

## Part I — Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. For individuals, this is your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the Part I instructions on page 3. For other entities, it is your employer identification number (EIN). If you do not have a number, see How to get a TIN on page 3.

**Note:** *If the account is in more than one name, see the chart on page 4 for guidelines on whose number to enter.*

Social security number

or

Employer identification number

## Part II — Certification

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and

2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, and

3. I am a U.S. person (including a U.S. resident alien).

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the Certification, but you must provide your correct TIN. (See the instructions on page 4.)

Sign Here    Signature of U.S. person ▶ *David P. Ferguson*    Date ▶ *3/31/05*

## Purpose of Form

A person who is required to file an information return with the IRS, must obtain your correct taxpayer identification number (TIN) to report, for example, income paid to you, real estate transactions, mortgage interest you paid, acquisition or abandonment of secured property, cancellation of debt, or contributions you made to an IRA.

**U.S. person.** Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN to the person requesting it (the requester) and, when applicable, to:

1. Certify that the TIN you are giving is correct (or you are waiting for a number to be issued),

2. Certify that you are not subject to backup withholding, or

3. Claim exemption from backup withholding if you are a U.S. exempt payee.

**Note:** *If a requester gives you a form other than Form W-9 to request your TIN, you must use the requester's form if it is substantially similar to this Form W-9.*

**Foreign person.** If you are a foreign person, use the appropriate Form W-8 (see **Pub. 515**, Withholding of Tax on Nonresident Aliens and Foreign Entities).

**Nonresident alien who becomes a resident alien.** Generally, only a nonresident alien individual may use the terms of a tax treaty to reduce or eliminate U.S. tax on certain types of income. However, most tax treaties contain a provision known as a "saving clause." Exceptions specified in the saving clause may permit an exemption from tax to continue for certain types of income even after the recipient has otherwise become a U.S. resident alien for tax purposes.

If you are a U.S. resident alien who is relying on an exception contained in the saving clause of a tax treaty to claim an exemption from U.S. tax on certain types of income, you must attach a statement that specifies the following five items:

1. The treaty country. Generally, this must be the same treaty under which you claimed exemption from tax as a nonresident alien.

2. The treaty article addressing the income.

3. The article number (or location) in the tax treaty that contains the saving clause and its exceptions.

4. The type and amount of income that qualifies for the exemption from tax.

5. Sufficient facts to justify the exemption from tax under the terms of the treaty article.

Cat. No. 10231X

Form **W-9** (Rev. 1-2003)

Form W-9 (Rev. 1-2003)

**Example.** Article 20 of the U.S.-China income tax treaty allows an exemption from tax for scholarship income received by a Chinese student temporarily present in the United States. Under U.S. law, this student will become a resident alien for tax purposes if his or her stay in the United States exceeds 5 calendar years. However, paragraph 2 of the first Protocol to the U.S.-China treaty (dated April 30, 1984) allows the provisions of Article 20 to continue to apply even after the Chinese student becomes a resident alien of the United States. A Chinese student who qualifies for this exception (under paragraph 2 of the first protocol) and is relying on this exception to claim an exemption from tax on his or her scholarship or fellowship income would attach to Form W-9 a statement that includes the information described above to support that exemption.

If you are a **nonresident alien or a foreign entity** not subject to backup withholding, give the requester the appropriate completed Form W-8.

**What is backup withholding?** Persons making certain payments to you must under certain conditions withhold and pay to the IRS 30% of such payments (29% **after** December 31, 2003; 28% after December 31, 2005). This is called "backup withholding." Payments that may be subject to backup withholding include interest, dividends, broker and barter exchange transactions, rents, royalties, nonemployee pay, and certain payments from fishing boat operators. Real estate transactions are not subject to backup withholding.

You will **not** be subject to backup withholding on payments you receive if you give the requester your correct TIN, make the proper certifications, and report all your taxable interest and dividends on your tax return.

**Payments you receive will be subject to backup withholding if:**

1. You do not furnish your TIN to the requester, or

2. You do not certify your TIN when required (see the Part II instructions on page 4 for details), or

3. The IRS tells the requester that you furnished an incorrect TIN, or

4. The IRS tells you that you are subject to backup withholding because you did not report all your interest and dividends on your tax return (for reportable interest and dividends only), or

5. You do not certify to the requester that you are not subject to backup withholding under **4** above (for reportable interest and dividend accounts opened after 1983 only).

Certain payees and payments are exempt from backup withholding. See the instructions below and the separate **Instructions for the Requester of Form W-9.**

## Penalties

**Failure to furnish TIN.** If you fail to furnish your correct TIN to a requester, you are subject to a penalty of $50 for each such failure unless your failure is due to reasonable cause and not to willful neglect.

**Civil penalty for false information with respect to withholding.** If you make a false statement with no reasonable basis that results in no backup withholding, you are subject to a $500 penalty.

**Criminal penalty for falsifying information.** Willfully falsifying certifications or affirmations may subject you to criminal penalties including fines and/or imprisonment.

**Misuse of TINs.** If the requester discloses or uses TINs in violation of Federal law, the requester may be subject to civil and criminal penalties.

## Specific Instructions

### Name

If you are an individual, you must generally enter the name shown on your social security card. However, if you have changed your last name, for instance, due to marriage without informing the Social Security Administration of the name change, enter your first name, the last name shown on your social security card, and your new last name.

If the account is in joint names, list first, and then circle, the name of the person or entity whose number you entered in Part I of the form.

**Sole proprietor.** Enter your **individual** name as shown on your social security card on the "Name" line. You may enter your business, trade, or "doing business as (DBA)" name on the "Business name" line.

**Limited liability company (LLC).** If you are a single-member LLC (including a foreign LLC with a domestic owner) that is disregarded as an entity separate from its owner under Treasury regulations section 301.7701-3, enter the owner's name on the "Name" line. Enter the LLC's name on the "Business name" line.

**Other entities.** Enter your business name as shown on required Federal tax documents on the "Name" line. This name should match the name shown on the charter or other legal document creating the entity. You may enter any business, trade, or DBA name on the "Business name" line.

**Note:** You are requested to check the appropriate box for your status (individual/sole proprietor, corporation, etc.).

### Exempt From Backup Withholding

If you are exempt, enter your name as described above and check the appropriate box for your status, then check the "Exempt from backup withholding" box in the line following the business name, sign and date the form.

Generally, individuals (including sole proprietors) are not exempt from backup withholding. Corporations are exempt from backup withholding for certain payments, such as interest and dividends.

**Note:** If you are exempt from backup withholding, you should still complete this form to avoid possible erroneous backup withholding.

**Exempt payees.** Backup withholding is **not required** on any payments made to the following payees:

1. An organization exempt from tax under section 501(a), any IRA, or a custodial account under section 403(b)(7) if the account satisfies the requirements of section 401(f)(2);

2. The United States or any of its agencies or instrumentalities;

3. A state, the District of Columbia, a possession of the United States, or any of their political subdivisions or instrumentalities;

4. A foreign government or any of its political subdivisions, agencies, or instrumentalities; or

5. An international organization or any of its agencies or instrumentalities.

Other payees that **may be exempt** from backup withholding include:

6. A corporation;

7. A foreign central bank of issue;

8. A dealer in securities or commodities required to register in the United States, the District of Columbia, or a possession of the United States;

9. A futures commission merchant registered with the Commodity Futures Trading Commission;

10. A real estate investment trust;

11. An entity registered at all times during the tax year under the Investment Company Act of 1940;

12. A common trust fund operated by a bank under section 584(a);

13. A financial institution;

14. A middleman known in the investment community as a nominee or custodian; or

15. A trust exempt from tax under section 664 or described in section 4947.

The chart below shows types of payments that may be exempt from backup withholding. The chart applies to the exempt recipients listed above, 1 through 15.

| If the payment is for . . . | THEN the payment is exempt for . . . |
|---|---|
| Interest and dividend payments | All exempt recipients except for 9 |
| Broker transactions | Exempt recipients 1 through 13. Also, a person registered under the Investment Advisers Act of 1940 who regularly acts as a broker |
| Barter exchange transactions and patronage dividends | Exempt recipients 1 through 5 |
| Payments over $600 required to be reported and direct sales over $5,000 [1] | Generally, exempt recipients 1 through 7 [2] |

[1] See Form 1099-MISC, Miscellaneous Income, and its instructions.

[2] However, the following payments made to a corporation (including gross proceeds paid to an attorney under section 6045(f), even if the attorney is a corporation) and reportable on Form 1099-MISC are not exempt from backup withholding: medical and health care payments, attorneys' fees; and payments for services paid by a Federal executive agency.

## Part I. Taxpayer Identification Number (TIN)

**Enter your TIN in the appropriate box.** If you are a resident alien and you do not have and are not eligible to get an SSN, your TIN is your IRS individual taxpayer identification number (ITIN). Enter it in the social security number box. If you do not have an ITIN, see **How to get a TIN** below.

If you are a **sole proprietor** and you have an EIN, you may enter either your SSN or EIN. However, the IRS prefers that you use your SSN.

If you are a single-owner **LLC** that is disregarded as an entity separate from its owner (see **Limited liability company (LLC)** on page 2), enter your SSN (or EIN, if you have one). If the LLC is a corporation, partnership, etc., enter the entity's EIN.

**Note:** See the chart on page 4 for further clarification of name and TIN combinations.

**How to get a TIN.** If you do not have a TIN, apply for one immediately. To apply for an SSN, get **Form SS-5,** Application for a Social Security Card, from your local Social Security Administration office or get this form on-line at **www.ssa.gov/online/ss5.html.** You may also get this form by calling 1-800-772-1213. Use **Form W-7,** Application for IRS Individual Taxpayer Identification Number, to apply for an ITIN, or **Form SS-4,** Application for Employer Identification Number, to apply for an EIN. You can get Forms W-7 and SS-4 from the IRS by calling 1-800-TAX-FORM (1-800-829-3676) or from the IRS Web Site at www.irs.gov.

If you are asked to complete Form W-9 but do not have a TIN, write "Applied For" in the space for the TIN, sign and date the form, and give it to the requester. For interest and dividend payments, and certain payments made with respect to readily tradable instruments, generally you will have 60 days to get a TIN and give it to the requester before you are subject to backup withholding on payments. The 60-day rule does not apply to other types of payments. You will be subject to backup withholding on all such payments until you provide your TIN to the requester.

**Note:** Writing "Applied For" means that you have already applied for a TIN or that you intend to apply for one soon.

**Caution:** A disregarded domestic entity that has a foreign owner must use the appropriate Form W-8.

Form W-9 (Rev. 1-2003)                                                                                    Page **4**

## Part II. Certification

To establish to the withholding agent that you are a U.S. person, or resident alien, sign Form W-9. You may be requested to sign by the withholding agent even if items 1, 3, and 5 below indicate otherwise.

For a joint account, only the person whose TIN is shown in Part I should sign (when required). Exempt recipients, see **Exempt from backup withholding** on page 2.

**Signature requirements.** Complete the certification as indicated in 1 through 5 below.

**1. Interest, dividend, and barter exchange accounts opened before 1984 and broker accounts considered active during 1983.** You must give your correct TIN, but you do not have to sign the certification.

**2. Interest, dividend, broker, and barter exchange accounts opened after 1983 and broker accounts considered inactive during 1983.** You must sign the certification or backup withholding will apply. If you are subject to backup withholding and you are merely providing your correct TIN to the requester, you must cross out item 2 in the certification before signing the form.

**3. Real estate transactions.** You must sign the certification. You may cross out item 2 of the certification.

**4. Other payments.** You must give your correct TIN, but you do not have to sign the certification unless you have been notified that you have previously given an incorrect TIN. "Other payments" include payments made in the course of the requester's trade or business for rents, royalties, goods (other than bills for merchandise), medical and health care services (including payments to corporations), payments to a nonemployee for services, payments to certain fishing boat crew members and fishermen, and gross proceeds paid to attorneys (including payments to corporations).

**5. Mortgage interest paid by you, acquisition or abandonment of secured property, cancellation of debt, qualified tuition program payments (under section 529), IRA or Archer MSA contributions or distributions, and pension distributions.** You must give your correct TIN, but you do not have to sign the certification.

## What Name and Number To Give the Requester

| For this type of account: | Give name and SSN of: |
|---|---|
| 1. Individual | The individual |
| 2. Two or more individuals (joint account) | The actual owner of the account or, if combined funds, the first individual on the account [1] |
| 3. Custodian account of a minor (Uniform Gift to Minors Act) | The minor [2] |
| 4. a. The usual revocable savings trust (grantor is also trustee) | The grantor-trustee [1] |
| b. So-called trust account that is not a legal or valid trust under state law | The actual owner [1] |
| 5. Sole proprietorship or single-owner LLC | The owner [3] |

| For this type of account: | Give name and EIN of: |
|---|---|
| 6. Sole proprietorship or single-owner LLC | The owner [3] |
| 7. A valid trust, estate, or pension trust | Legal entity [4] |
| 8. Corporate or LLC electing corporate status on Form 8832 | The corporation |
| 9. Association, club, religious, charitable, educational, or other tax-exempt organization | The organization |
| 10. Partnership or multi-member LLC | The partnership |
| 11. A broker or registered nominee | The broker or nominee |
| 12. Account with the Department of Agriculture in the name of a public entity (such as a state or local government, school district, or prison) that receives agricultural program payments | The public entity |

[1] List first and circle the name of the person whose number you furnish. If only one person on a joint account has an SSN, that person's number must be furnished.

[2] Circle the minor's name and furnish the minor's SSN.

[3] You must show your individual name, but you may also enter your business or "DBA" name. You may use either your SSN or EIN (if you have one).

[4] List first and circle the name of the legal trust, estate, or pension trust. (Do not furnish the TIN of the personal representative or trustee unless the legal entity itself is not designated in the account title.)

**Note:** *If no name is circled when more than one name is listed, the number will be considered to be that of the first name listed.*

## Privacy Act Notice

Section 6109 of the Internal Revenue Code requires you to provide your correct TIN to persons who must file information returns with the IRS to report interest, dividends, and certain other income paid to you, mortgage interest you paid, the acquisition or abandonment of secured property, cancellation of debt, or contributions you made to an IRA or Archer MSA. The IRS uses the numbers for identification purposes and to help verify the accuracy of your tax return. The IRS may also provide this information to the Department of Justice for civil and criminal litigation, and to cities, states, and the District of Columbia to carry out their tax laws. We may also disclose this information to other countries under a tax treaty, or to Federal and state agencies to enforce Federal nontax criminal laws and to combat terrorism.

You must provide your TIN whether or not you are required to file a tax return. Payers must generally withhold 30% of taxable interest, dividend, and certain other payments to a payee who does not give a TIN to a payer. Certain penalties may also apply.

Page: 1 Document Name: untitled

```
    A    ████████████                                          BALANCE PAGE
DAVID P FERGUSON                      HOME: ████████              0004 03/24
                                    . BUS: ████████            AGE: ████████
U/A/D 11-24-1999                      OTHR:                    RISK: AGGRESSIVE
FBO THE FERGUSON FAMILY TRUST         SSN: ████████            INVEST OBJECT:
                                    SWEEP: SBCX      BDP        1=GROWTH
                                                               2=CURR INCOME
CASH ACCT BAL                       NET CASH                    4=TAX DEFERRAL
FIXED INCOME           ████████     TYPE 1 MKT                  3=LIQUIDITY
ACCOUNT VALUE                         ACTION ITEMS            SPECULATION: Y
                      500,000.00    SUBJECT TO TEFRA  28%  W/H  HOLD DIV
                                    ACCRUED INT            1.73  STANDING INSTRX
                                                               BUYS: ST NAME
                                                               SELLS: HOLD
                                                               OPEN ORDER


GOTO: XBal, XSum, XDetail, XMarg bal
VERB TOPIC/SUBJECT          PGE OFF FC#
───────────────────────     ───────────
F1 BKMK   F2 BACK   F3 A     F4 S     F5 EXEC   F6 CMN (A)
```

Date: 3/24/2005 Time: 4:48:53 PM

**EXHIBIT D**

Ref: 00007507 00048713



AT SMITH BARNEY

# Smith Barney Reserved
## Client Statement
April 1 – April 30, 2008

Page 3 of 4

MR DAVID P FERGUSON

## Alternative Investments

*The value and prices assigned to the investments are estimates based on available information typically received from the funds or other sources outside Smith Barney. These values and prices may not be realized upon the sale or ultimate disposition of the investment and may not reflect more recent market volatility. Smith Barney generally does not maintain custody of these investments. They are listed below solely as a service to the customer and are not covered by SIPC. If your investment is held in "nominee name" at your request, Citgroup Global Markets Inc. (Smith Barney) is the owner of record on the books and records of the issuer. The issuer will only recognize Smith Barney as the owner of the investment for all purposes including, but not limited to, communications, capital calls and distributions. Smith Barney is not required to take any action with respect to your investment unless valid instructions are received from you in a timely manner. Some positions reflected on your statement may not represent interests in the fund, but rather redemption proceeds withheld by the issuer pending final valuations which are not subject to the investment performance of the fund and may or may not accrue interest for the length of the withholding.*

*Cash distributions from these investments are categorized as "other income" herein and will not be reported as taxable income on your year-end Form 1099. You will receive either a Schedule K-1 or such other documentation from the fund each year for use in preparing your annual tax return. Cash distributions that are classified as income may in fact be a return of principal as a result of a sale of assets, particularly private equity and real estate funds. For more information regarding the source of a cash distribution, please consult the fund's investor reports, investor services or year-end tax report.*

*Due to delays in the availability of the quarterly estimated values for private equity and real estate funds and/or certain hedge and fixed income alternatives that report off cycle quarterly estimated values, this report could contain valuation information, specifically valuation dates, that are inconsistent with other holdings and reflect your contributions and distributions subsequent to the valuation dates, if any, as opposed to the actual valuation of underlying assets, which in most cases is going to be prior to the "as of" date on your statement.*

*If you have any questions regarding these investments, please contact your Financial Advisor.*

| Fixed Income Alternative Investments Funds | Aggregate Investment | Date Acquired | As of | Estimated Value | Cumulative Distributed Since Inception + Redemptions |
|---|---|---|---|---|---|
| FALCON TWO SERIES 2005-1A | $ 500,000 | / / | 03/31/08 | $ 95,570 | $ 90,777 |
| **Total Alternative Investments** | | | | **$ 95,570.00** | |

## TRANSACTION DETAILS
*All transactions appearing are based on trade-date.*

### Other Alternative Investment Transactions

| Date | Activity | | Description | Quantity | Value |
|---|---|---|---|---|---|
| | Memo | | | | |
| 04/24/08 | | | FALCON TWO SERIES 2005-1A | | |
| | | | Distribution Update | | |
| | | | DISTRIBUTION  90,777 | | |

citi smith barney

**EXHIBIT E**

# FALCON STRATEGIES TWO LLC

a multi-strategy fixed income alternative

**Series 2005-1A (Issued March 2005)**
**Quarterly Investor Report as of June 30, 2005**

*Market Commentary:*

Once again the fixed income markets endured volatility as mixed economic data, record high oil prices and a few adverse corporate headlines left investors with mixed signals during the second quarter. In the first part of the quarter, economic data weighed in bearishly as May's ISM (Institute for Supply Management) survey and a drop in Non Farm Payrolls portrayed slowing growth as well as oil prices at a record $61/barrel, but the news later turned somewhat more positive when Consumer Confidence came in at a 3-year high and sales of existing homes hit record highs. The credit markets were also choppy, as unfavorable corporate headlines (GM, Ford and AIG) helped to whipsaw secondary spreads and lower interest rates spurred robust new issue activity. The Federal Open Market Committee (FOMC) continued on the path towards a measured removal of monetary accommodation and, as expected, tightened interest rates by raising its benchmark by 25 basis points at both the May 3rd and June 30th meetings to 3.25%. Text of the Fed's testimony released in July did not include new information, but did highlight on balance its belief that the economy had not fundamentally weakened. In our opinion, the Fed's commentary seems to strongly suggest that they will continue increasing rates with no hint of a pause. As of July 20th, the futures market is fully pricing at least 2 rate increases by the end of the year, and we would not be surprised to see a 4% Federal Funds rate at year-end.

The rollercoaster trend of the 10-year Treasury rate is illustrative of investors' uncertainty over mixed economic news and direction of the markets, as yields started the quarter at 4.47% and fell to as low as 3.89% in June, before rebounding somewhat to end the quarter at 4.02%. The 3.89% yield in June was the lowest level seen since April 2004. As longer-term rates plummeted and short-term rates continued to rise, the yield curve continued its flattening trend. Nevertheless, we remain bearish on long-term rates and believe market fundamentals do not justify the current levels.

It was a difficult quarter for the tax-exempt markets, as longer-term municipal bonds underperformed relative to Treasuries as a result of technical market factors relating to the sharp drop in Treasury yields and a heavy supply of municipal bonds. As discussed above, 10-year Treasuries dropped by approximately 45 basis points, while, and as is often the case, yields on AAA insured municipal bonds lagged and declined by only 10 to 14 basis points. In addition, the lower rate environment also helped trigger a substantial issuance of municipal bonds as municipalities rushed to take advantage of the opportunity to issue new, or refinance existing, debt. The heavy supply further contributed to the municipal market's lagging reaction by exerting upward influence on tax-exempt yields relative to taxables. For the first six months of 2005, municipalities issued $208 billion of bonds, an increase of $17 billion over the previous record high set in 2004. We believe valuations in the tax-exempt markets are currently attractive, and we will continue to position ourselves in an attempt to exploit any market opportunities that may arise due to continued technical pressures, including heavy supply.

The mortgage market modestly outperformed Treasuries on a duration-adjusted basis by about 8 basis points, and the option adjusted spread (OAS) of current coupon mortgages tightened by approximately 9 basis points, although rising volatility dampened those gains. Prepayment speeds on fixed rate mortgages continued at predictable levels and continued to be supported by turnover associated with a strong housing market. Large commercial banks and foreign investors continued to be large participants in the mortgage market while Fannie Mae and Freddie Mac continue to be largely absent. Net supply of fixed rate mortgages is near historically low levels with 15-year mortgage new issuance contracting on a year-to-date basis. We expect that fixed rate mortgage issuance will gradually start to rise, as the flattening yield curve further entices borrowers to opt for fixed rate, instead of adjustable rate, mortgages.

Credit markets experienced substantial volatility, with most credit spreads widening dramatically throughout the first part of the quarter before bouncing back and ending on a much firmer tone. Overall spreads widened by about 32 bps on the CSFB High Yield Index II and 2 bps in the Merrill Lynch U.S. Corporate Index, but tightened 30 bps in the Merrill Lynch Preferreds Index. Spreads softened in response to the headlines surrounding GM, Ford and AIG, and worries over potential hedge fund blowups and liquidations. In June, these concerns appeared to be overdone and spreads gradually rebounded on the heels of solid economic data and a rally in equities. In the near term, we believe credit fundamentals should remain intact as corporate profits remain reasonably strong and the investor demand for yield products remains robust. However, we believe the credit markets are beginning to move into unknown territory as we move through the lowest default rate environment since 1997 and a higher supply of lower quality/more aggressively structured debt in the high yield space. We continue to be underweight high yield, but neutral on investment grade corporates.

In conclusion, we are bullish on the economy and continue to be less concerned about long-term inflation. We believe that the Fed will continue along its "moderate" tightening path by gradually increasing short-term rates at each of their next two meetings, while the yield curve could see additional flattening before reversing the trend that started in mid-2003. We remain diversified across our core strategies and cautiously optimistic for the remainder of the year.

alternative thinking from Citigroup

*Data contained herein has not been audited.*

**citigroup**
alternative investments

# FALCON STRATEGIES TWO LLC
a multi-strategy fixed income alternative

*Fund Level Commentary and Performance:*

At the Fund level, net returns were flat during the quarter, with each of the strategies generally performing in line with our expectations given the market conditions and turmoil in the fixed income space. For the quarter, the Fund returned 0.08% (0.68% in April, -1.04% in May and 0.45% in June). Since inception the Fund has returned 2.85% (4.36% annualized). See below for the performance data pertaining to your specific series. The negative performance in May and muted performance for the quarter can be primarily attributable to underperformance in the municipal arbitrage strategy where, as is typically the case, tax-exempt yields lagged the sharp rally in Treasuries, causing what we believe was a temporary disruption in their historical relationship. The rapid decline in interest rates also triggered a substantial increase in municipal bond issuance and further contributed to their underperformance versus Treasuries. While these market conditions held back performance, they also created what we believe were attractive investment opportunities, and we selectively added to our municipal arbitrage investments.



Allocations
At June 30, 2005

Preferreds 17%
Leveraged Loans 7%
Opportunistic MBS 12%
Municipal Arbitrage 27%
Cash 15%
MBS Long / Short 21%

The MBS and credit strategies performed well during the quarter, but were mostly offset by municipal arbitrage. Subsequent to quarter-end, municipal arbitrage performance rebounded, as long Treasury rates increased and the forward muni supply calendar eased, allowing municipal yields to move towards more historical levels relative to Treasuries. We expect Falcon to have a solid month of performance in July.

As of June 30, 2005, Falcon had invested approximately 84% of its capital into what we believe were relatively attractive market opportunities, and at this time it is fully ramped up. During the quarter, the Fund's capital was leveraged approximately 4-5 times, on average across all strategies. Fund income generation, which is the key driver of long-term performance, has been strong and in line with our expectations. The next quarter-end date is September 30, 2005, and we expect Fund to make its next semi-annual distribution on October 20, 2005. Please keep in mind that unrealized movements in Fund NAV do not materially impact the Fund's ability to generate income.

Going forward, we are cautiously optimistic across all strategies and have positioned our current allocations, underlying diversification and leverage consistently within our views on the relative attractiveness of each strategy as summarized in the Market Commentary. We remain confident about the composition of the portfolio, yield and long-term performance expectations.

*Return Summary For Series 2005-1A:*

|  | April 2005 Total Return[1] | May 2005 Total Return[1] | June 2005 Total Return[1] | Quarter Total Return | Since Inception Total Return | Annualized Since Inception Total Return[2] |
|---|---|---|---|---|---|---|
| Series 2005-1A | 0.89% | -1.04% | 0.45% | 0.29% | 0.29% | 1.18% |
| 1-Month Libor Index[3] | 0.24% | 0.26% | 0.26% | 0.76% | 0.76% | 3.07% |
| SBBIG Index[3] | 1.40% | 1.12% | 0.57% | 3.10% | 3.10% | 13.11% |

As of June 30, 2005, the NAV for this series is 100.28% per $1mm. The first semi-annual distribution for this series is scheduled for October 20, 2005.

1. Monthly total return is calculated as the change in NAV, net of base fees, incentive fees & expenses, plus all distributions made during the stated month.
2. Annualized returns are calculated using monthly compounding of average monthly total returns.
3. 1-Month Libor Index (US0001M) and SBBIG Index (SBBIG) were obtained from Bloomberg.



# FALCON STRATEGIES TWO LLC

a multi-strategy fixed income alternative

This report has been prepared by Citigroup Alternative Investments (CAI), the Managing Agent, located at 399 Park Avenue, 7th Floor, New York, NY 10043, and is for the information of the shareholders of the Fund. It is confidential and is not to be reproduced or shared with any other person. This report is not authorized for distribution to prospective investors. Some of the information contained herein has been obtained from outside sources; while we believe these sources to be reliable, we do not represent that the information provided by them is accurate or complete. **Past performance is no guarantee of future results.** References to a benchmark or hurdle rate do not constitute any representation, implicit or explicit that they can or will be achieved. While some information used in this report has been obtained from various published and unpublished sources considered to be reliable, neither CAI nor any of its affiliates guarantees its accuracy or accepts liability for any direct or consequential losses arising from its use.

All expressions of opinion are as of July 20, 2005, and are subject to change without notice and are not intended to be a guarantee of future results.

Investing in alternative investments is speculative, not suitable for all clients, and intended for investors with sufficient knowledge and experience, who are willing to bear the high economic risks of the investment, which can include:

- Loss of all or a substantial portion of the investment due to leveraging, short-selling or other speculative investment practices;

- Lack of liquidity in that there may be no secondary market for the Fund and none expected to develop;

- Volatility of returns;

- Restrictions on transferring interests in the Fund;

- Potential lack of diversification and resulting higher risk due to concentration of trading authority with a single advisor;

- Absence of information regarding valuations and pricing;

- Delays in tax reporting and complex tax structures;

- Less regulation and higher fees than mutual funds; and

- Advisor risk.

Individual funds will have specific risks related to their investment programs, which will vary from fund to fund.

---

**Investment Products: Not FDIC Insured – No Bank Guarantee – May Lose Value**

---

For any questions related to the Fund or this report, please contact your representative.

alternative thinking from Citigroup          *Data contained herein has not been audited.*          
                                                              3

**EXHIBIT F**

Financial Statements of

**FALCON STRATEGIES TWO LLC**

December 31, 2007

# FALCON STRATEGIES TWO LLC

Table of Contents

| | Page |
|---|---|
| Independent Auditors' Report to the Shareholders | 1 |
| Statement of Assets and Liabilities | 2 |
| Schedule of Investments | 3 |
| Statement of Operations | 4 |
| Statement of Changes in Net Assets | 5 |
| Statement of Cash Flows | 6-7 |
| Notes to Financial Statements | 8-26 |
| Company Directory | 27 |



**KPMG**
P.O. Box 493
Century Yard, Cricket Square
Grand Cayman KY1-1106
CAYMAN ISLANDS

Telephone    + 1 345 949 4800
Fax          + 1 345 949 7164
Internet     www.kpmg.ky

## Independent Auditors' Report to the Shareholders

We have audited the accompanying statement of assets and liabilities, including the schedule of investments, of Falcon Strategies Two LLC (the "Company") as of December 31, 2007 and the related statement of operations, changes in net assets and cash flows for the year then ended. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audit.

We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of the Company as of December 31, 2007 and the results of its operations, changes in its net assets and its cash flows for the year then ended in conformity with accounting principles generally accepted in the United States of America.

The accompanying financial statements have been prepared assuming the Company will continue as a going concern. Without qualifying our opinion, we draw attention to note 10 to the financial statements. The Company is exposed to disruptions and uncertainties in the credit markets resulting in liquidity difficulties, raising costs of re-financing and an overall decline in the prices of asset holdings. In response, the Company has taken certain measures as outlined in note 10 to position the Company such that it can be managed in a controlled fashion in the current market conditions. These conditions, along with other matters as set forth in note 10, indicate the existence of a material uncertainty which may cast significant doubt about the Company's ability to continue as a going concern. These financial statements do not include any adjustments that might result from the outcome of this uncertainty.

*KPMG*

April 28, 2008

---

1

KPMG, a Cayman Islands partnership and a member firm of the
KPMG network of independent member firms affiliated with KPMG
International, a Swiss cooperative.

**FALCON STRATEGIES TWO LLC**

Statement of Assets and Liabilities

December 31, 2007
*(stated in United States dollars)*

|  | Note | 2007 |
|---|---|---|
| **Assets** | | |
| Cash and cash equivalents | 3 | 368,814 |
| Investments in other funds (cost: US$413,964,585) | 5 | 296,497,982 |
| Early redemption receivable | | 67,816,777 |
| Dividend receivable | | 1,901,050 |
| Other assets | | 78,612 |
| | | 366,663,235 |
| **Liabilities** | | |
| Management fees payable | 6 | 229,368 |
| Redemption payable | | 66,255,963 |
| Accrued expenses | | 101,116 |
| | | 66,586,447 |
| **Net assets** | US$ | 300,076,788 |
| **Net assets are comprised of:** | | |
| Share capital | 7 | 463,167,593 |
| Retained earnings | | (79,525,519) |
| Cumulative distributions | | (83,565,286) |
| **Net assets** | US$ | 300,076,788 |

*See accompanying notes to financial statements.*

2

# FALCON STRATEGIES TWO LLC

Schedule of Investments

December 31, 2007
*(stated in United States dollars)*

| | Cost | Fair value | % of net assets |
|---|---|---|---|
| **Investments in other funds** | | | |
| Condor Strategies Two Ltd. | 116,730,021 | 87,542,030 | 29.17% |
| Starling Strategies Two Ltd. | 71,408,182 | 71,118,365 | 23.70% |
| MAT Four LLC | 67,693,363 | 46,779,187 | 15.59% |
| Peregrine Strategies Three Ltd. | 70,819,679 | 30,659,810 | 10.22% |
| Municipal Opportunity Fund Four LLC | 28,326,172 | 22,971,876 | 7.65% |
| Peregrine Strategies Ltd. | 37,316,529 | 19,036,968 | 6.34% |
| Falcon Liquid Reserves Ltd. | 14,812,112 | 13,557,105 | 4.52% |
| Osprey Strategies Ltd. | 6,290,082 | 4,456,304 | 1.49% |
| Peregrine Strategies Two Ltd. | 500,306 | 315,269 | 0.11% |
| Condor Strategies Ltd. | 59,306 | 56,220 | 0.02% |
| Starling Strategies Ltd. | 8,833 | 4,848 | 0.00% |
| | 413,964,585 | 296,497,982 | 98.81% |

*See accompanying notes to financial statements.*

**FALCON STRATEGIES TWO LLC**

Statement of Operations

Year ended December 31, 2007
*(stated in United States dollars)*

| | Note | 2007 |
|---|---|---|
| **Investment income** | | |
| Distributions from underlying funds | | 31,018,946 |
| Interest income | | 3,915,299 |
| Periodic receipts under interest rate swaps, net | | 169,879 |
| Other income | | 109 |
| | | 35,104,233 |
| **Expenses** | | |
| Management fees | 6 | 1,744,704 |
| Interest expense | | 2,957,104 |
| Periodic payments under swaptions, net | | 8,724 |
| Other fees and operating expenses | | 241,391 |
| | | 4,951,923 |
| **Net investment income** | | 30,152,310 |
| **Realized and unrealized gain/(loss) from investment activities** | | |
| Realized loss on disposal of investments in other funds | | (62,892,460) |
| Realized loss on disposal of eligible investments | | (2,085,960) |
| Realized gain on eligible investments sold short | | 386,806 |
| Realized loss on futures | | (3,696,519) |
| Realized loss on options | | (32,272) |
| Net change in unrealized loss on investments in other funds | | (129,699,259) |
| Net change in unrealized loss on eligible investments | | (496,578) |
| Net change in unrealized gain on eligible investments sold short | | 27,745 |
| Net change in unrealized gain on interest rate swaps | | 128,578 |
| Net change in unrealized gain on swaptions | | 11,002 |
| Net change in unrealized gain on futures | | 337,930 |
| Net change in unrealized gain on options | | 11,625 |
| | | (197,999,362) |
| **Net decrease in net assets resulting from operations** | US$ | (167,847,052) |

*See accompanying notes to financial statements.*

4

**FALCON STRATEGIES TWO LLC**

Statement of Changes in Net Assets

Year ended December 31, 2007
*(stated in United States dollars)*

| | Note | Shareholders | Investment Manager | Total |
|---|---|---|---|---|
| Net assets at beginning of year | | 473,577,434 | 1,617,418 | 475,194,852 |
| **Net decrease in net assets resulting from operations:** | | | | |
| Net investment income | | 30,122,827 | 29,483 | 30,152,310 |
| Net realized loss from investment activities | | (68,405,655) | (61,041) | (68,466,696) |
| Net change in unrealized loss from investment activities | | (129,416,023) | (116,643) | (129,532,666) |
| | | (167,698,851) | (148,201) | (167,847,052) |
| **Net decrease in net assets resulting from capital transactions:** | | | | |
| Subscriptions for shares | | 116,737,725 | - | 116,737,725 |
| Shares redeemed | | (87,864,442) | - | (87,864,442) |
| Distributions | | (34,789,129) | (34,750) | (34,823,879) |
| Incentive allocation | 6 | (200,644) | 200,644 | - |
| Incentive allocation paid | | - | (1,320,416) | (1,320,416) |
| | | (6,116,490) | (1,154,522) | (7,271,012) |
| Net decrease in net assets during the year | | (173,815,341) | (1,302,723) | (175,118,064) |
| Net assets at end of year | US$ | 299,762,093 | 314,695 | 300,076,788 |

*See accompanying notes to financial statements.*

**FALCON STRATEGIES TWO LLC**

Statement of Cash Flows

Year ended December 31, 2007
*(stated in United States dollars)*

|  | 2007 |
|---|---|
| **Cash provided by/(applied in):** | |
| **Operating activities** | |
| Net decrease in net assets resulting from operations | (167,847,052) |
| Adjustments to reconcile net decrease in net assets resulting from operations to net cash provided by/(applied in) operating activities: | |
| Net change in unrealized loss on investments in other funds | 129,699,259 |
| Net change in unrealized loss on eligible investments | 496,578 |
| Net change in unrealized gain on eligible investments sold short | (27,745) |
| Net change in unrealized gain on interest rate swaps | (128,578) |
| Net change in unrealized gain on swaptions | (11,002) |
| Net change in unrealized gain on futures | (337,930) |
| Net change in unrealized gain on options | (11,625) |
| Realized loss on disposal of investments in other funds | 62,892,460 |
| Realized loss on disposal of eligible investments | 2,085,960 |
| Realized gain on eligible investments sold short | (386,806) |
| Repurchase agreements | 57,575,080 |
| Reverse repurchase agreements | (75,813,000) |
| Amortization on eligible investments, eligible investments sold short and futures options | 98,707 |
| Interest receivable | 1,192,016 |
| Unsettled trades receivable | 1,643,888 |
| Dividend receivable | (577,522) |
| Subscription to other fund paid in advance | 15,717,796 |
| Other assets | 111,248 |
| Interest payable | (492,489) |
| Management fees payable | 52,096 |
| Options premium | (11,247) |
| Accrued expenses | 5,562 |
| Purchase of investments in other funds | (687,843,235) |
| Purchase of eligible investments | (111,022,258) |
| Proceeds on disposal of investments in other funds | 555,393,073 |
| Proceeds on disposal of eligible investments | 202,729,853 |
| Proceeds from eligible investments sold short | (106,897,895) |
| Cover of eligible investments sold short | 50,893,099 |
| Paydowns on eligible investments | 7,021,402 |
|  | (63,800,307) |

*See accompanying notes to financial statements.*

**FALCON STRATEGIES TWO LLC**

Statement of Cash Flows (continued)

Year ended December 31, 2007
*(stated in United States dollars)*

|  |  | 2007 |
|---|---|---|

**Cash provided by/(applied in):**

**Financing activities**

| | | |
|---|---|---|
| Shareholder subscriptions | | 116,737,725 |
| Shares redeemed | | (24,087,387) |
| Performance allocation paid | | (1,320,416) |
| Distributions paid | | (34,823,879) |
| | | 56,506,043 |

| | | |
|---|---|---|
| **Decrease in cash and cash equivalents during the year** | | (7,294,264) |
| | | |
| Cash and cash equivalents at beginning of year | | 7,663,078 |
| Cash and cash equivalents at end of year | US$ | 368,814 |

**Supplementary information on cash flows from operating activities**

| | | |
|---|---|---|
| Interest paid | US$ | 3,449,593 |

*See accompanying notes to financial statements.*

7

**FALCON STRATEGIES TWO LLC**

Notes to Financial Statements

December 31, 2007
*(stated in United States dollars)*

### 1. General

Falcon Strategies Two LLC (the "Company") is a Delaware limited liability company formed on April 27, 2004, which commenced operations on October 29, 2004. AMACAR GP, Inc. ("AMACAR") is the sole managing member of the Company. AMACAR has delegated substantially all authority to manage the day to day operations of the Company to Citigroup Alternative Investments LLC (the "Investment Manager"). AMACAR is not affiliated with the Investment Manager. US Bank, National Association acts as the custodian and administrator to the Company (the "Administrator").

The Company's investment objective is to generate returns in the fixed income market consistent with a targeted level of risk/volatility while providing diversification from traditional long-only investments. The Company seeks to achieve its objective through directional and non-directional fixed income strategies that demonstrate attractive historical returns with low correlations to each other and, as a company, low correlations to traditional equity and fixed income investment strategies. The Company employs various investment, risk management and allocation processes in order to meet its investment objectives. The Company may also employ leverage at the portfolio level including eligible investments, as well as at the underlying strategy level, as more fully described in the Company's Offering Memorandum. Such leverage may be achieved through, among other methods, the borrowing of funds, the purchase of securities on margin and the use of options, futures, forward contracts, repurchase and reverse repurchase agreements, other derivatives and swaps.

The Company issues shares in separate Portfolios (each a "Portfolio"). A notice of the limitation on liabilities of a Portfolio in accordance with Section 18-215(b) of the Delaware Limited Liability Company Act is set forth in the certificate of formation of the Company. Accordingly, all debts, liabilities, and obligations and expenses incurred by a particular Portfolio are enforceable against the assets of such Portfolio only, and not against the assets of the Company generally or of any other Portfolios. Separate and distinct records will be maintained for each Portfolio and the assets associated with each Portfolio will be held and accounted for separately from the other assets of the Company generally or any other Portfolios.

As of December 31, 2007, shares of one Portfolio, Portfolio A, have been issued and are outstanding.

As of December 31, 2007, the Company had no employees. The registered office of the Company is located at the Corporation Trust Company, Corporation Trust Center 1209 Orange Street, Wilmington, Delaware 19801.

The Company has been rated AA-f/S2 by Standard & Poor's Rating Services.

# FALCON STRATEGIES TWO LLC

Notes to Financial Statements (continued)

December 31, 2007
*(stated in United States dollars)*

2. **Significant accounting policies**

These financial statements are prepared in conformity with accounting principles generally accepted in the United States of America and the significant accounting policies adopted by the Company are as follows:

(a) *Use of estimates*

The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of income and expenses during the period. Actual results could differ from those estimates.

(b) *Cash and cash equivalents*

Cash and cash equivalents consist of overnight and short term commercial paper issued by the Administrator.

(c) *Investments in other funds*

Investments in other funds ("Portfolio Funds") are accounted for on a trade date basis which is the date the contract was entered into or terminated. Investments in other funds are initially measured at cost. Subsequent to initial recognition, investments are measured at fair value. The fair value of investments in other funds is based on audited net asset values. Movements in fair value are recognized as unrealized gains or losses in the statement of operations.

(d) *Eligible investments*

Eligible investments are recorded on a trade date basis which is the date the contract was entered into or was terminated. Eligible investments are initially measured at cost. Subsequent to initial recognition, eligible investments are measured at fair value. Discounts and premiums on eligible investments purchased are amortized over the lives of the respective eligible investment. The fair value of eligible investments is based on their prices received from third party services and broker quotes as of the statement date.

**FALCON STRATEGIES TWO LLC**

Notes to Financial Statements (continued)

December 31, 2007
*(stated in United States dollars)*

2. **Significant accounting policies (continued)**

   (e) *Repurchase and reverse repurchase transactions*

   Securities sold subject to a simultaneous agreement to repurchase these securities at a certain later date at a fixed price (reverse repurchase agreements) are measured at fair value. The proceeds of the sale are reported as liabilities and are carried at amortized cost. Securities purchased under agreements to resell (repurchase agreements) are reported as receivables and are carried at amortized cost.

   Interest earned on repurchase agreements and interest incurred on reverse repurchase agreements is recognized as interest income or interest expense, over the life of each agreement.

   (f) *Eligible investments sold short*

   Eligible investments sold short are those positions where a Portfolio has sold a security that it does not own in anticipation of a decline in the market value of the security. To enter a short sale, the Portfolio may need to borrow the security for delivery to the buyer or the Portfolio may sell securities it holds as collateral under repurchase agreements. On each day the short sale transaction is open, the liability to replace the borrowed security is marked-to-market and an unrealized gain or loss is recorded in the statement of operations. While the transaction is open the Portfolio will also incur an expense for any interest that will be paid to the lender of the securities.

   (g) *Interest rate swaps*

   Each Portfolio records interest rate swaps on a trade date basis. Interest rate swaps are measured at fair value and changes in the associated unrealized gains/losses are recorded in the statement of operations. The amounts to be paid or received over the life of the agreements are recognized as periodic receipts under interest rate swaps in the statement of operations and are derived from the underlying reference obligations under the swap contracts.

   (h) *Swaptions*

   Swaptions are initially recorded at fair value, which is the premium paid or received. Swaptions are subsequently recognized at fair value and changes in fair value are recognized as unrealized gains or losses in the statement of operations. Premiums paid on the purchase of swaptions and premiums received on the sale of swaptions are amortized to the maturity date of the swaption.

# FALCON STRATEGIES TWO LLC

Notes to Financial Statements (continued)

December 31, 2007
*(stated in United States dollars)*

## 2. Significant accounting policies (continued)

### (i) Futures

Each Portfolio records futures on a trade date basis. Futures are measured at fair value. Upon entering into a futures contract the Portfolio is required to pledge to the broker an amount of cash or other assets equal to a certain percentage of the contract amount (initial margin deposit). Subsequent payments, known as variation margin, may be paid or received by the Portfolio each day, depending on the daily fluctuations in the fair value of the underlying security. The Portfolio recognizes an unrealized gain or loss equal to the daily variation margin.

### (j) Futures options

Each Portfolio may write (sell) put and call options. When a Portfolio writes an option, the premium received by the Portfolio is recorded as a liability and is subsequently adjusted to the current value of the option written. Premiums received from writing options that expire unexercised are recorded by the Portfolio on the expiration date as realized gains on investment transactions. The difference between the premium received and the amount paid on effecting a closing purchase transaction, including brokerage commissions, is also treated as a realized gain, or if the premium is less than the amount paid for the closing purchase transaction, as a realized loss. If a written call option is exercised, the premium received is added to the proceeds from the sale of the underlying security in determining whether a Portfolio has realized a gain or loss. If a put option is exercised, the premium reduces the cost basis of the securities purchased by the Portfolio. The writer of the option is exposed to the risk of loss if the price of the underlying securities decline (in the case of a put option) or increase (in the case of a call option).

### (k) Income and expense recognition

Interest income and operating expenses are recorded on the accruals basis.

### (l) Share capital

The Company's shares are classified as equity. The redemption value of the shares is directly related to changes in the net assets of the Company and the shares represent the only instrument with a residual interest in the net assets of the Company.

On the issuance of shares, the entire issue price is credited to the share capital account. On redemption, the amount repayable is debited to the share capital account and any remaining share capital is credited to retained earnings. Any amount in excess of the aggregate share capital paid in is debited to retained earnings. During the year ended December 31, 2007 an amount of US$38,591,856 was credited to retained earnings.

**FALCON STRATEGIES TWO LLC**

Notes to Financial Statements (continued)

December 31, 2007
*(stated in United States dollars)*

---

2. **Significant accounting policies (continued)**

*(m) Net asset value per share and allocation of income and expenses between series of share capital*

A Portfolio issues separate series of shares on each subscription date. In addition, separate series of shares may be issued on the same subscription date to reflect differences in fees, redemption notice periods, lock up periods, minimum subscription and redemption amounts or for other differences between series issued on the same date.

The net asset attributable to each series is determined first by allocating the increase or decrease in the net assets (excluding any liabilities specific only to certain series, such as incentive fees) among the series proportionally according to the number of shares outstanding in each such series at the beginning of the relevant period and second by allocating to the net assets of each series any liabilities or distributions specific to such series and any incentive fee with respect to such series accrued or made during the relevant period. The net asset value per series share at any time equals the net assets of the series divided by the number of shares in the series outstanding at that date.

*(n) Taxation*

The Company is treated as a partnership for U.S. federal income tax purposes. As a partnership, the Company's items of income, expenses and credits are allocated among the shareholders for U.S. federal income tax purposes. No taxes are levied on the Company itself. Therefore, no provision for taxation is made in these financial statements.

*(o) Fair value*

The carrying amounts of all financial instruments not specifically identified above approximate fair value due to the immediate or short-term nature of these financial instruments.

Fair value estimates are made at a specific point in time, based on market conditions and information about the financial instrument. These estimates are subjective in nature and involve uncertainties and matters of significant judgment and therefore, cannot be determined with precision. Changes in assumptions could significantly affect the estimates.

---

**FALCON STRATEGIES TWO LLC**

Notes to Financial Statements (continued)

December 31, 2007
*(stated in United States dollars)*

2.  **Significant accounting policies (continued)**

    *(p) Distributions*

    Distributions to shareholders are recognized as a liability in the period in which they are declared.

    *(q) Financial Accounting Standards Board (FASB) Interpretation No. 48 (FIN 48), Accounting for Uncertainty in Income Taxes*

    The Company has adopted Financial Accounting Standards Board (FASB) Interpretation No. 48 (FIN 48), Accounting for Uncertainty in Income Taxes, a clarification of FASB Statement No. 109, Accounting for Income Taxes. FIN 48 establishes financial reporting rules regarding recognition and measurement of tax positions taken or expected to be taken on a tax return. The adoption of FIN 48 had no impact on the Company's net assets or results of operations.

    *(r) Statement of Financial Accounting Standards ("SFAS") No. 157, "Fair Value Measurements"*

    In September 2006, the Financial Accounting Standards Board (FASB) issued Statement of Financial Accounting Standards ("SFAS") No. 157, "Fair Value Measurements". SFAS No. 157 defines fair value, establishes a framework for measuring fair value in accordance with GAAP, and expands disclosure about fair value measurements. SFAS No. 157 is effective for financial statements issued for fiscal years beginning after November 15, 2007. Management is currently evaluating the impact of adoption of SFAS No. 157 on its financial statements.

3.  **Cash and cash equivalents**

|  | Interest rate | December 31, 2007 |
|---|---|---|
| US Bank, National Association commercial paper | 4.20% | 368,814 |
|  | US$ | 368,814 |

**FALCON STRATEGIES TWO LLC**

Notes to Financial Statements (continued)

December 31, 2007
*(stated in United States dollars)*

### 4. Financial instruments and associated risks

The Company is exposed to various types of risks that are associated with the financial instruments and markets in which it invests. The financial instruments in which the Company invests may be subject to price volatility due to various factors including market risk, credit risk and liquidity risk.

The nature and extent of the financial instruments outstanding at the date of the statement of assets and liabilities and the risk management techniques employed by the Company are discussed below.

*Market risk*

The underlying holdings of the Portfolio Funds in which the Company invest may include mortgage-backed securities. Prices of mortgage-backed securities can be highly volatile. Price movements for such securities are influenced by, among other things, changing supply and demand relationships, government, trade, fiscal and economic events and changes in interest rates. Prepayments can affect the mortgage-backed securities. The frequency at which prepayments occur on loans underlying mortgage-backed securities will be affected by a variety of factors including the prevailing level of interest rates as well as economic, demographic, tax, social, legal and other factors.

Generally, mortgage obligors tend to prepay their mortgages when prevailing mortgage rates fall below the interest rates on their mortgage loans. In general, premium securities are adversely affected by faster than anticipated prepayments, and discount securities are adversely affected by slower than anticipated prepayments. Since many mortgage-backed securities will be discount securities when interest rates are high, and will be premium securities when interest rates are low, these mortgage-backed securities may be adversely affected by changes in prepayments in any interest rate environment.

The Company may invest in interest rate swaps, swaptions, futures contracts and futures options contracts to hedge market risk associated with adverse movements in interest rates on other eligible investments and other eligible investments sold short.

*Credit risk*

Credit risk is the risk that a counterparty to a financial instrument will fail to discharge an obligation or commitment that it has entered into with the Company.

The Portfolio Funds are subject to credit risk on their mortgage-backed securities due to the ability of the underlying mortgage obligors to make principal and interest payments and due to the perceived credit risk of the issuer and guarantor of the mortgage-backed security. Investments in mortgage-backed securities may experience losses due to defaults on the underlying mortgages or adverse changes in the market's perception of issuer or guarantors' creditworthiness. The Company is exposed to this risk through its investments in the Portfolio Funds. Details of the Company's investments are disclosed in the schedule of investments.

**FALCON STRATEGIES TWO LLC**

Notes to Financial Statements (continued)

December 31, 2007
*(stated in United States dollars)*

4. **Financial instruments and associated risks (continued)**

   *Credit risk (continued)*

   The Investment Manager monitors credit risk on an on-going basis. In addition, the investment portfolio is generally subject to investment guidelines that specify that the asset backed securities in which the Company invests be issued or guaranteed by a US Federally sponsored agency or be above various minimum credit ratings issued by any of the nationally recognized statistical rating agencies.

   *Liquidity risk*

   The other eligible investments in which the Company may invest are generally traded among broker-dealers and other institutional investors in over-the-counter markets. Such traders are generally not obligated to continue to make markets and may discontinue to make markets or offer quotes at very wide spreads at any time. The Company's portfolio may include securities which are not actively and widely traded and consequently, it may be relatively difficult for the Company to dispose of investments rapidly and at favourable prices in connection with redemption requests, adverse market developments or other factors. There is no assurance that a liquid secondary market will exist for mortgage-backed securities and related derivatives purchased or sold, and the Company may be required to maintain a position which could result in losses.

5. **Investments in other funds**

   The Company invests in other funds as set out in the schedule of investments. The Investment Manager also serves as investment manager or managing agent to each underlying fund. The investment objectives and strategies of the underlying funds are set out below:

   *(a) Municipal Opportunity Fund Four LLC ("MOF Four")*

   The investment objective of MOF Four is to generate attractive after-tax returns through economically leveraged investments in fixed-rate municipal bonds. MOF Four has acquired and manages a portfolio of securities consisting primarily of residual certificates issued in tender option bond programs. In a tender option bond program ("TOB") an underlying municipal bond is deposited in a TOB trust organized by a TOB dealer. The TOB trust issues two classes of securities (i) a floating rate certificate and (ii) a residual certificate. The residual certificate holder assumes the obligation to repurchase the floating rate certificates if the holders tender the floating rate certificates for repurchase or if the TOB trust is terminated.

   The holders of the floating rate certificates have the right to tender their certificates for a repurchase price equal to 100% of their face amount plus accrued interest. Liquidity providers enter into a liquidity facility to provide funds for payment of both principal and interest on the floating rate certificates upon the exercise by a holder of the floating rate certificate of its tender option and certain events requiring termination of the TOB trust.

# FALCON STRATEGIES TWO LLC

Notes to Financial Statements (continued)

December 31, 2007
*(stated in United States dollars)*

5. **Investments in other funds (continued)**

(a) *Municipal Opportunity Fund Four LLC ("MOF Four") (continued)*

The TOB dealer typically enters into a reimbursement agreement with the liquidity providers for all amounts paid to the holders of the floating rate certificates. The residual certificate holder typically agrees to reimburse the TOB dealer for payments under the reimbursement agreement. MOF Four enters into hedge transactions designed to offset the reimbursement obligations associated with their investments in residual certificates.

(b) *MAT Four LLC ("MAT Four")*

MAT Four's investment objective is to generate after-tax returns through investing substantially all of its assets in MOF Four. The investment objectives of MOF Four is noted in (a) above.

(c) *Osprey Strategies Ltd. ("Osprey")*

The investment objective of Osprey is to achieve a rate of total return, primarily through income generation and to a limited extent, capital appreciation over a medium term investment horizon. Osprey seeks to achieve its investment objective primarily by entering into total return swap transactions to create leveraged investments in a diversified portfolio of loans and debt securities. At least 80% of the aggregate principal amount of Osprey's portfolio assets must be invested in U.S. Dollar denominated investment grade and non-investment grade senior secured loans and debt securities, including classes of asset backed securities, issued by United States and non-emerging market obligors. Up to 20% of Osprey's portfolio assets may be invested in U.S. Dollar denominated investment grade and non-investment grade senior unsecured loans and senior unsecured debt securities issued by U.S. or non-emerging market obligors.

(d) *Peregrine Strategies Ltd. ("Peregrine")*

Peregrine's investment objective is to achieve a high total rate of return, primarily through income generation and to a limited extent, capital appreciation over a medium term investment horizon. Peregrine seeks to achieve its investment objective by entering into total return swap transactions to create leveraged investments in preferred securities issued by investment grade companies.

Peregrine will seek to create value by focusing on fundamental credit analysis, portfolio diversification and trading opportunities due to the large concentration of retail investors in the market. Buy and sell determinations are based on fundamental and technical research. The security selection process employs top down and bottom up analysis. The primary focus is credit quality (Baa3/BBB- and above) and the relative value of the preferred security compared to other securities in the market. Emphasis is also placed on industries with positive and/or improving outlooks.

**FALCON STRATEGIES TWO LLC**

Notes to Financial Statements (continued)

December 31, 2007
*(stated in United States dollars)*

---

5. **Investments in other funds (continued)**

(e) *Peregrine Strategies Two Ltd. ("Peregrine Two")*

Peregrine Two's investment objective is to achieve a total rate of return, primarily through income generation and to a limited extent, capital appreciation over a medium term investment horizon. Peregrine Two seeks to achieve its investment objective by entering into total return swap transactions to create leveraged investments in preferred securities issued by investment grade companies. Peregrine Two enters into hedge transactions to mitigate the interest rate risk associated with its leveraged position in preferred securities.

Peregrine Two will seek to create value by focusing on fundamental credit analysis, portfolio diversification and trading opportunities due to the large concentration of retail investors in the market. Buy and sell determinations are based on fundamental and technical research. The security selection process employs top down and bottom up analysis. The primary focus is credit quality (on average Baa3/BBB- and above) and the relative value of the preferred security compared to other securities in the market. Emphasis is also placed on industries with positive and/or improving outlooks.

(f) *Peregrine Strategies Three Ltd. ("Peregrine Three")*

Peregrine Three's investment objective is to seek attractive absolute returns, high levels of semi-annual cash flow and portfolio diversification by identifying and exploiting relative value, income and arbitrage spread opportunities across sectors and trading strategies within structured assets. Peregrine Three is expected to meet return objectives through security selection, relative value trading, opportunistic sector rotation and use of moderate and controlled leverage generally ranging according to portfolio credit quality. Peregrine Three will selectively invest in structured assets and have relative value trading flexibility to maximize returns and reduce risks. Peregrine Three will primarily be opportunistically invested across high grade Asset Backed Securities based on hard assets (non-consumer based risk), EETC/ETC and corporate bonds providing senior secured exposure to hard assets, and investment grade CDO tranches (primarily CLOs).

(g) *Starling Strategies Ltd. ("Starling")*

Starling's investment objective is to outperform high quality fixed income indices, net of fees. To achieve this objective Starling will pursue a long-only fixed income strategy that emphasizes investments in complex mortgage backed securities deemed to offer high absolute returns. Starling aims to earn high rates of return, factoring in associated risks, through long-term investments in well-analyzed securities. The strategy focuses on fundamentally undervalued mortgage backed securities. Fundamental to the strategy is the belief that complicated mortgage backed securities are at times undervalued, due to supply-demand imbalances, negative investor psychology, the complexity of the valuation process, and many investors' aversion to purchase assets that are difficult to analyze. These factors may cause inefficiency in the marketplace.

---

17

**FALCON STRATEGIES TWO LLC**

Notes to Financial Statements (continued)

December 31, 2007
*(stated in United States dollars)*

5. **Investments in other funds (continued)**

(h) *Starling Strategies Two Ltd. ("Starling Two")*

Starling Two's investment objective is to exploit relative value of high quality mortgage backed obligations to monetize the excess spread over funding and hedging costs. The strategy is expected to be prepayment and volatility neutral. Starling Two employs various investment, risk management and allocation processes in order to meet its investment objectives. Starling Two may also employ leverage at the portfolio level including eligible investments, as well as at the underlying strategy. Such leverage may be achieved through, among other methods, the borrowing of funds, the purchase of securities on margin and the use of options, futures, forward contracts, repurchase and reverse repurchase agreements, other derivatives and swaps.

(i) *Condor Strategies Ltd. ("Condor")*

Condor invests substantially all of its assets in MBS Fund, a Luxembourg domiciled fund. MBS Fund pursues a long/short approach that invests primarily in U.S. government agency mortgage backed securities while seeking to neutralize the portfolio to interest rate sensitivity and varying prepayment rates. MBS Fund seeks to generate uncorrelated excess returns by positioning convergence trades that are designed to capture the price differentials among the different categories of assets. MBS Fund uses bottom-up security analysis to identify relative value trades and isolate rate, yield curve, prepayment and volatility risks. MBS Fund focuses on three main types of relative value opportunities: cross-market relative value, curve trades, and mortgage backed securities relative value. It employs a two-step investment process that governs the entry and exit decision of any trade; firstly, identification of relative value opportunities and secondly, portfolio optimization, capital allocation and leverage. Quantitative models and analytical tools are used extensively in each step of the investment process. The strategy is intended to be market neutral where the objective is to generate uncorrelated excess returns with low levels of volatility. A market neutral strategy is defined as one with limited exposure to credit, interest rate, and option (prepayment) risks. Interest rate exposure is kept in check with various duration limits. Prepayment neutrality is achieved by taking the prepayment sensitivity, with respect to market-implied prepayment expectations, close to zero.

(j) *Condor Strategies Two Ltd. ("Condor Two")*

Condor Two's investment objective is to pursue a long/short approach that focuses on the relative value of various high grade fixed income securities arising from supply-demand imbalances, complexity of valuations and various technical and fundamental factors. Condor Two will primarily invest in agency and non-agency mortgage pass-through securities, agency collateralized mortgage obligations, agency debentures, commercial mortgage backed securities, asset backed securities, and a variety of interest rate hedging instruments (swaps, futures, etc.).

# FALCON STRATEGIES TWO LLC

Notes to Financial Statements (continued)

December 31, 2007
*(stated in United States dollars)*

## 5. Investments in other funds (continued)

### (k) Condor Strategies Two Ltd. ("Condor Two") (continued)

Condor Two's objective is to monetize excess spread over funding and hedging costs, while reducing portfolio duration and other associated risks. Condor Two will use various security selection techniques, sector rotation, hedging and portfolio optimization to generate returns.

### (l) FCM Strategies Ltd. ("FCM")

FCM's investment objective is to generate returns in the fixed income market consistent with a targeted level of risk/volatility while providing diversification from traditional long-only investments. FCM seeks to achieve its objective through directional and non-directional fixed income strategies that demonstrate attractive historical returns with low correlations to each other and, as a company, low correlations to traditional equity and fixed income investment strategies. FCM employs various investment, risk management and allocation processes in order to meet its investment objectives. FCM may also employ leverage, among other methods, the borrowing of funds, the purchase of securities on margin and the use of options, futures, forward contracts, repurchase and reverse repurchase agreements, other derivatives and swaps. As at December 31, 2007 the Company has no investments in FCM.

### (m) Falcon Liquid Reserves Ltd. ("Liquid Reserves")

Liquid Reserves' investment objective is to generate attractive returns while investing in primarily short duration assets. To achieve this objective Liquid Reserves will employ moderate leverage to a portfolio of high-quality fixed income assets and attempt to monetize the excess spread over funding and hedging costs. Active risk management and hedging strategies are utilized to manage residual risks including interest rate risk, exposure to volatility and basis risk and to maintain a hedged portfolio within a target duration range. The Investment Manager will employ a relative-value approach in its security selection and sector allocation strategies in an attempt to capture the highest expected return relative to risk. Eligible investments include fixed-rate U.S. agency and non-agency MBS, adjustable rate mortgages, CMOs, commercial MBS, ABS, U.S. agency debt, municipal bonds, interest rate swaps, index swaps and U.S. Treasury obligations and will have a minimum rating of 'A'.

## 6. Investment management fee and incentive allocation

Pursuant to the terms of the Investment Management Agreement, the Investment Manager receives a management fee which is calculated as a percentage of net assets, calculated and paid monthly in arrears. The Management fee rate with respect to each series is set out in the series supplement to the offering memorandum. No management fee is charged with respect to Eligible Investments or Liquid Reserves and FCM. For all series in issue during the year ended

**FALCON STRATEGIES TWO LLC**

Notes to Financial Statements (continued)

December 31, 2007
*(stated in United States dollars)*

6. **Investment management fee and incentive allocation (continued)**

December 31, 2007, with the exception of Series 2005-6A, management fees were calculated based on a management fee percentage of 2.25% per annum. The management fee may be paid at the Portfolio level or at the level of the underlying funds or partly at one level and partly at another level.

Management fees for Series 2005-6A were calculated based upon a management fee percentage of 3% per annum. No incentive allocation is allocated from Series 2005-6A.

At December 31, 2007, management fees of US$1,744,704 and management fees payable of US$229,368 were included in management fees in the statement of operations and management fees payable in the statement of assets and liabilities, respectively.

All or substantially all of the management fees will be used by the Investment Manager to pay all management fees, including incentive compensation, of the investment managers or any sub-advisors of the Portfolio Funds.

In addition, the Investment Manager is entitled to receive an incentive allocation which is calculated as a percentage of the cumulative return of a series calculated and paid quarterly in arrears.

The incentive allocation is calculated based on the excess of the cumulative return of a series over a cumulative benchmark return (which is calculated by reference to a hurdle rate). For all series in issue during the period ended December 31, 2007, with the exception of Series 2005-6A, the incentive allocation was calculated based on an incentive allocation percentage equal to 15% and hurdle rates ranging from 0% to 5%. For the year ended December 31, 2007, an incentive allocation of US$200,644 was allocated to the net assets of the Investment Manager.

7. **Share capital**

|  | Shares | US$ |
|---|---|---|
| Balance at beginning of year | 473,791,245 | 472,841,100 |
| Issued during the year: |  |  |
| Series 2004-2A | 1,000,000 | 1,000,000 |
| Series 2004-3A | 2,000,000 | 2,000,000 |
| Series 2004-4A | 494,648 | 500,000 |
| Series 2006-1FP | 123,569,601 | 113,282,790 |

**FALCON STRATEGIES TWO LLC**

Notes to Financial Statements (continued)

December 31, 2007
*(stated in United States dollars)*

7. Share capital (continued)

|  | Shares | US$ |
|---|---:|---:|
| Redeemed during the year: |  |  |
| Series 2004-1A |  |  |
| Series 2004-2A | (9,900,000) | (9,900,000) |
| Series 2004-3A | (18,500,000) | (18,500,000) |
| Series 2004-4A | (2,750,000) | (2,750,000) |
| Series 2004-5A | (7,256,485) | (7,335,000) |
| Series 2005-1A | (11,871,550) | (12,000,000) |
| Series 2005-3A | (3,331,804) | (3,340,000) |
| Series 2005-4A | (2,966,303) | (3,000,000) |
| Series 2005-6A | (3,807,764) | (3,750,000) |
| Series 2006-1FP | (50,770,184) | (50,000,000) |
| Balance at end of year | (16,247,017) | (15,881,297) |
|  | 473,454,387    US$ | 463,167,593 |

Certain employees of the Investment Manager or its affiliates hold personal ownership interests comprising 7,088,821 shares in the Company as at December 31, 2007.

Additional subscriptions for shares may be made with 10 days notice, at the discretion of the Investment Manager. Shares that are issued subsequent to a Portfolio's initial closing are issued as a separate series of shares. Separate series of shares are issued to enable the net asset value per share to be equitably tracked for each series in accordance with the differing terms and conditions set out in each series offering memorandum supplement.

Shares may be redeemed at the net asset value per share in accordance with the terms and conditions set out in the series offering memorandum supplement.

The Investment Manager owns 500,000 Series 2004-3A shares in Portfolio A.

Falcon Plus LLC, a fund managed by the Investment Manager, owns 158,180,460 shares of Series 2006-IFP in Portfolio A at December 31, 2007.

# FALCON STRATEGIES TWO LLC

Notes to Financial Statements (continued)

December 31, 2007
*(stated in United States dollars)*

8. **Net assets value by series**

The net assets at December 31, 2007 attributable to each series of shares are as follows:

| | Number of shares outstanding | Net assets per series | NAV per share |
|---|---|---|---|
| Series 2004-1A | 18,000,000 | 11,746,599 | 0.65259 |
| Series 2004-2A | 1,000,000 | 644,617 | 0.64462 |
| Series 2004-3A | 55,250,000 | 34,871,459 | 0.63116 |
| Series 2004-3A (CAI) | 500,000 | 314,695 | 0.62939 |
| Series 2004-4A | 71,872,341 | 45,450,123 | 0.63237 |
| Series 2005-1A | 76,328,332 | 48,169,123 | 0.63108 |
| Series 2005-2A | 7,581,350 | 4,874,397 | 0.64295 |
| Series 2005-3A | 22,375,811 | 14,225,768 | 0.63577 |
| Series 2005-4A | 62,366,093 | 39,376,819 | 0.63138 |
| Series 2006-1FP | 158,180,460 | 100,403,188 | 0.63474 |
| | 473,454,387 | US$ 300,076,788 | |

# FALCON STRATEGIES TWO LLC

Notes to Financial Statements (continued)

December 31, 2007
*(stated in United States dollars)*

## 9. Financial highlights

Per share operating performance (for a share outstanding throughout the year):

| | 2004-1A | 2004-2A | 2004-3A | 2004-3A (CAI) | 2004-4A |
|---|---|---|---|---|---|
| Net asset value per share at beginning of year/series issuance date | 1.0104 | 1.0105 | 0.9970 | 3.2348 | 0.9988 |
| Income from investment operations | | | | | |
| Net investment income | 0.0543 | 0.0595 | 0.0587 | 0.0590 | 0.0588 |
| Net realized and unrealized gain on investment activities | (0.3426) | (0.3559) | (0.3543) | (0.3554) | (0.3550) |
| | (0.2883) | (0.2964) | (0.2956) | (0.2964) | (0.2962) |
| Incentive allocation | - | - | (0.0007) | 0.4013 | (0.0007) |
| Incentive allocation paid | - | - | - | (2.6408) | - |
| Distributions | (0.0695) | (0.0695) | (0.0695) | (0.0695) | (0.0695) |
| Net asset value per share at end of year | 0.6526 | 0.6446 | 0.6312 | 0.6294 | 0.6324 |
| Total return[1] | (28.53%) | (29.33%) | (29.65%) | (9.16%) | (29.66%) |
| **Supplemental data:** | | | | | |
| Ratio of expenses, incentive allocation and net investment income to average assets[2] (on an annualized basis) | | | | | |
| Operating and other expenses | 1.12% | 1.16% | 1.06% | 1.06% | 1.06% |
| Incentive allocation paid/(received)[3] | 0.00% | 0.00% | 0.07% | (253.69%) | 0.07% |
| | 1.12% | 1.16% | 1.13% | (252.63%) | 1.13% |
| Net investment income | 5.92% | 6.91% | 6.63% | 6.68% | 6.67% |

[1] Total return is calculated based on the movement in net asset value during the period and has not been annualized.

[2] The expense and net investment income ratios presented above do not include the Portfolio's proportionate share of income and expenses of the underlying Portfolio Funds.

[3] The incentive allocation has not been annualized.

23

# FALCON STRATEGIES TWO LLC

Notes to Financial Statements (continued)

December 31, 2007
*(stated in United States dollars)*

9. **Financial highlights (continued)**

Per share operating performance (for a share outstanding throughout the year):

| | 2004-5A | 2005-1A | 2005-2A | 2005-3A | 2005-4A |
|---|---|---|---|---|---|
| **Net asset value per share at beginning of year/series issuance date** | 1.0114 | 0.9970 | 1.0088 | 1.0002 | 0.9977 |
| **Income from investment operations** | | | | | |
| Net investment income | 0.0590 | 0.0589 | 0.0590 | 0.0584 | 0.0590 |
| Net realized and unrealized gain/(loss) from investment activities | (0.3554) | (0.3546) | (0.3553) | (0.3526) | (0.3551) |
| | (0.2964) | (0.2957) | (0.2963) | (0.2942) | (0.2961) |
| Incentive allocation | - | | - | | |
| Incentive allocation paid | - | (0.0007) | - | (0.0007) | (0.0007) |
| Distributions | (0.0695) | (0.0695) | (0.0695) | (0.0695) | (0.0695) |
| **Net asset value per share at end of year** | 0.6455 | 0.6311 | 0.6430 | 0.6358 | 0.6314 |
| **Total return**[1] | (29.31%) | (29.66%) | (29.37%) | (29.41%) | (29.68%) |
| **Supplemental data:** | | | | | |
| Ratio of expenses and net investment income to average assets[2] (on an annualized basis) | | | | | |
| Other expenses | 1.10% | 1.07% | 1.04% | 1.07% | 1.06% |
| Incentive allocation paid/(received)[3] | 0.00% | 0.07% | 0.00% | 0.08% | 0.07% |
| Net investment income | 1.10% | 1.14% | 1.04% | 1.15% | 1.13% |
| | 6.98% | 6.65% | 6.58% | 6.57% | 6.69% |

[1] Total return is calculated based on the movement in net asset value during the period and has not been annualized.

[2] The expense and net investment income ratios presented above do not include the Portfolio's proportionate share of income and expenses of the underlying Portfolio Funds.

[3] The incentive allocation has not been annualized

# FALCON STRATEGIES TWO LLC

Notes to Financial Statements (continued)

December 31, 2007
*(stated in United States dollars)*

## 9. Financial highlights (continued)

Per share operating performance (for a share outstanding throughout the year):

|  | 2005-6A | 2006-1FP |
|---|---|---|
| Net asset value per share at beginning of year/series issuance date | 1.0018 | 1.0030 |
| Income from investment operations |  |  |
| Net investment income | 0.0521 | 0.0593 |
| Net realized and unrealized gain/(loss) from investment activities | (0.3553) | (0.3581) |
|  | (0.3032) | (0.2988) |
| Incentive allocation | - | - |
| Incentive allocation paid | - | - |
| Distributions | (0.0695) | (0.0695) |
| Net asset value per share at end of year | 0.6291 | 0.6347 |
| Total return[1] | (30.27%) | (29.79%) |
| Supplemental data: |  |  |
| Ratio of expenses and net investment income to average assets[2] (on an annualized basis) |  |  |
| Other expenses | 1.94% | 1.80% |
| Incentive allocation paid/(received)[3] | 0.00% | 0.00% |
|  | 1.94% | 1.80% |
| Net investment income | 6.26% | 7.14% |

[1] Total return is calculated based on the movement in net asset value during the period and has not been annualized.

[2] The expense and net investment income ratios presented above do not include the Portfolio's proportionate share of income and expenses of the underlying Portfolio Funds.

[3] The incentive allocation has not been annualized.

**FALCON STRATEGIES TWO LLC**

Notes to Financial Statements (continued)

December 31, 2007
*(stated in United States dollars)*

### 10. Subsequent Events

On January 8, 2008 Standard & Poor's Ratings Services changed its fund volatility ratings on the Company's rating from AA-/S2 to AA-/S5. The fund volatility rating changes reflect the increased volatility experienced by the Company during the six months ended December 31, 2007, which has caused monthly returns to move significantly outside the volatility band associated with S2. Standard & Poor's Ratings Services also changed its fund volatility ratings on two of the Company's underlying fund investments. The Condor Strategies Two Ltd., fund rating was changed from AAA/S2 to AAA/S5 and the Falcon Liquid Reserves Ltd., rating was changed from AAA/S1 to AAA/S2. On March 25, 2008 the Company requested that the ratings on Condor Strategies Two Ltd., and Falcon Liquid Reserves Ltd., be withdrawn, as it no longer intended to offer shares of the Company directly to investors other than the Funds.

On February 11, 2008 the Investment Manager reduced its Management Fee Rate with respect to the one year period commencing January 1, 2008 and concluding December 31, 2008, from 2.25% per annum to 1.50% per annum. The Investment Manager's incentive allocation percentages did not change.

As of February 20, 2008 Citigroup Inc. ("Citigroup"), the ultimate corporate parent of the Investment Manager, entered into a $500 million credit facility with the Falcon Strategies group of funds (the "Funds"), which includes the Company. As a result of providing this facility, Citigroup became the primary beneficiary of the Funds and the Company and will include the Funds' assets and liabilities in its Consolidated Balance Sheet commencing on February 20, 2008. As of March 31, 2008 the total draw by the Funds was $334,560,000.

On March 20, 2008 the Investment Manager determined that given the continued deterioration in the Company's liquidity position, it was prudent that redemptions be suspended indefinitely.

Subsequent to December 31, 2007 the Company continued to experience severe dislocation in its markets as significant decreases in liquidity led to a precipitous decline in the market values of the Company's underlying investments. As of March 31, 2008, the Company's unaudited net asset value per share had decreased to $0.19.

As of the April 15, 2008 the Company had substantially redeemed all holdings in Falcon Liquid Reserves Ltd., Osprey Strategies Ltd., FCM Strategies Ltd., Condor Strategies Ltd., and Starling Strategies Ltd.

**FALCON STRATEGIES TWO LLC**

**Company Directory**

**Investment Manager:**

Citigroup Alternative Investments LLC
731 Lexington Avenue
24th Floor
New York, NY 10022

**Administrator:**

US Bank, National Association
777 East Wisconsin Avenue
Milwaukee, WI 53202

**Managing Member:**

AMACAR GP, Inc.
6525 Morrison Boulevard
Charlotte, NC 28211

**EXHIBIT G**

FOCUS - 9 of 20 DOCUMENTS

· Copyright 2008 Factiva ®, from Dow Jones
All Rights Reserved

# Dow Jones Factiva

(Copyright (c) 2008, Dow Jones & Company, Inc.)

# THE WALL STREET JOURNAL.

The Wall Street Journal

March 17, 2008 Monday

**SECTION:** Pg. A1

**LENGTH:** 1289 words

**HEADLINE:** J.P. Morgan Buys Bear in Fire Sale, As Fed Widens Credit to Avert Crisis --- Central Bank Offers Loans To Brokers, Cuts Key Rate --- Historic Steps

**BYLINE:** By Greg Ip

**BODY:**

The Federal Reserve announced one of the broadest expansions of its lending authority since the 1930s in an effort to stem a credit crisis that is engulfing the financial system and threatening a deep recession.

For the first time securities dealers, effective today, may borrow from the Fed on much the same terms as banks. The Fed also lowered the rate charged on such borrowings from what's known as its discount window by a quarter of a percentage point, to 3.25%, and extended the maximum term to 90 days from 30.

"These steps will provide financial institutions with greater assurance of access to funds," Federal Reserve Chairman Ben Bernanke said in announcing the emergency initiatives yesterday evening.

Early trading in Asia suggested additional steps might be needed to calm markets. In Tokyo the Nikkei 225 Average fell 4.2% to its lowest level since August 2005. Hong Kong's Hang Seng index dropped 4.7% in the first 15 minutes of trading, while the Shanghai Composite fell 1.9%.

Meanwhile, the U.S. dollar sank against the Japanese yen on expectations the situation may reflect a greater tolerance of inflation by the Fed. The Fed is expected to follow up tomorrow with a cut in the federal-funds rate, charged on overnight loans between banks, of a half to a full percentage point from its current 3%.

The steps were announced at the same time the Fed agreed to lend $30 billion to J.P. Morgan Chase & Co. to complete its acquisition of Bear Stearns & Co. The loans will be secured solely by difficult-to-value assets inherited from Bear Stearns. If the assets decline in value, the Fed-and thus, the U.S. taxpayer-will bear the cost.

The historic nature of the steps the Fed has taken reflects what the central bank sees as the unprecedented scale of the storm now sweeping through the markets and the economy. Starting with rising defaults on subprime mortgages a year ago, the crisis now has caused investors to question the ability of once rock-solid firms to repay loans.

J.P. Morgan Buys Bear in Fire Sale, As Fed Widens Credit to Avert Crisis --- Central Bank Offers Loans To Brokers, Cuts Key Rate --- Historic Steps The Wall Street Journal March 17, 2008 Monday

That has triggered a massive deleveraging. Investors, banks and others are hoarding cash, pulling in their loans and trying to reduce their own exposure to risky markets. That has sent yields on risky securities such as mortgage-backed bonds up, dealing the housing market and the economy a fresh blow and leaving the Fed seemingly powerless to restore a willingness to lend by cutting interest rates, its traditional tool.

In some ways, the initiatives better equip the Fed to help a financial system that has changed drastically from what has prevailed for most of its 95-year existence. But they also take the central bank into uncharted territory with new and potentially troublesome risks.

Those risks include the possibility that with the credit crunch showing no sign of lifting, the Fed will be called on to lend to other troubled firms and end up a major creditor of Wall Street, even if at present the risk of any substantial loss appears small. Another risk is that while the Fed used a loophole yesterday in the Federal Reserve Act to expand its lending to nonbanks in "unusual and exigent" circumstances, it has in effect expanded the federal safety net with no political debate. However, the Fed sought and received the approval for the $30 billion loan from Treasury Secretary Henry Paulson, who informed President Bush.

For now, though, the bigger test will be how the markets greet the initiatives today with relief at the bold steps taken to shore up the financial system, or with alarm at how unstable the financial system had to be to invite such action.

Officials appear to hope the initiatives will restore enough confidence to markets to make some of the larger cuts being talked about unnecessary, but acknowledge it will depend partly on how markets evolve over coming days.

On Wall Street, there is likely to be some relief that the Fed has finally opened the discount window to securities dealers, something they have long clamored for. The Fed has been reluctant because the move was outside its explicit mandate. "This is a five-vodka event," said a senior executive at one big brokerage firm that previously did not have access to this funding source. "Liquidity is no longer an issue."

Federal Reserve Bank of New York President Timothy Geithner told reporters: "This is designed to help get liquidity to where it can help play an appropriate role in helping address the range of challenges" in the markets, especially in the mortgage-backed securities market.

Treasury Secretary Paulson said in statement, "I appreciate the additional actions taken this evening by the Federal Reserve to enhance the stability, liquidity and orderliness of our markets."

For all their creativity, the Fed moves are also an acknowledgment that its previous steps have failed to stem the collapse in investor confidence, forcing it to abandon many of its original principles, such as not favoring particular firms or market sectors and sticking within its explicit statutory authority.

Last Tuesday, it announced what was touted as its most creative initiative yet: It lent up to $200 billion of its much-sought Treasurys to investment banks in return for a like amount of now-shunned mortgage backed securities for up to 28 days. The announcement led to a huge rally in stocks. But within days dealers were telling the Fed it didn't go far enough. They wanted longer term, more immediate funding against a broader range of collateral.

It also came too late to save Bear Stearns. On Thursday evening, Bear Stearns informed the Securities and Exchange Commission and Fed that it had experienced a dramatic loss of cash reserves and now saw no option other than to file for bankruptcy protection Friday morning. Fed officials at that point saw just two options. They could try to wall off the rest of the financial system. If the environment had been less tumultuous they might have chosen that option.

But in the current period they feared that a failure by Bear to make good on billions of dollars of contracts could severely dislocate critical markets, especially garden-variety repo loans-overnight loans secured by various collateral

J.P. Morgan Buys Bear in Fire Sale, As Fed Widens Credit to Avert Crisis --- Central Bank Offers Loans To Brokers, Cuts Key Rate --- Historic Steps The Wall Street Journal March 17, 2008 Monday

that are the grease of the credit markets.

Officials grimly concluded that while Bear Stearns was not too big to fail, it was too interconnected to be allowed to fail in just one day. They spent Thursday night going over Bear's books and huddling with the SEC and Treasury. By Friday morning it had settled on its second option: a 28-day secured loan via J.P. Morgan to give time for a sale or wind up of the firm.

Over the weekend officials led by Mr. Geithner and Mr. Paulson and assisted by Fed governor Kevin Warsh, a former investment banker, and joined by Mr. Bernanke and Fed Vice Chairman Donald Kohn in Washington, worked to hammer out a deal. The Fed's priorities were to limit the spread of fear to the rest of the financial system, especially the repo market. That meant it wanted a deal done before markets opened Monday.

To reassure the markets and Bear Stearns's counterparties, Fed officials wanted the investment bank's buyer to be able to announce at the same time as the purchase that it would stand behind all of Bear's agreements in the repo, derivative and securities lending markets. Also to reassure those counterparties, the buyer had to be of unquestioned financial strength. All those priorities meant a deal for the whole firm was far preferable to a deal for just the pieces and the uncertainty that could create.

---

Michael Phillips and Susanne Craig contributed to this article.

(See related article: "Ailing Firm Sold For Just $2 a Share In U.S.-Backed Deal" -- WSJ March 17, 2008)

J.P. Morgan Buys Bear in Fire Sale, As Fed Widens Credit to Avert Crisis --- Central Bank Offers Loans To Brokers, Cuts Key Rate --- Historic Steps The Wall Street Journal March 17, 2008 Monday

Page 4



License this article from Dow Jones Reprint Service

**NOTES:**
PUBLISHER: Dow Jones & Company, Inc.

**LOAD-DATE:** March 18, 2008

**EXHIBIT H**

CONFIDENTIAL TENDER AND EXCHANGE OFFER MEMORANDUM

# FALCON STRATEGIES TWO LLC
## PORTFOLIO A

**Offers Existing Holders a Cash Payment and**
**Offers Existing Holders that are Accredited Investors**
**a Cash Payment and Newly Created Participation Shares**
**in Exchange for any and all Existing Shares of Limited Liability Company Interest**

Falcon Strategies Two LLC (Portfolio A of which is referred to herein as "we," "us" or the "Company") is offering to exchange a cash payment of $0.45 per share (the "Exchange Consideration") as described in this confidential tender and exchange offer memorandum (this "Confidential Memorandum") for its outstanding shares of each series of limited liability company interest (the "Existing Shares" and the holders of Existing Shares, the "Existing Holders"). Existing Holders who are "accredited investors," as defined in Rule 501(a) of Regulation D under the Securities Act of 1933, as amended (the "Securities Act" (such offerees collectively being referred to herein as the "Accredited Investors") may also elect to receive, in addition to the Exchange Consideration, one share of limited liability company participation interest (a "Participation Share") for each Existing Share so tendered. The foregoing transactions are collectively referred to herein as the "Exchange Offer." For each Existing Share tendered, we will sell one share of a new class of limited liability company interest to Citi (as defined herein) (the "Citi Shares"), for a purchase price per Citi Share equal to the Exchange Consideration, the proceeds of which will be used to pay the Exchange Consideration. Upon the liquidation of the Company or the redemption of the Citi Shares (in each case, a "Participation Event"), each Participation Share issued will be allocated an amount equal to 75% of the excess by which the then current net asset value per share of the corresponding Citi Share exceeds the Exchange Consideration plus an amount equal to the cost of capital on the purchase price of such Citi Share (initially 9%). Existing Holders that are not Accredited Investors may participate in the Exchange Offer, but such holders will not be entitled to receive Participation Shares in addition to the Exchange Consideration. All other terms and requirements of the Exchange Offer will remain the same with respect to such holders. By tendering your Existing Shares in the Exchange Offer you will, with respect to your investment in the Company, not be allocated any further losses of the Company, but your continued investment in the Company through ownership of Participation Shares, if applicable, is not likely to result in any appreciation or otherwise in a recoupment of your initial investment (although we can make no assurance that, upon the occurrence of a Participation Event, Existing Holders who participate in the Exchange Offer (whether or not eligible or electing to receive Participation Shares) will be in a better position than Existing Holders who choose not to participate). In order to tender your Existing Shares, you will be required to unconditionally release and discharge (the "Release") any and all claims against us, Citigroup Alternative Investments LLC (the "Investment Manager"), the selling broker for the Existing Shares, Citigroup Inc. and its subsidiaries (collectively, "Citi"), AMACAR GP, Inc. (the "Managing Member"), and a number of other individuals and entities described herein relating to or arising from the acquisition, disposition or ownership of Existing Shares of any series, whether those claims arise under United States federal or state securities laws, arbitration agreements or otherwise and regardless of whether those claims are known or unknown at the time of the exchange (See "Release" in this Confidential Memorandum).

**None of the Participation Shares have been registered under the Securities Act or any state securities law and, unless so registered, may not be offered or sold except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act and applicable state securities laws. The offer of the Participation Shares is being made in reliance upon the exemption from registration provided by Section 4(2) of the Securities Act and similar exemptions from registration provided by certain state securities laws. Accordingly, the Participation Shares are being offered only to Accredited Investors as that term is defined above. The Participation Shares will be subject to significant restrictions on transfer, see "Acknowledgements and Consents" on page 27.**

*The decision as to whether to participate in the Exchange Offer involves a high degree of risk and uncertainty. You should carefully consider the risks and other information described in this Confidential Memorandum before making a decision whether to participate in the Exchange Offer. In order for holders of Participation Shares to receive a distribution upon the occurrence of a Participation Event, there will need to be a significant increase in the Company's net asset value as compared to its net asset value as of March 31, 2008. As a result, we currently do not anticipate there being any distribution to holders of Participation Shares upon the occurrence of a Participation Event. Existing Holders that are not Accredited Investors that participate in the Exchange Offer and Accredited Investors who do not elect to receive Participation Shares will not receive any Participation Allocation upon the liquidation of the Company. The Company expects to complete its liquidation and Citi expects to redeem its Citi Shares in the next twelve to eighteen months, although such period may be longer or shorter.*

**THE PARTICIPATION SHARES ARE NOT DEPOSITS IN, OBLIGATIONS OF OR GUARANTEED BY CITIBANK, N.A. OR ANY OF ITS AFFILIATES, DO NOT HAVE THE BENEFIT OF DEPOSIT INSURANCE, AND ARE NOT GUARANTEED BY ANY GOVERNMENTAL ENTITY.**

**DISTRIBUTION OR REPRODUCTION OF ALL OR ANY PART OF THIS CONFIDENTIAL MEMORANDUM, OR DIVULGING ITS CONTENTS OTHER THAN AS SPECIFICALLY SET FORTH HEREIN, IS UNAUTHORIZED.**

THE EXCHANGE OFFER WILL EXPIRE AT 5:00 P.M., NEW YORK CITY TIME, ON MONDAY, JUNE 30, 2008, UNLESS EXTENDED BY THE COMPANY WITH RESPECT TO ALL SERIES OF EXISTING SHARES (THE "EXPIRATION DATE"). EXISTING HOLDERS WHO PROPERLY SUBMIT THEIR EXCHANGE OFFER SUBSCRIPTION AGREEMENTS PRIOR TO 5:00 P.M., NEW YORK CITY TIME, ON MAY 30, 2008 OR SUBSEQUENT TO 5:00 P.M. ON MAY 30, 2008 BUT PRIOR TO 5:00 P.M., NEW YORK CITY TIME ON JUNE 13, 2008 MAY ELECT TO RECEIVE THE EXCHANGE CONSIDERATION AND PARTICIPATION SHARES, IF APPLICABLE, WITH RESPECT TO SUCH SHARES BY JUNE 6, 2008 OR JUNE 20, 2008, RESPECTIVELY (EACH SUCH CASE, "EARLY SETTLEMENT"), BUT WILL RETAIN THE RIGHT TO REVOKE SUCH TENDERS PRIOR TO THE EXPIRATION DATE BY RETURN TO THE COMPANY OF ANY SUCH EXCHANGE CONSIDERATION AND FORFEITURE OF ANY PARTICIPATION SHARES DELIVERED PURSUANT TO SUCH EARLY SETTLEMENT IN ADDITION TO COMPLIANCE WITH THE OTHER REVOCATION PROCEDURES DESCRIBED IN THIS CONFIDENTIAL MEMORANDUM.

The date of this Confidential Memorandum is May 8, 2008.

## SUMMARY TERMS OF THE OFFER

- The Expiration Date is 5:00 p.m., New York City time, on June 30, 2008, unless extended by us at our sole discretion with respect to all series of Existing Shares. The Company reserves the right to amend or terminate the terms of this Exchange Offer in its sole discretion, as more fully described under "The Exchange Offer" on page 18. Any action described herein to be taken by the Company may be made by the Managing Member or the Investment Manager.

- Except as set forth in this Confidential Memorandum, we will accept any and all outstanding Existing Shares of any series that are properly tendered and not revoked prior to the Expiration Date. Holders of Existing Shares who wish to tender such shares will be required to tender all Existing Shares of all series so held by them in order to participate in the Exchange Offer, as more fully described under "The Exchange Offer" on page 18. Notwithstanding anything to the contrary contained herein, certain persons who are affiliates of Citi ("Citi Affiliated Persons") that are also Existing Holders are expected to be excluded from participating in the Exchange Offer. Such exclusion from participation should not be construed as a recommendation or view on whether or not you should participate in the Exchange Offer but rather an effort to minimize perceived conflicts of interest associated with affiliates of the Company participating in the Exchange Offer. None of the Company, the Investment Manager, Citi, our Managing Member or any of their respective affiliates is making any recommendation regarding whether you should participate in the Exchange Offer; accordingly, you must make your own determination whether to participate in the Exchange Offer.

- We will pay, on the terms and subject to the conditions set forth herein and in the related Exchange Offer Subscription Agreement, the Exchange Consideration of $0.45 per Existing Share and issue the Participation Shares, if applicable, to those holders who have properly tendered and not properly revoked their election to tender their Existing Shares and receive Exchange Consideration and Participation Shares, if applicable, prior to the Expiration Date. Other than with respect to Existing Shares tendered for Early Settlement, we will issue the Participation Shares, if applicable, and pay the Exchange Consideration promptly following the Expiration Date upon our determination that the conditions to the Exchange Offer have been satisfied or waived, as more fully described under "The Exchange Offer" on page 18.

- Upon the occurrence of a Participation Event, each Participation Share will be allocated an amount equal to 75% of the excess by which the then current net asset value per share of the corresponding Citi Share exceeds the Exchange Consideration plus an amount equal to the cost of capital on the purchase price of such Citi Share (3-month LIBOR plus a variable spread determined by Citi, compounding annually, which will initially be equal to 9% but may increase or decrease based on various market, economic and other factors, the "Cost of Capital"). We do not expect the Cost of Capital to vary materially from the initial percentage. In order for holders of Participation Shares to receive a distribution upon the occurrence of a Participation Event, there will need to be a significant increase in the Company's net asset value as compared to its net asset value as of March 31, 2008. As a result, we currently do not anticipate there being any distribution to holders of Participation Shares upon the occurrence of a Participation Event.

- If the Exchange Offer is not consummated, all tendered Existing Shares will be returned, regardless of when they were tendered, no Participation Shares or Citi Shares will be issued and no Exchange Consideration will be paid, other than with respect to any Early Settlement, which settlements, if any, will be rescinded. The Company has not set a minimum tender amount as a condition for the consummation of the Exchange Offer. In the event that you elect to revoke your election to tender your Existing Shares and you follow all the procedures for revocation described under the caption "The Exchange Offer—Revocation Rights" on page 21, you shall continue to be a holder of the Existing Shares.

- The offer of the Participation Shares pursuant to the Exchange Offer is being extended in reliance on the exemption from registration provided by Section 4(2) of the Securities Act and similar exemptions from registration provided by certain state securities laws and has not been registered with the Securities and Exchange Commission (the "SEC"). In order to preserve certain private offering exemptions under the Securities Act, only Accredited Investors may receive Participation Shares in addition to the Exchange Consideration. All Existing Holders were required to be Accredited Investors at the time they acquired their Existing Shares. However, Existing Holders that are no longer Accredited Investors may participate in the Exchange Offer and receive the Exchange Consideration and thereby realize immediate liquidity similar to tendering Existing Holders that are Accredited Investors. All other terms and requirements of the Exchange

ii

Offer will remain the same with respect to such holders. Existing Holders that are Accredited Investors may also elect not to receive Participation Shares.

- The Participation Shares are subject to significant restrictions on transfer, as described under the caption "Acknowledgements and Consents" on page 27. Participation Shares (similar to the Existing Shares) may not be directly or indirectly transferred, resold or otherwise hypothecated without the prior written consent of the Investment Manager (which may grant or withhold such consent in its sole discretion) and in compliance with applicable securities laws.

- No Existing Shares of any series or Participation Shares are listed for trading on any national securities exchange or for quotation on any automated quotation system and we do not intend to list the Existing Shares or Participation Shares for trading or quotation and do not expect any other market to develop.

- Although there is no direct authority addressing an exchange such as the Exchange Offer, the transaction is expected to be a taxable exchange with respect to the Existing Shares exchanged (or deemed exchanged) for Exchange Consideration, and a non-taxable exchange with respect to the Existing Shares deemed exchanged for Participation Shares, as described more fully under "Certain United States Federal Income Tax Consequences" on page 23. Existing Holders that do not participate in the Exchange Offer will not incur any U.S. federal income tax liability as a result of the consummation of the Exchange Offer.

- We will not receive any cash proceeds from the Exchange Offer other than from the concurrent sale of the Citi Shares, as described herein, the proceeds of which will be used to pay the Exchange Consideration, as more fully described under "The Exchange Offer" on page 18. Any Existing Shares that are properly tendered and accepted pursuant to the Exchange Offer will be considered redeemed.

- By tendering your Existing Shares in the Exchange Offer and executing the Exchange Offer Subscription Agreement and accompanying Release (whether or not you are an Accredited Investor and whether or not you elect to receive Participation Shares), you will unconditionally release and discharge any and all claims against the Company, the Investment Manager, our advisory board, the selling broker for the Existing Shares, Citi, the Managing Member, any of the Company's past or present sub-advisors, the Company's auditors and tax preparers, U.S. Bank National Association (the "Administrator") and past and present counsel (Cayman and U.S.) to such parties (such parties, and their respective affiliates, including but not limited to any other Falcon Fund (as defined herein) and Falcon Strategies LLC, and the employees, officers, directors, partners, counsel and agents of each of the aforesaid parties, are collectively referred to herein as the "Releasees") relating to or arising from the acquisition, disposition or ownership of Existing Shares of any series, whether those claims arise under United States federal or state securities laws, arbitration agreements or otherwise and regardless of whether those claims are known or unknown at the time of such exchange.

- In connection with this Exchange Offer, the Company's Limited Liability Company Agreement (the "LLC Agreement") is being amended to set forth the terms of the Participation Shares and the Citi Shares and related matters. Such amendments do not require the consent of the Existing Holders.

- Existing Holders may elect Early Settlement and receive the Exchange Consideration and Participation Shares, if applicable, by June 6, 2008 with respect to Existing Shares tendered prior to 5:00 p.m. on May 30, 2008 or by June 20, 2008 with respect to such Existing Shares tendered after 5:00 p.m. on May 30, 2008 but prior to 5:00 p.m. on June 13, 2008, as more fully described under "The Exchange Offer—Early Settlement" on page 19. Such holders will retain the right to revoke such tenders prior to the Expiration Date by return to the Company of the applicable Exchange Consideration and forfeiture of any Participation Shares received in addition to compliance with the other revocation procedures described herein.

**This Confidential Memorandum is for the exclusive use of Existing Holders (other than certain Citi Affiliated Persons that are expected to be excluded from the Exchange Offer) in connection with this Exchange Offer and their legal, tax, financial and other advisers on a confidential basis, and may not be used by any other person or for any other purpose. In consideration for the receipt of this Confidential Memorandum, the recipient agrees that, in the absence of the express prior written consent of the Company or Investment Manager, it will not reproduce, copy, use or transmit this document or the information contained herein, in whole or in part or permit such action by others for any purpose (except that an Existing Holder may provide copies of this Confidential Memorandum or portions hereof to its legal, tax, financial and other advisers for the purpose described above). Except as set forth below, the recipient further agrees**

iii

to keep strictly confidential the information contained herein or made available in connection with any further investigation of the Company.

This Confidential Memorandum summarizes various documents and other information. Those summaries are qualified in their entirety by reference to the documents and information to which they relate. In making an investment decision, you must rely on your own examination of the Company, the Investment Manager, the Participation Shares, the Release, the value of the Exchange Consideration and the terms of the Exchange Offer, including the merits and risks involved in the Exchange Offer. No representation is made to you or any other Existing Holder regarding the legality of an investment in the Participation Shares by the electing Accredited Investors under any applicable legal investment or similar laws or regulations or the adequacy of the Exchange Consideration. The contents of this Confidential Memorandum are not to be construed as legal, business, tax or other advice. You should consult your own advisors as needed to assist you in making your decision whether to participate in the Exchange Offer.

No dealer, salesperson or other person has been authorized to give any information or to make any representations not contained in this Confidential Memorandum, and, if given or made, such information or representation must not be relied upon as having been authorized by the Company, the Investment Manager, Citi, our Managing Member or any of our or their respective affiliates.

This Confidential Memorandum does not constitute an offer to sell or a solicitation of an offer to buy Participation Shares to any person in any jurisdiction where it is unlawful to make such an offer or solicitation. The information contained in this Confidential Memorandum is current only as of the date hereof and neither the delivery of this Confidential Memorandum nor the offering, sale or delivery of the Participation Shares pursuant to the Exchange Offer made hereunder shall, under any circumstances, create any implication that the information contained herein is accurate as of any time other than the date hereof.

None of the Participation Shares described in this Confidential Memorandum has been registered or qualified under the Securities Act, the securities laws of any state or the securities laws of any other jurisdiction. This is a private offering of Participation Shares pursuant to exemptions provided by Section 4(2) of the Securities Act, Rule 506 of Regulation D thereunder and applicable state securities laws. Neither the Securities and Exchange Commission, the securities regulatory authority of any state nor the securities regulatory authority of any other jurisdiction has passed upon the value of the Participation Shares, the Release or any Exchange Consideration, made any recommendations as to their purchase, approved or disapproved this Exchange Offer, or passed upon the adequacy or accuracy of this Confidential Memorandum. Any representation to the contrary is a criminal offense.

Participation Shares of each series are subject to restrictions on transferability and resale and may not be directly or indirectly transferred, resold or otherwise hypothecated without the prior written consent of the Investment Manager (which may grant or withhold such consent in its sole discretion), and in compliance with applicable securities laws.

During the course of this Exchange Offer and prior to the Expiration Date, each Existing Holder and its representative(s), if any, is invited to question the Company, the Managing Member and the Investment Manager concerning the terms and conditions of the Exchange Offer and to obtain additional information, to the extent the Company, the Investment Manager or the Managing Member has such information or can acquire it without unreasonable expense or effort, concerning the Company, the Exchange Offer or to verify the accuracy of information contained in this Confidential Memorandum. Subject to the foregoing, any representation or information not contained herein must not be relied upon as having been authorized by the Company, the Investment Manager or its Managing Member because no person has been authorized to make any such representations or to provide any such information. Questions for the Company, the Investment Manager and the Managing Member may be directed to the Investment Manager, attention Investor Services, as set forth herein.

Notwithstanding anything to the contrary set forth herein, each Existing Holder (and each employee, representative or other agent of such Existing Holder) may disclose to any and all persons, without limitations of any kind, the tax treatment and tax structure of the transactions contemplated herein and all

iv

materials of any kind (including any options or other tax analyses) that are provided to such Existing Holder relating to such tax treatment and tax structure. This authorization of tax disclosure is retroactively effective to the commencement of the first discussions between such Existing Holder and the Investment Manager, Managing Member or the Company regarding the transactions contemplated herein.

The Managing Member is exempt from registration with the U.S. Commodity Futures Trading Commission ("CFTC") as a commodity pool operator because this pool is operated pursuant to the following criteria: (i) shares in this pool are exempt from registration under the Securities Act, and such shares are not offered and sold through a public offering in the United States; and (ii) (a) each natural person participant (including such person's self-directed employee benefit plan, if any), is a "qualified eligible person," as that term is defined in CFTC Regulation Section 4.7(a)(2); and (b) each non-natural person participant is a "qualified eligible person," as that term is defined in CFTC Regulation Section 4.7, or an "accredited investor," as that term is defined in Sections 501(a)(1)-(3), (7), and (8) of Regulation D under the Securities Act. Unlike a registered commodity pool operator, the Managing Member is not required to deliver a disclosure document and a certified annual report to participants in the Company. The Managing Member will, however, deliver audited annual reports described herein.

## NOTICE TO FLORIDA RESIDENTS

Where sales are made to five or more persons in Florida, any such sale made pursuant to section 517.061(11) of the Florida Securities Act shall be voidable by the purchaser either within three days after the first tender of consideration is made by such purchaser to the issuer, or an agent of the issuer, or an escrow agent or within three days after the availability of that privilege is communicated to such purchaser, whichever occurs later.

## NOTICE TO GEORGIA RESIDENTS

These securities have been issued or sold in reliance on paragraph (13) of Code Section 10-5-9 of the Georgia Securities Act of 1973, and may not be sold or transferred except in a transaction which is exempt under such act or pursuant to an effective registration under such act.

## NOTICE TO NEW HAMPSHIRE RESIDENTS

Neither the fact that a registration statement or an application for a license has been filed under Chapter 421-b of the New Hampshire Revised Statutes with the State of New Hampshire nor the fact that a security is effectively registered or a person is licensed in the State of New Hampshire constitutes a finding by the Secretary of State that any document filed under Chapter 421-b of the New Hampshire Revised Statutes is true, complete and not misleading. Neither any such fact nor the fact that an exemption or exception is available for a security or a transaction means that the Secretary of State has passed in any way upon the merits or qualifications or, or recommended or given approval to, any person, security or transaction. It is unlawful to make, or cause to be made, to any prospective purchaser, customer or client any representation inconsistent with the provisions of this paragraph.

## TABLE OF CONTENTS

|  | Page |
|---|---|
| Summary | |
| Risk Factors | 2 |
| The Exchange Offer | 13 |
| Release | 18 |
| Certain United States Federal Income Tax Consequences | 23 |
| Acknowledgements and Consents | 23 |
| Counsel | 27 |
|  | 28 |

ANNEX A – Net Asset Value

vi

## FORWARD-LOOKING STATEMENTS

This Confidential Memorandum includes forward-looking statements. Forward-looking statements may be identified by the presence in such statements of the words "may," "will," "expect," "intend," "anticipate," "believe," "attempt," "seek," or "project" or the negatives, derivatives, and variations of such words or comparable terminology. The Company has based these forward-looking statements on the Company's current expectations and projections about future events. These forward-looking statements are subject to risks, uncertainties and assumptions about the Company and its investments. Additionally, some forward-looking statements are based on the assumption that the volatility of market conditions in the future will generally not deviate materially from the volatility of market conditions seen over the past decade. Such assumptions would be invalidated in the event of an extended market disruption.

Neither the Company, the Investment Manager nor the Managing Member or their respective affiliates undertake any obligation to update or revise any forward-looking statements, whether as a result of new information, future events or otherwise. In light of these risks, uncertainties and assumptions, the prospective events discussed in this Confidential Memorandum may not occur.

**BEFORE DETERMINING TO PARTICIPATE IN THE EXCHANGE OFFER, EXISTING HOLDERS WHO WISH TO TENDER THEIR EXISTING SHARES SHOULD READ THIS ENTIRE CONFIDENTIAL MEMORANDUM AND REFER TO THE COMPANY'S HISTORICAL FINANCIAL STATEMENTS, WHICH HAVE PREVIOUSLY BEEN PROVIDED TO INVESTORS, INCLUDING THE COMPANY'S AUDITED FINANCIAL STATEMENTS FOR THE YEAR ENDED DECEMBER 31, 2007. ADDITIONALLY, EXISTING HOLDERS SHOULD CONSULT THEIR INDEPENDENT LEGAL, TAX, FINANCIAL AND OTHER ADVISORS, AND MAKE THEIR OWN INVESTIGATION OF THE COMPANY, THE RELEASE AND THE EXCHANGE OFFER. CITI, ITS AFFILIATES AND ITS EMPLOYEES ARE NOT IN THE BUSINESS OF PROVIDING TAX AND LEGAL ADVICE TO INVESTORS. THE CONTENTS OF THIS CONFIDENTIAL MEMORANDUM ARE NOT TO BE CONSIDERED AS LEGAL, TAX, BUSINESS OR OTHER ADVICE. YOU SHOULD CONSULT YOUR OWN ADVISORS, INCLUDING INDEPENDENT LEGAL AND TAX ADVISORS, AS NEEDED TO ASSIST YOU IN MAKING YOUR DECISION WHETHER TO PARTICIPATE IN THE EXCHANGE OFFER.**

1

# SUMMARY

*This summary highlights selected information from this Confidential Memorandum and may not contain all the information that is important to you. As used in this Confidential Memorandum, the terms "we," "us," "our," and "the Company" refer to Falcon Strategies Two LLC Portfolio A. Any action described herein to be taken by the Company may be made by the Managing Member or the Investment Manager.*

## The Company

The Company was formed to serve as a multi-strategy fixed income alternative seeking to provide investors with absolute returns, current income and portfolio diversification. The Company invested in a select combination of fixed income strategies and sought to achieve attractive risk-adjusted returns. As of March 31, 2008, the Company had $471.6 million of capital and $79.6 million of net assets in a total of nine series of Existing Shares. For the net asset value per Existing Share as of March 31, 2008 of the series of Existing Shares you own, which may vary from series to series, please refer to Annex A of this Confidential Memorandum.

Beginning in August 2007, the global bond markets began experiencing a reduction in the availability of credit. Over the following months, this credit crunch rapidly accelerated due to a combination of many factors, including falling asset values, forced de-leveraging and low trading activity in what has become a vicious cycle of de-leveraging across the financial system. These market conditions have severely impacted the cash position and net asset value of the Company.

On February 20, 2008, an affiliate of Citigroup Alternative Investments LLC (the "Investment Manager") entered into an approximately $500 million 364 day secured credit facility (the "Credit Facility") with Falcon Strategies Two B LLC for its benefit and the benefit of the Company, Falcon Strategies Three Ltd. and Falcon Strategies Four LLC (collectively with the Company, the "Falcon Funds") and Falcon Strategies LLC, currently not a borrower under the Credit Facility. As of March 31, 2008, the Falcon Funds had drawn an aggregate of approximately $335 million under the Credit Facility (which is attributable pro rata to each of the Falcon Funds). Each of the Falcon Funds, together with Falcon Strategies LLC, pursues substantially the same investment program pursued by the Company. The Investment Manager entered into the Credit Facility to provide the Falcon Funds with additional borrowing capacity and liquidity to help meet variation margin calls and prevent a forced sale of fund assets by financing counterparties during a period of extreme market distress and falling asset values. Because the size of the Credit Facility was based on then current market conditions and volatility projections, which may change over time, we can give no assurance that the Credit Facility will be of sufficient size to prevent a missed margin call and forced unwind if market conditions continue to deteriorate. The repayment of the Credit Facility is subordinate in right to the claims of other financing counterparties, but senior to the claims of the investors in the Falcon Funds, including the Existing Holders. The Credit Facility may be used for the Falcon Funds' liquidity purposes only and cannot be used to fund redemption payments or distributions to investors.

On March 20, 2008, the Investment Manager announced that because of the Company's low cash position and the ongoing dislocation in the credit markets, it believed that it was advisable and in the best overall interests of the Existing Holders to indefinitely suspend both redemptions from the Falcon Funds (and payments of related redemption proceeds) and semi-annual income distributions in an effort to preserve liquidity. The Investment Manager continues to look for opportunities to sell assets, increase liquidity and reduce leverage across the Company's various strategies to allow the Company to move toward a more defensive position, but the Company has suspended further investment pursuant to the strategies and its activities are now limited to this Exchange Offer and related transactions and the sale of the Company's assets and corresponding liquidation of the Company. The Company's assets are currently allocated to the following five strategies within the credit, residential mortgage-backed, asset-backed and municipal securities markets: (i) relative value preferred securities (approximately 0.5% of total assets as of March 31, 2008), (ii) relative value fixed income (mortgage-backed securities and asset-backed securities) (approximately 62.5% of total assets as of March 31, 2008), (iii) municipal arbitrage (approximately 11.2% of total assets as of March 31, 2008), (iv) opportunistic mortgage-backed securities (approximately 17.2% of total assets as of March 31, 2008) and (v) diversified asset-backed securities (approximately 8.6% of total assets as of March 31, 2008). Because of market illiquidity outside of preferred and municipal arbitrage securities, the

Company's assets are as of the date of this Confidential Memorandum invested primarily in mortgage-backed and asset-backed securities. See "Risk Factors" herein for a discussion of the degrees of risk and uncertainty associated with investments in these securities markets.

The Company does not expect to resume redemptions of Existing Shares or initiate any redemption of Citi Shares (and as a result, Participation Shares) prior to liquidation of the Company. The Company expects the sales of the Company's assets and the liquidation of the Company to be completed over the next twelve to eighteen months, subject to the risks and uncertainties described herein.

### Background and Purpose of the Offer

In connection with our review of the developments identified above and their impact on the Existing Holders, we are undertaking the Exchange Offer to create immediate liquidity for Existing Holders by exchanging Existing Shares for the Exchange Consideration (which represents a premium to the March 31, 2008 net asset value per Existing Share, which varies with respect to each series of Existing Shares (the net asset value as of March 31, 2008 with respect to the series of Existing Shares you own is set forth in Annex A hereto)), and issuing Participation Shares to Existing Holders that are Accredited Investors and make an election to receive such shares, thereby allowing holders of the Participation Shares to continue to participate in certain of the profits, if any, of the Company's portfolio of assets upon the occurrence of a Participation Event. Existing Holders who tender their Existing Shares for exchange will not be exposed to any further losses of the Company, while those who continue to hold Existing Shares may suffer further losses if the net asset value of the Company continues to decline as the Company's assets are liquidated. However, there can be no assurance that any profits on the assets of the Company will be realized or that any such profits will be sufficient to result in any distribution to holders of the Existing Shares or Participation Shares upon the occurrence of an applicable Participation Event, that the Company's liquidation will occur on the timetable anticipated by the Investment Manager, as described herein, or that Existing Holders that do not participate in the Exchange Offer will ultimately realize a greater amount than those Existing Holders that participate in the Exchange Offer. In order for holders of Participation Shares to receive a distribution upon the occurrence of a Participation Event, there will need to be a significant increase in the Company's net asset value as compared to its net asset value as of March 31, 2008. As a result, we currently do not anticipate there being any distribution to holders of Participation Shares upon the occurrence of a Participation Event.

### Transactions Overview

The Exchange Offer and related transactions have two primary components: (1) the exchange of Existing Shares tendered by Existing Holders for the Exchange Consideration and, with respect to Accredited Investors who elect to receive Participation Shares, the Participation Shares, and (2) the sale and issuance to Citi of the Citi Shares equal to the number of Existing Shares accepted for exchange in the Exchange Offer, the proceeds of such issuance will be used to pay the Exchange Consideration. Existing Holders that are not Accredited Investors may participate in the Exchange Offer and receive the Exchange Consideration (but not the Participation Shares) and thereby realize immediate liquidity similar to tendering Existing Holders that are Accredited Investors. In addition, Existing Holders that are Accredited Investors may also elect not to receive Participation Shares. All Existing Holders who wish to tender their Existing Shares in the Exchange Offer, whether or not eligible or electing to receive Participation Shares, will also be required to grant the Release, foregoing any and all legal claims against the Releasees relating to or arising from the acquisition, disposition or ownership of Existing Shares of any series, whether those claims arise under United States federal or state securities laws, arbitration agreements or otherwise and regardless of whether those claims are known or unknown at the time of the exchange. In connection with this Exchange Offer, the Company's LLC Agreement is being amended to set forth the terms of the Participation Shares and the Citi Shares and related matters. Such amendments do not require consent of the Existing Holders.

3

**Additional Information**

Falcon Strategies Two LLC is a Delaware limited liability company and was formed in 2004. Our mailing address is c/o Citigroup Alternative Investments LLC, Attn: Investor Services, 731 Lexington Avenue, 27th Floor, New York, New York 10022. The telephone number for our office is (212) 783-1330.

4

### The Exchange Offer

**Existing Shares**.................................... Shares of limited liability company interest which are divided into nine series (the "Existing Shares") of Portfolio A.

**Participation Shares**.............................. The number of shares of the Company's series P limited liability company participation interest (the "Participation Shares") equal to the number of Existing Shares tendered by Accredited Investors (as defined below) that elect to receive Participation Shares in addition to the Exchange Consideration.

**Citi Shares**.......................................... The number of the Company's series C limited liability company interest (the "Citi Shares") equal to the aggregate number of Existing Shares tendered by Existing Holders (whether or not eligible or electing to receive Participation Shares).

**Exchange Consideration** ....................... $0.45 per Existing Share (up to a total of approximately $184.3 million if all outstanding Existing Shares are tendered). The Exchange Consideration represents a premium to the March 31, 2008 net asset value per Existing Share. The net asset value as of March 31, 2008 with respect to the series of Existing Shares you own is set forth in Annex A hereto.

**Release**................................................ In order to participate in the Exchange Offer, each tendering Existing Holder (whether or not an Accredited Investor and whether or not electing to receive Participation Shares), by executing the Exchange Offer Subscription Agreement, will unconditionally release and discharge any and all claims against the Releasees, relating to or arising from the acquisition, disposition or ownership of Existing Shares of any series, whether those claims arise under United States federal or state securities laws, arbitration agreements or otherwise and regardless of whether those claims are known or unknown at the time of the exchange.

**Exchange Offer**.................................... For each Existing Share of any series outstanding and held by an Accredited Investor (other than certain Citi Affiliated Persons) who properly tenders and does not properly revoke the election to tender Existing Shares prior to the Expiration Date and elects to receive Participation Shares in addition to the Exchange Consideration, we will issue one (1) Participation Share. In addition, subject to the terms, conditions and exceptions described herein, we will pay the Exchange Consideration of $0.45 per share to all Existing Holders (whether or not an Accredited Investor and whether or not electing to receive Participation Shares, and other than certain Citi Affiliated Persons) who tender and do not revoke the election to tender Existing Shares prior to the Expiration Date. Other than in connection with Early Settlement, the Exchange Consideration will be paid only upon consummation of the Exchange Offer. The Company reserves the right to amend the amount of the Exchange Consideration with respect to one or more series of Existing Shares in its sole discretion.

By participating in the Exchange Offer you will, with respect to your investment in the Company, not be allocated further losses of the Company, but your continued investment in the Company is not likely to result in any appreciation or otherwise in a recoupment of your

5

initial investment.

**Expiration Date** .......................................  The Expiration Date for the Exchange Offer will be 5:00 p.m., New York City time, on June 30, 2008, unless extended with respect to all series of Existing Shares.

**Holders Entitled to Elect to Receive Participation Shares and the Exchange Consideration** ........................  The right to elect to receive Participation Shares in addition to the Exchange Consideration in the Exchange Offer is being offered only to persons who are "accredited investors" as defined in Rule 501(a) of Regulation D under the Securities Act ("Accredited Investors"). Existing Holders that are not Accredited Investors may still participate in the Exchange Offer. Such holders will be entitled to receive the Exchange Consideration but will not be entitled to elect to receive Participation Shares. In addition, Existing Holders that are Accredited Investors may also elect not to receive Participation Shares. All other terms and requirements of the Exchange Offer will remain the same with respect to such holders. Each Existing Holder that wishes to tender his or her Existing Shares in the Exchange Offer must agree in the manner set forth herein and in the Exchange Offer Subscription Agreement to tender all Existing Shares of all series held by such Existing Holder in order to participate in the Exchange Offer.

**Conditions to the Exchange Offer** ...........  The Exchange Offer is subject to certain conditions, any or all of which we may waive. The Exchange Offer is not conditioned upon the participation of a minimum number of Existing Holders. See the discussion below under the caption "The Exchange Offer— Conditions to the Exchange Offer" beginning on page 22.

**Procedures for Tendering Existing Shares** ........................................  See "The Exchange Offer—Procedures for Tendering Existing Shares." For further information, please contact the Investment Manager for assistance. No action is required if you decline to participate in the Exchange Offer.

**Revocation of Tendered Existing Shares** ...................................................  Tenders of Existing Shares (including Existing Shares tendered for Early Settlement) of any series may be validly revoked at any time prior to the Expiration Date. See "The Exchange Offer—Revocation Rights" beginning on page 21. A revocation must revoke all Existing Shares of all series held by such holder. A form of notice of revocation is attached as Annex A to the Exchange Offer Subscription Agreement.

**Acceptance of Tenders** ............................  Subject to certain conditions described herein, we will accept any and all Existing Shares of any series from Existing Holders which are properly tendered and which tender is not properly revoked on or prior to the Expiration Date.

Other than with respect to Existing Shares tendered for Early Settlement as described below, we will issue the Participation Shares to Accredited Investors that elect to receive Participation Shares in addition to the Exchange Consideration, and pay the Exchange Consideration to all properly tendering holders, promptly following the Expiration Date upon our determination that the conditions to the

Exchange Offer have been satisfied.

**No Recommendation to Participate by the Board or Otherwise** ...................... Notwithstanding anything to the contrary contained herein, certain Citi Affiliated Persons are expected to be excluded from participating in the Exchange Offer. Such exclusion from participation should not be construed as a recommendation or view on whether or not you should participate in the Exchange Offer but rather an effort to minimize perceived conflicts of interest associated with affiliates of the Company participating in the Exchange Offer. None of the Company, the Investment Manager, Citi, our Managing Member or any of their respective affiliates is making any recommendation regarding whether you should participate in the Exchange Offer; accordingly, you must make your own determination whether to tender your Existing Shares for exchange.

**Consequences of Not Participating in the Exchange Offer** ............................ Existing Holders who do not participate in the Exchange Offer will continue to hold their Existing Shares and receive no Exchange Consideration or Participation Shares and not be required to execute the Release. Redemptions with respect to the Existing Shares are not expected to resume prior to liquidation of the Company. Those who continue to hold Existing Shares may suffer further losses if the net asset value of the Company continues to decline as the Company's assets are liquidated. It is unlikely that the net asset value of the Company will increase prior to liquidation to an amount in excess of the Exchange Consideration. However, there can be no assurance that Existing Holders who do not participate in the Exchange Offer will not be in a better position upon liquidation of the Company than those Existing Holders who do participate in the Exchange Offer.

**Early Settlement** ...................................... Existing Holders may elect Early Settlement and receive the Exchange Consideration and Participation Shares, if applicable, by June 6, 2008 with respect to Existing Shares tendered prior to 5:00 p.m. on May 30, 2008 or by June 20, 2008 with respect to Existing Shares tendered after 5:00 p.m. on May 30, 2008 but prior to 5:00 p.m. on June 13, 2008, as more fully described under "The Exchange Offer—Early Settlement" on page 19. Such holders will retain the right to revoke such tenders prior to the Expiration Date by return to the Company of the applicable Exchange Consideration and forfeiture of any Participation Shares received in addition to compliance with the other revocation procedures described herein.

**Certain United States Federal Income Tax Consequences** ...................... Although there is no direct authority addressing an exchange such as the Exchange Offer, the transaction is expected to be a taxable exchange with respect to the Existing Shares exchanged (or deemed exchanged) for Exchange Consideration, and a non-taxable exchange with respect to the Existing Shares deemed exchanged for Participation Shares, as described more fully under "Certain United States Federal Income Tax Consequences" on page 23. Existing Holders that do not participate in the Exchange Offer will not incur any U.S. federal income tax liability as a result of the consummation of the Exchange Offer.

7

**The tax consequences to you of the Exchange Offer will depend on your individual situation. You should consult your tax advisor for a full understanding of these tax consequences.**

Use of Proceeds...................................... We will not receive any cash proceeds from the Exchange Offer other than from the concurrent sale of the Citi Shares, the proceeds of which will be used to pay the Exchange Consideration. Any Existing Shares of any series that are properly tendered and accepted pursuant to the Exchange Offer will be considered redeemed.

**Lack of Dealer Manager; Exchange Agent; Information Agent**....................... We are not employing the services of any dealer manager, exchange agent or information agent in connection with the Exchange Offer. No broker, dealer, commercial bank or trust company has been authorized to act as our agent for purposes of the Exchange Offer other than the Managing Member and the Investment Manager.

Fees and Expenses.................................. We will bear all expenses related to the Exchange Offer. As a result, you are not required to pay any brokerage commissions or any other fees or expenses to the Company, the Managing Member or the Investment Manager.

Additional Information ........................... You may obtain additional copies of this Confidential Memorandum or a copy of the LLC Agreement and the proposed amendments thereto, as well as our financial statements for the years ended December 31, 2006 and 2007 and historical net asset values by contacting the Investment Manager at the phone number and address set forth on the back cover of this Confidential Memorandum.

### The Participation Shares

Subject to the terms, conditions and exceptions contained herein, we are offering to exchange the Exchange Consideration plus one Participation Share, if so elected, for each Existing Share of any series validly tendered by any Accredited Investor in accordance with this Confidential Memorandum and the accompanying Exchange Offer Subscription Agreement.

Participation Allocation.......................... Upon the liquidation of the Company, each Participation Share will be redeemed and, immediately prior to such redemption, each Participation Share will be allocated an amount equal to 75% of the excess by which the then current net asset value per share of the corresponding Citi Share exceeds the Exchange Consideration plus Citi's Cost of Capital (such excess in each case, the "Participation Allocation"), as set forth in the following calculation:

Participation Allocation = (0.75) * ((Net asset value per Citi Share) - (Exchange Consideration + Cost of Capital))

In order for holders of Participation Shares to receive a distribution upon the occurrence of a Participation Event, there will need to be a significant increase in the Company's net asset value as compared to its net asset value as of March 31, 2008. As a result, we currently do not anticipate there being any distribution to holders of Participation Shares upon the occurrence of a Participation Event.

Allocation of Profits and Losses ........... Other than as set forth above, the Participation Shares will not be allocated any of the profits or losses of the Company.

Term .................................................... The Participation Shares will remain outstanding until liquidation of the Company or the redemption of the corresponding Citi Shares. Liquidation of the Company is anticipated to occur, in the sole discretion of the Investment Manager and Managing Member, within twelve to eighteen months from the issuance of the Participation Shares, although the term may be longer or shorter.

Redemption............................................ If Citi Shares are redeemed prior to the liquidation of the Company, then the same number of Participation Shares will simultaneously be compulsorily redeemed by the Company. Holders of Participation Shares will participate pro rata in any such compulsory redemption, without regard to series, and, immediately prior to such compulsory redemption, the Participation Allocation will be calculated with respect to the Citi Shares to be redeemed. The Participation Allocation will then be distributed with respect to each Participation Share so redeemed at the same time the Citi Shares receive their redemption proceeds. Participation Shares are not otherwise redeemable.

Voting Rights......................................... Participation Shares are non-voting other than with respect to matters directly adversely impacting such Participation Shares. For such matters, Participation Shares will vote as one class with all other classes of limited liability company interest (including in certain circumstances, with holders of Existing Shares and/or holders of Citi Shares) entitled to vote on such matters.

9

| | |
|---|---|
| **Lack of Transferability** ........................ | Participation Shares may not be directly or indirectly transferred, resold or otherwise hypothecated without the consent of the Investment Manager (which may grant or withhold such consent in its sole discretion) and only to those who meet the same standards as those required to be an Accredited Investor. |
| **Management Fee** ................................. | Participation Shares will not be subject to a management fee. |
| **Incentive Allocation** ............................. | Participation Shares will not be subject to an incentive allocation. |

10

**The Citi Shares**

Concurrently with the consummation of the Exchange Offer or Early Settlement, as applicable, the Company is selling to Citi a number of series C shares of limited liability company interest equal to the number of Existing Shares accepted for exchange in the Exchange Offer at a purchase price per share equal to the Exchange Consideration, the proceeds of which issuance will be used to pay the Exchange Consideration.

**Participation Deduction** ........................ Upon the liquidation of the Company, each Citi Share will have deducted from the liquidation proceeds, if any, attributable to such Citi Share an amount equal to 75% of the excess by which the then current net asset value per share of such Citi Share exceeds the Exchange Consideration plus an amount equal to the Cost of Capital on the purchase price of such Citi Share (the "Participation Deduction"). To the extent that Citi Shares are issued without corresponding Participation Shares also being issued, such Citi Shares will not be subject to the Participation Deduction upon the occurrence of a Participation Event and Citi will be entitled to retain such amount.

**Allocation of Profits and Losses** ............ Other than as set forth above, the Citi Shares will be allocated their pro rata share of the profits or losses of the Company in the same manner as profits and losses are allocated to the Existing Shares.

**Term** ...................................................... Unless earlier redeemed, the Citi Shares will remain outstanding until liquidation of the Company, which is anticipated to occur, in the sole discretion of the Investment Manager and Managing Member, within twelve to eighteen months from the issuance of the Citi Shares, although such period may be longer or shorter.

**Redemption** ............................................ If Citi Shares are redeemed, then the same number of Participation Shares will simultaneously be compulsorily redeemed. The first Citi Shares eligible for redemption are those with respect to which a corresponding Participation Share was issued. Once all such Citi Shares are redeemed, then Citi Shares issued without a corresponding Participation Share issued may be redeemed. Citi Shares are subject to the same redemption terms as the Existing Shares. The Company expects liquidation to be completed and redemption of the Citi Shares in the next twelve to eighteen months, although such period may be longer or shorter.

**Voting Rights** ......................................... Citi Shares will possess the same voting rights as the Existing Shares and will vote as a single class with all other classes of limited liability company interest entitled to vote on any matter brought to a vote of holders (including in certain circumstances, with holders of Existing Shares and/or holders of Participation Shares).

**Lack of Transferability** ......................... Citi Shares may not be directly or indirectly transferred, resold or otherwise hypothecated without the consent of the Company or Investment Manager (which may grant or withhold such consent in its sole discretion) and only to those who meet the same standards as those required to be an Accredited Investor. Any such transfer shall not impair the Participation Allocation with respect to the Participation Shares.

**Management Fee** .................................... Citi Shares will not be subject to a management fee.

Incentive Allocation ............................... Citi Shares will not be subject to an incentive allocation.

Distributions ......................................... The Company does not intend to make any distribution with respect to the Citi Shares prior to the liquidation of the Company.

## RISK FACTORS

*The decision as to whether to participate in the Exchange Offer involves a high degree of risk and uncertainty. You should carefully consider the risks and uncertainties described below as well as the other information appearing elsewhere in this Confidential Memorandum before making a decision whether to participate in the Exchange Offer. The risks and uncertainties described below are intended to highlight risks and uncertainties that are specific to us but are not the only risks and uncertainties that we face. The Company's investments involve risks, and there can be no assurance that the Company will achieve its objectives or that holders will receive any distribution on the Participation Shares or that Existing Holders that do not participate in the Exchange Offer will not suffer further losses. In considering participation in the Exchange Offer, Existing Holders should consult their independent legal, tax, financial and other advisers, and should be aware of certain considerations and risk factors, which include, but are not limited to, the risks described below.*

*The information in this Confidential Memorandum includes forward-looking statements which involve risks and uncertainties. Our actual results could differ materially from those anticipated in these forward-looking statements as a result of numerous factors, including those described in this section and elsewhere in this Confidential Memorandum and in the Company's financial statements that have been previously provided to investors, including the audited annual financial statements for the year ended December 31, 2007. See "Forward-Looking Statements."*

**Market Effects**

Over the past nine months, an unprecedented wave of volatility has swept through the global fixed income markets, leading to sharp price declines and pushing risk premiums on many credit instruments to record or near-record highs vis-à-vis U.S. treasury securities. In many sectors, buyers have virtually vanished, making it difficult or impractical to sell large blocks of securities without incurring substantial losses. Even the short-term money markets have been disrupted, forcing the Federal Reserve and the world's major central banks to intervene repeatedly. The magnitude of the negative effect of such factors on the liquidity and prices of financial assets in general, or a particular asset, is difficult to predict. The value of the Existing Shares has been negatively impacted by these factors, and the return on the sale of the Company's assets upon liquidation will be affected by these conditions. As a result, holders of Participation Shares should not anticipate realizing any distribution on these shares upon the occurrence of a Participation Event.

**General Economic Conditions**

The crisis in the financial markets has had an adverse affect on many investments, particularly those using leveraged strategies to take advantage of expected risk relationships or market inefficiencies. Various funds, including the sub-funds in which the Company invests (the "Funds"), using such leveraged strategies may be vulnerable to requests for additional collateral, or margin calls, when market conditions deteriorate. While fund managers can and often do seek short-term financing to ride out temporary bouts of illiquidity due to a lack of buyers, under current conditions, financing can be difficult or impossible to arrange. This has forced many funds, including the Funds, to sell assets into sharply declining markets. The return on the sale of the Company's assets upon liquidation will be affected by these conditions, which could impair the Company's ability to sell investments at or above the price at which they were purchased and therefore raise amounts sufficient to make distributions to holders of Participation Shares upon the occurrence of a Participation Event. These conditions may also continue to negatively impact the value of the Existing Shares.

**Liquidity**

Beginning in August 2007, the global bond markets began experiencing a reduction in the availability of credit. Over the following months, this credit crunch rapidly accelerated due to a combination of many factors, including falling asset values, forced de-leveraging and low trading activity in what has become a vicious cycle of de-leveraging across the financial system. These market conditions have severely impacted the cash position and net asset value of the Existing Shares (the net asset value as of March 31, 2008 with respect to the series of Existing Shares you own is set forth in Annex A hereto) and there can be no assurance that such conditions will not result in further losses to Existing Holders that do not participate in the Exchange Offer or impact the ability of holders of Participation Shares to receive a distribution upon the occurrence of a Participation Event.

As a result, the Investment Manager has indefinitely suspended both redemptions from the Company (and payments of related redemption proceeds) and semi-annual income distributions in an effort to preserve liquidity and does

13

not expect to allow redemptions to resume before the liquidation of the Company. The Investment Manager continues to look for opportunities to sell assets, increase liquidity and reduce leverage across the Company's various strategies to allow the Company to move toward a more defensive position, but the Company has now suspended further investment pursuant to the strategies and its activities are now limited to this Exchange Offer and related transactions and the sale of the Company's assets and the corresponding liquidation of the Company, which the Company expects to complete over the next twelve to eighteen months. There can be no guarantee that liquidation will occur in that timetable.

While the Existing Shares are being exchanged for the Exchange Consideration, representing a premium to the March 31, 2008 net asset value per Existing Share which varies with respect to each series of Existing Shares and, in certain circumstances, Participation Shares, such consideration represents substantially less than the initial per share investment of the Existing Holders and it is unlikely that Existing Holders who receive Participation Shares will receive any additional distribution upon the occurrence of a Participation Event. Existing Holders who retain their Existing Shares may receive more or less per share upon redemption or the liquidation of the Company than the aggregate of the Exchange Consideration plus any Participation Allocation (which will be determined by Citi and may vary both due to various market, economic and other factors as well as by fluctuations in 3-month LIBOR affecting the Cost of Capital), depending on the amounts received upon the sale of the Company's assets. Existing Holders that are not Accredited Investors and Accredited Investors who do not elect to receive Participation Shares will not receive any distributions other than the Exchange Consideration upon their tender of Existing Shares. In order for holders of Participation Shares to receive a distribution upon the occurrence of a Participation Event, there will need to be a significant increase in the Company's net asset value as compared to its net asset value as of March 31, 2008. As a result, we currently do not anticipate there being any distribution to holders of Participation Shares upon the occurrence of a Participation Event.

**Risk of Loss**

By participating in the Exchange Offer you will, with respect to your investment in the Company, not be allocated further losses of the Company, but your continued investment in the Company through ownership of Participation Shares, if applicable, is not likely to result in any appreciation or otherwise in a recoupment of your initial investment. As of March 31, 2008, the net asset value per Existing Share, which varies with respect to each series of Existing Shares, was substantially below the initial investment price. It is unlikely that the Company's assets will be sold at or above the price at which they were purchased and may decline in value before they are sold. Existing Holders that are not Accredited Investors, or Existing Holders who are Accredited Investors but elect not to receive Participation Shares, that participate in the Exchange Offer will not receive any further distributions. Existing Holders who elect not to participate in the Exchange Offer and retain their Existing Shares may suffer further losses if the net asset value of the Company continues to decline as the assets are liquidated, while in the likely scenario that assets are sold at prices that are less than the sum of the Exchange Consideration and the Cost of Capital (which will be determined by Citi and may vary both due to various market, economic and other factors as well as by fluctuations in 3-month LIBOR affecting the Cost of Capital), those Existing Holders who receive Participation Shares in exchange for Existing Shares are unlikely to realize any Participation Allocation. While we do not expect the Cost of Capital to change materially from its initial percentage (9%), we have not set any maximum percentage above which the Cost of Capital may not rise.

**Margin Call Risk**

On February 20, 2008, the Investment Manager entered into the approximately $500 million 364 day secured Credit Facility (the "Credit Facility") with the Falcon Funds, including the Company, and Falcon Strategies LLC. As of March 31, 2008, the Falcon Funds had drawn an aggregate of approximately $335 million under the Credit Facility (which is attributable pro rata to each of the Falcon Funds). The Investment Manager entered into the Credit Facility to provide the Falcon Funds with additional borrowing capacity and liquidity to help meet variation margin calls and prevent a forced sale of fund assets by financing counterparties during a period of extreme market distress and falling asset values. The Credit Facility may be used for the Falcon Funds' liquidity purposes only and cannot be used to fund redemption payments or distributions to investors. Because the size of the Credit Facility was based on then current market conditions and volatility projections, which may change over time, we can give no assurance that the Credit Facility will be of sufficient size to prevent a missed margin call and forced unwind if market conditions continue to deteriorate. If future margin calls exceed the amount the Company is able to borrow under the Credit Facility, we may be forced to sell assets at disadvantageous prices to meet such margin calls and there may not be any additional funds for distribution upon liquidation of the Company. Neither the Investment Manager, nor any of its affiliates, has any obligation to provide further credit or financial support to the Company and there should be no expectation that it will do so.

14

**Risk of Litigation and Release of Liability**

On April 4, 2008 an investor in Falcon Strategies Two B LLC ("Falcon Two B"), one of the Falcon Funds, filed a class action complaint against Falcon Two B, Citi and the Investment Manager in the U.S. District Court for the Southern District of Florida, for common law fraud, violations of Florida blue sky law, negligent misrepresentation and violations of Section 12(a)(2) of the Securities Act. The complaint alleges that the Investment Manager misrepresented the level of risk of its investment strategy and that Falcon Two B and the Investment Manager were aware and knew high risk investment and management strategies were being undertaken in managing Falcon Two B, but failed to disclose those investment strategies to the existing investors and continued to market the fund as a low risk investment tool to investors. The plaintiff seeks compensatory and punitive damages, as well as disgorgement of profits and commissions, reimbursement of legal fees and expenses, restitution and rescission. There can be no assurance that similar suits and claims will not be made against the Company. Additionally, the Investment Manager or any individuals selected to advise and manage Funds (each such individual, an "Advisor") might become involved in litigation as a result of investments made by the Company or any other Falcon Fund. Under such circumstances, the Company and/or the Falcon Funds could be named as a defendant in a lawsuit or regulatory action. Citi is currently responding to a U.S. regulatory inquiry relating to Falcon Two B, Citi, and certain other funds sponsored by, and entities affiliated with, Citi.

You are releasing various parties, including without limitation the Company, the Investment Manager and any Advisor, from liability in connection with any investment loss in respect of your Existing Shares in order to participate in the Exchange Offer; although you are not releasing such parties to the extent, and with respect to, equity interests you may own in any other Falcon Fund. In addition, to the extent that you or others have claims against us or any Releasee in connection with your or their Existing Shares and choose to litigate such claims, including the claim described above with respect to Falcon Two B or similar claims that may be brought against one or more of the Falcon Funds, including the Company, you will not be able to pursue any such claims or participate in any award or settlement which may be obtained as a result of such litigation, which award or settlement may include compensatory and punitive damages, as well as disgorgement of profits and commissions, reimbursement of legal fees and expenses, restoration and rescission. Any damages required to be paid by the Company will reduce the funds available, if any, for distribution on the Participation Shares upon the occurrence of a Participation Event.

**Valuation**

As a result of the ongoing dislocation in the credit markets described above, the net asset value of the Existing Shares may not reflect the amount that may be received by the Company for its assets upon their liquidation. This is particularly the case given the Company's investments in mortgage-backed and asset-backed securities and collateralized debt obligations, which asset classes could be subject to valuation adjustments as a result of the factors described herein. To the extent that the Company is able to sell such assets for more than their currently reported value, Existing Holders who do not tender their Existing Shares may be entitled to per share distributions that are greater than the aggregate of the Exchange Consideration plus the Participation Allocation, if applicable and if any. We can make no assurance that, upon the occurrence of a Participation Event, Existing Holders who participate in the Exchange Offer will be in a better position than Existing Holders who choose not to participate and receive a direct per share liquidation distribution of the proceeds of the sale of assets.

**Lack of Control**

The Managing Member of the Company is AMACAR GP, Inc., a Delaware corporation. Subject to the provisions of the LLC Agreement, as amended in connection with this Exchange Offer, the Managing Member delegates substantially all authority to manage the day-to-day operations and the assets of the Company to the Investment Manager pursuant to an investment management agreement (the "Investment Management Agreement"). The holders of Participation Shares will not be entitled to make decisions with respect to the management, disposition or other realization of any investment made by the Company, or regarding the Company's business and affairs. In addition, because the Participation Shares are non-voting other than with respect to matters directly and adversely impacting the Participation Shares, their holders will not be able to determine the outcome of matters submitted to a vote of our members for approval and will not be able to cause or prevent a change in control and, following the Exchange Offer, holders of Existing Shares and Citi Shares will control 100% of all voting interests of the Company.

15

**Non-Transferability of Shares**

The Participation Shares represent highly illiquid investments. You will not be permitted to directly or indirectly transfer, resell or otherwise hypothecate your Participation Shares (or Existing Shares) without the prior written consent of the Company or Investment Manager, which may be withheld in their sole discretion, and the satisfaction of certain other conditions, including compliance with applicable securities laws. You should not expect the Company or Investment Manager to grant their consent to transfers. There is currently no market for any series of Participation Shares, and it is not contemplated that one will develop. You may not be able to liquidate your investment in the event of an emergency or for any other reason, and your Participation Shares may not be readily accepted as collateral for a loan.

## Possible Alternative Characterizations of the Exchange Offer for U.S. Federal Income Tax Purposes

Although there is no direct authority addressing an exchange such as the Exchange Offer, the transaction is expected to be a taxable exchange with respect to the Existing Shares exchanged (or deemed exchanged) for Exchange Consideration, and a non-taxable exchange with respect to the Existing Shares deemed exchanged for Participation Shares, as described more fully under "Certain United States Federal Income Tax Consequences" below.

You should be aware that the proper U.S. federal income tax treatment of, and the consequences arising from, the receipt of the Participation Shares is uncertain and subject to multiple potential characterizations under current law, including for example, treatment of the Participation Shares as a contractual right calling for a contingent payment to which Section 483 of the U.S. Internal Revenue Code of 1986, as amended (the "Code"), might apply and in which case the exchange would be a taxable exchange in its entirety, and a portion of any gain subsequently recognized in respect of the Participation Shares may be treated as ordinary income. There can be no assurance that the U.S. Internal Revenue Service ("IRS") will not assert that another characterization properly applies to the receipt of the Participation Shares. You are urged to consult your tax advisor regarding the consequences to you arising from an election to receive Participation Shares in the Exchange Offer, particularly as regards the various potential characterizations.

Further, if you exchange your Existing Shares pursuant to the Exchange Offer, (whether or not you are eligible or elect to receive Participation Shares), a portion of the Exchange Consideration paid to you may be deemed a payment for your release and assignment of claims. The proper treatment for U.S. federal income tax purposes of your receipt of any deemed payments for your release and assignment of claims is uncertain. No opinion or assurance can be given that the IRS will not challenge the treatment of any deemed payments for your release and assignment of claims as additional consideration for surrender of the Existing Shares, and assert that such amount should be treated as an ordinary income payment in exchange for your release and/or assignment of current and future claims. You should consult your tax advisor regarding the tax consequences to you with respect to your right to, and your receipt of, any deemed payments for your release and assignment of claims.

## Illiquidity of Underlying Investments

Certain of the Funds in which the Company invests hold illiquid investments. Illiquidity increases risk and may make it impossible to close out positions against which the market is moving, as well as cause delays in the payment of withdrawal proceeds to the Company. Lack of liquidity can make it economically unfeasible for a Fund to recognize profits or limit losses on open positions.

In particular, certain Funds have invested in restricted, as well as thinly traded, securities (including privately placed securities, which are subject to resale restrictions). This illiquidity has further restricted the ability of our Funds to dispose of such securities in a timely fashion and at a fair price. In some cases, there is no trading market for these securities, and the Funds would be forced to liquidate these positions, if at all possible, at disadvantageous prices. As such, the Funds have been forced to hold such securities despite adverse price movements. Funds may have also sold securities at unfavorable prices, however, in order to fund redemptions or reallocations from such Fund, leading to additional losses. In addition, Funds which have made short sales of illiquid securities may have had difficulties in covering the short sales, resulting in potentially unlimited losses on those positions. Continuing illiquidity may reduce the chances of favorable sales of our remaining investments and, as a result, reduce the chances that you will receive any distribution on your Participation Shares upon the occurrence of a Participation Event as well as continue to negatively impact the value of the Existing Shares.

**Key Personnel**

As noted above, the Investment Manager manages the operations of the Company. The members of the Company are not entitled to make decisions with respect to the management, disposition or other realization of any investment made by the Company, or regarding the Company's business and affairs. Consequently, the success of the sale of the Company's assets and corresponding liquidation depends, in large part, upon the skill and expertise of the individuals employed by the Investment Manager.

**Conflicts of Interest**

Citigroup Inc. and its affiliates (collectively, for purposes of this section, "Citigroup") engage in a broad spectrum of activities, including insurance, banking, underwriting, private equity and financial advisory activities, and have extensive investment activities that are independent from, and may from time to time conflict with those of, the Company or its shareholders. For example, Citigroup may have participated in advising Existing Holders in the purchase of Existing Shares and now has authority on behalf of the Company in the Exchange Offer relating to such shares. There may also be instances where the interests of Citigroup conflict with the interests of the Company or the Funds. Citi is also purchasing the Citi Shares concurrently with this offering, and may have interests that differ from those of the Existing Holders as a result of the ownership of the Citi Shares. Certain affiliates of the Investment Manager may engage in transactions with, and may provide services to, the Advisors or to funds in which the Company has invested or may potentially invest, and will receive compensation from such entities. The Investment Manager and its affiliates may also provide services to, invest in, advise, sponsor or act as investment manager to investment vehicles and other person or entities that may have similar structures and investment objectives and policies to those of the Company, that may compete with the Company and Funds for investment opportunities and that may co-invest with the Company in certain transactions.

The activities of Citigroup may also restrict or preclude the Investment Manager, and therefore the Company, from pursuing certain investment opportunities and from taking certain actions with respect to a particular investment. In addition to investment management services, affiliates of the Investment Manager may provide services to the Company or to the Advisors, including, without limitation, brokerage and custodial services and moneys held by the Company may be invested in instruments issued by Citigroup and money market funds managed by Citigroup.

Any such activities may create a conflict of interest between the Company and Citigroup, including the Investment Manager and the Advisors. We can give no assurance that, to the extent conflicts arise between the interests of the Company and those of Citigroup, such conflicts will be resolved in our favor.

**Other Clients of Advisors**

In addition to the Funds, the Advisors generally will manage other accounts (including other accounts in which the Advisors may have an interest) and may have financial and other incentives to favor such accounts over the Funds. In investing on behalf of a number of different clients, Advisors may face limits on their management resources, as well as limited market opportunities. These limitations and increased competition for the same market opportunities could make it difficult or impossible for a Fund to liquidate a particular position at a price indicated by an Advisor's strategy.

17

## THE EXCHANGE OFFER

**General**

Upon the terms, conditions and exceptions set forth in this Confidential Memorandum, we are offering Existing Holders the Exchange Consideration in exchange for outstanding Existing Shares validly tendered and whose tender is not revoked prior to the Expiration Date as described below. Existing Holders that are Accredited Investors that participate in the Exchange Offer may also elect to receive one Participation Share of a corresponding series for every Existing Share validly tendered, in addition to the Exchange Consideration. Existing Holders who are not Accredited Investors who participate in the Exchange Offer will receive the Exchange Consideration in exchange for outstanding Existing Shares validly tendered and not revoked prior to the Expiration Date, but are not eligible to elect to receive Participation Shares. All Existing Holders that wish to tender their Existing Shares in the Exchange Offer will be required to execute the Release, releasing and discharging any and all claims against the Releasees relating to or arising from the acquisition, disposition or ownership of the Existing Shares of any series, whether those claims arise under federal or state securities laws or otherwise. Each Existing Holder who wishes to tender his or her Existing Shares in the Exchange Offer must agree in the manner set forth herein and in the Exchange Offer Subscription Agreement to tender all Existing Shares held by such Existing Holder in order to participate in the Exchange Offer, regardless of any Early Settlement election. The Exchange Consideration represents a premium to the March 31, 2008 net asset value per Existing Share, which premium varies slightly with respect to each series of Existing Shares based upon the slight variance in March 31, 2008 net asset value for each series. The net asset value as of March 31, 2008 with respect to the series of Existing Shares that you own is set forth in Annex A hereto.

Existing Shares tendered for exchange in the Exchange Offer will be considered redeemed upon acceptance and consummation of the Exchange Offer by the Company, subject to revocation in the case of Existing Shares tendered for Early Settlement. Concurrently with the Exchange Offer (including upon any Early Settlement), the Company will sell such number of Citi Shares to Citi representing a number of shares equal to the number of Existing Shares tendered in the Exchange Offer (whether or not tendered by Existing Holders who elect to receive Participation Shares), for a purchase price of $0.45 per Citi Share, the proceeds of which will be used to pay the Exchange Consideration. In the case of a validly revoked tender by an Existing Holder participating in Early Settlement, the Citi Shares corresponding to such revoked Existing Shares will be cancelled and the purchase price for such Citi Shares will be returned to Citi.

This Confidential Memorandum, together with the Exchange Offer Subscription Agreement, is being sent to all registered holders of Existing Shares as of May 8, 2008. The Company reserves the right to amend the terms of this Exchange Offer in its sole discretion. The Exchange Offer is not conditioned upon the participation of a minimum number of Existing Holders. In addition, our obligation to accept Existing Shares for exchange in the Exchange Offer is subject to the satisfaction of the conditions set forth hereunder "—Conditions to the Exchange Offer," any or all of which we may waive in our sole discretion.

None of the Company, the Investment Manager, Citi, our Managing Member or any of their respective affiliates is making any recommendation regarding whether you or any Existing Holder should participate in the Exchange Offer, and, accordingly, you must make your own determination whether to participate in the Exchange Offer. Notwithstanding anything to the contrary contained herein, certain Citi Affiliated Persons are expected to be excluded from participating in the Exchange Offer (and as a result, any Citi Affiliated Person that receives this Confidential Memorandum should not deem such receipt as an invitation to participate in the Exchange Offer). Such exclusion from participation should not be construed as a recommendation or view on whether or not you should participate in the Exchange Offer but rather an effort to minimize perceived conflicts of interest associated with affiliates of the Company participating in the Exchange Offer.

Existing Shares of any series will be deemed to have been accepted as validly tendered if, as and when we have given oral or written notice thereof to the Investment Manager. The Investment Manager will act as agent for tendering Existing Holders in delivering the Participation Shares and/or the Exchange Consideration to such Existing Holders.

We and our affiliates reserve the right to purchase or make offers for any Existing Shares of any series that remain outstanding subsequent to the Expiration Date or, as set forth under "—Conditions to the Exchange Offer," to terminate the Exchange Offer, or, after the Expiration Date, to redeem any series of Existing Shares as a whole or in part and from time to time, as permitted by the LLC Agreement, and to the extent permitted by applicable law, purchase Existing Shares in privately negotiated transactions or otherwise. Following consummation of the Exchange Offer, the terms of any such redemptions, purchases or offers could differ from the terms of the Exchange Offer.

Tendering holders of Existing Shares of any series will not be required to pay brokerage commissions or fees or, subject to the instructions in the Exchange Offer Subscription Agreement, transfer taxes with respect to the receipt of the Participation Shares in exchange for Existing Shares pursuant to the Exchange Offer. We will pay all charges and expenses, other than certain applicable taxes, in connection with the Exchange Offer. See "—Fees and Expenses" below.

**Expiration Date; Extensions; Amendments**

The Expiration Date is 5:00 p.m., New York City time on June 30, 2008, unless the Exchange Offer period is extended with respect to all series of Existing Shares, in which case the Expiration Date will be the last date to which the Exchange Offer is extended. We may extend the Exchange Offer from time to time, in our sole discretion, for any purpose including without limitation to permit the satisfaction or waiver of all conditions to the Exchange Offer.

We expressly reserve the right to (i) delay acceptance of any Existing Shares, extend the Exchange Offer or terminate the Exchange Offer and not accept Existing Shares not previously accepted if any of the conditions set forth herein under "—Conditions to the Exchange Offer" shall have not been waived or satisfied prior to the Expiration Date, and (ii) amend at any time, or from time to time, the terms of the Exchange Offer. To extend the Expiration Date, the Company will so notify the Investment Manager and the Existing Holders in writing or orally and will make a public announcement thereof, not later than 9:00 a.m., New York City time, on the next business day after the previously scheduled Expiration Date. If the Exchange Offer is amended in a manner determined by us to constitute a material change, we will promptly disclose such amendment in a manner reasonably calculated to inform the Existing Holders of such amendment.

The minimum period during which the Exchange Offer will remain open following material changes in the terms of such Exchange Offer or in the information concerning such Exchange Offer (other than a change in Exchange Consideration) will depend upon the facts and circumstances of such change, including the relative materiality of the terms or information changes. With respect to any change in the Exchange Consideration, a minimum ten business-day extension period will be made to allow for adequate dissemination of such change. If any of the terms of the Exchange Offer, or the terms of the Participation Shares, are amended in a manner we determine to constitute a material change adversely affecting any Existing Holder, we will promptly disclose any such amendment in a manner reasonably calculated to inform such Existing Holders of such amendment and we will extend the Exchange Offer period for a time period which we, in our sole discretion, deem appropriate, depending upon the significance of the amendment and the manner of disclosure to holders of Existing Shares, if the Exchange Offer period would otherwise expire during such time period. Existing Holders who tender their Existing Shares for Early Settlement will receive the benefit of any amendment to the Exchange Offer, including but not limited to any increase in Exchange Consideration or change in the terms of Participation Shares, and will retain revocation rights until the Expiration Date, including any extension.

**Early Settlement**

Existing Holders may elect Early Settlement and receive the Exchange Consideration and Participation Shares, if applicable, by June 6, 2008 with respect to Existing Shares tendered prior to 5:00 p.m. (New York City time) on May 30, 2008 or by June 20, 2008 with respect to Existing Shares tendered prior to 5:00 p.m. (New York City time) on June 13, 2008. Such holders will retain the right to revoke such tenders prior to the Expiration Date by return to the Company of such Exchange Consideration and forfeiture of any Participation Shares received in addition to compliance with the other revocation procedures described herein. See "—Revocation Rights" below. You should consult your tax advisor regarding the tax consequences to you with respect to the revocation of any Existing Shares tendered and accepted for Early Settlement.

Existing Holders who desire to participate in Early Settlement should so indicate by marking the appropriate boxes in, and signing and dating, the accompanying Exchange Offer Subscription Agreement.

Existing Holders who have tendered Existing Shares for Early Settlement who wish to revoke such tenders must also return the Exchange Consideration received prior to the Expiration Date. Upon acceptance by the Company of a valid notice of revocation and return of the Exchange Consideration, the Citi Shares issued and corresponding to such revoked Existing Shares will be cancelled, any Participation Shares received pursuant to such Early Settlement will be rescinded and an equal number of Existing Shares of the applicable series will be re-credited to such holders' account on the books and records of the Company. The capital accounts of such holders will be re-established in the same amount as immediately prior to their previous tenders.

19

**Procedures for Tendering Existing Shares in the Exchange Offer**

All Exchange Offer Subscription Agreements that are validly delivered and not validly revoked will be given effect in accordance with the specifications therein. Tenders of Existing Shares may only be made with respect to all of the Existing Shares owned by such Existing Holder and such Existing Holder must also execute the Release. Elections with respect to receipt of Participation Shares shall apply to all Existing Shares tendered. In order to change an election after delivering a completed Exchange Offer Subscription Agreement, Existing Holders must properly revoke their prior tender by following the procedures described under "—Revocation Rights" (and, if applicable "—Early Settlement") and then resubmit a new Exchange Offer Subscription Agreement.

Existing Holders who desire to participate in the Exchange Offer should so indicate by marking the appropriate boxes in, and signing and dating, the accompanying Exchange Offer Subscription Agreement and Release and any other required attachments thereto, and delivering such items in accordance with the instructions contained herein and therein. Unless all of the appropriate boxes in the Exchange Offer Subscription Agreement are checked, the Existing Holder will not be deemed to have tendered his or her Existing Shares in the Exchange Offer or granted the Release.

The Exchange Offer Subscription Agreement must be executed in exactly the same manner as the name of the Existing Holder appears on the books and records of the Company. **If Existing Shares are held of record by two or more joint Existing Holders, all such Existing Holders must sign the Exchange Offer Subscription Agreement and Release.** If a signature is by a trustee, executor, administrator, guardian, attorney-in-fact, officer of a corporation or other Existing Holder acting in a fiduciary or representative capacity, such person should so indicate when signing. If an Existing Holder has Existing Shares registered in different names, separate Exchange Offer Subscription Agreements and corresponding Releases must be executed covering each form of registration. If an Exchange Offer Subscription Agreement is executed by a person other than the Existing Holder, then such person must have been authorized by proxy or in some other manner acceptable to the Company to execute the Exchange Offer Subscription Agreement with respect to the applicable Existing Shares on behalf of the Existing Holder, but the corresponding Release must be executed by the Existing Holder. If shares of one series of Existing Shares are held in a manner different than the shares of another series of Existing Shares, then an Exchange Offer Subscription Agreement and corresponding Release will be required for each series of Existing Shares.

An Existing Holder must complete, sign and date the Exchange Offer Subscription Agreement and Release (or photocopies thereof) and deliver such Exchange Offer Subscription Agreement and Release and any other required documentation by mail, first-class postage prepaid, hand delivery, overnight courier or by facsimile transmission (with an original to be delivered subsequently) to the appropriate address or number set forth in the Exchange Offer Subscription Agreement. Delivery of Exchange Offer Subscription Agreements and other applicable documentation should be made sufficiently in advance of the Expiration Date to assure that the Exchange Offer Subscription Agreements are received prior to the Expiration Date (and, in the case of facsimile transmission, that the original Exchange Offer Subscription Agreements are received by the appropriate party prior to 5:00 p.m., New York City time, on the second business day following the Expiration Date) or the applicable date of Early Settlement, as applicable.

The Company reserves the right to receive Exchange Offer Subscription Agreements by any other reasonable means or in any form that reasonably evidences the tender of Existing Shares and the granting of the Release.

All questions as to the validity, form, eligibility (including time of receipt), acceptance and revocations of tender of Existing Shares will be resolved by the Company, whose determination will be binding. The Company reserves the absolute right to reject any or all Exchange Offer Subscription Agreements and revocations thereof that are not in proper form or the acceptance of which could, in the opinion of the Company's counsel, be unlawful. The Company also reserves the right to waive any irregularities in connection with deliveries of Exchange Offer Subscription Agreements, which the Company may require to be cured within such time as the Company determines. Neither the Company, the Managing Member, the Investment Manager, the Administrator nor any other person shall have any duty to give notification of any such irregularities or waiver, nor shall any of them incur any liability for failure to give such notification. Deliveries of Exchange Offer Subscription Agreements or notices of revocation will not be deemed to have been made until such deliveries of Exchange Offer Subscription Agreements, which may include irregularities in how or when Exchange Offer Subscription Agreements are delivered. The Company's interpretation of the terms and conditions of the Exchange Offer (including this Confidential Memorandum and the accompanying Exchange Offer Subscription Agreement and the instructions hereto and thereto) will be final and binding on all parties.

**Acceptance of Existing Shares for Exchange; Delivery of Participation Shares and/or Exchange Consideration**

Subject to the limitations set forth herein, upon satisfaction or waiver of all of the conditions to the Exchange Offer, all Existing Shares properly tendered and not revoked will be accepted, and the Participation Shares, if applicable, will be issued and payment of the Exchange Consideration will be made promptly after acceptance of the Existing Shares, which, in the case of Existing Holders who elect Early Settlement and do not validly revoke such tenders, will be by May •, 2008, June 6, 2008 or June 20, 2008 with respect to shares tendered for Early Settlement prior to 5:00 p.m. on May •, 2008, May 30, 2008 or June 13, 2008, respectively, and for other Existing Shares, promptly after the Expiration Date. See "—Conditions to the Exchange Offer." For purposes of the Exchange Offer, Existing Shares shall be deemed to have been accepted as validly tendered for exchange when, as and if we have given oral or written notice thereof to the Investment Manager. For each Existing Share tendered for exchange by an Accredited Investor that elects to receive Participation Shares, such holder will receive one Participation Share and the Exchange Consideration. For each Existing Share tendered by an Existing Holder that is not an Accredited Investor or is an Accredited Investor who has not elected to receive Participation Shares, the holder will receive the Exchange Consideration. Exchange Consideration will be paid by wire transfer to the Smith Barney or Citi Private Bank account(s) in which the Existing Shares to be exchanged are held and Participation Shares, if applicable, will be credited to such account.

In all cases, issuances of Participation Shares for Existing Shares that are accepted for exchange pursuant to the Exchange Offer will be made only after timely receipt of a properly completed and duly executed Exchange Offer Subscription Agreement and all other required documents in accordance with the terms thereof.

If any tendered Existing Shares are not accepted for any reason set forth under "—Conditions to the Exchange Offer," such unaccepted or such unexchanged Existing Shares will be credited to the account of the applicable Existing Holder in the name of the Existing Holder of such Existing Shares on the books and records of the Company as promptly as practicable after the expiration or termination of the Exchange Offer with respect to the applicable series of Existing Shares.

**Revocation Rights**

Tenders of Existing Shares (including Existing Shares tendered for Early Settlement) may be revoked at any time prior to the Expiration Date.

For a revocation of a tender to be effective, a written notice of revocation (the form of which is attached as Annex A to the Exchange Offer Subscription Agreement) must be received by the appropriate party prior to the Expiration Date in accordance with the instructions set forth in the Exchange Offer Subscription Agreement. Any such notice of revocation must:

- specify the name of the person that tendered the Existing Shares to be revoked;

- state that the tender of all Existing Shares previously made are to be revoked (and to be effective all of such Existing Holder's Existing Shares (across all series) must be revoked);

- contain a statement that such Existing Holder is revoking its election to tender such Existing Shares;

- be signed by the holder in the same manner as the original signature on the Exchange Offer Subscription Agreement by which such Existing Shares were tendered, or be accompanied by documents of transfer, acceptable to the Investment Manager, to have the Administrator register the transfer of such Existing Shares in the name of the person revoking the tender; and

- specify the name in which such Existing Shares are registered, if different from the person who tendered such shares.

All questions as to the validity, form, eligibility and time of receipt of such notice will be determined by us, and our determination shall be final and binding on all parties. Any Existing Shares so revoked will be deemed not to have been validly tendered for exchange for purposes of the Exchange Offer and the corresponding Release shall be voided. Any Existing Shares that have been tendered for exchange but are not exchanged for any reason will be credited to an account in the name of the Existing Holder of such Existing Shares on the books and records of the Company for the Existing Shares as soon as practicable after revocation, rejection of tender or termination of the Exchange Offer with

21

respect to the Existing Holder. Properly revoked Existing Shares may be retendered by following the procedures described under "—Procedures for Tendering Existing Shares in the Exchange Offer" above at any time prior to the Expiration Date including execution of a new Release.

**Conditions to the Exchange Offer**

Notwithstanding any other provision of the Exchange Offer, or any extension of the Exchange Offer, we shall not be required to accept for exchange any Existing Shares, issue any Participation Shares or make any payment of the Exchange Consideration, and we may terminate or amend the Exchange Offer, if at any time prior to the consummation of the Exchange Offer, we determine, in our reasonable judgment, that any of the following conditions has not been satisfied, prior to or concurrently with such consummation of the Exchange Offer:

- the completion of the other components of the related transactions, including the closing of the offer and sale of the Citi Shares;

- our assets would not be treated as assets of any "employee benefit plan" as defined in and subject to ERISA or of any "plan" subject to Section 4975 of the Code none of the transactions contemplated under the Exchange Offer constitute or give rise to a non-exempt prohibited transaction as defined in Section 406 of ERISA or Section 4975(c) of the Code for any purpose of ERISA or Section 4975 of the Code.

- there shall not have occurred or be likely to occur any event affecting our business or financial affairs that would or might prohibit, prevent, restrict or delay consummation of the Exchange Offer and related transactions as a whole, or that will, or is reasonably likely to, impair the contemplated benefits to us of the Exchange Offer and related transactions as a whole or that might be material to the Existing Holders of a series of Existing Shares in deciding whether to accept the Exchange Offer; and

- there shall not have been any action taken or threatened, or any statute, rule, regulation, judgment, order, stay, decree or injunction promulgated, enacted, entered, enforced or deemed applicable to the Exchange Offer or related transactions or the exchange of Existing Shares or issuance of Participation Shares or payment of Exchange Consideration pursuant to the Exchange Offer, by or before any court or governmental regulatory or administrative agency or authority, tribunal, domestic or foreign, which (1) challenges the making of the Exchange Offer or the related transactions as a whole or might, directly or indirectly, prohibit, prevent, restrict or delay consummation of, or might otherwise adversely affect in any material manner, the Exchange Offer or the related transactions as a whole or (2) could materially adversely affect our business, condition (financial or otherwise), income, operations, properties, assets, liabilities or prospects, or materially impair the contemplated benefits of the Exchange Offer or the related transactions as a whole to us or that might be material to Existing Holders of a series of Existing Shares in deciding whether to accept such Exchange Offer.

The foregoing conditions are for our sole benefit and may be asserted by us regardless of the circumstances giving rise to any such condition (including any action or inaction by us) or may be waived by us, in whole or in part, at any time and from time to time, in our sole discretion. The failure by us at any time to exercise any of the foregoing rights shall not be deemed a waiver of any such right and each such right shall be deemed an ongoing right which may be asserted at any time and from time to time by us. If we terminate or revoke the Exchange Offer, Participation Shares issued pursuant to Early Settlement will be rescinded and an equal number of Existing Shares will be re-credited to each applicable Existing Holder's account on the books and records of the Company, and each such Existing Holder will be required to return all Exchange Consideration previously received. The capital accounts of such holders will be re-established in the same amount as immediately prior to their previous tenders.

**Fees and Expenses**

We will pay the aggregate Exchange Consideration to those Existing Holders who validly tender and do not revoke their Existing Shares prior to the Exchange Date with the proceeds of the offer and sale of the Citi Shares.

Additionally, we will pay all transfer taxes, if any, applicable to the exchange of Existing Shares pursuant to the Exchange Offer. Existing Holders of Existing Shares of any series will not be required to pay a redemption fee on the exchange of Existing Shares pursuant to the Exchange Offer. If, however, Participation Shares or Existing Shares of any series are to be issued in the name of any person other than the registered holder of the Existing Shares tendered for principal amounts not tendered or accepted for exchange or if tendered Existing Shares are registered in the name of any

22

person other than the person signing the Exchange Offer Subscription Agreement, or if a transfer tax is imposed for any reason other than the exchange of Existing Shares pursuant to the Exchange Offer, then the amount of any such transfer taxes imposed on the registered holder or any other persons will be payable by the tendering holder. If satisfactory evidence of payment of such taxes or exemption therefrom is not submitted with the Exchange Offer Subscription Agreement, the amount of such transfer taxes will be billed directly to such tendering holder.

## RELEASE

In connection with this Exchange Offer, participants tendering Existing Shares of any series will be required to execute and deliver the Release. The Release releases and discharges all claims against the Company, the Investment Manager, our advisory board, the selling broker for the Existing Shares, Citi, the Managing Member, any of our past or present sub-advisors, our auditors and tax preparers, the Administrator and past and present counsel (Cayman and U.S.) to such parties (such parties, and their respective affiliates (including but not limited to any other Falcon Fund and Falcon Strategies LLC) and the employees, officers, directors, partners, counsel and agents of each of the aforesaid parties, are collectively referred to herein as the "Releasees") from all actions or claims directly or indirectly arising from, relating to or in any manner connected with (i) any investment by such participant in the Company, including the acquisition or disposition of any securities of the Company, (ii) such participant's acceptance of the terms of this Exchange Offer, (iii) the operation, management, supervision, or investment of any of the assets of the Company by any of the Releasees or (iv) any actions taken or omitted to be taken by any of the Releasees in connection with or otherwise relating to or affecting in any way the Company or the acquisition, ownership or disposition of Existing Shares of any series, whether those claims arise under United States federal or state securities laws, arbitration agreements or otherwise and regardless of whether those claims are known or unknown at the time of tender pursuant to the Exchange Offer. No Participation Shares will be issued in exchange for Existing Shares, and no Exchange Consideration will be paid, unless a properly executed Release has been delivered by the tendering Existing Holder in accordance with the Exchange Offer Subscription Agreement.

## CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES

**TO ENSURE COMPLIANCE WITH TREASURY DEPARTMENT CIRCULAR 230, HOLDERS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF FEDERAL TAX ISSUES IN THIS MEMORANDUM IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON, BY HOLDERS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON HOLDERS UNDER THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS BEING USED IN CONNECTION WITH THE PROMOTION OR MARKETING (WITHIN THE MEANING OF CIRCULAR 230) BY THE COMPANY OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

The following summary describes the material U.S. federal income tax consequences to the current Existing Holders who are U.S. Holders of an exchange of Existing Shares for the Participation Shares, if eligible and so elected, and the Exchange Consideration pursuant to the Exchange Offer. This summary is based on current provisions of the Code, applicable regulations of the U.S. Department of the Treasury ("Treasury Regulations"), judicial authority and rulings and pronouncements of the IRS as in effect on the date hereof, all of which are subject to change, possibly with retroactive effect. There can be no assurance that the IRS will not take views contrary to those summarized below, and no ruling from the IRS has been or will be sought by us.

This discussion deals only with Existing Holders who hold their shares as capital assets. This discussion does not deal with all tax consequences that may be relevant to all categories of Existing Holders (such as dealers in securities, foreign currencies, or commodities, traders in securities that elect to mark their holdings to market, financial institutions, regulated investment companies, real estate investment trusts, holders whose functional currency is not the U.S. dollar, insurance companies, tax-exempt organizations, non-U.S. persons, holders with shares received through the exercise of qualified incentive stock options, holders who may be subject to the alternative minimum tax or personal holding company provisions of the Code, or holders who hold shares as part of a hedging, integrated, conversion or constructive sale transaction or as a position in a straddle).

23

This discussion does not address the state, local or foreign tax consequences of participating in the Exchange Offer. Further, the U.S. federal income tax treatment of an Existing Holder participating in the Exchange Offer depends in some instances on determinations of fact and interpretations of complex provisions of U.S. federal income tax law for which no clear precedent or authority may be available. Accordingly, you should consult your tax advisor regarding the U.S. federal, state, local and foreign tax consequences of participating in or abstaining from the Exchange Offer in light of your specific tax situation.

For purposes of this section, a "U.S. Holder" is, as determined for U.S. federal income tax purposes, (i) a citizen or individual resident of the United States of America, (ii) a corporation that is created or organized in or under the laws of the United States of America, any state thereof or the District of Columbia, (iii) an estate, the income of which is includible in gross income for U.S. federal income tax purposes regardless of its source or (iv) a trust if, in general, a court within the United States of America is able to exercise primary supervision over its administration and one or more U.S. persons have the authority to control all substantial decisions of such trust, or if it has a valid election in effect under applicable Treasury Regulations to be treated as a "U.S. person."

In the case of an Existing Holder that is treated as a partnership for U.S. federal income tax purposes, the U.S. federal income tax treatment of a partner therein will generally depend on the status of the partner and upon the activities of the partnership. Partners in partnerships considering participation in the Exchange Offer should consult their tax advisors.

*Non-Participation in the Exchange Offer.*

Existing Holders that do not participate in the Exchange Offer will not incur any U.S. federal income tax liability as a result of the consummation of the Exchange Offer.

*Tax Consequences to Existing Holders of Participation in the Exchange Offer.*

*Electing to Receive the Exchange Consideration and the Participation Shares.* Although there is no direct authority addressing an exchange such as the Exchange Offer, the receipt of the Exchange Consideration and the Participation Shares in exchange for Existing Shares pursuant to the Exchange Offer is expected to be subject to the "disguised sale" rules of the Code. As a result, the transaction is expected to be a taxable exchange with respect to the Existing Shares exchanged for Exchange Consideration, and a non-taxable exchange with respect to the Existing Shares exchanged for Participation Shares. This means that your basis in your Existing Shares should be allocated between the Existing Shares deemed surrendered for the Exchange Consideration (the "Deemed Sale Shares") and the Existing Shares deemed surrendered for the Participation Shares (the "Deemed Exchange Shares"), based on the relative fair market value of the Exchange Consideration and the Participation Shares as of the date of the Exchange Offer. The remainder of this discussion assumes such treatment, except as expressly noted to the contrary,

You generally will recognize gain or loss on a sale of your Deemed Sale Shares equal to the difference, if any, between (i) your "amount realized" on the sale and (ii) your adjusted tax basis in the Deemed Sale Shares surrendered in the Exchange Offer. Your adjusted basis in your Deemed Sale Shares generally will be adjusted for items of income, gain, deduction or loss allocated, for tax purposes, to you by the Company for periods prior to the Exchange Offer with respect to the Deemed Sale Shares and will include your allocable share of the Company's nonrecourse borrowings (as defined for U.S. federal income tax purposes), if any, with respect to the Deemed Sale Shares. The "amount realized" with respect to your Deemed Sale Shares will be equal to the sum of the Exchange Consideration received pursuant to the Exchange Offer plus your allocable share of the Company's nonrecourse borrowings (as defined for U.S. federal income tax purposes), if any, with respect to the Deemed Sale Shares.

The gain or loss recognized by you on the disposition of the Deemed Sale Shares pursuant to the Exchange Offer generally will be treated as a long-term capital gain or loss if you held the Deemed Sale Shares for more than one year. Long-term capital gains recognized by individuals and certain other noncorporate taxpayers generally will be subject to a maximum U.S. federal income tax rate of 15%. Notwithstanding your holding period in your Deemed Sale Shares, you will recognize ordinary income to the extent your allocable share of the Company's "unrealized receivables" or items of Company inventory exceeds your basis in such unrealized receivables or items of Company inventory, as determined pursuant to Treasury Regulations. For these purposes, accrued but untaxed market discount, if any, on securities held by

the Company will be treated as an unrealized receivable. You should consult your tax advisor regarding the length of your holding period and the treatment of any gain or loss as long-term or short-term capital gain or loss.

Certain limitations apply to the use of capital losses. If you are an individual taxpayer, any capital loss recognized on your Deemed Sale Shares generally will be deductible only to the extent of your capital gains for the taxable year plus up to $3,000 of ordinary income ($1,500 in the case of a married individual filing a separate return). Excess capital losses may be carried forward by individuals indefinitely. If you are a corporation, such capital loss generally will be deductible only to the extent of your capital gains for the taxable year. Corporations may carry capital losses back three years and forward five years. You should consult your tax advisor regarding your ability to deduct any capital loss incurred in connection with the Exchange Offer.

Your initial basis in the Participation Shares should equal your adjusted basis in the Deemed Exchange Shares. Your holding period in the Participation Shares should include your holding period in the Deemed Exchange Shares. Your basis in the Participation Shares will be adjusted by your allocable share, if any, of the Company's items of income, gain, loss, deduction or credit. Future distributions on, or disposition proceeds in respect of, the Participation Shares in excess of your adjusted basis will be taxable as gain from the sale or exchange of such Participation Shares and will be long-term capital gain or loss if your holding period in the Participation Shares exceeds one year.

*Alternative Characterization of the Exchange Offer with Respect to the Participation Shares.* You should be aware that the proper U.S. federal income tax treatment of, and the consequences arising from, the receipt of the Participation Shares is subject to multiple potential characterizations under current law, including for example, treatment of the Participation Shares as a contractual right calling for a contingent payment to which Section 483 of the Code might apply and in which case the exchange would be a taxable exchange in its entirety and a portion of any gain recognized in respect of the Participation Shares may be treated as ordinary income. There can be no assurance that the IRS will not assert that another characterization properly applies to the receipt of the Participation Shares. Certain of such characterizations could, if asserted successfully by the IRS, adversely affect the U.S. federal income tax consequences arising from the receipt of Participation Shares in the Exchange Offer. You are urged to consult your tax advisors regarding the consequences to you arising from the election to receive of Participation Shares in the Exchange Offer, particularly as regards the various alternative characterizations.

*Electing to Receive Only the Exchange Consideration.* If you elect to receive only the Exchange Consideration in exchange for your Existing Shares, you will be treated as having sold your Existing Shares for the Exchange Consideration in in a fully taxable transaction. You generally will recognize gain or loss on the sale equal to the difference, if any, between (i) your "amount realized" on the sale and (ii) your adjusted tax basis in your Existing Shares. Your adjusted basis in your Existing Shares generally will be adjusted for items of income, gain, deduction or loss allocated, for tax purposes, to you by the Company for periods prior to the Exchange Offer with respect to the Existing Shares and will include your allocable share of the Company's nonrecourse borrowings (as defined for U.S. federal income tax purposes), if any, with respect to the Existing Shares. The "amount realized" with respect to your Existing Shares will be equal to the sum of the Exchange Consideration received pursuant to the Exchange Offer plus your allocable share of the Company's nonrecourse borrowings (as defined for U.S. federal income tax purposes), if any, with respect to the Existing Shares.

The gain or loss recognized by you generally will be treated as a long-term capital gain or loss if you held the Existing Shares for more than one year. Long-term capital gains recognized by individuals and certain other noncorporate taxpayers generally will be subject to a maximum U.S. federal income tax rate of 15%. Notwithstanding your holding period in your Existing Shares, you will recognize ordinary income to the extent your allocable share of the Company's "unrealized receivables" or items of Company inventory exceeds your basis in such unrealized receivables or items of Company inventory, as determined pursuant to Treasury Regulations. For these purposes, accrued but untaxed market discount, if any, on securities held by the Company will be treated as an unrealized receivable.

Certain limitations apply to the use of capital losses. If you are an individual taxpayer, any capital loss recognized on a sale of your Existing Shares generally will be deductible only to the extent of your capital gains for the taxable year plus up to $3,000 of ordinary income ($1,500 in the case of a married individual filing a separate return). Excess capital losses may be carried forward by individuals indefinitely. If you are a corporation, such capital loss generally will be deductible only to the extent of your capital gains for the taxable year. Corporations may carry capital losses back three years and forward five years. You should consult your tax advisor regarding your ability to deduct any capital loss incurred in connection with the Exchange Offer. You should also consult your tax advisor regarding the length of your holding period and the treatment of any gain or loss as long-term or short-term capital gain or loss.

25

*Release and Assignment of Claims.* If you participate in the Exchange Offer, a portion of the Exchange Consideration paid to you may be deemed a payment for your release and assignment of claims. The proper treatment for U.S. federal income tax purposes of your receipt of any deemed payments for your release and assignment of claims is uncertain. No opinion or assurance can be given that the IRS will not challenge the treatment of any deemed payments for your release and assignment of claims as part of the consideration for surrender of the Existing Shares, and assert that such amount should be treated as an ordinary income payment in exchange for your release and/or assignment of current and future claims. You should consult your tax advisor regarding the tax consequences to you with respect to your right to, and your receipt of, any deemed payments for your release and assignment of claims.

**Tax Shelter Regulations.**

The IRS has issued final Regulations that may require the Company or its Existing Holders to report their direct or indirect participation in certain "reportable transactions" by filing IRS Form 8886 ("Reportable Transaction Disclosure Statement").

A "reportable transaction" includes a transaction that results in a loss claimed under Section 165 of the Code by a taxpayer (computed without taking into account offsetting income or gain items, and without regard to limitations on its deductibility) in excess of the thresholds described below, unless the transaction has been exempted from reporting by the IRS. Your participation in the Exchange Offer may be considered participation in such a "reportable transaction" and require you to file a Reportable Transaction Disclosure Statement if you recognize a loss with respect to the Deemed Sale Shares in excess of certain thresholds (currently, at least $2 million in any single taxable year or $4 million for the taxable year the Exchange Offer is entered into and the five succeeding taxable years for Existing Holders that are that are individuals, S corporations or trust, and at least $10 million in any single taxable year or $20 million for the taxable year Exchange Offer is entered into and the five succeeding taxable years for Existing Holders that are corporations).

**Information Reporting and Backup Withholding.**

U.S. Holders participating in the Exchange Offer may be subject to information reporting and backup withholding on any cash payments received by them in the Exchange Offer. To prevent the possible application of U.S. federal back-up withholding tax (currently, 28%) with respect to the payment of the Exchange Consideration, U.S. Holders are generally required to provide us a completed Substitute IRS Form W-9, included with the letter of transmittal. Back-up withholding is not an additional tax. Any amounts withheld under the back-up withholding rules may be refunded or credited against any such holder's U.S. federal income tax liability, if any, provided that the required information is furnished to the IRS.

**State and Local Withholding and Disclosure.**

We may be required under state or local tax laws to deduct and withhold a portion of the Exchange Consideration with respect to U.S. Holders participating in the Exchange Offer. U.S. Holders should consult their tax advisors concerning whether any state or local withholding would be required on an exchange of your Existing Shares for Exchange Consideration and Participation Shares, if eligible and so elected, and whether such amounts may be available to such holders as a credit on state or local tax returns.

In addition, some jurisdictions may impose reporting requirements similar to those described above in "—Tax Shelter Regulations." You are urged to consult your tax advisor with respect to any applicable state or local law filing or disclosure requirement with respect to your participation in the Exchange Offer.

**THE FOREGOING SUMMARY IS INCLUDED HEREIN SOLELY FOR GENERAL INFORMATION AND DOES NOT CONSTITUTE TAX ADVICE. YOU SHOULD CONSULT YOUR TAX ADVISOR AS TO THE SPECIFIC CONSEQUENCES TO YOU OF THE EXCHANGE OFFER INCLUDING THE APPLICABILITY OF STATE, LOCAL, OR FOREIGN INCOME OR OTHER TAX LAWS.**

## ACKNOWLEDGEMENTS AND CONSENTS

Because the following restrictions will apply to Participation Shares, holders of Existing Shares who exchange their Existing Shares for Participation Shares in the Exchange Offer are advised to consult legal counsel prior to making any offer, resale, pledge or transfer of the Participation Shares.

The Participation Shares to be issued in the Exchange Offer have not been registered under the Securities Act or any state or non-U.S. securities laws and may not be offered or sold within the United States or to, or for the account or benefit of, U.S. persons except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act and any applicable state and foreign securities laws. Accordingly, the right to receive Participation Shares, is only for those individuals and entities that are "accredited investors" (as defined in Rule 501(a) under the Securities Act).

**By delivering an Exchange Offer Subscription Agreement and receiving Participation Shares, if eligible and so electing, and the Exchange Consideration in the Exchange Offer, each such Existing Holder participating in the Exchange Offer will be deemed to:**

1.    Represent that it is acquiring the Participation Shares for its own account or an account with respect to which it exercises sole investment discretion and that it and any such account is an Accredited Investor;

2.    Acknowledge that the Participation Shares may not be directly or indirectly transferred, resold or otherwise hypothecated without the prior written consent of the Investment Manager (which may grant or withhold such consent in its sole discretion);

3.    Acknowledge that the Participation Shares issued in the Exchange Offer have not been, nor will they be, registered under the Securities Act or with any securities regulatory authority of any jurisdiction and that such Participation Shares may not be offered or sold within the United States or to, or for the account or benefit of, U.S. persons except as set forth below;

4.    Agree that it will deliver to each person to whom it transfers any of the Participation Shares notice of any restrictions on transfer of such Participation Shares; and

5.    Understand that, unless registered under the Securities Act, any Participation Shares issued in the Exchange Offer in certificated form will bear a legend to the effect that such shares may only be transferred upon prior written consent of the Company or Investment Manager and in compliance with applicable federal and state securities laws. Participation Shares issued in book entry form will be subject to appropriate stop orders limiting transfer.

**All Existing Holders who deliver an Exchange Offer Subscription Agreement and receive the Exchange Consideration in the Exchange Offer, whether or not eligible or electing to receive Participation Shares, will be deemed to:**

1.    Represent that it has such knowledge and experience in financial and business matters, that it is capable of evaluating the merits and risks of participating in the Exchange Offer;

2.    Represent that it is tendering all of its Existing Shares and, upon the completion of the Exchange Offer and the exchange of its Existing Shares for Participation Shares, if applicable, the only shares or other equity interests of the Company owned by it will be such Participation Shares and otherwise will own no equity interests of the Company;

3.    Represent that it is a sophisticated investor and understands, fully appreciates and is willing to assume any and all risks associated with and any and all potential negative or adverse consequences of its participation in the Exchange Offer including, but not limited to, the risks described in this Confidential Memorandum;

4.    Grant the Release; and

5.    Acknowledge that the Company, the Investment Manager and others will rely upon the truth and accuracy of the foregoing acknowledgments, representations and agreements, and agree that if any of the acknowledgments,

27

representations or warranties deemed to have been made by it by its exchange of Existing Shares are no longer accurate, it shall promptly notify the Company and the Investment Manager. If it is acquiring any Participation Shares as a fiduciary or agent for one or more investor accounts, it represents that it has sole investment discretion with respect to each such account and it has full power to make the foregoing acknowledgments, representations and agreements on behalf of each such account.

## COUNSEL

The Investment Manager has retained Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden") to serve as counsel to the Investment Manager with respect to certain matters relating to the Exchange Offer. Skadden may act as counsel to the Investment Manager in connection with investments made by the Company or the day to day operation of the Company. Skadden does not represent and has not represented the Company, the Funds or their respective members in organizing the Company or the Funds, negotiating their business terms or in connection with this Exchange Offer. It is not anticipated that, in connection with the general operation of the Company or the Funds, the Company or the Funds will engage separate counsel.

Skadden's engagement by the Investment Manager in respect of the Company is limited to the specific matters as to which it is consulted by the Investment Manager and, therefore, there may exist facts or circumstances which could have a bearing on the Company's or the Investment Manager's financial condition or operations with respect to which Skadden has not been consulted and for which Skadden expressly disclaims any responsibility. Skadden is not representing any Existing Holder in connection with the Exchange Offer.

The Investment Manager may remove Skadden at any time without the consent of, or notice to, the holders.

Confidential Tender and Exchange Offer Memorandum

# Falcon Strategies Two LLC
## PORTFOLIO A

Offers Existing Holders
a Cash Payment
and
Offers Existing Holders that are Accredited Investors
a Cash Payment and Newly Created Participation Shares
in Exchange for any and all
Existing Shares of Limited Liability Company Interest

———————————

**Copies of the Exchange Offer Subscription Agreement will be accepted by the Company pursuant to the instructions set forth therein.  Questions or requests regarding the Exchange Offer may be directed to the Investment Manager at the address set forth below:**

## Citigroup Alternative Investments LLC

731 Lexington Avenue
27th Floor
New York, NY  10022
Attn:  Investor Services
Telephone: (212) 783-1330

———————————

May 8, 2008

**EXHIBIT I**

# Falcon Strategies Two LLC
## Portfolio A
## Exchange Offer Subscription Agreement
## (U.S. Investors)

**INSTRUCTIONS:** All Subscribers should read the entire document as well as the accompanying Confidential Tender and Exchange Offer Memorandum. **All Subscribers must deliver a duly executed Release, included as Appendix A hereto, and a Substitute Form W-9, included as Appendix B hereto.**

Executed exchange offer subscription agreements should be sent to:

| | |
|---|---|
| **For Citi Private Bank clients:** | **For Smith Barney clients:** |
| Falcon Strategies Two LLC | Falcon Strategies Two LLC |
| Portfolio A | Portfolio A |
| c/o J.C. Lyons | c/o CAI Investing Services Onshore |
| Americas Investment Center | 731 Lexington Avenue |
| Two Court Square, 5th Floor | 27th Floor |
| Long Island City, NY 11120 | New York, NY 10022 |
| Facsimile: (347) 750-1717 | Attention: Lindsay Halas |
| | Facsimile: (917) 463-0136 |

The undersigned investor ("Subscriber") hereby tenders all shares of each series of limited liability company interest (the "Existing Shares") of Falcon Strategies Two LLC, a Delaware limited liability company (Portfolio A of which is referred to herein as the "Company"), held by Subscriber in exchange for a one-time cash payment of $0.45 per share (the "Exchange Consideration") as described herein and, if the undersigned is an Accredited Investor (as defined herein) and makes the applicable election on the signature page hereof, an equivalent number of shares of new limited liability company participation interest (the "Participation Shares") of the Company.

---

| Subscriber's<br>Name: | Name in which Existing Shares are<br>registered, if not Subscriber: |
|---|---|

Subscriber's Citi Private Bank or Smith Barney Account
Number(s) in which Subscriber's Existing Shares are Held
("Account(s)"):

**Investor Type:** ☐ Individual   ☐ Corporation   ☐ Trust   ☐ Partnership   ☐ LLC

**Joint (if applicable):** ☐ Rights of Survivorship   ☐ Tenants in Common   ☐ Community Property

---

Subject to the terms and conditions of this Exchange Offer Subscription Agreement (this "Agreement"), the Company's Limited Liability Company Agreement, as amended from time to time (the "LLC Agreement"), and the Company's Confidential Tender and Exchange Offer Memorandum dated May 8, 2008 (the "Confidential Memorandum"), including but not limited to the revocation rights contained therein, Subscriber's obligation to exchange all of his, her or its Existing Shares of any series for the Exchange Consideration and Participation Shares, to the extent so elected by participating Accredited Investors, shall be complete upon the due execution and delivery of this Agreement and all appendices hereto and acceptance thereof by the Company.

Subscriber hereby acknowledges and agrees that he, she or it wishes to participate in the exchange of all of his, her or its Existing Shares of any series for the Exchange Consideration of $0.45 per share and, if eligible and so electing,

1

the Participation Shares as described in the Confidential Memorandum (the "Exchange Offer") and authorizes Citibank N.A. or its affiliates to custodize any Participation Shares in Subscriber's Account(s). Subscriber hereby acknowledges that the information provided in this Agreement shall be provided to Citigroup Alternative Investments LLC (the "Investment Manager") and U.S. Bank, National Association (the "Administrator"). See "Summary—The Participation Shares" in the Confidential Memorandum for more information regarding the Participation Shares.

**SUBSCRIBERS WHO WISH TO TENDER ANY EXISTING SHARES MUST TENDER ALL EXISTING SHARES OF ANY SERIES SO HELD BY THEM IN ORDER TO PARTICIPATE IN THE EXCHANGE OFFER.**

In order to participate in the Exchange Offer, a properly completed and duly executed copy of this Agreement and all appendices hereto must be received by the appropriate party at the address or facsimile number set forth above no later than 5:00 p.m., New York City time, on June 30, 2008, unless extended with respect to all series of Existing Shares (the "Expiration Date"). The Company may extend the Exchange Offer with respect to Existing Shares of all series, in its sole discretion, for any purpose including, without limitation, to permit the satisfaction or waiver of all conditions to the Exchange Offer. Existing Holders who properly tender their Existing Shares prior to 5:00 p.m. on May 30, 2008 or subsequent to 5:00 p.m. on May 30, 2008 but prior to 5:00 p.m. on June 13, 2008 may elect to receive the Exchange Consideration and Participation Shares, if applicable, by June 6, 2008 or June 20, 2008, respectively (in each case, "Early Settlement"), but will retain the right to revoke such tenders prior to the Expiration Date by return to the Company of the Exchange Consideration and forfeiture of any Participation Shares received in addition to compliance with the other revocation procedures described herein. IN ORDER TO VALIDLY REVOKE A TENDER OF EXISTING SHARES TENDERED FOR EARLY SETTLEMENT, AN EXISTING HOLDER MUST RETURN ANY EXCHANGE CONSIDERATION THAT HAS BEEN WITHDRAWN FROM SUCH SUBSCRIBER'S ACCOUNT(S) AND AUTHORIZE THE COMPANY TO DEBIT SUCH ACCOUNT(S) AN AMOUNT EQUAL TO SUCH EXCHANGE CONSIDERATION. In the event that a tender pursuant to Early Settlement is revoked, upon return of the Exchange Consideration, any Participation Shares received pursuant to such Early Settlement will be rescinded and an equal number of Existing Shares will be re-credited to such holders' accounts on the books and records of the Company upon acceptance by the Company of a valid notice of revocation. The capital accounts of such holders will be re-established in the same amount as immediately prior to their previous tenders. See "The Exchange Offer—Early Settlement" for more information.

The Company reserves the right to amend or terminate the terms of the Exchange Offer or the terms of the Participation Shares in its sole discretion. Existing Holders who tender their Existing Shares for Early Settlement will receive the benefit of any amendment to the Exchange Offer, including but not limited to any increase in Exchange Consideration or change in the terms of Participation Shares and will retain revocation rights until the Expiration Date, including any extension. If the Company terminates or withdraws this Exchange Offer, any Participation Shares received pursuant to Early Settlement will be rescinded and an equal number of Existing Shares will be re-credited to each such holder and each such holder will be required to return any Exchange Consideration received in Early Settlement. The capital accounts of such holders will be re-established in the same amount as immediately prior to their previous tenders. See "The Exchange Offer" in the Confidential Memorandum for more information. Notwithstanding anything to the contrary contained herein or in the Confidential Memorandum, certain Citi Affiliated Persons (as defined in the Confidential Memorandum) are expected to be excluded from participating in the Exchange Offer. Such exclusion from participation should not be construed as a recommendation or view on whether or not Existing Holders should participate in the Exchange Offer but rather an effort to minimize perceived conflicts of interest associated with affiliates of the Company participating in the Exchange Offer. None of the Company, the Investment Manager, Citi, the Managing Member (as defined herein) or any of their respective affiliates is making any recommendation regarding whether Existing Holders should participate in the Exchange Offer; accordingly, Existing Holders must make their own determination whether to participate in the Exchange Offer.

**SUBSCRIPTIONS CANNOT BE ACCEPTED AND THE EXCHANGE OF EXISTING SHARES CANNOT BE COMPLETED UNLESS AND UNTIL A PROPERLY EXECUTED AND COMPLETED COPY OF**

2

**THIS AGREEMENT AND ALL APPENDICES HERETO ARE RECEIVED BY THE APPROPRIATE PARTY SET FORTH ABOVE PRIOR TO THE EXPIRATION DATE, OR, IN THE CASE OF EARLY SETTLEMENT, PRIOR TO 5:00 P.M., NEW YORK CITY TIME, ON MAY 30, 2008 OR JUNE 13, 2008, AS APPLICABLE.**

Tenders of Existing Shares (including Existing Shares tendered for Early Settlement) may be revoked at any time prior to the Expiration Date by delivering to the appropriate party a written notice of revocation in the form attached hereto as Annex A. Existing Holders who revoke such tenders must do so with respect to all Existing Shares of any series so held by them. Existing Holders who have tendered Existing Shares for Early Settlement and wish to revoke such tenders must also return all Exchange Consideration and forfeit any Participation Shares received prior to the Expiration Date in order to effect a valid revocation. See "The Exchange Offer—Revocation Rights" in the Confidential Memorandum for more information.

Subject to the terms, conditions and exceptions set forth herein and in the Confidential Memorandum, the Company agrees to make a one-time payment of the Exchange Consideration to each Subscriber who timely delivers a properly completed Agreement, including all appendices, that is not subsequently validly revoked and that is accepted by the Company. Existing Holders who are Accredited Investors may also elect to receive, in addition to the Exchange Consideration, one Participation Share for each Existing Share so tendered. For purposes of the Exchange Offer, Existing Shares shall be deemed to have been accepted as validly tendered for exchange when, as and if we have given oral or written notice thereof to the Investment Manager. The Exchange Consideration will be paid as stated under "The Exchange Offer" in the Confidential Memorandum. Existing Holders tendering Existing Shares of any series will not be required to pay brokerage commissions, redemption fees, other fees or, subject to the instructions contained herein, transfer taxes with respect to the issue of the Participation Shares, if applicable, and receipt of the Exchange Consideration in exchange for the Existing Shares tendered pursuant to the Exchange Offer.

**NO EXCHANGE CONSIDERATION WILL BE PAID TO A SUBSCRIBER WHOSE PROPERLY COMPLETED AGREEMENT, INCLUDING ALL APPENDICES HERETO, IS NOT RECEIVED BY THE APPROPRIATE PARTY SET FORTH ABOVE PRIOR TO THE EXPIRATION DATE AND SO ACCEPTED BY THE COMPANY.**

A Subscriber must complete, sign and date this Agreement (or photocopy hereof) and deliver this Agreement and complete and duly executed Appendices A and B hereto to the appropriate party set forth above by mail, first-class postage prepaid, hand delivery, overnight courier or by facsimile transmission (with an original to be delivered subsequently as set forth below) at the address or facsimile number set forth above. Delivery of this Agreement and all appendices hereto and any other applicable documentation should be made sufficiently in advance of the Expiration Date to assure that such documentation is received prior to the Expiration Date (and, in the case of facsimile transmission, that the original Agreement, including all appendices, is received by the appropriate party prior to 5:00 p.m., New York City time, on the second business day following the Expiration Date).

**THE METHOD OF DELIVERY OF ALL DOCUMENTS IS AT THE ELECTION AND RISK OF THE SUBSCRIBER.**

Notwithstanding any other provision of the Exchange Offer or this Agreement, or any amendment thereto or hereto, or any extension of the Exchange Offer, the Company shall not be required to accept for exchange any Existing Shares, issue any Participation Shares or pay any Exchange Consideration and the Company may terminate or amend the Exchange Offer if, at any time prior to the consummation of the Exchange Offer, it determines, in its reasonable judgment, that any of the following conditions has not been satisfied, prior to or concurrently with such consummation of the Exchange Offer:

- the completion of the other components of the related transactions, including the closing of the offer and sale of the Citi Shares;

3

- the Company's assets would not be treated as assets of any "employee benefit plan" as defined in and subject to the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), or of any "plan" subject to Section 4975 of the Internal Revenue Code of 1986, as amended (the "Code"), none of the transactions contemplated under the Exchange Offer constitute or give rise to a non-exempt prohibited transaction as defined in Section 406 of ERISA or Section 4975(c) of the Code for any purpose of ERISA or Section 4975 of the Code (See "Certain ERISA Considerations" in the Confidential Memorandum);

- there shall not have occurred or be likely to occur any event affecting the Company's business or financial affairs that would or might prohibit, prevent, restrict or delay consummation of the Exchange Offer and related transactions as a whole, or that will, or is reasonably likely to, impair the contemplated benefits to the Company of the Exchange Offer and related transactions as a whole or that might be material to the Existing Holders of a series of Existing Shares in deciding whether to accept the Exchange Offer; and

- there shall not have been any action taken or threatened, or any statute, rule, regulation, judgment, order, stay, decree or injunction promulgated, enacted, entered, enforced or deemed applicable to the Exchange Offer or related transactions or the exchange of Existing Shares or issuance of Participation Shares or payment of Exchange Consideration pursuant to the Exchange Offer, by or before any court or governmental regulatory or administrative agency or authority, tribunal, domestic or foreign, which (1) challenges the making of the Exchange Offer or the related transactions as a whole or might, directly or indirectly, prohibit, prevent, restrict or delay consummation of, or might otherwise adversely affect in any material manner, the Exchange Offer or the related transactions as a whole or (2) could materially adversely affect the Company's business, condition (financial or otherwise), income, operations, properties, assets, liabilities or prospects, or materially impair the contemplated benefits of the Exchange Offer or the related transactions as a whole to the Company or that might be material to Existing Holders of a series of Existing Shares in deciding whether to accept such Exchange Offer.

The foregoing conditions are for the Company's sole benefit and may be asserted by it regardless of the circumstances giving rise to any such condition (including any action or inaction by the Company) or may be waived by the Company, in whole or in part, at any time and from time to time, in its sole discretion. The failure by the Company at any time to exercise any of the foregoing rights shall not be deemed a waiver of any such right and each such right shall be deemed an ongoing right which may be asserted at any time and from time to time by the Company. Should the Company reject or rescind the acceptance of this Agreement, Subscriber's Existing Shares will remain unaffected. In such event, however, Subscriber will be required to return any Exchange Consideration received pursuant to Early Settlement and, upon return of the Exchange Consideration, any Participation Shares received pursuant to such Early Settlement will be rescinded and an equal number of Existing Shares will be re-credited to such holders' accounts on the books and records of the Company upon acceptance by the Company of a valid notice of revocation. The capital accounts of such holders will be re-established in the same amount as immediately prior to their previous tenders. See "The Exchange Offer—Conditions to the Exchange Offer" in the Confidential Memorandum,

Subscriber hereby acknowledges and agrees that Participation Shares may be acquired only by those persons who are "accredited investors," as defined in Rule 501(a) of Regulation D under the Securities Act of 1933, as amended (the "Securities Act"), and set forth on Annex B hereto ("Accredited Investors"). Holders of Existing Shares who do not satisfy the requirements to be an Accredited Investor may still elect to participate in the Exchange Offer and receive the Exchange Consideration, but will not have the right to elect to receive any Participation Shares. Such holders should check the appropriate box on the signature page hereto. All other terms and requirements of the Exchange Offer will remain the same with respect to such holders.

All questions as to the validity, form, eligibility (including time of receipt), acceptance and revocations of tender of Existing Shares will be resolved by the Company, whose determinations will be binding. The Company reserves the absolute right to reject any or all Agreements and revocations that are not in proper form or the acceptance of which could, in the opinion of the Company's counsel, be unlawful. The Company also reserves the right to waive any irregularities in connection with deliveries of Agreements, which the Company may require to be cured within such time as the Company determines. Neither the Company, the Investment Manager, the Administrator nor any other

4

person shall have any duty to give notification of any such irregularities or waiver, nor shall any of them incur any liability for failure to give such notification. Deliveries of Agreements or notices of revocation will not be deemed to have been made until such irregularities have been cured or waived. The Company, in its sole discretion, may waive any irregularities in any deliveries of this Agreement, which may include irregularities in how or when this Agreement is delivered. The Company's interpretation of the terms and conditions of the Exchange Offer (including this Agreement and the Confidential Memorandum and the instructions hereto and thereto) will be final and binding on all parties.

Exchange Consideration will be paid by wire transfer, and Participation Shares, if applicable, will be credited, to the Account(s) set forth on the first page hereof.

**Representations and Warranties**

Subscriber hereby represents and warrants to, and covenants and agrees with the Company, the Administrator, the Investment Manager and Citibank, N.A., and to and for the benefit of the original placement agent for the Existing Shares (the "Original Placement Agent"), as follows:

1. **For Accredited Investors electing to receive Participation Shares:**

    (a)    Subscriber understands that a copy of the amendments to the LLC Agreement setting forth, among other things, the terms of the Participation Shares and the Citi Shares is available upon written request to the Investment Manager.

    (b)    Subscriber has read and understands and has duly executed the "Release" attached as <u>Appendix A</u> to this Agreement and understands that tenders of Existing Shares pursuant to this Agreement will not be accepted unless accompanied by a properly completed and duly executed Release.

    (c)    Subscriber is tendering <u>all</u> of his, her or its Existing Shares of each series so held and, upon the completion of this Exchange Offer and the exchange of Subscriber's Existing Shares for Participation Shares, the only shares or other equity interests of the Company owned by Subscriber will be such Participation Shares.

    (d)    Subscriber has full power and authority (individual, corporate or otherwise) to tender, sell, assign and transfer the Existing Shares, and to acquire Participation Shares issuable upon the exchange of such tendered Existing Shares.

    (e)    **In the event that the Company terminates or withdraws this Exchange Offer or Subscriber wishes to revoke a prior election to tender Existing Shares, Subscriber hereby agrees to return any Exchange Consideration previously paid pursuant to Early Settlement to Subscriber's Account(s) if subsequently withdrawn and hereby authorizes the Company to debit such Account(s) an amount equal to such Exchange Consideration.**

    (f)    Subscriber is an "accredited investor" within the meaning of Rule 501(a) of Regulation D promulgated under the Securities Act (such definition is set forth on Annex B hereto) and recognizes that only Subscribers so qualified are permitted to hold or receive Participation Shares in the Exchange Offer (see the instructions on the signature page hereto).

    (g)    Subscriber represents to the truth and correctness of the information previously supplied to the Company and the Investment Manager in connection with the acquisition of the Existing Shares and, if there should be any material change in such information prior to its receipt of Participation Shares, Subscriber will immediately furnish such revised or corrected information to the Company.

    (h)    Subscriber has all requisite power, authority and capacity (individual, corporate or otherwise) to acquire and hold Participation Shares and to execute, deliver and comply with the terms of each of the instruments required to be executed and delivered by Subscriber in connection with Subscriber's exchange of Existing Shares for Participation Shares, including this Agreement and the Release, and such execution, delivery and compliance does not conflict with or constitute a default under, any instruments governing the Subscriber, any law, regulation or order, or any agreement to which the Subscriber is a party or by which the Subscriber may be bound. If Subscriber is an individual, he or she is over 21 years of age and is legally competent to execute this Agreement and the Release.

If the Subscriber is an entity, the person executing and delivering each of the instruments on behalf of Subscriber has all requisite power, authority and capacity to execute and deliver such instruments. This Agreement and the Release are valid and binding and enforceable against Subscriber in accordance with their respective terms.

(i)     **Subscriber has received, carefully read and understands the Confidential Memorandum including, without limitation, the section entitled "Risk Factors," and this Agreement. The Subscriber has had an opportunity to (i) ask questions of and receive answers concerning the terms and conditions of the Exchange Offer and the business of the Company and (ii) obtain any additional information concerning the Exchange Offer, the Company, the Investment Manager, the value of the Exchange Consideration, the terms of the Participation Shares, the terms of the Release, the terms of the Citi Shares and any related material to the extent the Company possesses such information or can acquire it without unreasonable effort or expense, and all such questions, if asked, have been answered satisfactorily and all such documents, if examined, have been found to be fully satisfactory. Subscriber acknowledges and understands that no representation is made to any Existing Holder regarding the legality of an investment in the Participation Shares by Accredited Investors under any applicable legal investment or similar laws or regulations or the adequacy of the Exchange Consideration.**

(j)     Participation Shares were not offered to Subscriber by means of any general solicitation or general advertising by the Company or any person acting on its behalf, including without limitation (i) any advertisement, article, notice, or other communication published in any newspaper, magazine, or similar media or broadcast over television or radio, or (ii) any seminar or meeting to which Subscriber was invited by any general solicitation or general advertising or as a result of, subsequent to or pursuant to any of the foregoing.

(k)     The address set forth on the signature page below is the Subscriber's true and correct legal address and the Subscriber maintains it domicile, and is not merely a transient or temporary resident, at the residence address shown in this Agreement.

(l)     Subscriber acknowledges and understands that (i) no Participation Shares of any series have been registered under the Securities Act, the securities laws of any state or the laws of any other jurisdiction, nor is such registration contemplated, and (ii) no non-U.S., U.S. federal or state authority has made any finding or determination as to the fairness to the Exchange Offer or for the acquisition of any Participation Shares and no non-U.S., U.S. federal or state authority has recommended or endorsed or will recommend or endorse this offering.

(m)     Any Participation Shares for which Subscriber hereby exchanges Existing Shares are being acquired solely for his, her or its account, for investment, and are not being purchased with a view to or for the resale, distribution, subdivision or fractionalization thereof; and Subscriber has no present plans to enter into any such contract, undertaking, agreement or arrangement.

(n)     None of the Company, Citibank N.A., the Investment Manager, the Administrator, the Original Placement Agent nor anyone on their behalf has made any representations (whether written or oral) to the Subscriber (i) regarding the future performance of the Company, or (ii) that the past performance of the Company, the Investment Manager or their affiliates will in any way predict or guarantee the results of the Company's activities. None of the Company, Citibank N.A., the Investment Manager, the Administrator, the Original Placement Agent nor anyone on their behalf makes any recommendation as to whether Existing Holders should participate in the Exchange Offer.

(o)     Subscriber acknowledges and is aware that (i) there will be significant restrictions on the transferability of the Participation Shares; (ii) the Participation Shares will not be, and holders of Participation

Shares of the Company have no rights to require, that the Participation Shares be, registered under the Securities Act; (iii) there will be no public market for the Participation Shares; and (iv) it may not be possible for Subscriber to liquidate his, her or its investment in the Company. The Subscriber agrees to be bound by the restrictions and conditions set forth in the Confidential Memorandum and acknowledges and agrees that it may not directly or indirectly assign, participate, pledge, hypothecate, rehypothecate, exchange or otherwise dispose of or transfer in any manner (each a "Transfer") its interest in any Participation Shares unless: (i) Subscriber provides the transferee notice of such transfer restrictions and such transferee signs a subscription agreement, (ii) such Transfer does not violate the terms of the Confidential Memorandum and the LLC Agreement, and (iii) the Company has consented in writing prior to such Transfer. Any purported Transfer that does not satisfy the above mentioned conditions shall be null, void and of no effect. Participation Shares issued in the Exchange Offer in certificated form will bear a legend to the effect that such shares may only be transferred upon prior written consent of the Investment Manager and in compliance with applicable federal and state securities laws. Participation Shares issued in book entry form will be subject to appropriate stop orders limiting transfer.

(p)     Subscriber will hold all Participation Shares subject to the terms of this Agreement and the Confidential Memorandum (as each may be amended from time to time).

(q)     Subscriber acknowledges that (i) the Company will retain certain nonpublic personal information about Subscriber as a result of Subscriber's subscription and investment in the Company, and (ii) the Company has agreed not to disclose any nonpublic personal information about Subscriber to others except (A) as Subscriber specifically authorizes (including pursuant to the "Authority to Disclose Information" below), (B) as necessary in connection with the administration, processing and servicing of Subscriber's accounts and investment in the Company, and/or (C) to the Company's accountants, attorneys and auditors (who are required to use the information only for the purposes for which they were hired).

(r)     Subscriber acknowledges and agrees that he, she or it has released and discharged any and all claims against the Company, the Investment Manager, the Company's advisory board, the selling broker for the Existing Shares, Citigroup Inc. and its subsidiaries (collectively, "Citi"), AMACAR GP, Inc. (the "Managing Member"), auditors and tax preparers of the Company, past and present sub-advisors to the Company, the Administrator and past and present counsel (Cayman and U.S.) to such parties (such parties, and their respective affiliates (including the Falcon Funds, as defined in the Confidential Memorandum) and the employees, officers, directors, partners, counsel and agents of each of the aforesaid parties, are collectively referred to as the "Releasees") relating to or arising from, among other things, any investment by Subscriber in the Company, including the acquisition, disposition or ownership of any securities of the Company, Subscriber's acceptance of the Exchange Offer, the operation, management, supervision, or investment of any of the assets of the Company by any of the Releasees or any actions taken or omitted to be taken by any of the Releasees in connection with or otherwise relating to or affecting in any way the Company, whether those claims arise under federal or state securities laws, arbitration agreements or otherwise and whether known or unknown at the time of delivery thereof.

(s)     Subscriber agrees that it will execute and/or supply all additional documentation or information that the Company, the Investment Manager or their respective counsel determines is reasonably required, including by any regulatory agency or authority.

(t)     Subscriber agrees that the representations and warranties included herein may be used as a defense in any actions relating to the Company, the Exchange Offer or the issuing of Participation Shares, and that it is only on the basis of such representations and warranties and the Release that the Company and the Investment Manager may be willing to accept Subscriber's tender of Existing Shares hereunder.

8

(u)    Subscriber is aware and acknowledges that (i) there is no assurance of any returns from the Participation Shares, and further that receipt of any distribution in respect of either Existing Shares or Participation Shares upon the occurrence of a Participation Event (as defined in the Confidential Memorandum) is subject to the risks and uncertainties described in the Confidential Memorandum; (ii) any federal and/or state income tax benefits which may be available to the Subscriber may be lost through the adoption of new laws or regulations or changes to existing laws and regulations or differing interpretations of existing laws and regulations, in certain circumstances with retroactive effect; (iii) the Subscriber, in making this exchange is relying, if at all, solely upon the advice of such Subscriber's personal tax advisor with respect to the tax aspects of an investment in the Company; and (iv) because there are significant restrictions on the transferability of the Participation Shares it will likely not be possible for the Subscriber to liquidate such Subscriber's investment readily in any event, including in case of an emergency. The Subscriber acknowledges that the Company and the Investment Manager have given no assurance that, for Existing Holders who participate in the Exchange Offer, the aggregate of the Exchange Consideration plus any per share amount distributed in respect of such Participation Shares upon the occurrence of a Participation Event will be greater than any amounts received by holders who do not participate in the Exchange Offer in respect of their Existing Shares. Subscriber further acknowledges that, in order for holders of Participation Shares to receive a distribution upon the occurrence of a Participation Event, there will need to be a significant increase in the net asset value of the Existing Shares as compared to their net asset value as of March 31, 2008, which may vary from series to series and which net asset value is set forth with respect to the series of Existing Shares owned by Subscriber in Annex A to the Confidential Memorandum.

(v)    If Subscriber is a partnership, grantor trust or S corporation, less than 50% of the value of any person's interest in the Subscriber is attributable to its interest in the Company.

(w)    <u>Subscriber must check one of the following</u>:

☐    is not, and for so long as Subscriber holds Participation Shares, will not be a "benefit plan investor" (as defined below). The Subscriber agrees to notify the Investment Manager immediately if the Subscriber becomes a benefit plan investor.

☐    is a "benefit plan investor."

The term "benefit plan investor" refers to (i) any "employee benefit plan" as defined in ERISA that is subject to the fiduciary responsibility provisions of ERISA, (ii) any "plan" as defined in section 4975 of the Code that is subject to Section 4975 of the Code, and (iii) any entity ("Plan Assets Entity") deemed for any purpose of ERISA or Section 4975 of the Code to hold assets of any such employee benefit plan or plan due to investments made in such entity by already described benefit plan investors. Benefit plan investors include, but are not limited to, corporate pension and profit sharing plans, "simplified employee pension plans," Keogh plans for self-employed individuals (including partners), individual retirement accounts, medical benefit plans, life insurance plans, church plans that have elected to subject to ERISA, bank commingled trust funds, or insurance company separate accounts, for such plans and accounts, and, under certain circumstances, all or a portion of the general account of an insurance company.

Subscriber:    If the Subscriber has indicated above that it is a "benefit plan investor," Subscriber represents that

☐    is a "Plan Assets Entity" (as defined above).

☐    is not a "Plan Assets Entity" (as defined above).

9

If the Subscriber has indicated above that it is a Plan Assets Entity, the Subscriber hereby represents and warrants that the percentage of the Subscriber's equity interests held by benefit plan investors does not exceed the percentage set forth below. To ease the administrative burden related to monitoring and updating this percentage, the Investment Manager recommends that the Subscriber build in some cushion so that the Subscriber will not have to notify the Investment Manager if the percentage changes slightly.

_____%

The Subscriber agrees to immediately notify the Investment Manager upon any change to the foregoing representations.

    (x)    <u>Subscriber must check one of the following:</u>

    ☐    is not a "controlling person" (as defined below).

    ☐    is a "controlling person" (as defined below).

**A "controlling person" is any person or entity (other than a benefit plan investor) that has discretionary authority or control with respect to the assets of the Company, a person who provides investment advice for a fee (direct or indirect) with respect to the assets of the Company, or any "affiliate" (within the meaning of U.S. Department of Labor Regulation Section 2510.3-101(f)(3)) of any such person.** Employees of Citi or any of its affiliates should check the "controlling person" box.

    (y)    If any part of the assets used by Subscriber to acquire the Existing Shares to be exchanged for Participation Shares and hold the Participation Shares constitutes or, while the Participation Shares are held by such Subscriber, may constitute assets of any employee benefit plan subject to Section 406 of ERISA, any plan subject to Section 4975 of the Code or any entity subject to substantially similar U.S. federal, state, local or foreign law (a "Similar Law"), then the Subscriber has determined that the acquisition of the Existing Shares to be exchanged for Participation Shares, the granting of the Release and the holding of such Participation Shares by such owner is subject to an exemption from the prohibited transaction rules of Section 406 of ERISA, Section 4975 of the Code or similar law and, as a result, has not, does not and will not constitute or otherwise result in a non-exempt prohibited transaction in violation of Section 406 of ERISA, Section 4975 of the Code or Similar Law.

    (z)    If the Subscriber is, or is acting on behalf of, an "employee benefit plan," as defined in and subject to ERISA, or any "plan," as defined in and subject to Section 4975 of the Code (a "Plan"), the individual signing this Subscription Agreement on behalf of the Subscriber, in addition to the representations and warranties herein, hereby further represents and warrants as, or on behalf of, the fiduciary of the Plan responsible for purchasing the Existing Shares to be exchanged for Participation Shares (the "Plan Fiduciary") that: (a) the Plan Fiduciary has considered an investment in the Company for such Plan in light of the risks relating thereto; (b) the Plan Fiduciary has determined that, in view of such considerations, the investment in the Company is consistent with the Plan Fiduciary's responsibilities under ERISA; (c) the Plan's investment in the Company does not violate and is not otherwise inconsistent with the terms of any legal document constituting the Plan or any trust agreement thereunder; (d) the Plan's investment in the Company has been duly authorized and approved by all necessary parties; (e) none of the Investment Manager, any Advisor, the Managing Member, the Administrator, any member of the Advisory Board, any placement agent or any other selling agent (except any placement agent or other selling agent that waives or rebates all selling commissions from the Investment Manager with respect to the Plan's purchase of Participating Shares) any of their respective affiliates or any of their respective agents or employees: (i) has investment discretion with respect to the investment of assets of the Plan used to purchase Existing Shares that are being exchanged for Participation Shares; (ii) has authority or responsibility to or regularly gives investment advice with respect to the

assets of the Plan used to purchase Existing Shares that are being exchanged for Participation Shares for a fee and pursuant to an agreement or understanding that such advice will serve as a primary basis for investment decisions with respect to the Plan and that such advice will be based on the particular investment needs of the Plan; or (iii) is an employer maintaining or contributing to the Plan; and (f) the Plan Fiduciary (i) is authorized to make, and is responsible for, the decision to invest in the Company, including the determination that such investment is consistent with the requirement imposed by Section 404 of ERISA that Plan investments be diversified so as to minimize the risks of large losses, (ii) is independent of the Investment Manager, each Advisor, the Managing Member, the Administrator, each member of the Advisory Board, any placement agent, each other selling agent and each of their respective affiliates, and (iii) is qualified to make such investment decision. The undersigned will, at the request of the Investment Manager, furnish the Investment Manager with such information as the Investment Manager may reasonably require to establish that the purchase of the Existing Shares that were being exchanged for Participation Shares by the Plan did not violate any provision of ERISA or the Code, including without limitation, those provisions relating to "prohibited transactions" by "parties in interest" or "disqualified persons" as defined therein.

(aa)    If Subscriber is a plan subject to ERISA, or an entity whose assets are treated as "plan assets" for purposes of ERISA and/or the Code, the individual executing this agreement on behalf of Subscriber (the "Plan Fiduciary") acknowledges, understands and agrees that neither Citi nor any of their respective agents or employees (i) manages any portion of the assets used to acquire the Existing Shares (the "Assets") on a discretionary basis; or (ii) renders any advice to Subscriber as to the value of securities or other property, or makes recommendation as to the advisability of investing in, purchasing, or selling securities or other property, on a regular basis pursuant to a mutual agreement, arrangement or understanding, written or otherwise, between Citi and Subscriber, where such services will serve as a primary basis for investment decisions with respect to the Assets, nor will render individualized investment advice to Subscriber based on the particular needs of Subscriber regarding such matters as, among other things, investment policies or strategy, overall portfolio composition, or diversification of investments. Accordingly, notwithstanding any contractual representation or circumstances to the contrary with respect to services provided by Citi to Subscriber under other accounts or regarding assets other than the Assets, neither Citi nor any of their respective agents or employees is a fiduciary (as defined in Section 3(21) of ERISA and/or section 4975(e) (3) of the Code) with respect to the Assets. Further, the Plan Fiduciary acknowledges, understands and agrees that Citi may be relying on the foregoing representations to ensure that the execution, delivery and performance of its duties with respect to the Assets, the corresponding receipt of compensation by Citi or any of their respective agents or employees, and the purchase of Interests shall not constitute a prohibited transaction under Section 406 of ERISA and/or Section 4975 of the Code.

(bb)    Subscriber acknowledges that Subscriber, the Company, Citi, the Investment Manager, the Original Placement Agent, the Managing Member and each employee, representative and other agent of the foregoing may disclose to any and all persons, without limitation of any kind, the U.S. tax treatment and tax structure of the transaction and all materials of any kind (including opinions or other tax analyses) that are provided to Subscriber and the other parties to the transaction relating to such U.S. tax treatment and tax structure and that no part of the information related to the Company is claimed to be proprietary or exclusive to the Company or any other person.

(cc)    Subscriber acknowledges that if the Investment Manager determines that the Company's activities create one or more "reportable transactions" under Treasury Regulations, then the Company will disclose its participation in such reportable transaction by completing and filing Form 8886 with the Company's U.S. federal information return and filing a copy of such form with the IRS's Office of Tax Shelter Analysis, that Subscriber may also be required to file such form with its U.S. federal income tax return and to submit a copy to the Office of Tax Shelter Analysis, and that the Company and its material advisors may be required to maintain a list of Subscribers, a detailed description of the structure of the Company, its activities and the expected U.S. federal income tax consequences to the Investors and any additional written materials relating to the Company that have been provided to potential investors or their agents and to make such list and information available for inspection upon request by the IRS.

11

2. **For non-Accredited Investors and Accredited Investors electing to receive only Exchange Consideration:**

(a)     Subscriber understands that a copy of the amendments to the LLC Agreement setting forth, among other things, the terms of the Participation Shares and the Citi Shares is available upon written request to the Investment Manager.

(b)     Subscriber has read and understands and has duly executed the "Release" attached as <u>Appendix A</u> to this Agreement and understands that tenders of Existing Shares pursuant to this Agreement will not be accepted unless accompanied by a properly completed and duly executed Release.

(c)     Subscriber is tendering <u>all</u> of his, her or its Existing Shares of each series so held and, upon the completion of this Exchange Offer and the tender of Subscriber's Existing Shares for the Exchange Consideration, Subscriber will hold no shares or other equity interests of the Company.

(d)     Subscriber has full power and authority (individual, corporate or otherwise) to tender, sell, assign and transfer the Existing Shares.

(e)     **In the event that the Company terminates or withdraws this Exchange Offer or Subscriber wishes to revoke a prior election to tender Existing Shares, Subscriber hereby agrees to return any Exchange Consideration previously paid pursuant to Early Settlement to Subscriber's Account(s) if subsequently withdrawn and hereby authorizes the Company to debit such Account(s) an amount equal to such Exchange Consideration.**

(f)     Subscriber represents to the truth and correctness of the information previously supplied to the Company and the Investment Manager in connection with the acquisition of the Existing Shares and, if there should be any material change in such information prior to its receipt of the Exchange Consideration, Subscriber will immediately furnish such revised or corrected information to the Company.

(g)     The address set forth on the signature page below is the Subscriber's true and correct legal address and the Subscriber maintains it domicile, and is not merely a transient or temporary resident, at the residence address shown in this Agreement.

(h)     Subscriber has all requisite power, authority and capacity (individual, corporate or otherwise) to execute, deliver and comply with the terms of each of the instruments required to be executed and delivered by Subscriber in connection with Subscriber's exchange of Existing Shares for Exchange Consideration, including this Agreement and the Release, and such execution, delivery and compliance does not conflict with or constitute a default under, any instruments governing the Subscriber, any law, regulation or order, or any agreement to which the Subscriber is a party or by which the Subscriber may be bound. If Subscriber is an individual, he or she is over 21 years of age and is legally competent to execute this Agreement and the Release. If the Subscriber is an entity, the person executing and delivering each of the instruments on behalf of Subscriber has all requisite power, authority and capacity to execute and deliver such instruments. This Agreement and the Release are valid and binding and enforceable against Subscriber in accordance with their respective terms.

(i)     Subscriber has received, carefully read and understands the Confidential Memorandum including, without limitation, the section entitled "Risk Factors," and this Agreement. The Subscriber has had an opportunity

12

to (i) ask questions of and receive answers concerning the terms and conditions of the Exchange Offer and the business of the Company and (ii) obtain any additional information concerning the Exchange Offer, the Company, the Investment Manager, the value of the Exchange Consideration, the terms of the Release and any related material to the extent the Company possesses such information or can acquire it without unreasonable effort or expense, and all such questions, if asked, have been answered satisfactorily and all such documents, if examined, have been found to be fully satisfactory. Subscriber understands and acknowledges that no representation is made to any Existing Holder regarding the adequacy of the Exchange Consideration.

(j)     None of the Company, Citibank N.A., the Investment Manager, the Administrator, the Original Placement Agent nor anyone on their behalf has made any representations (whether written or oral) to the Subscriber (i) regarding the future performance of the Company, or (ii) that the past performance of the Company, the Investment Manager or their affiliates will in any way predict or guarantee the results of the Company's activities. None of the Company, Citibank N.A., the Investment Manager, the Administrator, the Original Placement Agent nor anyone on their behalf makes any recommendation as to whether Existing Holders should participate in the Exchange Offer.

(k)     Subscriber acknowledges and agrees that he, she or it has released and discharged any and all claims against the Company, the Investment Manager, the Company's advisory board, the selling broker for the Existing Shares, Citigroup Inc. and its subsidiaries (collectively, "Citi"), AMACAR GP, Inc. (the "Managing Member"), auditors and tax preparers of the Company, past and present sub-advisors to the Company, the Administrator and past and present counsel (Cayman and U.S.) to such parties (such parties, and their respective affiliates (including the Falcon Funds, as defined in the Confidential Memorandum) and the employees, officers, directors, partners, counsel and agents of each of the aforesaid parties, are collectively referred to as the "Releasees") relating to or arising from, among other things, any investment by Subscriber in the Company, including the acquisition, disposition or ownership of any securities of the Company, Subscriber's acceptance of the Exchange Offer, the operation, management, supervision, or investment of any of the assets of the Company by any of the Releasees or any actions taken or omitted to be taken by any of the Releasees in connection with or otherwise relating to or affecting in any way the Company, whether those claims arise under federal or state securities laws, arbitration agreements or otherwise and whether known or unknown at the time of delivery thereof.

(l)     Subscriber agrees that it will execute and/or supply all additional documentation or information that the Company, the Investment Manager or their respective counsel determines is reasonably required, including by any regulatory agency or authority.

(m)     Subscriber agrees that the representations and warranties included herein may be used as a defense in any actions relating to the Company or the Exchange Offer and that it is only on the basis of such representations and warranties and the Release that the Company and the Investment Manager may be willing to accept Subscriber's tender of Existing Shares hereunder.

(n)     Subscriber acknowledges that Subscriber, the Company, Citi, the Investment Manager, the Original Placement Agent, the Managing Member and each employee, representative and other agent of the foregoing may disclose to any and all persons, without limitation of any kind, the U.S. tax treatment and tax structure of the transaction and all materials of any kind (including opinions or other tax analyses) that are provided to Subscriber and the other parties to the transaction relating to such U.S. tax treatment and tax structure and that no part of the information related to the Company is claimed to be proprietary or exclusive to the Company or any other person.

(o)     Subscriber acknowledges that if the Investment Manager determines that the Company's activities create one or more "reportable transactions" under Treasury Regulations, then the Company will disclose its

13

participation in such reportable transaction by completing and filing Form 8886 with the Company's U.S. federal information return and filing a copy of such form with the IRS's Office of Tax Shelter Analysis, that Subscriber may also be required to file such form with its U.S. federal income tax return and to submit a copy to the Office of Tax Shelter Analysis, and that the Company and its material advisors may be required to maintain a list of Subscribers, a detailed description of the structure of the Company, its activities and the expected U.S. federal income tax consequences to the Investors and any additional written materials relating to the Company that have been provided to potential investors or their agents and to make such list and information available for inspection upon request by the IRS.

## Capitalized Terms

Capitalized terms used herein but not otherwise defined herein shall have the meanings ascribed to such terms in the Confidential Memorandum.

## Authority to Disclose Information

Subscriber hereby authorizes Citibank, N.A., Citi, the Company, the Investment Manager, the Original Placement Agent, the Administrator, the counsel and auditor to the Company and any other contracting party in respect of the Company or otherwise with regard to the Company to disclose such information, to each other and to any United States or other relevant country's governmental, regulatory, tax or court authority, as may be required (including Subscriber's name and proof of identity of the beneficial owners of Subscriber) by any such United States or other relevant country's governmental, regulatory, tax or court authority in accordance with the applicable law of such jurisdiction, or to comply with or to enable each other to comply with any rules or regulation established by any law or regulatory agency (including any self-regulatory organization) or any request applicable to any of the above-referenced parties. The Subscriber acknowledges that the Company will send or cause to be sent copies of the Company's account statements and any other correspondence relating to this investment, as they become available, through a Citi affiliate, to the Original Placement Agent, to the Investment Manager or the Subscriber's private banker or financial adviser, as indicated by the Investment Manager. **Subscriber hereby waives rights it may have in any jurisdiction to maintain the confidentiality or secrecy of any such information disclosed under these circumstances.**

## Confidentiality

Subscriber understands that, if Subscriber is an Accredited Investor and elects to receive Participation Shares, as a holder of Participation Shares of the Company it will periodically receive non-public information concerning the Company and the investments made by the Company. As a condition to subscribing for Participation Shares, if applicable, Subscriber agrees to treat as confidential, and not to disclose to any third party without the Advisor's consent, any information concerning the Company, and investments made by the Company which may be furnished to Subscriber, and any analyses or other documents prepared by the Company or Advisor that contain or reflect any such information (herein collectively referred to as the "Confidential Information"). The term "Confidential Information" does not include information which (i) is already lawfully in Subscriber's possession prior to the Subscriber's application to invest in the Company and was received from a source other than the Company, the Advisor or any of their affiliates, (ii) becomes generally available to the public other than as a result of a disclosure by Subscriber in violation of its obligations hereunder (it being understood that information will not be deemed to be generally available to the public merely because it has been disclosed to investors or potential investors in the Company and their respective advisors), or (iii) becomes available to Subscriber on a non-confidential basis from a source other than a Citi-affiliated company, provided that such source is not known by Subscriber to be bound by a confidentiality agreement with or other obligation of secrecy to a Citi-affiliated company. Subscriber agrees that it will use the Confidential Information only in connection with evaluating or monitoring its current or potential investment in the Company. In addition, Subscriber agrees that at the Company's request it will return or destroy all Confidential Information in its possession. Notwithstanding anything to the contrary set forth herein, Subscriber may disclose any Confidential Information to third parties to the extent Subscriber is required to do so by law or regulatory authority and may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of (i) the Company and (ii) any of the transactions by the Company, and all materials of any kind

14

(including opinions or other tax analyses) that are provided to the Subscriber relating to such tax treatment and tax structure.

**Indemnification**

Subscriber agrees to indemnify and hold harmless the Company, the Administrator, the Investment Manager, the Original Placement Agent, Citi and each of their respective affiliates, officers, employees, directors, partners, members, agents, legal representatives, advisors and each other person, if any, who controls, is controlled by, or is under common control with, any of the foregoing, within the meaning of Section 15 of the Securities Act (collectively, the "Indemnified Persons"), against any and all claims, demands, liabilities, costs, expenses, damages, losses, suits, proceedings and actions, whether judicial, administrative, investigative or otherwise, of whatever nature, known or unknown, liquidated or unliquidated, including, without limitation, reasonable attorneys' fees and expenses reasonably incurred in preparing or defending (collectively, "Damages") to which any of them may become subject arising out of or based upon: (i) any false representation or warranty made by Subscriber, or breach or failure by Subscriber to comply with any covenant or agreement made by Subscriber, in this Agreement or in any other document furnished by Subscriber to any of the foregoing in connection with this transaction; or (ii) any action for securities law violations instituted by Subscriber which is finally resolved by judgment against Subscriber.

Subscriber hereby indemnifies the Indemnified Persons and agree to keep each of them indemnified, against any loss of any nature whatsoever arising to each of them as a result of any of them acting on facsimile instructions. The Indemnified Persons may rely conclusively upon, and shall incur no liability in respect of any action taken upon, any notice, consent, request, instructions or other instrument believed, in good faith, to be genuine or to be signed by properly authorized persons.

The indemnity and reimbursement obligations of Subscriber under this Agreement shall survive Subscriber's receipt of Exchange Consideration and, if applicable, Participation Shares in the Exchange Offer and shall be in addition to any liability, which Subscriber may otherwise have. Notwithstanding any provision of this Agreement to the contrary, Subscriber does not waive any rights granted to it under applicable securities laws to the extent such laws prohibit the waiver of such right.

**Miscellaneous**

All notices or other communications given or made hereunder shall be in writing and shall be delivered or mailed, if to the Subscriber, at the address set forth on the signature page hereto and, if to the Company, to the applicable Citi Private Bank or Smith Barney address set forth on the first page hereof. Such address may be changed from time to time by a notice given in accordance with the provisions hereof.

The Subscriber acknowledges and agrees that this Agreement and the agreements and documents referenced herein, including, without limitation, the Release, constitute the entire agreement between the parties hereto with respect to the subject matter hereof and may be amended only in writing, executed by all parties hereto. This Agreement shall be construed in accordance with and governed by the laws of the State of New York without regard to its conflicts of law rules, notwithstanding the place where this Agreement may be executed by any party. With respect to clients of the Citi Private Bank only, the courts of the State of New York shall have exclusive jurisdiction over any action, suit or proceeding with respect to this Agreement and the Subscriber hereby irrevocably waives, to the fullest extent permitted by law, any objection that it may have, whether now or in the future, to the laying of venue in, or to the jurisdiction of, any and each of such courts for the purposes of any such suit, action, proceeding or judgment and further waives any claim that any such suit, action, proceeding or judgment has been brought in an inconvenient forum, and the Subscriber hereby submits to such jurisdiction. The parties hereby agree that no punitive or consequential damages shall be awarded in any such action, suit or proceeding.

This Agreement (i) shall be binding upon the Subscriber and the heirs, legal representatives, successors, and permitted assigns of the Subscriber and shall inure to the benefit of the Company and its successors and assigns, (ii)

shall survive the acceptance of Subscriber's investment in the Company, (iii) shall survive any changes in the transaction documents and (iv) shall, if the Subscriber consists of more than one person, be the joint and several obligation of each of such person.

This Agreement and the agreements and documents referenced herein, including without limitation the Release, constitute the entire agreement between the parties hereto with respect to the subject matter hereof and may be amended only in writing, executed by all parties hereto.

If any information required in connection with this Agreement is found to be false, forged or misleading, Subscriber understands that the Administrator, the Investment Manager or the Company may require that such Subscriber's Participation Shares be cancelled.

If any provision of this Agreement is invalid or unenforceable under any applicable law, then such provision shall be deemed inoperative to the extent that it may conflict therewith and shall be deemed modified to conform with such applicable law. Any provision hereof which may be held invalid or unenforceable under any applicable law shall not affect the validity or enforceability of any other provisions hereof, and to this extent the provisions hereof, shall be severable.

ANY CLAIM, CONTROVERSY, DISPUTE OR DEADLOCK ARISING UNDER THIS AGREEMENT SHALL BE SETTLED BY ARBITRATION ADMINISTERED UNDER THE RULES OF THE FINANCIAL INDUSTRY REGULATORY AUTHORITY IN NEW YORK, NEW YORK. ANY ARBITRATION AND AWARD OF THE ARBITRATORS, OR A MAJORITY OF THEM, SHALL BE FINAL AND THE JUDGMENT UPON THE AWARD RENDERED MAY BE ENTERED IN ANY STATE OR FEDERAL COURT HAVING JURISDICTION. NO PUNITIVE DAMAGES SHALL BE AWARDED.

Subscriber acknowledges and agrees that the Administrator, the Original Placement Agent and the Investment Manager are third party beneficiaries of this Agreement and shall be entitled to enforce the provisions hereunder with respect to which the Company is named herein, including, without limitation, the representations and warranties set forth herein.

**SUBSCRIBER SECTION:**

**SIGNATURE PAGE TO THE EXCHANGE OFFER SUBSCRIPTION AGREEMENT**

Subscriber desires to participate in the Exchange Offer by tendering all of his, her or its Existing Shares of any series so owned and hereby elects to receive in exchange thereof:

---

**For Subscribers who meet the definition of "Accredited Investor" as defined herein:**

**Subscriber hereby elects to receive** *(indicate selection with a "√" mark):*

**Only** the Exchange Consideration corresponding to each series of Existing Shares tendered (no Participation Shares).

☐　　YES　☐　　NO

The Exchange Consideration **and** Participation Shares corresponding to each series of Existing Shares tendered.

☐　　YES　☐　　NO

Subscriber hereby certifies that he, she or it meets the standards of "Accredited Investor," as defined herein and in the accompanying Confidential Tender and Exchange Offer Memorandum.

☐　　YES　☐　　NO

**Subscriber hereby elects Early Settlement with respect to Subscriber's Existing Shares:**

☐　　YES　☐　　NO

(See "The Exchange Offer—Early Settlement" in the Confidential Memorandum)

**By checking "yes" above, Subscriber hereby acknowledges and understands that in order to participate in Early Settlement, this Agreement and all appendices hereto must be received by the appropriate party set forth on the first page hereof no later than 5:00 p.m., New York City time, on May 30, 2008 or June 13, 2008, as applicable.  In the event that the Company terminates or withdraws this Exchange Offer or Subscriber wishes to revoke a prior election to tender Existing Shares, Subscriber hereby agrees to return any Exchange Consideration previously paid pursuant to Early Settlement to Subscriber's Account(s) if subsequently withdrawn and hereby authorizes the Company to debit such Account(s) an amount equal to such Exchange Consideration.**

---

**For Subscribers who do NOT meet the definition of "Accredited Investor" as defined herein:**

**Subscriber hereby elects to receive** *(indicate selection with a "√" mark):*

The Exchange Consideration corresponding to each series of Existing Shares tendered.

☐　　YES　☐　　NO

Subscriber hereby acknowledges that he, she or it does not meet the standards of "Accredited Investor," as defined herein and as a result is not eligible to hold Participation Shares under the terms of the Company's LLC Agreement.

17

☐    YES    ☐    NO

**Subscriber hereby elects Early Settlement with respect to Subscriber's Existing Shares:**

☐    **YES**    ☐    **NO**

(See "The Exchange Offer—Early Settlement" in the Confidential Memorandum)

By checking "yes" above, Subscriber hereby acknowledges and understands that in order to participate in Early Settlement, this Agreement and all appendices hereto must be received by the appropriate party set forth on the first page hereof no later than 5:00 p.m., New York City time, on May 30, 2008 or June 13, 2008, as applicable.  In the event that the Company terminates or withdraws this Exchange Offer or Subscriber wishes to revoke a prior election to tender Existing Shares, Subscriber hereby agrees to return any Exchange Consideration previously paid pursuant to Early Settlement to Subscriber's Account(s) if subsequently withdrawn and hereby authorizes the Company to debit such Account(s) an amount equal to such Exchange Consideration.

SUBSCRIBER SECTION:

## SIGNATURE PAGE TO THE EXCHANGE OFFER SUBSCRIPTION AGREEMENT (CONTINUED)

In addition to those representations, warranties and covenants set out in (1) or (2) above, Subscriber hereby represents and warrants to, and covenants and agrees with the Company, the Administrator, the Investment Manager and Citibank, N.A., and to and for the benefit of the Original Placement Agent, as follows:

The Subscriber understands that the Company, the Investment Manager and others will rely upon the truth and accuracy of the foregoing acknowledgments, representations and agreements contained in (1) or (2) above, as applicable. Subscriber agrees that if any of the acknowledgments, representations or warranties made by him, her or it by or in relation to the exchange of Existing Shares and execution of this Agreement are no longer accurate, Subscriber shall promptly notify the Company and the Investment Manager. If Subscriber is acquiring any Participation Shares as a fiduciary or agent for one or more investor accounts, Subscriber represents that he, she or it has sole investment discretion with respect to each such account and has full power to make the foregoing acknowledgments, representations and agreements on behalf of each such account.

Subscriber acknowledges that in making a decision to tender Existing Shares in exchange for Exchange Consideration and, if applicable, Participation Shares, Subscriber has relied solely upon the Confidential Memorandum, including any amendments or supplements thereto, the LLC Agreement, the Company's financial statements that have been provided to Subscriber and independent investigations made by Subscriber. Subscriber is not relying on the Company, the Investment Manager, the Administrator, the Original Placement Agent, Citibank N.A., or any other person or entity with respect to the legal, tax and other economic considerations involved in such decision other than Subscriber's own independent advisers. Subscriber has carefully considered and has, to the extent Subscriber believes such discussion necessary, discussed with Subscriber's advisers, including independent legal, tax, accounting and financial advisers, the suitability of participating in the Exchange Offer and, to the extent Subscriber is an Accredited Investor and makes an election to receive Participation Shares, thereby further investing in the Company for Subscriber's particular tax and financial situation and has determined that participating in the Exchange Offer and thereby investing in the Company constitutes a suitable investment. Subscriber has carefully read this Agreement and, to the extent he, she or it believes necessary, has discussed with legal counsel the representations, warranties and agreements which Subscriber is making herein.

Subscriber has sufficient knowledge and experience in financial and business matters so as to be capable of evaluating the merits and risks of tendering Existing Shares in exchange for the Exchange Consideration and, if applicable, Participation Shares and, to the extent receiving Participation Shares, (i) is able to bear the economic cost of carrying the investment in the Company for an indefinite period of time; (ii) has adequate means of providing for his, her or its current needs and possible personal contingencies even in the event of a complete loss in this investment; and (iii) has no further need for liquidity of his, her or its investment in the Company beyond that which is provided by receipt of the applicable Exchange Consideration. Subscriber's acquisition of the Participation Shares, if applicable, is consistent with the investment purposes and objectives and cash flow requirements of Subscriber and will not adversely affect Subscriber's overall need for diversification and liquidity. Subscriber is a sophisticated investor and understands, fully appreciates and is willing to assume any and all risks associated with and any and all potential negative or adverse consequences of its participation in the Exchange Offer including, but not limited to, the risks arising from the absence of current or historical financial information regarding the Company.

Subscriber, to the extent electing to receive Participation Shares, if applicable, understands, agrees and acknowledges that Participation Shares (i) are not bank deposits, nor government guaranteed; (ii) are not obligations of, nor guaranteed by, Citibank N.A., Citigroup Inc., the Original Placement Agent nor any of

their affiliates; and (iii) are subject to investment risks, including possible loss of the entire principal amount invested.

The Subscriber acknowledges and agrees that neither the Investment Manager nor Citi, nor any of their respective affiliates, has any obligation to provide credit or financial support to the Company and there should be no expectation that any such party will do so.

SUBSCRIBER SECTION:

### SIGNATURE PAGE TO THE EXCHANGE OFFER SUBSCRIPTION AGREEMENT (CONTINUED)

**Please make sure you have checked the appropriate boxes and provided the appropriate information on pages 1, 9, 10, 17 and 18 herein, as applicable, before completing this signature page.**

**If Existing Shares are held of record by two or more joint Existing Holders, all such Existing Holders must sign this Exchange Offer Subscription Agreement.**

IN WITNESS WHEREOF, Subscriber has executed this Agreement this _____ day of _____, 2008.

| | |
|---|---|
| **Name of Subscriber** | **Name of Subscriber** |
| **By:** _____ | **By:** _____ |
| **Signature** | **Signature** |
| **Title:** _____ | **Title:** _____ |
| **(If Subscriber is not an individual)** | **(If Subscriber is not an individual)** |

**Tax ID or Social Security No.:** _____       **Tax ID or Social Security No.:** _____

Address: _____

_____

_____

Facsimile No.: _____

E-mail Address: _____

**YOU MUST ALSO SIGN THE RELEASE ON THE NEXT PAGE TO PARTICIPATE IN THE EXCHANGE OFFER**

**Appendix A**

**RELEASE**

_____ _____, a [corporation] [limited liability company] [limited partnership] [individual person(s)] [organized under the laws of] ("Releasor") in consideration of the agreement by Falcon Strategies Two LLC (the "Company") to purchase all of Releasor's outstanding shares of each series of limited liability company interest (the "Existing Shares") of the Company in exchange for payment of the Exchange Consideration set forth in the Confidential Exchange Offer Memorandum of the Company, dated May 8, 2008 (the "Confidential Memorandum" and the transactions described therein, the "Exchange Offer"), and shares of a new series of limited liability company interest in the Company (the "Participation Shares") to the extent Releasor is an "Accredited Investor" (as defined herein) and elects to receive Participation Shares, releases and discharges the Company, the Investment Manager, the Company's advisory board, the selling broker for the Existing Shares, Citigroup Inc. and its subsidiaries (collectively, "Citi"), AMACAR GP, Inc. (the "Managing Member"), auditors and tax preparers of the Company, past and present sub-advisors of the Company, U.S. Bank National Association (the "Administrator") and past and present counsel (Cayman and U.S.) to such parties (such parties, and their respective employees, officers, directors, partners, counsel and agents of each of the aforesaid parties, past, present and future, and each of their respective "Affiliates" (as defined below), are collectively referred to herein as the "Releasees"), as well as the Releasees' heirs, executors, administrators, successors and assigns from all actions, causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, arbitration or other agreements, promises, variances, trespasses, damages, judgments, extents, executions, claims, and demands whatsoever, whether known or unknown on the date hereof, in law, admiralty or equity, which against the Releasees, the Releasor or the Releasor's heirs, executors, administrators, successors or assigns ever had, now have or hereafter can, shall or may have, for, upon, or by reason of any matter, cause or thing whatsoever from the beginning of the world to the date of this Release and thereafter directly or indirectly arising from, relating to or in any manner connected with (i) any direct or indirect investment by Releasor in the Company, including the acquisition or disposition of any securities of the Company, (ii) Releasor's direct or indirect acceptance of the Exchange Offer, (iii) the operation, management, supervision, or investment of any of the assets of the Company by any of the Releasees or (iv) any actions taken or omitted to be taken by any of the Releasees in connection with or otherwise relating to or affecting in any way the Company.

This Release may not be amended, modified or changed without the written consent of the Releasor. If any provision of this Release is determined to be invalid or to violate any applicable law this Release shall be deemed to be modified or nullified only to the extent necessary to make this Release valid or otherwise to bring this Release in compliance with the requirements of such applicable law.

"Accredited Investor" shall have the meaning ascribed to such term in the Exchange Offer Subscription Agreement. For purposes of this Release, the term "Affiliate" means a person controlled by, controlling or under common control with another person (which shall include without limitation the Falcon Funds, as defined in the Confidential Memorandum, and Falcon Strategies LLC). For purposes of this Release, the term "person" means any individual person, corporation, trust, limited liability company, partnership, custodial or other account, contractual arrangement or any other juridical entity.

This Release shall be construed in accordance with and governed by the laws of the State of New York without reference to choice of law principles thereof.

IN WITNESS WHEREOF, the *Releasor has caused this Release to be executed [by its duly authorized officers]* on _____ _____, *2008*.

BY:       _____

                 Name: _____

WITNESS:    _____

                 Name: _____

**If Existing Shares are held of record by two or more joint Existing Holders, all such Existing Holders must sign this Release.**

BY:       _____

                 Name: _____

WITNESS:    _____

                 Name: _____

| SUBSTITUTE<br>Form W-9<br>Department of the Treasury<br>Internal Revenue Service<br><br>Payer's Request for<br>Taxpayer Identification<br>Number (TIN) | Part 1 — Please provide your TIN in the box at the right and certify by signing and dating below.<br><br>Part 2 — For payees exempt from backup withholding, see enclosed Guidelines for Certification of Taxpayer Identification Number on Substitute Form W-9, and complete in accordance therewith. | Social Security Number OR<br>Employer Identification Number<br>If awaiting TIN, write "Applied For."<br>_____ |

CERTIFICATION — UNDER THE PENALTIES OF PERJURY, I CERTIFY THAT:

(1)   The number shown on this form is my correct Taxpayer Identification Number (or I am waiting for a number to be issued to me), and

(2)   I am not subject to backup withholding because: (a) I am exempt from backup withholding; or (b) I have not been notified by the Internal Revenue Service (the "IRS") that I am subject to backup withholding as a result of a failure to report all interests or dividends; or (c) the IRS has notified me that I am no longer subject to backup withholding, and

(3)   I am a U.S. person (including a U.S. resident alien).

CERTIFICATION INSTRUCTIONS —You must cross out item (2) above if you have been notified by the IRS that you are subject to backup withholding because of underreporting of interest or dividends on your tax return. However, if after being notified by the IRS that you were subject to backup withholding you received another notification from the IRS that you are no longer subject to backup withholding, do not cross out item (2). Also see the enclosed Guidelines for Certification of Taxpayer Identification Number on Substitute Form W-9.

SIGNATURE: _____ DATE: _____

NOTE: FAILURE TO COMPLETE AND RETURN THIS FORM MAY RESULT IN BACKUP WITHHOLDING WITH RESPECT TO ANY PAYMENTS MADE TO YOU.  PLEASE REVIEW THE ENCLOSED GUIDELINES FOR CERTIFICATION OF TAXPAYER IDENTIFICATION NUMBER ON SUBSTITUTE FORM W-9 FOR ADDITIONAL DETAILS.

IF YOU INDICATED ON THE SUBSTITUTE FORM W-9 THAT YOU APPLIED FOR A TAXPAYER IDENTIFICATION NUMBER, YOU MUST SIGN AND DATE THE FOLLOWING CERTIFICATION:

I certify, under penalties of perjury, that a Taxpayer Identification Number has not been issued to me, and that I mailed or delivered an application to receive a Taxpayer Identification Number to the appropriate IRS Center or Social Security Administration Office (or I intend to mail or deliver an application in the near future). I understand that notwithstanding that I have written "Applied For" in Part I and have completed the Certification of Payee Awaiting Taxpayer Identification Number, the applicable percentage of all payments made to me pursuant to this Merger shall be withheld until I provide a Taxpayer Identification Number to the payor.

SIGNATURE: _____ DATE: _____

**FOR U.S. INVESTORS ONLY**

**GUIDELINES FOR CERTIFICATION OF TAXPAYER IDENTIFICATION
NUMBER ON SUBSTITUTE FORM W-9**

Guidelines for Determining the Proper Identification Number for the Payee

**To Give the Payer** — Social security numbers have nine digits separated by two hyphens: i.e., 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. Employee identification numbers have nine digits separated by only one hyphen: i.e., 00-0000000. The table below will help determine the number to give the payer. All "Section" references are to the Internal Revenue Code of 1986, as amended. "IRS" is the Internal Revenue Service.

| For This Type of Account: | Give The Taxpayer Identification |
|---|---|
| 1. Individual | The individual |
| 2. Two or more individuals (joint account) | The actual owner of the account, if combined fund, the first individual on the account[1] |
| 3. Custodian account of a minor (Uniform Gift to Minors Act) | The minor[2] |
| 4.a. The usual revocable savings trust account (grantor is also trustee) | The grantor-trustee[1] |
| b. So-called trust that is not a legal or valid trust under state law | The actual owner[1] |
| 5. Sole proprietorship | The owner[3] |
| 6. A valid trust, estate or pension trust | The legal entity[4] |
| 7. Corporate | The corporation |
| 8. Association, club, religious, charitable, educational, or other tax-exempt organization account | The organization |
| 9. Partnership | The partnership |
| 10. A broker or registered nominee | The broker or nominee |
| 11. Account with the Department of Agriculture in the name of a public entity (such as a state or local government, school district, or prison) that receives agricultural program payments | The public entity |

(1) List first and circle the name of the person whose number you furnish. If only one person on a joint account has a social security number, that person's number must be furnished.

(2) Circle the minor's name and furnish the minor's social security number.

(3) You must show your individual name, but you may also enter your business or "doing business as" name. You may use either your social security number or your employer identification number (if you have one).

(4) List first and circle the name of the legal trust, estate or pension trust. (Do not furnish the taxpayer identification number of the personal representative or trustee unless the legal entity itself is not designated in the account title.)

NOTE: If no name is circled when there is more than one name, the number will be considered to be that of the first name listed.

OBTAINING A NUMBER

If you don't have a taxpayer identification number or you don't know your number, obtain Form SS-5, Application for a Social Security Card, at the local Social Administration office, or Form SS-4, Application for Employer Identification Number, by calling 1 (800) TAX-FORM, and apply for a number.

PAYEES EXEMPT FROM BACKUP WITHHOLDING

Payees specifically exempted from withholding include:

(i)   An organization exempt from tax under Section 501(a), an individual retirement account (IRA), or a custodial account under Section 403(b)(7), if the account satisfied the requirements of Section 401(f)(2).

(ii)  The United States or a state thereof, the District of Columbia, a possession of the United States, or a political subdivision or wholly-owned agency or instrumentality of any one or more of the foregoing.

(iii) An international organization or any agency or instrumentality thereof.

(iv)  A foreign government and any political subdivision, agency or instrumentality thereof.

Payees that may be exempt from backup withholding include:

(i)    A corporation.

(ii)   A financial institution.

(iii)  A dealer in securities or commodities required to register in the United States, the District of Columbia, or a possession of the United States.

(iv)   A real estate investment trust.

(v)    A common trust fund operated by a bank under Section 584(a).

(vi)   An entity registered at all times during the tax year under the Investment Company Act of 1940.

(vii)  A middleman known in the investment community as a nominee or custodian.

(viii) A futures commission merchant registered with the Commodity Futures Trading Commission.

(ix)   A foreign central bank of issue.

(x)    A trust exempt from tax under Section 664 or described in Section 4947.

Payments of dividends and patronage dividends generally exempt from backup withholding include:

(i)    Payments to non-resident aliens subject to withholding under Section 1441.

(ii)   Payments to partnerships not engaged in a trade or business in the United States and that have at least one non-resident alien partner.

(iii)  Payments of patronage dividends not paid in money.

(iv)   Payments made by certain foreign organizations.

(v)    Section 404(k) payments made by an ESOP.

Payments of interest generally exempt from backup withholding include:

(i)    Payments of interest on obligations issued by individuals. Note:  You may be subject to backup withholding if this interest is $600 or more and you have not provided your correct taxpayer identification number to the payer.

(ii)   Payments of tax-exempt interest (including exempt-interest dividends under Section 852).

(iii)  Payments described in Section 6049(b)(5) to non-resident aliens.

(iv)   Payments on tax-free covenant bonds under Section 1451.

(v)    Payments made by certain foreign organizations.

(vi)   Mortgage interest paid to you.

Certain payments, other than payments of interest, dividends, and patronage dividends, that are exempt from information reporting are also exempt from backup withholding.  For details, see the regulations under section 6041, 6041A, 6042, 6044, 6045, 6049, 6050A and 6050N.

Exempt payees described above must file a Substitute Form W-9 included in this Letter of Transmittal to avoid possible erroneous backup withholding.  FILE THIS FORM WITH THE PAYER, FURNISH YOUR TAXPAYER IDENTIFICATION NUMBER, WRITE "EXEMPT" IN PART 2 OF THE FORM, SIGN AND DATE THE FORM AND RETURN IT TO THE PAYER.

PRIVACY ACT NOTICE — Section 6109 requires you to provide your correct taxpayer identification number to payers, who must report the payments to the IRS.  The IRS uses the number for identification purposes and may also provide this information to various government agencies for tax enforcement or litigation purposes.  Payers must be given the numbers whether or not recipients are required to file tax returns.  Payers must generally withhold 28% of taxable interest, dividend, and certain other payments to a payee who does not furnish a taxpayer identification number to payer.  Certain penalties may also apply.

PENALTIES

(1)  **Failure to Furnish Taxpayer Identification Number** – If you fail to furnish your taxpayer identification number to a payer, you are subject to a penalty of $50 for each such failure unless your failure is due to reasonable cause and not to willful neglect.

(2)  **Civil Penalty for False Information With Respect to Withholding** – If you make a false statement with no reasonable basis that results in no backup withholding, you are subject to a $500 penalty.

(3)  **Criminal Penalty for Falsifying Information** – Willfully falsifying certificates or affirmations may subject you to criminal penalties including fines and/or imprisonment.

**For additional information, consult your tax consultant or the IRS**

Annex A

FORM OF NOTICE OF REVOCATION

This form needs to be signed <u>ONLY</u> if you want to revoke a previously tendered Subscription Agreement.

**For Citi Private Bank clients:**

Falcon Strategies Two LLC
Portfolio A
c/o J.C. Lyons
Americas Investment Center
Two Court Square, 5th Floor
Long Island City, NY 11120
Facsimile: (347) 750-1717

**For Smith Barney clients:**

Falcon Strategies Two LLC
Portfolio A
c/o CAI Investing Services Onshore
731 Lexington Avenue
27th Floor
New York, NY 10022
Attention: Lindsay Halas
Facsimile: (917) 463-0136

Dear Sir or Madam:

　　　　Reference is hereby made to the Confidential Exchange Offer Memorandum, dated May 8, 2008 (the "Confidential Memorandum" and the transactions contemplated thereby, the "Exchange Offer"), of Falcon Strategies Two LLC, a Delaware limited liability company (the "Company"), and that certain Exchange Offer Subscription Agreement (the "Subscription Agreement"), dated _____, 2008, submitted by the undersigned to the addressee set forth above, pursuant to which the undersigned tendered and exchanged all of its shares of each series of limited liability company interest of the Company ("Existing Shares") for a cash payment per share ("Exchange Consideration," as described more fully in the Confidential Memorandum) and, to the extent an Accredited Investor (as defined in the Subscription Agreement), shares of a new series of limited liability company participation interest ("Participation Shares"). Capitalized terms used herein but not otherwise defined herein shall have the meanings ascribed to such terms in the Subscription Agreement.

　　　　The undersigned hereby wishes to revoke its election to tender its Existing Shares by delivery of this Notice of Revocation to the addressee set forth above. Pursuant to the revocation procedures set forth in the Confidential Memorandum, the undersigned certifies as follows:

**Subscriber's Name:** _____

**Name in which Existing Shares are registered, if not Subscriber:** _____

**Subscriber's Citi Private Bank or Smith Barney Account Number(s) in which Subscriber's Existing Shares are Held ("Account(s)"):** _____

**Investor Type:** ☐ Individual　☐ Corporation　☐ Trust　☐ Partnership　☐ LLC

**Joint (if applicable):** ☐ Rights of Survivorship　☐ Tenants in Common　☐ Community Property

**Subscriber tendered Existing Shares pursuant to Early Settlement:** ☐ YES　☐ NO

If Subscriber answered "Yes" above, Subscriber must provide the following information and certification:

Subscriber certifies that it has received $ _____ of Exchange Consideration and elected [to] / [not to] *(circle one)* receive Participation Shares pursuant to its previous tender being revoked hereby.

Subscriber acknowledges that, in order for this Notice of Revocation to be effective, any and all Exchange Consideration so received must be returned to the Company and that its Participation Shares, if applicable, will automatically be rescinded and an equal number of Existing Shares will be re-credited to Subscriber's account on the books and records of the Company upon acceptance hereof by the Company.

Subscriber certifies that any Exchange Consideration previously received has remained in or has been returned to the Citi Private Bank or Smith Barney account(s) in which Subscriber's Existing Shares were previously held and hereby authorizes the Company to debit an amount equal to the Exchange Consideration set forth above from such account(s).    ☐    YES

IN WITNESS WHEREOF, the undersigned has signed this Notice of Revocation in the same manner as the original signature on the Exchange Offer Subscription Agreement by which its Existing Shares were tendered this _____ day of _____, 2008.

By: _____
    Name:

By: _____
    Name:

<b>Annex B</b>

"Accredited Investor" shall mean any person who comes within any of the following categories, or who the Company reasonably believes comes within any of the following categories, at the time of the exchange of securities with respect to that person:

1.  Any bank as defined in section 3(a)(2) of the Securities Act of 1933, as amended (for purposes of this Annex, the "Act"), or any savings and loan association or other institution as defined in section 3(a)(5)(A) of the Act whether acting in its individual or fiduciary capacity; any broker or dealer registered pursuant to section 15 of the Securities Exchange Act of 1934; any insurance company as defined in section 2(a)(13) of the Act; any investment company registered under the Investment Company Act of 1940 or a business development company as defined in section 2(a)(48) of that Act; any Small Business Investment Company licensed by the U.S. Small Business Administration under section 301(c) or (d) of the Small Business Investment Act of 1958; any plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions, for the benefit of its employees, if such plan has total assets in excess of $5,000,000; any employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974 if the investment decision is made by a plan fiduciary, as defined in section 3(21) of such act, which is either a bank, savings and loan association, insurance company, or registered investment adviser, or if the employee benefit plan has total assets in excess of $5,000,000 or, if a self-directed plan, with investment decisions made solely by persons that are accredited investors;

3.  Any private business development company as defined in section 202(a)(22) of the Investment Advisers Act of 1940;

4.  Any organization described in section 501(c)(3) of the Internal Revenue Code, corporation, Massachusetts or similar business trust, or partnership, not formed for the specific purpose of acquiring the securities offered, with total assets in excess of $5,000,000;

5.  Any director, executive officer, or general partner of the issuer of the securities being offered or sold, or any director, executive officer, or general partner of a general partner of that issuer;

6.  Any natural person whose individual net worth, or joint net worth with that person's spouse, at the time of his purchase exceeds $1,000,000;

7.  Any natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year;

8.  Any trust, with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the securities offered, whose purchase is directed by a sophisticated person as described in Rule 506(b)(2)(ii) and

9.  Any entity in which all of the equity owners are accredited investors.

**EXHIBIT J**

SUPPLEMENT NO. 1

TO

FALCON STRATEGIES TWO LLC
PORTFOLIO A

CONFIDENTIAL TENDER AND EXCHANGE OFFER MEMORANDUM

This supplement ("Supplement") is being furnished by Falcon Strategies Two LLC (Portfolio A of which is referred to as the "Company") in connection with its offer to exchange a cash payment of $0.45 per share (the "Exchange Consideration") for its outstanding shares of each series of limited liability company interest ("Existing Shares" and the holders of Existing Shares, "Existing Holders") and, to those Existing Holders who are eligible and so electing, shares of limited liability company participation interest ("Participation Shares") for each Existing Share so tendered, as more fully explained in the Company's confidential tender and exchange offer memorandum, dated May 8, 2008 (the "Confidential Memorandum" and the transactions contemplated thereby, the "Exchange Offer"). This Supplement amends and supplements, and should be read in conjunction with, the Confidential Memorandum. Capitalized terms used herein but not otherwise defined shall have the respective meanings assigned to such terms in the Confidential Memorandum.

**Risks**

We have amended and restated the following risk factor as set forth below:

### Risk of Litigation and Release of Liability

On April 4, 2008 an investor in Falcon Strategies Two B LLC ("Falcon Two B"), one of the Falcon Funds, filed a class action complaint against Falcon Two B, Citi and the Investment Manager in the U.S. District Court for the Southern District of Florida, for common law fraud, violations of Florida blue sky law, negligent misrepresentation and violations of Section 12(a)(2) of the Securities Act. The complaint alleged that the Investment Manager misrepresented the level of risk of its investment strategy and that Falcon Two B and the Investment Manager were aware and knew high risk investment and management strategies were being undertaken in managing Falcon Two B, but failed to disclose those investment strategies to the existing investors and continued to market the fund as a low risk investment tool to investors. The plaintiff sought compensatory and punitive damages, as well as disgorgement of profits and commissions, reimbursement of legal fees and expenses, restitution and rescission. On May 12, 2008, the plaintiff voluntarily dismissed the complaint described above. There can be no assurance that this complaint will not be re-filed or that other similar suits will not be filed or similar claims will not be made against the Company or any of its affiliates. Additionally, the Investment Manager or any individuals selected to advise and manage Funds (each such individual, an "Advisor") might become involved in litigation as a result of investments made by the Company or any other Falcon Fund. Under such circumstances, the Company, the Falcon Funds and/or other affiliated entities could be named as a defendant in a lawsuit or regulatory action. Additionally, Citi is currently responding to a U.S. regulatory inquiry relating to Falcon Two B, Citi, and certain other funds sponsored by, and entities affiliated with, Citi.

You are releasing various parties, including without limitation the Company, the Investment Manager and any Advisor, from liability in connection with any investment loss in respect of your Existing Shares in order to participate in the Exchange Offer; although you are not releasing such parties to the extent, and with respect to, equity interests you may own in any other Falcon Fund. In addition, to the extent that you or others have claims against us or any Releasee in connection with your or their Existing Shares and choose to litigate such claims, including the claim described above, with respect to the Company or similar claims that may be brought against one or more of the Falcon Funds, including the Company, you will not be able to pursue any such claims or participate in any award or settlement which may be obtained as a result of such litigation, which award or settlement may include compensatory and punitive damages, as well as disgorgement of profits and commissions, reimbursement of legal fees and expenses, restoration

1

and rescission. Any damages required to be paid by the Company will reduce the funds available, if any, for distribution on the Participation Shares upon the occurrence of a Participation Event.

**Additional Information**

Except as described in this Supplement, the information provided in the Confidential Memorandum continues to apply and this Supplement should be read in conjunction with the Confidential Memorandum. To the extent information in this Supplement differs from, updates or conflicts with information contained in the Confidential Memorandum, the information in this Supplement is more current. If you need another copy of the Confidential Memorandum or the Exchange Offer Subscription Agreement, please contact Citigroup Alternative Investments LLC, Attn: Investing Services, 731 Lexington Avenue, 27th Floor, New York, New York 10022, or by telephone at (212) 783-1330.

**This Supplement is for informational purposes only. If you have already tendered Existing Shares, you do not need to take any further action with respect to such Existing Shares unless you wish to revoke your prior tender thereof.**

Falcon Strategies Two LLC
Portfolio A

May 15, 2008

**EXHIBIT K**

SUPPLEMENT NO. 2

TO

**FALCON STRATEGIES TWO LLC
PORTFOLIO A**

**CONFIDENTIAL TENDER AND EXCHANGE OFFER MEMORANDUM**

This supplement ("Supplement") is being furnished by Falcon Strategies Two LLC (Portfolio A of which is referred to as the "Company") in connection with its offer to exchange a cash payment of $0.45 per share (the "Exchange Consideration") for its outstanding shares of each series of limited liability company interest ("Existing Shares" and the holders of Existing Shares, "Existing Holders") and, to those Existing Holders who are eligible and so electing, shares of limited liability company participation interest ("Participation Shares") for each Existing Share so tendered, as more fully explained in the Company's confidential tender and exchange offer memorandum, dated May 8, 2008, as amended by Supplement No. 1, dated May 15, 2008 (as so amended, the "Confidential Memorandum" and the transactions contemplated thereby, the "Exchange Offer"). This Supplement amends and supplements, and should be read in conjunction with, the Confidential Memorandum. Capitalized terms used herein but not otherwise defined shall have the respective meanings assigned to such terms in the Confidential Memorandum.

**Risks**

We have amended and restated the following risk factor as set forth below:

**Risk of Litigation and Release of Liability**

On April 4, 2008 an investor in Falcon Strategies Two B LLC ("Falcon Two B"), one of the Falcon Funds, filed a class action complaint against Falcon Two B, Citi and the Investment Manager in the U.S. District Court for the Southern District of Florida, for common law fraud, violations of Florida blue sky law, negligent misrepresentation and violations of Section 12(a)(2) of the Securities Act. The complaint alleged that the Investment Manager misrepresented the level of risk of its investment strategy and that Falcon Two B and the Investment Manager were aware and knew high risk investment and management strategies were being undertaken in managing Falcon Two B, but failed to disclose those investment strategies to the existing investors and continued to market the fund as a low risk investment tool to investors. The plaintiff sought compensatory and punitive damages, as well as disgorgement of profits and commissions, reimbursement of legal fees and expenses, restitution and rescission. On May 12, 2008, the plaintiff voluntarily dismissed the complaint described above. The voluntary dismissal was not the result of an out-of-court settlement or other payment by Falcon Two B or any of its affiliates to the plaintiff. There can be no assurance that this complaint will not be re-filed or that other similar suits will not be filed or similar claims will not be made against the Company or any of its affiliates. Additionally, the Investment Manager or any individuals selected to advise and manage Funds (each such individual, an "Advisor") might become involved in litigation as a result of investments made by the Company or any other Falcon Fund. Under such circumstances, the Company, the Falcon Funds and/or other affiliated entities could be named as a defendant in a lawsuit or regulatory action. Additionally, Citi has received two requests for documents concerning Citi-managed hedge funds in connection with an informal inquiry by the SEC. Citi is responding to those requests and cooperating with the SEC.

On May 20, 2008, an investor in the Company filed a putative class action complaint (the "Complaint") against the Company, Citi, the Managing Member, the Investment Manager and an employee of the Investment Manager (the "Defendants") in the U.S. District Court for the Southern District of New York, alleging violations of sections 10(b) and 14(e) of the Exchange Act and breach of fiduciary duty under Delaware law. The complaint alleges that the Confidential Memorandum contains materially misleading statements and omissions of fact, including the omission of (1) information sufficient to permit investors to accurately value their shares, (2) sufficiently specific information regarding the nature or value of the Company's underlying assets, (3) the nature of existing and potential claims that would be released by tendering investors, (4) the voluntary dismissal of the putative class action related to Falcon Two B

described above, (5) the nature and scope of the U.S. regulatory inquiry disclosed in the Confidential Memorandum, (6) information sufficient to determine whether the liquidation of assets in the Company may generate proceeds exceeding the Exchange Consideration; and (7) misrepresents the events resulting in the decline in value of the Existing Shares. The plaintiff seeks relief in the form of an injunction barring the tender and exchange offer until Defendants have made disclosures the plaintiff claims are necessary to correct or supplement the allegedly inadequate disclosures set forth in the Complaint. On May 21, 2008, the plaintiffs filed an application for a preliminary injunction enjoining the Exchange Offer until such time as the additional disclosures sought in the Complaint are made. We believe we have meritorious defenses to this Complaint and intend to assert such defenses to the fullest extent. The Complaint (Ferguson Family Trust v. Falcon Strategies Two LLC et al., No. 08 Civ. 4723 (S.D.N.Y.)) is publicly available.

By participating in the Exchange Offer, you are releasing various parties, including without limitation the Company, the Investment Manager and any Advisor, from liability in connection with any investment loss in respect of your Existing Shares in order to participate in the Exchange Offer; although you are not releasing such parties to the extent, and with respect to, equity interests you may own in any other Falcon Fund. In addition, to the extent that you or others have claims against us or any Releasee in connection with your or their Existing Shares and choose to litigate such claims, including the claims described above with respect to the Company or similar claims that may be brought against one or more of the Falcon Funds, including the Company, you will not be able to pursue any such claims or participate in any award or settlement which may be obtained as a result of such litigation, which award or settlement may include compensatory and punitive damages, as well as disgorgement of profits and commissions, reimbursement of legal fees and expenses, restoration and rescission. Any damages required to be paid by the Company will reduce the funds available, if any, for distribution on the Participation Shares upon the occurrence of a Participation Event.

**Additional Information**

Existing Holders are encouraged to review the original offering memorandum (the "PPM") pursuant to which they purchased their Existing Shares. Except as described in this Supplement, the information provided in the Confidential Memorandum continues to apply and this Supplement should be read in conjunction with the Confidential Memorandum. To the extent information in this Supplement differs from, updates or conflicts with information contained in the Confidential Memorandum, the information in this Supplement is more current. If you need another copy of the PPM, Confidential Memorandum or the Exchange Offer Subscription Agreement, please contact Citigroup Alternative Investments LLC, Attn: Investing Services, 731 Lexington Avenue, 27th Floor, New York, New York 10022, or by telephone at (212) 783-1330.

**This Supplement is for informational purposes only. If you have already tendered Existing Shares, you do not need to take any further action with respect to such Existing Shares unless you wish to revoke your prior tender thereof.**

Falcon Strategies Two LLC
Portfolio A

May 23, 2008

AFFIDAVIT OF SERVICE BY FEDERAL EXPRESS

STATE OF NEW YORK        )
                         )    ss.:
COUNTY OF NEW YORK       )

Leana Loncarevic, being duly sworn, deposes and says:

1. I am not a party to this action, am over 18 years of age and am employed by Paul,

Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York,

New York 10019.

2. On May 28, 2008, I served true copies of the attached: DEFENDANTS'

MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S APPLICATION FOR

EXPEDITED DISCOVERY AND A PRELIMINARY INJUNCTION and AFFIDAVIT

OF JAMES O'BRIEN on the following:

> Samuel H. Rudman
> Coughlin Stoia Geller Rudman & Robbins LLP
> 58 South Service Road, Suite 200
> Melville, NY 11747

3. I made such service by placing true copies of the aforementioned documents in a

properly addressed prepaid wrapper and delivering it to a Federal Express office for

Priority Overnight Delivery.

_____
Leana Loncarevic
Licence No.: 1262377

Sworn to before me this
28TH day of May, 2008

Notary Public

HERMAN M. WINKLES JR.
Notary Public, State of New York
No. 01WI5049365
Qualified in New York County
Commission Expires Sept. 18, 2009