UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x
FERGUSON FAMILY TRUST, On Behalf of  :  Civil Action No. 08 Civ. 4723 (SHS)
Itself and All Others Similarly Situated,  :
                                :
                    Plaintiff,  :  **REPLY AFFIDAVIT IN FURTHER**
                                :  **SUPPORT OF PLAINTIFF'S**
    vs.  :  **APPLICATION BY ORDER TO SHOW**
                                :  **CAUSE FOR A PRELIMINARY**
FALCON STRATEGIES TWO LLC,  :  **INJUNCTION**
AMACAR GP, INC., CITIGROUP  :
ALTERNATIVE INVESTMENTS LLC,  :
CITIGROUP, INC. and REAZ ISLAM,  :
                                :
                    Defendants.  :
———————————————————— x

STATE OF NEW YORK    )
                           ) ss:
COUNTY OF SUFFOLK   )

      Joseph Russello, an attorney duly licensed to practice in the State of New York, hereby

deposes and says, under penalty of perjury, that:

      1.     I am associated with the law firm of Coughlin Stoia Geller Rudman & Robbins LLP,

counsel for Plaintiff Ferguson Family Trust ("Plaintiff") in this matter, and I submit this Reply

Affidavit for the purpose of placing certain documentary exhibits before the Court in connection

with Plaintiff's Reply Memorandum of Law in further support of Plaintiff's application by Order to

Show Cause for a preliminary injunction.

<h3 style="text-align:center">Exhibits Referenced in the Reply Memorandum of Law</h3>

      2.     The following documents, each of which is a true and correct copy, are referred to as

Exhibits in the accompanying Reply Memorandum of Law by the corresponding letters set forth next

to each one:

            A.     Transcript of May 30, 2008 oral argument before the Court in connection
                  with Plaintiff's expedited discovery motion;

      B.      Cover letter dated May 30, 2008 from Citigroup Alternative Investments LLC, together with Supplement No. 3, dated May 30, 2008, to the Tender Offer Memorandum;

      C.      Supplement No. 1, dated May 23, 2008, to the memorandum issued in connection with the Falcon Strategies Two B LLC tender offer; and

      D.      Page 17 from the memorandum issued in connection with the MAT Five LLC tender offer.

WHEREFORE, Plaintiff respectfully requests the Court to grant its motion for a preliminary injunction, together with such other, different or further relief as this Court deems just and proper.

Dated: Melville, New York
      June 10, 2008

_____
JOSEPH RUSSELLO

Sworn to and subscribed before me
this 10th day of June 2008.

_____
Notary Public

**KELLY A. STADELMANN**
Notary Public, State Of New York
No. 01ST6047260
Qualified In Nassau County
Commission Expires August 28, 2010

# EXHIBIT A

85trferm                                                                    1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   FERGUSON FAMILY TRUST,

4                   Plaintiff,

5           v.                              08 Civ. 4723 (SHS)

6   FALCON STRATEGIES TWO LLC, et al.,
                                            Argument
7                   Defendants.

8   ------------------------------x

9                                           New York, N.Y.
                                            May 30, 2008
10                                          1:25 p.m.
    Before:
11
                HON. SIDNEY H. STEIN
12
                                            District Judge
13

14          APPEARANCES

15

16  COUGHLIN STOIA GELLER RUDMAN & ROBBINS LLP
         Attorneys for Plaintiff
17  JOSEPH RUSSELLO, ESQ.
    ROBERT M. ROTHMAN, ESQ.
18

19  PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
         Attorneys for Defendants Falcon Strategies Two and
20       AMACAR GP and Citigroup
    CHARLES E. DAVIDOW, ESQ.
21

22  ARKIN KAPLAN RICE LLP
         Attorneys for defendant Raez Islam
23  SEAN R. O'BRIEN, ESQ.

24

25

85trferm                                                                    2

```
 1              (Case called)

 2              THE CLERK:  Counsel, please state your names for the

 3     record.

 4              MR. RUSSELLO:  Joseph Russello, with the firm of

 5     Coughlin Stoia Geller Rudman & Robbins, for the plaintiff.

 6              MR. ROTHMAN:  Robert Rothman, from Coughlin Stoia

 7     Geller Rudman & Robbins, on behalf of the plaintiff.

 8              THE COURT:  Good afternoon.

 9              MR. DAVIDOW:  Charles Davidow, from Paul, Weiss,

10     Rifkind, Wharton & Garrison, for defendants Falcon Strategies

11     Two, AMACAR, Citigroup Alternative Investments, and Citigroup

12     Inc.  With me is my colleague Christy Tillingham.

13              THE COURT:  Good afternoon.

14              MR. O'BRIEN:  Sean O'Brien on behalf of Arkin Kaplan

15     Rice, for defendant Raez Islam.

16              THE COURT:  Good afternoon.  First, a disclosure.  I

17     was an attorney at the firm of Paul, Weiss, Rifkind before.

18     That's where I started my legal career.  I left that firm to

19     start my own firm in 1981.

20              Let me set forth on the record the status of the case

21     as I understand it.  Apparently, it originally commenced with

22     the filing of the summons and complaint and the presentation of

23     an order to show cause before Judge Batts in Part I on May 21.

24     It looks as if the case was assigned at that point to Judge

25     Castel.  In any event, sometime subsequent to that it was
```

1  wheeled out to me.  It must be that Judge Castel recused

2  himself, although I don't know.

3      The order to show cause that was signed by Judge Batts

4  does not set a date for requested briefing on a motion for a

5  preliminary injunction.  It says TBA, which I guess is to be

6  ascertained.  But it does provide that today at this time is

7  the return date of an application for expedited discovery.

8  That's where I find myself.

9      The briefing, the moving papers, were a memorandum in

10  support of an application by order to show cause for expedited

11  discovery and preliminary injunction.  So the movants have

12  briefed not only the expedited discovery, which I repeat is

13  what is on before me today, but also the motion for a

14  preliminary injunction.  And there was an affidavit with that,

15  the affidavit of Mr. Rudman.

16      The defendants filed a memorandum of law also, in

17  opposition to both the application for expedited discovery and

18  for preliminary injunction, along with an affidavit of Mr.

19  O'Brien.  And earlier this morning I received a reply

20  memorandum of law in further support of the request for

21  expedited discovery.  The reply did not deal with the motion

22  for a preliminary injunction.

23      So, as I see it, today is a motion for expedited

24  discovery, and indeed the motion for preliminary injunction is

25  fully briefed but for a reply memorandum by the movants.  Do

85trferm

1    both sides agree with that as a statement of where we are

2    today?

3              MR. RUSSELLO:  Yes, your Honor.

4              MR. DAVIDOW:  Yes, your Honor, it is, although we

5    believe your Honor has a sufficient record to deny the

6    preliminary injunction today if you chose.

7              THE COURT:  I'm not going to, because I'm not fully

8    versed in that aspect of it.

9              I have some basic questions that I need to get a

10   better sense of.  There is a tender offer.  Plaintiffs have to

11   decide what to do.  They have to decide whether to tender their

12   shares, which entails getting 45 cents a share, I think.  In

13   exchange, they release certain claims.  They have to decide

14   whether to do that, whether or not to tender their shares.  The

15   tender offer closes, I believe, on June 30.  Correct so far?

16             MR. RUSSELLO:  Yes, your Honor.

17             THE COURT:  If they don't tender their shares, then

18   they will participate in the per share value as the entity is

19   liquidated, correct?

20             MR. RUSSELLO:  Yes.

21             THE COURT:  I understand full well how plaintiffs

22   would want the most information possible so they can be as well

23   informed as is possible on which of those two options to

24   choose, in other words, whether to tender their shares or not

25   to tender their shares.

1        What I'm having trouble understanding is how that

2    concept gibes with the complaint itself, which is based on rule

3    10b-5 and section 10(b) of the Securities Exchange Act and

4    section 14(e) of the Securities Exchange Act.  Then there is a

5    separate claim under Delaware law for breach of fiduciary

6    duties.  Do I have the claims down?

7        MR. RUSSELLO:  Yes, your Honor.

8        THE COURT:  10b-5 and 14(a) are essentially antifraud

9    provisions.  They state essentially that it's unlawful for

10   anyone by any means or instrumentality in interstate commerce

11   to make an untrue statement of material fact or to omit to

12   state a material fact necessary in order to make the statements

13   made in the light of the circumstances under which they were

14   made not misleading.  That's what you are arguing.  You're

15   claiming that there were fraudulent statements or fraudulent

16   omissions, that is, omissions necessary in order to make the

17   statement made not misleading.

18       MR. RUSSELLO:  Yes, your Honor.

19       THE COURT:  I don't really see any claims of

20   misstatements.  I see requests for more information, which I

21   think are understandable.  But I take it there is some body of

22   law out there that says what type of information you are

23   entitled to in tenders offers and what isn't.  You don't seem

24   to be invoking those.  You seem to be invoking the antifraud

25   provisions of the Securities Exchange Act.  That's a

85trferm                                                                        6

1    dislocation that I don't understand.  Speak to me.

2              MR. RUSSELLO:  Your Honor, if I may.  Essentially,

3    what we were seeking to do was proceed under the securities

4    laws and, in addition, 14(e), which is part of the Exchange

5    Act, and of course also the Williams Act.  We believe that the

6    goals of those two statutes essentially are to provide full and

7    accurate material information to shareholders or in this case

8    investors.  14(e) specifically is addressed to the context of a

9    tender offer.

10             You are absolutely correct in saying that we are

11   seeking additional information to render certain statements not

12   misleading.  That's where we are essentially alleging those

13   claims.  They may be recklessness claims.  They may not be

14   claims where somebody set out to defraud the investors

15   specifically, but certainly we believe there are grounds to

16   proceed under those two sections.

17             In that respect, the tender offer is an unlawful

18   tender offer, if you will, which I believe is referred to by

19   even the Gulf case in the Second Circuit, which says that

20   nobody has a right to proceed with an unlawful tender offer.

21   So the claims somewhat coalesce between the Delaware law claims

22   and the securities law claims because we are seeking additional

23   information.

24             THE COURT:  The Delaware law claims are not your

25   Williams Act claim, right?  That's separate?

1           MR. RUSSELLO:   That is correct, that's separate.

2    However, a main concern of the Delaware courts and the Delaware

3    law in general which applies here as well is full and accurate

4    material information to shareholders and investors, and in fact

5    perhaps even broader than the securities laws in certain

6    respects, and of course without an intent requirement.

7           THE COURT:   There is an automatic stay under the PSLRA

8    during the pendency of a motion to dismiss, and there is case

9    law that says that's true before a motion to dismiss is filed

10   if the time has not expired in which to file a motion to

11   dismiss, which is the situation here.  I understand that I have

12   the ability to permit some discovery, particularized discovery,

13   in order to prevent undue prejudice.

14          What the defendants say is the end game here for

15   plaintiff is the discovery itself, that is, what you are

16   seeking is discovery.  I'm sympathetic to that concept.  I'm

17   not certain what the law requires, what the boundaries are as

18   to how much has to be disclosed in the context of a tender

19   offer, but I certainly understand the idea that you need to

20   make an informed decision.

21          The defense is saying that's what you want here, you

22   just want discovery so you know what to do with your shares,

23   and you want the injunction in order that the time will be

24   extended by which you have to make up your mind, and in the

25   meantime you want to be getting additional information and

1    analyzing that to make the most informed choice possible.  But

2    they say the discovery is the end point here, the discovery is

3    not a means to determining whether or not fraudulent and

4    misleading statements have been made.  Address that.

5              MR. RUSSELLO:  Your Honor, we think that's incorrect,

6    with all due respect.

7              THE COURT:  It's correct that what you really want

8    here is more information so you know what to do with your

9    shares, and you want more time so that when you get more

10   information you'll be able to make a more informed decision.

11             MR. RUSSELLO:  Yes, we wholeheartedly agree with your

12   Honor's characterization.  We didn't agree with the defendants'

13   characterization of this being kind of an end run around the

14   PSLRA stay.  The reason for that --

15             THE COURT:  It's not an end run.  It's a total

16   knocking it down.  You go right into it and tackle it, you

17   don't go around it.

18             MR. RUSSELLO:  Of course, we are seeking information

19   regarding some of the omissions that we have identified in

20   order to then provide a full record for the Court and even the

21   parties, for the benefit all, to determine which corrective

22   disclosures, if any, need to be made.  That's the first point.

23             The second point, because this is a private --

24             THE COURT:  Again, I don't think it is corrective

25   disclosure.  As I said, I don't want this to be an argument on

1    the injunction, but there is a merger here to a certain extent

2    of the merits on this discovery issue.  It's not corrective

3    disclosures you're seeking, it's disclosure disclosures.  They

4    don't seem to be connected to a misleading statement.  That's

5    what I'm still struggling with.

6              MR. RUSSELLO:  It may be termed more properly a

7    supplemental disclosure.  I'm give you an example.  With regard

8    to the net asset value of the shares, for instance, defendants

9    say they have produced enough information about that.  As it

10   turns out, in Mr. O'Brien's affidavit in paragraph 11 he notes

11   that the net asset value as of May 31, 2008, will be available

12   on or about June 28, 2008, a month later.  The tender offer

13   closes --

14             THE COURT:  I'm sorry.  They say that monthly the

15   participants in this get the net asset value and it takes it

16   almost a month to get the net asset value.  I think monthly

17   throughout the investment that's what's been happening,

18   correct?

19             MR. RUSSELLO:  I believe that may be what's happening.

20   I can't speak directly to that other than insofar as defendants

21   have said it.  However, our issue with that, and this is why

22   this is an issue on which we need additional or supplemental

23   disclosure, is because in the connection of this tender offer,

24   which involves obviously a private fund, there's no publicly

25   available information whatsoever.

1              That sort of ties in with Judge Mukasey's case, the

2     American Insured case, which involved a public company.

3     However, there it appeared that it was very difficult to value

4     the company.  And that's what we get down to here.  It's very

5     difficult for investors to determine a fair value for this

6     company when they are receiving the information a month later.

7              Now, the defendants are already accepting tendered

8     shares, and they will make payment on those shares as early as

9     June 6, 2008.  So we already have a transaction in which money

10    has flowed through to the investors.

11             We can't really speak to how difficult it would be to

12    reverse that kind of a transaction.  That's why we are seeking

13    information regarding something like the net asset value in

14    order to provide investors with that information on an earlier

15    basis than they would ordinarily receive it on the base of the

16    transaction.

17             THE COURT:  When does the May 30 net asset value come

18    out?  Does it come out prior to the close of the tender offer?

19             MR. RUSSELLO:  As far as I understand, it comes out

20    two days prior to the tender offer.

21             THE COURT:  You will have that then.

22             MR. RUSSELLO:  The only problem is that investors

23    currently are tendering shares and in doing so they are also

24    releasing claims and potentially will not revoke those tenders.

25    That's where the issue is.  That's where we tie in to the

1   principles under the Williams Act and Delaware law in providing

2   investors with fully informed circumstances under which to make

3   decisions about significant corporate transactions like the

4   tender offer.

5          THE COURT:  Can you cite a particular case or

6   provision that is not an antifraud provision, that doesn't deal

7   with misleading statements, but that simply says you haven't

8   gotten the information you're entitled to in a tender offer?

9          MR. RUSSELLO:  Essentially, your Honor --

10         THE COURT:  That doesn't seem to be what you are suing

11  on.  Go ahead.

12         MR. RUSSELLO:  The same rules that would apply to any

13  corporate transaction such as a merger would also apply here.

14  That's where we come into Delaware law as well.  The Pure

15  Resources case is specifically on point in a sense.  That was a

16  Delaware chancery court case in which a so-called naked

17  fairness opinion was disclosed to investors.

18         What that fairness opinion said was just basically the

19  end game, the result:  This is the result, this is the

20  valuation of your shares, this is the valuation of your shares.

21  There was not the work, so to speak, that went into that, the

22  analyses.

23         Here we have a similar situation.  In disclosing only

24  the net asset value but not the inputs themselves, which we

25  deem are material and should be disclosed -- and really I think

1    the standard is materiality here, what's material and what's

2    not.   Under Delaware law, all material information must be

3    disclosed.   That would include the analyses or the inputs that

4    went into determining the net asset value.  So that's more

5    information we would like.

6              THE COURT:  When you say the inputs, you certainly

7    know the methodology.  Right?  The methodology of their

8    obtaining the net asset value figure has been disclosed.

9              MR. RUSSELLO:  That was disclosed in the initial

10   offering memorandum.  But as far as I understand it, it was not

11   disclosed in connection with this tender offer, and that is

12   also something we would like disclosed.  I know defendants have

13   characterized that as almost quarreling with the methodology.

14   There is no quarreling.  It's just additional information that

15   should be disclosed in this context.

16             THE COURT:  What you want to know is if the

17   methodology of determining net asset value has changed from the

18   original offering memorandum?

19             MR. RUSSELLO:  That's precisely what we also need to

20   know.  That's extremely material, particularly because of the

21   events that have recently occurred with the credit and

22   financial markets.  There is an indication in the offering

23   memorandum that in fact the strategy has changed, that most of

24   the assets now are parked into two separate investments, asset-

25   backed securities and some other securities, as a result of

85trferm                                                                    13

1    some turmoil or perhaps even mishandling of the funds.

2           THE COURT:  That's a different issue, I think.  You're

3    talking now about whether the methodology of the investments

4    they are in has altered.  I thought we were talking about the

5    methodology of how they determined what they call NAV.

6           MR. RUSSELLO:  Yes, your Honor.  But they are almost

7    interrelated issues because insofar as some sort of strategy

8    has changed, inevitably the inputs will change.  And even if

9    they are using the same methodologies, the net asset value

10   would not have the same sort of weight it would have if they

11   had stuck with the initial structure and the investment

12   strategy.  Certainly it can also be a separate issue insofar as

13   yes, that's purely material information with regard to whether

14   or not they are calculating it the same way that they

15   represented initially.

16          Also, I should point out that the initial offering

17   memorandum may not even be within the investors' possession at

18   this point.  A lot of these investors are credit investors, and

19   they have brokers and others who sort of communicate things

20   between them and information about the company and things of

21   this nature.  So it's not clear whether or not they even have

22   that information within their possession at this point.

23          THE COURT:  When you say the inputs, are you talking

24   about the specific assets of the company?  The company says, if

25   we disclose the specific assets, that will hinder our ability

                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

1   to sell them in a liquidation.  I assume what they mean is if

2   they disclose that they have $2 billion of X security, then the

3   market will know that there is about to come on to the market

4   $2 billion of that security, which will hinder Falcon's ability

5   to liquidate.

6           MR. RUSSELLO:   That's sort of circuitous logic.  The

7   reason why is, first of all, investors have to decide whether

8   or not to retain their shares as part of the tender offer.

9   They can retain their shares and have no idea how things are

10  being liquidated or what the assets are to make any independent

11  determination or even a determination based on information

12  that, of course, is exclusively within defendants' possession,

13  to see what the value of these assets is now as compared to the

14  tender offer consideration, to see what may occur in the

15  markets, to kind of wait it out even.  They don't really have

16  that option.

17          In this context particularly, where you have, again, a

18  private entity, and this information simply can't be obtained

19  anywhere else, the information is more material than ever.  I

20  harken back to the American Insured case with Judge Mukasey,

21  who said that essentially the circumstances are what deem what

22  is material and what it is.

23          But specifically with the assets, first of all, that

24  was a completely conclusory statement in an affidavit.  Other

25  than that, there's no indication that investors themselves are

1  going to disclose this information publicly.  That would, of

2  course, undercut their own interests.

3           THE COURT:  Thank you.

4           Let me hear from the defense.  I'll hear whatever

5  you'd like to say, but I'd like a preview of your response on

6  irreparable injury.

7           The plaintiff says, and it has some resonance with me,

8  that because Falcon is being liquidated, if they are right, at

9  the end of the day there are not going to be any assets there.

10  I think your response in your papers was, first of all, it's

11  money damages we're talking about, and if the value has been

12  miscalculated, the reward for that or at the end of the day

13  what they will get is a difference in value; but even if Falcon

14  is liquidated, there are other defendants here, so it doesn't

15  matter.  Is that essentially your response?

16           MR. DAVIDOW:  Yes, although I'd like to elaborate

17  slightly.  The notion that Falcon's liquidation will deprive

18  them of a source of funds is wrong for three separate reasons.

19           First, bear in mind Falcon is just a pool of assets.

20  They own it.  If their notion is they are going to sue Falcon

21  and get money out of it, all they are doing is suing

22  themselves, taking money out of their left pocket and, after

23  paying a fee to their counsel, putting what's left into their

24  right pocket.  The notion that this class will want to recover

25  damages from Falcon is, frankly, preposterous.

85trferm

1            Second of all, the issue before you is not --

2            THE COURT:  Why?  You mean its preposterous in a

3    different way than shareholders suing a corporation because

4    they own the corporation also?

5            MR. DAVIDOW:  It differs from that in a couple of

6    respects.  One is there is a changing group of shareholders in

7    a corporation.  Second, the corporation is an operating

8    business that is continually generating new money.  This is

9    just a pool of assets that's being liquidated.  There's no one

10   other than themselves to recover in a much more literal sense

11   than is the case in an action against a corporation.

12           The second reason why their argument is invalid is

13   that we're not here talking about the liquidation.  One way or

14   another this entity is going to be liquidated.  They are not

15   trying to stop it.  They can't stop it.  Whether they tender or

16   not, it will be liquidated.

17           Whatever claims they have, if they don't release them,

18   they will be bringing them against this liquidating entity.  If

19   they do release them, then there will be no one they need to

20   bring them against.  But the fact of the liquidation is not

21   what's before your Honor here.

22           As you noted, the other defendants aren't going

23   anywhere.  So the argument that they will be prejudiced in that

24   way simply doesn't work.

25           More significantly, it seems to me, the basic core

1    elements of irreparable injury aren't met.  Number one, this is

2    a transaction that ultimately involves changing who owns what's

3    left in Falcon and paying out money to the tendering

4    shareholders now.  If the Court were to decide at some point in

5    the future that they really do have a claim and the interests

6    need to be rejiggered back to where they were, this is not a

7    case where things will have happened that wouldn't have

8    happened otherwise, and that can still be done.

9            Second of all, what they are getting at is a matter

10   that is purely compensable in damages.  If their view is 45

11   cents turns out not to be a good price, then they still have

12   their claim.

13           Now, since in this particular tender offer those who

14   tender will retain an interest in the excess, they are going to

15   know what the excess is, if any.  This is purely a matter

16   that's compensable in damages.

17           THE COURT:  Wait.  Do that again.  I thought if you

18   tender it's only if you're part of that second group that you

19   retain an interest.

20           MR. DAVIDOW:  Essentially, Falcon could only be

21   offered to accredited investors, that is, those who met certain

22   net worth requirements.  Anyone who tenders and who still meets

23   those requirements will get participation shares.  It

24   automatically goes with it.  It's only if someone has had a

25   sufficient downturn in their net worth that they are no longer

1    accredited.

2            THE COURT:  I see.  I didn't realize that.

3            MR. DAVIDOW:  So the fact is that they will still have

4    a 75 percent interest in the liquidation above 45 cents, if

5    any, although the materials indicate that that seems unlikely

6    given that the net asset values at the moment are in the low

7    20's.

8            There are a couple of other points I'd like to

9    address.  First, with respect to the statement that NAV's

10   aren't available --

11           THE COURT:  NAV's aren't?

12           MR. DAVIDOW:  Aren't available.  The suggestion is

13   they don't have any current NAV's.  As of the time of the

14   current tender offer, the most recently NAV available was March

15   31st, and it was provided.  The April 30th NAV just became

16   available in the last couple of days according to the normal

17   schedule.  It has been posted.  It's available online to

18   investors who choose to get their information that way.  And

19   it's in the mail, so those who rely on the mail will have it

20   within a few days.  There's every reason to expect that their

21   NAV's for the end of May will be available in late June, just

22   as you suggested.

23           As to the reason it takes so long, there are some

24   small number of assets remaining that one can price off of a

25   pricing service, and those are easy.  The overwhelming majority

1    of them are not in that category.  They are highly illiquid

2    investments, such as mortgage-backed securities, collateralized

3    loan obligations, collateralized debt obligations.

4         The way those are priced is that the custodians, or

5    Citi Alternative Investments, has to go out and try and find a

6    brokerage firm that will give them a quote.  We're talking

7    about hundreds of these illiquid and somewhat arcane

8    investments.  That's a process that takes time.

9         There has been no issue raised as to the adequacy or

10   the accuracy of these valuations.  Plaintiffs have not been

11   able to allege that there's anything wrong with the NAV's.  And

12   they are being provided them on a normal basis.

13        Each investor is perfectly in a position to say, my

14   NAV was 20 cents a share last month, it's 22 cents a share this

15   month, they are offering me 45 cents a share as part of this

16   tender offer.  The investor is then in a situation where it can

17   say, I will or will not take the risk that this will turn out

18   to be a good deal or a bad deal based on what I know about the

19   value of what I have now.

20        With respect to the underlying assets, I'm unaware of

21   any case, even those involving publicly held securities which

22   are subject to specific disclosure requirements under the

23   Williams Act, where a court has said you must list every asset

24   and put a price on it.  I have not seen that held.  To the

25   contrary, there are two Delaware cases, and it's really

20

1    Delaware that plaintiffs are relying on principally on this

2    issue, that are very close to directly on point and come out to

3    the contrary.

4         The Delaware supreme court addressed the case in Skeen

5    v. Jo-Ann Stores, which we cite in our brief.  That was a

6    cash-out merger transaction where the minority shareholders

7    claimed they needed backup detail behind the company's

8    financial statements to assess the best course of action, just

9    as the plaintiff is saying here.

10        The Delaware supreme court rejected that view.  In a

11   couple of quotes, first it said, quote, "Omitted facts are not

12   material simply because they might be helpful."  Second, it

13   said, "The complaint alleges no facts suggesting that the

14   undisclosed information is inconsistent with or otherwise

15   significantly differs from the disclosed information."

16        THE COURT:  That's from Skeen?

17        MR. DAVIDOW:  That's Skeen, yes, your Honor.  The

18   court goes on to state, concluding the quote, "Appellants

19   merely alleged that the information would be helpful in valuing

20   the company."  That's precisely what plaintiffs are saying here

21   and precisely what the Delaware supreme court rejected.

22        The point here is that the key information they need

23   they have.  As your Honor noted, providing a complete list of

24   several hundred of these highly illiquid investments to our

25   hundreds of investors would run an extreme risk, indeed almost

1   a certainty, that that information would get out.

2        When you're talking about these illiquid securities,

3   telling the other firms on Wall Street that there is, shall we

4   say, a very highly motivated seller looking to sell them would

5   reasonably be expected to be damaging to the ability to obtain

6   the best value from those investments.

7        The other items that plaintiffs claim they need,

8   frankly, are makeweights.  They claim they need to know more

9   about a class action that was filed against a different Falcon

10  partnership, not the one in which they invested, and it was

11  voluntarily dismissed by the plaintiff.

12       If what they want to know is what do other people

13  think the defendants did wrong, they can find that.  That

14  complaint is publicly available to them.  It was filed in the

15  Southern District of Florida and we closed it.

16       They say that we have disclosed that there is a

17  regulatory proceeding and they want to know all about it.  No

18  case has been brought.  As we have disclosed, we received two

19  document requests from the SEC relating to Citigroup-related

20  hedge funds generally.

21       THE COURT:  I take it it doesn't involve the

22  defendants?

23       MR. DAVIDOW:  Yes.  Well, it involves Citigroup, hedge

24  funds owned by Citigroup, Citigroup, Inc. and Citigroup

25  Alternative Investments.

1          THE COURT:  All right.

2          MR. DAVIDOW:  All we have at this point is a request

3    for documents.  The notion that they have to see that request

4    because it will affect the decisions of investors once again

5    appears to me to be a makeweight.

6          Finally, they suggest that they need to know more

7    about what they view as inaccurate sales practices or

8    inaccurate representations.  Again, that's difficult to

9    understand because their complaint asserts that this was sold

10   as a conservative investment when the offering memorandum

11   states on its face that it's highly risky.

12         The last point I want to make is that plaintiff's

13   counsel indicated that some of the investors may have lost

14   their offering memoranda.  If there's an investor who wants a

15   copy of the offering memorandum and doesn't have it, they

16   really ought to ask.  They don't need to come to court to seek

17   injunctive relief to get that.

18         In sum, your Honor, our view of this is they haven't

19   come close to alleging any of the basic elements for a

20   preliminary injunction.  No matter how much discovery they seek

21   or get, they are not going to be able to establish irreparable

22   injury here.

23         No matter how much discovery they seek or get, they

24   are not going to be able to create out of thin air disclosure

25   requirements when, as your Honor pointed out, 10(b) and 14(e)

1    are antifraud provisions.  Additional discovery is not needed

2    for those.

3            That was the reason why I had suggested at the

4    beginning of the day that your Honor has all the information

5    necessary and the briefs adequate to address the issue of

6    whether a preliminary injunction should be granted at all.

7    Recognizing that your Honor doesn't choose to do that today,

8    we'd be happy to appear at whatever time your Honor sets.

9            THE COURT:  Thank you.

10           Did you wish to add anything, sir?

11           MR. O'BRIEN:  No.  I just join in Mr. Davidow's

12   presentation.

13           THE COURT:  Thank you.

14           Did you have anything you wanted to rebut?

15           MR. RUSSELLO:  Yes, your Honor.  Briefly, I'll touch

16   on a few points here.

17           The first point that I wanted to address was

18   irreparable harm.  If we even get to this part of the

19   equation -- actually it's not a requirement under the good

20   faith standard that allows parties to conduct discovery on an

21   expedited basis.  Judge Lynch held that in Bank Al-Madina, I

22   believe it was.  So we actually believe that that standard

23   should apply.

24           But assuming that we do need to make a further showing

25   here with regard to the irreparable harm, defense counsel

85trferm

1    actually made our case for us insofar as he stated that there

2    wouldn't be any monetary recover available from Falcon, there

3    just wouldn't be.  So in this case at this stage injunctive

4    relief is appropriate.

5           More than that, the Federated case again is somewhat

6    on point here because that case involved a tender offer in

7    which noteholders were asked to tender but because the company

8    had a planned insolvency, as a part of a reorganization I

9    believe it was, there wouldn't be any funds to recover.  So

10   there that was held to be irreparable harm.  We have a similar

11   situation here with this planned liquidation, and we really

12   think that requires further consideration.

13          THE COURT:  Again, for example, you ask for documents

14   to disclose the current net asset value.

15          MR. RUSSELLO:  Yes.

16          THE COURT:  You will get the current asset value on

17   the schedule that has always been available, apparently.

18   Discovery on the methodology of determining the net asset

19   value, for example, you have that.  And you are not alleging

20   this is anything misleading about that as I understand it, is

21   that right?  You say it may have changed; that I understand.

22          MR. RUSSELLO:  In context it may be misleading.  The

23   reason why is because the net asset value of course would have

24   changed.  When the offering memorandum came out, it was May

25   8th.  At that time they disclosed net asset value for March

85trferm

1    31st.  In connection with a tender offer, you would think that

2    that would at least require additional disclosure on an earlier

3    basis.  Disclosing on June 28th the net asset value from a

4    month early just does no good for investors.

5            THE COURT:  That brings me again to where I'm stuck.

6    The allegations are fraudulent misstatements, but you seem to

7    be simply saying, I want more information to know whether or

8    not I should tender my shares as opposed to information

9    designed to unpack an alleged fraudulent misstatement.  That's

10   where I'm stuck.

11           MR. RUSSELLO:  Part of the issue I think arises under

12   just the general policy of the Williams Act, which was

13   essentially enacted to target investors with enough

14   information.  It's still an antifraud provision, that's

15   absolutely true.

16           But here we are also alleging certain recklessness

17   that occurred.  That comes out of the fact that Citigroup and

18   CIA and its affiliates control this company.  So as part of the

19   transaction, what's going to happen is that for each tendered

20   share, Citigroup is going to pay the tender offer amount, 45

21   cents, and a newly issued share is going to be issued to

22   Citigroup.  So the money is essentially going to pass directly

23   through.

24           Citigroup is, of course, in a position of superior

25   knowledge.  Inevitably, it is using that knowledge to move

85trferm

1    forward on a tender offer which is sort of under the guise of

2    Falcon acquiring its own shares.  In reality, it's really

3    Citigroup acquiring Falcon.  So there must certainly be some

4    information out there that is useful to investors.

5             That's what we are alleging, that there is information

6    out there that would render some of the statements misleading

7    in its absence because we just don't know what the current net

8    asset value is, we don't even necessarily know the purpose of

9    the transaction.  Of course, defendants have said they don't

10   have to disclose that.  In truth, in the Arnold case the

11   Delaware supreme court held that in fact certain aspects of the

12   events leading up to a transaction do need to be disclosed.

13            Your Honor, I don't know if you would like me to spend

14   more time on this or if you would like me to move on to further

15   points.

16            THE COURT:  Go ahead, move on.

17            MR. RUSSELLO:  With respect to the Skeen case, there

18   are two interesting cases that follow Skeen.  One is the Pure

19   Resources case.  In that case specifically the Delaware

20   chancery court tried to resolve what it called an ambivalent

21   response toward disclosure and said that stockholders are

22   entitled to a fair summary of the substantive work performed by

23   investment bankers upon whose advice the recommendations of the

24   board as to how to vote on a merger or tender rely.

25            We do think that that is akin to a situation where

1    your only access is information provided by defendants of, say,

2    the NAV but no other underlying information.  There the court

3    specifically spoke to Skeen and supposedly resolved that

4    ambivalent response issue.

5             There is also another case that followed Skeen, and I

6    believe that that is the Ericsson case, which is also in

7    Delaware.  That I think essentially pointed out that the

8    plaintiffs didn't allege that there was anything wrong with the

9    information that was provided in Skeen, so that didn't

10   necessitate any further disclosure.

11            But here we have some other, additional issues that

12   were deemed makeweight by defendants.  The SEC inquiry by no

13   means is makeweight.  In fact, an important case on this point

14   may be the Gulf case, again the Second Circuit, where A&P was

15   going to be inquired into.  There was a transaction involving

16   A&P, but what wasn't disclosed were these very real antitrust

17   risks.

18            Here as well we have very real regulatory risks.

19   People don't know the scope of the inquiry other than it

20   involves Citi's management of its hedge funds.  Does that

21   include Falcon?  Presumably so, but, again, we don't have any

22   information on that.

23            The fact that the SEC has made document requests

24   actually bears in favor of lifting any stay of discovery at

25   this juncture.

85trferm                                                                    28

1            THE COURT:  How?  I don't understand your entitlement

2    to know what a regulatory action by the government involves.

3            MR. RUSSELLO:  Part of the problem is the fact that

4    investors are being asked to release their claims.  So they

5    can't determine the nature of their claims necessarily if they

6    don't really know the scope of the regulatory investigation

7    that may uncover some information.

8            The second thing is that there are those cases, Judge

9    Sweet I believe in LaBranche, for instance, ordered the stay to

10   be lifted when there had been documents produced to

11   governmental authorities.  It happens routinely.  It happened

12   in WorldCom, in Enron, a whole number of cases.

13           THE COURT:  That was much further down the line in an

14   ongoing series of litigations.  I don't think you could use

15   WorldCom and Enron in this context.

16           MR. RUSSELLO:  That's true.  But the importance I

17   think still should be recognized here insofar as the tender

18   offer is a very time-sensitive transaction.  It's going to

19   close soon and we're not going to have the information.  Of

20   course that necessitates the injunction motion and necessitates

21   the demand for documents, which we believe, by the way, are

22   very particularized.  In addition, there hasn't been any

23   objection to the number of depositions that we would like to

24   conduct either.

25           THE COURT:  Thank you.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1          Defense, respond to the point that because they are

2   being asked to sign a broad release, they are entitled to know

3   exactly what potential claims are, and if they knew more about

4   the SEC regulatory action, they would get a better sense of

5   what potential claims out there exist that they would be

6   releasing if they tendered their shares.

7          MR. DAVIDOW:  Information about an SEC document

8   request tells them nothing about what claims might be out

9   there.

10         THE COURT:  But it tells them what the SEC is sniffing

11  around about.

12         MR. DAVIDOW:  It tells them what documents the SEC has

13  asked for, that's all it tells them.  I know of no basis to

14  suggest that that is a matter that investors would consider

15  material.  Materiality is the issue here under Delaware law.

16  Under the federal laws, as your Honor noted before, unless they

17  have alleged a false or misleading statement, there is simply

18  no basis for simply wanting more information.

19         In the cases like Enron and others, where you had

20  investigations that had gone on to the point, and I believe

21  this is the case, that there had been large productions of

22  materials, that there had been cases brought -- in the case of

23  WorldCom, the SEC had actually commenced a proceeding and made

24  accusations -- one can see a better argument for it.

25         Where there has not been so much as a Wells call or a

85trferm                                                                          30

1    case brought, there is absolutely no reason to believe that the

2    SEC has considered what claims to bring or that the investors

3    have a need as a matter of materiality to know what requests

4    have been sent.

5              THE COURT:  Thank you.

6              We have segued I think by way of necessity into the

7    preliminary injunction.  I'm going to ask that you come back,

8    because I want to think about the cases that you have presented

9    me with more, come back on Tuesday the 17th if you can, at

10   3:00, and we will have further discussion on the injunction

11   point.

12             Right now I'm going to deny the request for expedited

13   discovery.  I'm going to adhere to the PSLRA stay of discovery.

14   I don't think discovery is needed here to prevent undue

15   prejudice based on what I've heard.  I do think it is a search

16   for additional information; I just don't see the linkage to

17   alleged misleading statements.  I obviously want to focus on

18   that.

19             I'll be working on this.  If I change my mind, I'll

20   certainly let everybody now.  As of now, this is a denial of

21   the request for expedited discovery.

22             Oral argument, or I should say further oral argument

23   on June 17th at 3 p.m.

24             Anything else?  Sir?

25             MR. RUSSELLO:  One thing, your Honor.  With respect to

85trferm                                                                    31

1   an opportunity to reply in connection with the injunction

2   motion, may we have an opportunity?

3            THE COURT:  Yes, you do have an opportunity.  When

4   would you like to respond?  I'm not going to press you on the

5   time, but the more time I have to think about it, the better it

6   is for the litigants.  Whatever you want.  Save this weekend

7   though.

8            MR. RUSSELLO:  Would it be OK to file a reply on or

9   about the 12th?  I don't really have a date in front of me.

10           THE COURT:  Can you do it by the 10th?  That's a

11  Tuesday.

12           MR. RUSSELLO:  Sure.

13           THE COURT:  Do it by the 10th, Tuesday, and have a

14  copy hand-delivered to chambers as well as filing.

15           MR. RUSSELLO:  Sure.

16           THE COURT:  Anything else?  Thank you all.

17           (Adjourned)

18

19

20

21

22

23

24

25

# EXHIBIT B

731 Lexington Avenue
New York, NY  10022

Citi Alternative Investments



May 30, 2008

Dear Investor in Falcon Strategies Two LLC (the "Company"):

Enclosed is Supplement No. 3 to the Company's Confidential Tender and Exchange Offer Memorandum dated May 8, 2008, as supplemented by Supplement No. 1 dated May 15, 2008 and Supplement No. 2 dated May 23, 2008 (the "Confidential Memorandum").  This Supplement should be read in conjunction with the Confidential Memorandum.

This Supplement is for informational purposes only.  If you have already tendered Existing Shares (as defined in the Confidential Memorandum) you do not need to take any further action with respect to such Existing Shares.

If you have any questions regarding the terms of the Tender and Exchange Offer, please direct your questions to CAI Investor Services at (212) 783-1330.  Thank you for your time in reviewing this request.

Sincerely,

Citigroup Alternative Investments LLC

**SUPPLEMENT NO. 3**

**TO**

**FALCON STRATEGIES TWO LLC
PORTFOLIO A**

**CONFIDENTIAL TENDER AND EXCHANGE OFFER MEMORANDUM**

This supplement ("Supplement") is being furnished by Falcon Strategies Two LLC (Portfolio A of which is referred to as the "Company") in connection with its offer to exchange a cash payment of $0.45 per share (the "Exchange Consideration") for its outstanding shares of each series of limited liability company interest ("Existing Shares" and the holders of Existing Shares, "Existing Holders") and, to those Existing Holders who are eligible and so electing, shares of limited liability company participation interest ("Participation Shares") for each Existing Share so tendered, as more fully explained in the Company's confidential tender and exchange offer memorandum, dated May 8, 2008, as amended by Supplement No. 1, dated May 15, 2008, and by Supplement No. 2, dated May 23, 2008 (as so amended, the "Confidential Memorandum" and the transactions contemplated thereby, the "Exchange Offer"). This Supplement amends and supplements, and should be read in conjunction with, the Confidential Memorandum. Capitalized terms used herein but not otherwise defined shall have the respective meanings assigned to such terms in the Confidential Memorandum.

**This Supplement is for informational purposes only. If you have already tendered Existing Shares, you do not need to take any further action with respect to such Existing Shares unless you wish to revoke your prior tender thereof.**

**Net Asset Value**

We have amended and restated Annex A to the Confidential Memorandum to provide the net asset value ("NAV") per Existing Share as of April 30, 2008. The Exchange Offer does not affect the methodology employed to calculate the NAV of the Company or the Existing Shares. The NAV of the Existing Shares has been and will continue to be calculated in the same manner as has been calculated since the date of the original offering memorandum pursuant to which the Existing Shares were purchased (the "Original PPM"). The Exchange Offer will not affect the methodology by which income, gains and losses are allocated to the Existing Shares for those who choose not to participate.

**Risks**

We have amended and restated the following risk factor as set forth below:

**Risk of Litigation and Release of Liability**

On April 4, 2008 an investor in Falcon Strategies Two B LLC ("Falcon Two B"), one of the Falcon Funds, filed a class action complaint against Falcon Two B, Citi and the Investment Manager in the U.S. District Court for the Southern District of Florida, for common law fraud, violations of Florida blue sky law, negligent misrepresentation and violations of Section 12(a)(2) of the Securities Act. The complaint alleged that the Investment Manager misrepresented the level of risk of its investment strategy and that Falcon Two B and the Investment Manager were aware and knew high risk investment and management strategies were being undertaken in managing Falcon Two B, but failed to disclose those investment strategies to the existing investors and continued to market the fund as a low risk investment tool to investors. The plaintiff sought compensatory and punitive damages, as well as disgorgement of profits and commissions, reimbursement of legal fees and expenses, restitution and rescission. On May 12, 2008, the plaintiff voluntarily dismissed the complaint described above. The voluntary dismissal was not the result of an out-of-court settlement or other payment by Falcon Two B or any of its affiliates to the plaintiff. There can be no assurance that this complaint will not be re-filed or that other similar suits will not be filed or similar claims will not be made against the Company or any of its affiliates.

On May 20, 2008, an investor in the Company filed a putative class action complaint (the "Complaint") against the Company, Citi, the Managing Member, the Investment Manager and an employee of the Investment Manager (the "Defendants") in the U.S. District Court for the Southern District of New York, alleging violations of sections 10(b) and 14(e) of the Exchange Act and breach of fiduciary duty under Delaware law. The complaint alleges that the Confidential Memorandum contains materially misleading statements and omissions of fact, including the omission of (1) information sufficient to permit investors to accurately value their shares, (2) sufficiently specific information regarding the nature or value of the Company's underlying assets, (3) the nature of existing and potential claims that

would be released by tendering investors, (4) the voluntary dismissal of the putative class action related to Falcon Two B described above, (5) the nature and scope of the U.S. regulatory inquiry disclosed in the Confidential Memorandum, (6) information sufficient to determine whether the liquidation of assets in the Company may generate proceeds exceeding the Exchange Consideration; and (7) misrepresents the events resulting in the decline in value of the Existing Shares. The plaintiff seeks relief in the form of an injunction barring the tender and exchange offer until Defendants have made disclosures the plaintiff claims are necessary to correct or supplement the allegedly inadequate disclosures set forth in the Complaint. On May 21, 2008, the plaintiffs filed an application for a preliminary injunction enjoining the Exchange Offer until such time as the additional disclosures sought in the Complaint are made. We believe we have meritorious defenses to this Complaint and intend to assert such defenses to the fullest extent. The Complaint (Ferguson Family Trust v. Falcon Strategies Two LLC et al., No. 08 Civ. 4723 (S.D.N.Y.)) is publicly available.

Additionally, the Investment Manager or any individuals selected to advise and manage Funds (each such individual, an "Advisor") might become involved in litigation as a result of investments made by the Company or any other Falcon Fund. Under such circumstances, the Company, the Falcon Funds and/or other affiliated entities could be named as a defendant in a lawsuit or regulatory action. Citi has received two requests for documents concerning Citi-managed hedge funds in connection with an informal inquiry by the SEC. Citi is responding to those requests and cooperating with the SEC. Certain affiliates of the Company are currently the subject of Financial Industry Regulatory Authority arbitration proceedings relating to sales practices relating to securities of the Company or its affiliates. The Release would prevent participating holders from engaging in such proceedings and there can be no assurance as to the ultimate result of such claims or that other similar proceedings will not be brought against the Company the Falcon Funds and/or other affiliated entities.

By participating in the Exchange Offer, you are releasing various parties, including without limitation the Company, the Investment Manager and any Advisor, from liability in connection with any investment loss in respect of your Existing Shares in order to participate in the Exchange Offer; although you are not releasing such parties to the extent, and with respect to, equity interests you may own in any other Falcon Fund. In addition, to the extent that you or others have claims against us or any Releasee in connection with your or their Existing Shares and choose to litigate such claims, including the claims described above with respect to the Company or similar claims that may be brought against one or more of the Falcon Funds, including the Company, you will not be able to pursue any such claims or participate in any award or settlement which may be obtained as a result of such litigation, which award or settlement may include compensatory and punitive damages, as well as disgorgement of profits and commissions, reimbursement of legal fees and expenses, restoration and rescission. Any damages required to be paid by the Company will reduce the funds available, if any, for distribution on the Participation Shares upon the occurrence of a Participation Event.

## Revocation Rights

Tenders of Existing Shares (including Existing Shares tendered for Early Settlement) may be revoked at any time prior to the Expiration Date. For a revocation of a tender to be effective, a written notice of revocation (the form of which is attached as Annex A to the Exchange Offer Subscription Agreement) must be received by the appropriate party prior to the Expiration Date in accordance with the instructions set forth in the Exchange Offer Subscription Agreement. Existing Holders who have tendered Existing Shares for Early Settlement who wish to revoke such tenders must also return the Exchange Consideration received prior to the Expiration Date. See "The Exchange Offer—Revocation Rights" (and, if applicable "—Early Settlement") in the Confidential Memorandum.

## Additional Information

Except as described in this Supplement, the information provided in the Confidential Memorandum continues to apply and this Supplement should be read in conjunction with the Confidential Memorandum. To the extent information in this Supplement differs from, updates or conflicts with information contained in the Confidential Memorandum, the information in this Supplement is more current. If you need another copy of the Original PPM, Confidential Memorandum or the Exchange Offer Subscription Agreement, please contact Citigroup Alternative Investments LLC, Attn: Investing Services, 731 Lexington Avenue, 27th Floor, New York, New York 10022, or by telephone at (212) 783-1330.

Falcon Strategies Two LLC
Portfolio A

May 30, 2008

2

AMENDED AND RESTATED

ANNEX A TO CONFIDENTIAL TENDER AND EXCHANGE OFFER MEMORANDUM

NET ASSET VALUE AND EXCHANGE CONSIDERATION

FALCON STRATEGIES TWO LLC - SERIES 2005-1A

| Net Asset Value | | | |
|---|---|---|---|
| Per Share as of March 31, 2008 | Percentage of Initial Capital Invested* | Per Share as of April 30, 2008 | Percentage of Initial Capital Invested* |
| $0.192 | 19.1% | $0.224 | 22.3% |

| Exchange Consideration | |
|---|---|
| Per Share | Percentage of Initial Capital Invested* |
| $0.450 | 44.9% |

| Distributions Since Inception as a Percentage of Initial Capital Invested* |
|---|
| 18.2% |

*Initial Capital Invested represents purchases from the Company and not any subsequent transfers

# EXHIBIT C

**SUPPLEMENT NO. 1**

**TO**

**FALCON STRATEGIES TWO B LLC**

**AMENDED AND RESTATED CONFIDENTIAL TENDER AND EXCHANGE OFFER MEMORANDUM**

This supplement ("Supplement") is being furnished by Falcon Strategies Two B LLC (the "Company") in connection with its offer to exchange a cash payment of $0.45 per share (the "Exchange Consideration") for its outstanding shares of each series of limited liability company interest ("Existing Shares" and the holders of Existing Shares, "Existing Holders") and, to those Existing Holders who are eligible and so electing, shares of limited liability company participation interest ("Participation Shares") for each Existing Share so tendered, as more fully explained in the Company's confidential tender and exchange offer memorandum, dated April 23, 2008, as amended and restated by Amendment No. 1, dated April 29, 2008 (as so amended and restated, the "Confidential Memorandum" and the transactions contemplated thereby, the "Exchange Offer"). This Supplement amends and supplements, and should be read in conjunction with, the Confidential Memorandum. Capitalized terms used herein but not otherwise defined shall have the respective meanings assigned to such terms in the Confidential Memorandum.

**Extension of Expiration Date**

We have extended the Exchange Offer in order to change the expiration date to June 30, 2008 (the "Expiration Date"), unless further extended by the Company. Existing Holders will be entitled to revoke any tender of Existing Shares prior to such new Expiration Date, including any Existing Shares tendered for Early Settlement or pursuant to the Prior Settlement Option (defined below).

**Results**

Pursuant to the terms of the Confidential Memorandum, as of May 22, 2008, Existing Holders had tendered 205,867,104 Existing Shares (representing approximately 60% of the Existing Shares), of which 187,694,676 Existing Shares (representing approximately 55% of the Existing Shares) were tendered pursuant to the Prior Settlement Option or May 15, 2008 Early Settlement deadline.

**Early Settlement**

Existing Holders can still elect to participate in Early Settlement as set forth in the Confidential Memorandum. Existing Holders may elect Early Settlement and receive the Exchange Consideration and Participation Shares, if applicable, by June 6, 2008 with respect to such Existing Shares tendered subsequent to May 15, 2008 but prior to 5:00 p.m. on May 30, 2008.

**Revocation Rights**

Holders who participated in the Prior Settlement Option or who have chosen or choose to participate in Early Settlement will retain the right to revoke such tenders prior to the Expiration Date by return to the Company of any Exchange Consideration, and forfeiture of any Participation Shares, received in addition to compliance with the revocation procedures set forth in the Confidential Memorandum.

If you participated in the Prior Settlement Option or Early Settlement, or are considering participating in Early Settlement for the May 30, 2008 deadline, you should consult your tax advisor with respect to any potential effect of the extension of the Exchange Offer on the tax consequences to you of any such past or future participation including, without limitation, any potential effect on your holding period for your Existing Shares. In addition, you should consult your tax advisor regarding the tax consequences to you with respect to the revocation of any Existing Shares tendered and accepted for Early Settlement or pursuant to the Prior Settlement Option.

**Risks**

We have amended and restated the following risk factor as set forth below:

### Risk of Litigation and Release of Liability

On April 4, 2008 an investor in the Company filed a class action complaint against the Company, Citi and the Investment Manager in the U.S. District Court for the Southern District of Florida, for common law fraud, violations of Florida blue sky law, negligent misrepresentation and violations of Section 12(a)(2) of the Securities Act. The complaint alleged that the Investment Manager misrepresented the level of risk of its investment strategy and that the Company and the Investment Manager were aware and knew high risk investment and management strategies were being undertaken in managing the Company, but failed to disclose those investment strategies to the existing investors and continued to market the fund as a low risk investment tool to investors. The plaintiff sought compensatory and punitive damages, as well as disgorgement of profits and commissions, reimbursement of legal fees and expenses, restitution and rescission. On May 12, 2008, the plaintiff voluntarily dismissed the complaint described above. The voluntary dismissal was not the result of an out-of-court settlement or other payment by the Company or any of its affiliates to the plaintiff. There can be no assurance that this complaint will not be re-filed or that other similar suits will not be filed or similar claims will not be made against the Company or any of its affiliates. Additionally, the Investment Manager or any individuals selected to advise and manage Funds (each such individual, an "Advisor") might become involved in litigation as a result of investments made by the Company or any other Falcon Fund. Under such circumstances, the Company, the Falcon Funds and/or other affiliated entities could be named as a defendant in a lawsuit or regulatory action. Additionally, Citi has received two requests for documents concerning Citi-managed hedge funds in connection with an informal inquiry by the SEC. Citi is responding to those requests and cooperating with the SEC.

On May 20, 2008, an investor in Falcon Two LLC ("Falcon Two"), one of the Falcon Funds, filed a putative class action complaint (the "Complaint") against the Falcon Two, Citi, the Managing Member, the Investment Manager and an employee of the Investment Manager (the "Defendants") in the U.S. District Court for the Southern District of New York, alleging violations of sections 10(b) and 14(e) of the Exchange Act and breach of fiduciary duty under Delaware law. The complaint alleges that the Confidential Tender and Exchange Offer Memorandum (the "Falcon Two OM"), relating to an exchange offer launched by Falcon Two similar to the Exchange Offer, contains materially misleading statements and omissions of fact, including the omission of (1) information sufficient to permit investors to accurately value their shares, (2) sufficiently specific information regarding the nature or value of Falcon Two's underlying assets, (3) the nature of existing and potential claims that would be released by tendering investors, (4) the voluntary dismissal of the putative class action related to Falcon Two B described above, (5) the nature and scope of the U.S. regulatory inquiry disclosed in the Falcon Two OM, (6) information sufficient to determine whether the liquidation of assets in Falcon Two may generate proceeds exceeding the exchange consideration offered in such exchange offer; and (7) misrepresents the events resulting in the decline in value of the existing shares of Falcon Two. The plaintiff seeks relief in the form of an injunction barring Falcon Two's exchange offer until Defendants have made disclosures the plaintiff claims are necessary to correct or supplement the allegedly inadequate disclosures set forth in the Complaint. On May 21, 2008, the plaintiffs filed an application for a preliminary injunction enjoining Falcon Two's exchange offer until such time as the additional disclosures sought in the Complaint are made. Falcon Two believes it has meritorious defenses to this Complaint and intends to assert such defenses to the fullest extent. The Complaint (Ferguson Family Trust v. Falcon Strategies Two LLC et al., No. 08 Civ. 4723 (S.D.N.Y.)) is publicly available.

By participating in the Exchange Offer, you are releasing various parties, including without limitation the Company, the Investment Manager and any Advisor, from liability in connection with any investment loss in respect of your Existing Shares in order to participate in the Exchange Offer; although you are not releasing such parties to the extent, and with respect to, equity interests you may own in any other Falcon Fund. In addition, to the extent that you or others have claims against us or any Releasee in connection with your or their Existing Shares and choose to litigate such claims, including the claims described above

2

with respect to the Company or similar claims that may be brought against one or more of the Falcon Funds, including the Company, you will not be able to pursue any such claims or participate in any award or settlement which may be obtained as a result of such litigation, which award or settlement may include compensatory and punitive damages, as well as disgorgement of profits and commissions, reimbursement of legal fees and expenses, restoration and rescission. Any damages required to be paid by the Company will reduce the funds available, if any, for distribution on the Participation Shares upon the occurrence of a Participation Event.

**Additional Information**

Existing Holders are encouraged to review the original offering memorandum (the "PPM") pursuant to which they purchased their Existing Shares. Except as described in this Supplement, the information provided in the Confidential Memorandum previously mailed to all Existing Holders continues to apply and this Supplement should be read in conjunction with the Confidential Memorandum. To the extent information in this Supplement differs from, updates or conflicts with information contained in the Confidential Memorandum, the information in this Supplement is more current. If you need another copy of the PPM, Confidential Memorandum or the Exchange Offer Subscription Agreement, please contact Citigroup Alternative Investments LLC, Attn: Investing Services, 731 Lexington Avenue, 27th Floor, New York, New York 10022, or by telephone at (212) 783-1330.

**This Supplement is for informational purposes only. If you have already tendered Existing Shares, you do not need to take any further action with respect to such Existing Shares unless you wish to revoke your prior tender thereof.**

Falcon Strategies Two B LLC

May 23, 2008

# EXHIBIT D

# RISK FACTORS

*The decision as to whether to participate in the Exchange Offer involves a high degree of risk and uncertainty. You should carefully consider the risks and uncertainties described below as well as the other information appearing elsewhere in this Confidential Memorandum before making a decision whether to participate in the Exchange Offer. The risks and uncertainties described below are intended to highlight risks and uncertainties that are specific to us but are not the only risks and uncertainties that we face. The Company's investments in MOF Five involve risks, and there can be no assurance that the Company will achieve its objectives or that holders will receive any distribution on the Participation Shares or Existing Shares or that holders of Existing Shares following the Exchange Offer will not suffer further losses including with respect to amounts allocated as part of the April Citi Allocation or Special Interest Allocation. In considering participating in the Exchange Offer, Existing Holders should consult their independent legal, tax, financial and other advisers, and should be aware of certain considerations and risk factors which include, but are not limited to, the risks described below.*

*The information in this Confidential Memorandum includes forward-looking statements which involve risks and uncertainties. Our actual results could differ materially from those anticipated in these forward-looking statements as a result of numerous factors, including those described in this section and elsewhere in this Confidential Memorandum and the audited annual financial statements for the year ended December 31, 2007. See "Forward-Looking Statements." See also Annex B to this Confidential Memorandum for sample calculations comparing the potential outcomes for Existing Holders who do or do not participate in the Exchange Offer, given different assumptions of the future performance of the Company and subject to the qualifications and limitations disclosed therein.*

## Risk of Litigation and Release of Liability

On May 1, 2008 an investor in MAT Five filed a class action complaint against MAT Five, Citi and the Managing Agent in the U.S. District Court for the Southern District of New York for breach of fiduciary duties and violations of Section 12(a)(2) of the Securities Act. The complaint alleges that MAT Five, Citi and the Managing Agent misrepresented the level of risk of MOF Five's investment strategy and that the prospectus relating to the Existing Shares contained untrue statements of material fact and concealed and failed to disclose material facts. The complaint further alleges that Citi and the Managing Agent failed to properly preserve the assets of MAT Five and ignored and did not protect against numerous conflicts of interest in connection with Citi's investment in MAT Five. The plaintiff seeks class certification, compensatory damages, reimbursement of legal fees and expenses, rescission or a rescissory measure of damages and additional equitable and/or injunctive relief. There can be no assurance that other similar suits will not be filed or that claims will not be made against MAT Five or any of its affiliates.

In addition to the foregoing, the Managing Agent might become involved in other litigation as a result of investments made in MOF Five. Under such circumstances, MAT Five and/or other affiliated entities could be named as a defendant in a lawsuit or regulatory action. Citi has received two requests for documents concerning Citi-managed hedge funds in connection with an informal inquiry by the SEC. Citi is responding to those requests and cooperating with the SEC. Certain affiliates of the Company are currently the subject of Financial Industry Regulatory Authority arbitration proceedings relating to sales practices relating to securities of the Company or its affiliates. The Release would prevent participating holders from engaging in such proceedings and there can be no assurance as to the ultimate result of such claims or that other similar proceedings will not be brought against MAT Five or any of its affiliates, including the Company.

You are releasing various parties, including without limitation MOF Five, MAT Five, Citi, the Managing Agent and any sub-agent, from liability in connection with any investment loss in respect of your Existing Shares in order to participate in the Exchange Offer; although you are not releasing such parties to the extent, and with respect to, equity interests you may own in any other portfolio of MAT Five. In addition, to the extent that you or others have claims against us or any Releasee in connection with your or their Existing Shares and choose to litigate such claims, including the claim described above with respect to MAT Five or similar claims that may be brought against MAT Five or any portfolio thereof, including the Company, you will not be able to pursue any such claims or participate in any award or settlement which may be obtained as a result of such litigation, which award or settlement may include compensatory and punitive damages, as well as disgorgement of profits and commissions, reimbursement of legal fees and expenses, restoration and rescission. Any damages or indemnity required to be paid by MOF Five or MAT Five will reduce the funds available, if any, to the Company for distribution on the Participation Shares or Existing Shares upon the occurrence of an applicable Participation Event.